UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS

DISTRIBUTION MARKET ANTITRUST          SECTION: R(2)

LITIGATION

JUDGE VANCE

MAG. JUDGE

WILKINSON

**THIS DOCUMENT RELATES TO ALL DIRECT-PURCHASER PLAINTIFF CASES**

<u>**ORDER AND REASONS**</u>

Before the Court are defendants'[1] motions to dismiss direct purchasers' antitrust claims.[2] For the following reasons, defendants' motions are granted in part and denied in part. Specifically, the Court grants defendants' motion to dismiss plaintiffs' monopolization claim under Section 2 of the Sherman

---

[1] One motion to dismiss was filed jointly by defendants Pool Corporation, SCP Distributors LLC, and Superior Pool Products (collectively the "Pool Defendants", "PoolCorp", or "Pool"); a second motion to dismiss was filed jointly by Hayward Industries, Inc., Pentair Water Pool and Spa, Inc., and Zodiac Pool Systems, Inc. (collectively the "Manufacturer Defendants").

[2] R. Doc. 141; R. Doc. 159. This Order and Reasons addresses only claims brought by the direct-purchaser plaintiffs. The Court will issue a ruling on the state law claims brought by the indirect-purchaser plaintiffs at a later date.

Act and plaintiffs' claim that defendants engaged in a *per se* illegal boycott under Section 1 of the Sherman Act. The Court denies defendants' motion to dismiss plaintiffs' attempted monopolization claim under Section 2 of the Sherman Act and plaintiffs' Sherman Act Section 1 claims under the rule of reason. Finally, the Court grants defendants' motion to dismiss plaintiffs' claim that defendants fraudulently concealed their antitrust offenses.

## I. Background

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against PoolCorp and the Manufacturer Defendants. PoolCorp is the country's largest distributor of Pool Products. The Manufacturer Defendants are Hayward Industries, Inc., Pentair Water Pool and Spa, Inc., and Zodiac Pool Systems, Inc., which plaintiffs allege are the three largest manufacturers of Pool Products in the U.S. As defined in DPPs' complaint, Pool Products are the equipment, products, parts and materials used for the construction, renovation, maintenance, repair, and service of residential and commercial swimming pools. Pool Products include pumps, filters, covers, drains, fittings, rails, diving boards, and chemicals, among other goods. Pool buys Pool Products from manufacturers, including the three Manufacturer Defendants. DPPs are pool

builders, pool retail stores, and pool service and repair companies (collectively "Pool Dealers") that buy Pool Products from distributors and sell them to owners of residential and commercial pools. On November 21, 2011, the Federal Trade Commission (FTC) announced that it had conducted an investigation into unfair methods of competition by Pool and had entered a consent decree with Pool resolving the matter. Shortly after the FTC's announcement, the plaintiffs in this case filed the suits against Pool that have been consolidated for pretrial purposes in this court. Plaintiffs later added claims against the Manufacturer Defendants.

Plaintiffs allege that Pool monopolized and attempted to monopolize the Pool Products distribution market in the U.S. in violation of Section 2 of the Sherman Act by acquiring rival distributors and by entering into agreements with manufacturers to exclude Pool's rivals. Plaintiffs also allege that PoolCorp and the Manufacturer Defendants violated Section 1 of the Sherman Act by engaging in an unlawful conspiracy to exclude Pool's competitors. Plaintiffs allege that PoolCorp entered agreements with Manufacturer Defendants that prevented them from selling to new and existing PoolCorp rivals, with the purpose of raising their rivals' costs, preventing them from competing with Pool, and increasing prices for Pool Products. Plaintiffs claim to have suffered damages from defendants' conduct in the form of

overcharges they paid as a result of defendants' conduct. They assert claims on behalf of a class of direct purchasers, defined as "[a]ll persons or entities that purchased Pool Products in the United States directly from PoolCorp...at anytime between August 1, 2002 and the present."[3] Defendants contend that none of plaintiffs' antitrust claims can withstand a motion to dismiss.

*The Specifics of Plaintiffs' Claims*

Plaintiffs allege that Pool pursued a deliberate strategy to restrain trade and monopolize through the acquisition of competitors and through the foreclosure of actual and potential competition by conditioning access to its distribution network on promises by manufacturers not to supply Pool's rivals. They allege that PoolCorp is the world's largest Pool Products distributor with roughly $1.8 billion in net sales revenue in 2011 and the only Pool Products distributor that operates nationwide.[4] Pool is alleged to operate more than 200 distribution centers throughout the country, with the next largest U.S. distributor operating less than 40.[5] The complaint

---

[3] R. Doc. 107 at 27.

[4] *Id.* at 9.

[5] *Id.*

alleges that PoolCorp "prices its products on a national basis and controls its pricing from its headquarters."[6]

Plaintiffs generally allege that the Manufacturer Defendants, the only full-line Pool Products vendors, agreed with Pool Defendants to eliminate existing distribution competitors and prevent new entrants from obtaining the products necessary to compete. Plaintiffs allege that the Manufacturer Defendants collectively represent more than 50 percent of sales of Pool Products at the wholesale distribution level and that as the only Manufacturers carrying a full line of pool products, they are "must have" inputs for wholesale distributors.[7] They allege that each of the three Manufacturer Defendants markets itself as either the leading manufacturer of Pool Products in the world or one of the world's leaders.[8]

Plaintiffs allege that Pool eliminated competition by acquiring rivals. Specifically, the complaint describes 13 instances from 1995 to 2009 when Pool purchased all or some of the assets of existing Pool Products distributors or suppliers in the U.S.[9]

---

[6] *Id.*

[7] *Id.* at 7.

[8] *Id.* at 4-5.

[9] *Id.* at 11-12.

Plaintiffs also allege that Pool entered into exclusionary agreements with manufacturers. Pool allegedly "often represent[s] 30 to 50 percent of a manufacturer's total sales."[10] Plaintiffs allege that Pool used the leverage of its high volume purchasing to induce manufacturers, including Manufacturer Defendants, to agree to exclude Pool's rivals upon Pool's command. Plaintiffs allege that Pool "conditioned access to its distribution network on promises by manufacturers not to supply PoolCorp's rivals."[11] The complaint alleges that Pool carried this out primarily through a Preferred Vendor Program (PVP). The complaint describes the PVP as a program by which Pool promoted member manufacturers' goods to customers, and provided advertising and marketing programs and product support.[12] Plaintiffs allege that Pool informed PVP members, including the three Manufacturer Defendants and "virtually all of the other major Pool Products manufacturers," that they were to discontinue favorable pricing or sales of Pool Products altogether to rival distributors if Pool Corp so directed.[13] They allege that manufacturers, including the Manufacturer Defendants, complied with this condition because they feared losing Pool's business since no

_____

[10] *Id.*

[11] *Id.* at 10.

[12] *Id.* at 14.

[13] *Id.* at 15.

other distributor could replace Pool's volume and geographic coverage. Plaintiffs allege that when a new entrant sought to distribute Pool Products in a particular geographic area, Pool threatened to refuse to sell the manufacturers' products throughout the U.S., not just in the geographic area of the new entrant. The complaint includes allegations of eight rival distributors that were denied supply from manufacturers because Pool demanded that they be foreclosed.[14] Plaintiffs allege that one of those companies went out of business, while the others allegedly experienced increased costs because of Pool's actions.[15] Plaintiffs cite these instances as "examples" of a broader pattern of conduct.

Plaintiffs allege that Pool tended to target new entrants into the Pool Products distribution industry because new entrants "represented a unique threat to PoolCorp because they were more likely to compete aggressively on price to earn new business."[16]

Plaintiff's also specifically allege that, in the mid-2000s, Mareva, a manufacturer of specialty chemicals in Florida, entered into an agreement to sell exclusively to PoolCorp and not to any other Pool Products distributor.[17] They allege that Mareva would

---

[14] *Id.* at 17-20, 22.

[15] *Id.*

[16] *Id.* at 20.

[17] *Id.* at 21-22.

have preferred to sell to more distributors but could not afford
to risk losing PoolCorp's substantial business.[18] Plaintiffs
allege that PoolCorp entered into agreements with rival
distributors to refrain from competing with each other, such as a
2002 agreement with Cardinal Systems in Pennsylvania to avoid
competition "for each other's customers on products they both
sold."[19]

The complaint alleges that Pool's agreements with preferred
vendors generally included a most favored nation (MFN) clause, by
which the supplier agreed to give PoolCorp prices and terms that
were at least as favorable as any provided to other purchasers
with the same or similar volume levels as those of PoolCorp.[20]
Plaintiffs allege that the MFNs operated to suppress the ability
of competitors to compete on price with Pool because they
established a price floor for products bought from
manufacturers.[21]

Finally, plaintiffs allege that the conduct of Pool and the
Manufacturer Defendants "substantially impaired and foreclosed
competition from PoolCorp's rivals in the relevant market, ...
raised barriers to entry for potential rivals," "enabled PoolCorp

---

[18] *Id.*

[19] *Id.* at 23.

[20] *Id.*

[21] *Id.*

to establish and maintain artificially high, supra-competitive prices," and reduced product output and choice.[22] Plaintiffs allege that they were injured because defendants' conduct caused them to pay higher prices for Pool Products than they would have otherwise paid absent defendants' illegal practices. They allege they suffered losses in the form of overcharges paid for Pool Products. Finally, plaintiffs allege that defendants fraudulently concealed their illegal conduct until November 2011 when an FTC investigation and related consent decree made public the nature of Pool's anticompetitive conduct.

## II. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1960 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1940. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).

---

[22] *Id.* at 25.

But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 129 S.Ct. at 1949.

A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true. *Id.* It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly,* 550 U.S. at 555. In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 256. If there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007), the claim must be dismissed.


**III. Discussion**

A.   *Monopolization under Section 2 of the Sherman Act*

Section 2 of the Sherman Act forbids monopolization and attempts to monopolize. 15 U.S.C. § 2. The offense of monopolization requires both the possession of monopoly power in a relevant market and "the willful acquisition or maintenance of that power as distinguished from growth or development as a

10

consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). As the United States Supreme Court made clear in *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." 540 U.S. at 407 (emphasis in the original).

1. Market Definition

Plaintiffs' claim of monopolization under Section 2 of the Sherman Act requires allegations of a relevant market. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458 (1993). Without a definition of a relevant market, there is no way to measure a defendant's ability to lessen or destroy competition. *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (rejecting "direct evidence of anticompetitive effects" as substitute for market definition; plaintiff must provide "at least a rough definition of a product and geographic market").

A relevant market has both product and geographic dimensions. *Brown Shoe Co. v. United States,* 370 U.S. 294, 324 (1962); *Surgical Care Ctr. v. Hosp. Dist.*, 309 F.3d 836, 839-40

(5th Cir. 2002) (affirming dismissal for failure to provide evidence sufficient to demonstrate relevant geographic market). Plaintiffs must plead facts sufficient to support this element to survive a motion to dismiss. *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992); *see Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1077-78 (11th Cir. 2004) (plaintiffs must allege facts in support of each element of an antitrust violation).

The relevant product market must include all products, the use of which is reasonably interchangeable. *See R.D. Imports Ryno Indus. v. Mazda Distribs.*, 807 F.2d 1222, 1225 (5th Cir. 1987), cert. denied, 484 U.S. 818 (1987) ("The antitrust plaintiff is required to define the relevant product market in terms of goods that are "reasonably interchangeable" with the goods at issue."). Products that consumers view as substitutes for other products can be said to be in competition with each other. *Id.* at 1225. Whether one product is reasonably interchangeable for another depends both on the ease and speed with which customers can substitute it and the desirability of doing so, and on the cross-elasticity of suppliers' production facilities. *See F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008); *Brown Shoe*, 370 U.S. at 325 n. 42. The boundaries of a product market are determined by eliminating from the market all products

12

that are not reasonably interchangeable substitutes for the
product manufactured or sold by the defendants. *United States v.
E.I. Dupont De Nemours & Co.*, 351 U.S. 377, 394-404 (1956). A
broad market may also contain relevant submarkets which
themselves "constitute product markets for antitrust purposes."
*Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502. "The boundaries of
such a submarket may be determined by examining such practical
indicia as industry or public recognition of the submarket as a
separate economic entity, the product's peculiar characteristics
and uses, unique production facilities, distinct customers,
distinct prices, sensitivity to price changes, and specialized
vendors." *Id.*

The relevant geographic market is the "area of effective
competition ... in which the seller operated, and to which the
purchaser can practically turn for supplies." *United States v.
Philadelphia Nat'l Bank*, 374 U.S. 321, 359 (1963) (quoting *Tampa
Elec. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). As with
the relevant product market, courts analyze the relevant
geographic market with reference to the cross-elasticity of
demand. *See, e.g., Heerwagen v. Clear Channel Commc'ns*, 435 F.3d
219, 227-34 (2d. Cir. 2006). For example, if an increase in price
in one region leads suppliers in another region to increase
supply, the two regions are likely in the same relevant
geographic market. *Id.* Because it is difficult to measure

elasticity directly, courts look at several related indicators in determining whether a particular geographic area can be characterized as a relevant geographic market. As the Supreme Court explained in *Brown Shoe*:

> The geographic market selected must..., both correspond to the commercial realities of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small a single metropolitan area.

370 U.S. at 336-37 (citations and quotations omitted).

The definition of the relevant market is ordinarily a fact question left to the jury. *Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1184 (5th Cir. 1988). However, the Fifth Circuit has made clear that a plaintiff's failure to allege a relevant market properly is grounds for dismissal of an antitrust claim for which market definition is required. *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 418 (5th Cir. 2010).

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted.

*Id.* (quoting *Apani Sw., Inc. v. Coca-Cola Enter., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002)). Nevertheless, dismissal of an

14

antitrust claim at the motion to dismiss stage for failure to plead the relevant market adequately should not be done lightly because market definition is a fact-intensive inquiry. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market").

The Second Circuit identified two types of cases in which courts find dismissal at the pleading state appropriate for insufficient market definition:

> Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.

*Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (citations omitted).

Pool Defendants first contend that the DPPs have failed to define a plausible product market. Specifically, defendants challenge the complaint's definition of Pool Products as a relevant product market because of the number and diversity of products it includes.[23] DPPs allege a

---

[23] R. Doc. 168 at 5-6.

15

product market consisting of the wholesale distribution of Pool Products, and they define Pool Products as:

> the equipment, products, parts or materials used for the construction, renovation, maintenance, repair or service of residential and commercial swimming pools. Pool Products include, among other goods, pumps, filters, heaters, cleaners, covers, drains, fittings, diving boards, steps, rails, pool liners, pool walls, chemicals, cleaning tools, and "white goods" (the parts necessary to maintain pool equipment). Pool Products do not include pool toys or games, generic building materials, or products used solely for landscaping or irrigation, Olympic-style pools, or pools used in commercial water parks.[24]

Plaintiffs allege that "Pool Products are designed and manufactured specifically for residential and commercial swimming pools," and that "there are no close substitutes for Pool Products" that would significantly constrain their pricing.[25] Pool contends that the alleged product market is overly broad because Pool offers its customers some 160,000 products, in more than 300 product lines spanning over 40 product categories.[26] Their products include, among other things, repair and replacement parts for pool equipment and components and building materials for new pool construction and the repair of and remodeling of existing pools.[27] But,

---

[24] *Id.* at 2.

[25] *Id.* at 26.

[26] R. Doc. 141-1 at 10.

[27] R. Doc. 168 at 6.

16

courts have upheld product market definitions that include a
range of products that are related in the eyes of purchasers
and that are marketed together by a particular type of
seller. *See, e.g., Grinnell.*, 384 U.S. at 572-73 (accredited
central station services, including automatic burglar
alarms, automatic fire alarms, sprinkler supervision
services, and watch signal services, constitute proper
relevant market); *F.T.C. v. Staples, Inc.*, 970 F. Supp.
1066, 1075 (D.D.C. 1997) (upholding product market
consisting of all consumable office supplies sold through
office superstores); *F.T.C. v. Whole Foods*, 548 F.3d 1028,
1040 (D.C. Cir. 2008) (upholding product market consisting
of sales at premium, natural, and organic supermarkets);
*Matter of Toys R Us, Inc.*, 126 F.T.C. 415, 593 (1998)
(concluding that relevant product market is the retail sale
of toys, including products as distinct as bikes, video
games, and dolls). Here, plaintiffs have alleged that
wholesalers' ability to offer the full line of Pool Products
with prompt delivery and credit is what makes them a
distinct and desirable channel of distribution for both
manufacturers and Pool Dealers. *See infra*. In the context
pleaded here, the breadth of products involved does not make
plaintiffs' product market definition implausible.

Pool Defendants also argue that by limiting the market definition to Pool Products sold by distributors, plaintiffs have alleged a product market that is too narrow. They argue that Pool faces competition for Pool Product sales, not only from other distributors, "but also from mass-market retailers (*e.g.* Wal-Mart, Home Depot and Lowe's)," large pool supply retailers with internal distribution networks, buying groups, grocery stores, hardware stores, and online retailers.[28] Defendants' argument is unavailing as plaintiffs have alleged practical industry indicia that support the Pool Product distribution market as a distinct market.

Significantly, plaintiffs allege that market participants view the wholesaling of Pool Products as a distinct channel of distribution. The complaint alleges that Pool Product manufacturers consider wholesale distributors such as PoolCorp to be a "unique and essential channel for the efficient distribution of their products," because it would be expensive for manufacturers to directly access Pool Dealers and other customers.[29] The complaint alleges that Pool Product Distributors are essential to manufacturers because they warehouse significant volumes of a wide range

---

[28] R. Doc. 141-1 at 13-14.

[29] R. Doc. 107 at 6.

of product lines throughout the year, which allows
manufacturers to operate their factories year-round despite
the seasonal nature of the business.[30] Dealers allegedly
value the range of benefits offered by distributors that are
not available elsewhere.[31] The Complaint alleges that
distributors offer one-stop shopping, timely delivery, and
the extension of credit to customers, and they administer
manufactures' dealer rebate and warranty programs and answer
product-related questions.[32] Plaintiffs also allege that
distributors are the only available source of Pool Products
for many small dealers who lack the resources and customer
base to purchase in large volumes directly from
manufacturers.[33] With all factual inferences made in
plaintiffs' favor, as is required at the motion to dismiss
stage, the complaint sufficiently alleges a relevant product
market. *See Brown Shoe*, 370 U.S. at 325 (boundaries of a
market established by practical indicia including industry
recognition, the product's peculiar characteristics and
uses, and specialized vendors).

---

[30] *Id.* at 6-7.

[31] *Id.* at 8.

[32] *Id.* at 6-7.

[33] *Id.* at 7.

19

Again, *Staples* is instructive. There, the FTC defined the relevant market as "the sale of consumable office supplies through office superstores, with 'consumable' meaning products that customers buy recurrently, *i.e.* items which get used up or discarded." *Staples,* 970 F. Supp. at 1073. The defendants in *Staples* argued that the alleged product market was contrived, and the appropriate market was the overall sale of office products. *Id.* The court found that although the products were the same whether they were sold through superstores or other types of retailers, products sold by office superstores nonetheless made up the relevant market. *Id.* at 1074-76. The court relied on evidence that "office superstore prices [were] affected primarily by other office superstores and not by non-superstore competitors." *Id.* at 1076-77. The Court also cited differences between office superstores and other outlets, as well as special characteristics of office superstores' customers. *Id.* at 1078-80.

Here the plaintiffs similarly allege facts that suffice to make it plausible that sales of pool products by distributors are distinct from sales of Pool Products through other means in economically significant ways. Plaintiffs allege that Pool Dealers - the direct purchasers of Pool Products from distributors - favor distributors

because of the diversity of offerings and fast delivery that distributors provide and the willingness of distributors to extend credit. The more manufacturers' lines carried by a distributor, the better able the distributor is to satisfy dealer demands.[34] As noted, the complaint alleges that distributors "are the only available source of Pool Products for the vast majority of dealers."[35] There is nothing in the complaint from which the Court could infer that Wal-Mart or other retailers offer Pool Products on the scale offered by distributors or with a similar level of service. *See Grinnell*, 384 U.S. at 573 ("There are, to be sure, substitutes for the accredited central station service[,]" "[b]ut none of them appears to operate on the same level as the central station service"). That Pool Dealers might in some instance purchase pool products from manufacturers or other retailers does not negate that distributors can be Pool Dealers' "core" suppliers. *Whole Foods*, 548 F.3d at 1037 (D.C. Cir. 2008) (upholding a market consisting of sales at premium, natural and organic supermarkets, despite evidence that non-"core" customers of Whole Foods and Wild Oats sometimes "cross-shopped" at conventional supermarkets).

---

[34] *Id.* at 7-8.

[35] *Id.* at 7.

The Fifth Circuit's decision in *Leegin*, 615 F.3d at 418, does not require the Court to find plaintiff's proposed product market implausible. In *Leegin*, the court rejected a proposed market definition of the "wholesale sale of brand-name women's accessories to independent retailers." *Id.* The court said that "'wholesale sale' does not adequately define the relevant market, because the relevant market definition must focus on the product rather than the distribution level." *Id.* The Court found "women's accessories" too broad and vague a relevant product market and that PSKS failed to allege why brand-name goods were not interchangeable with non-brand-name products. *Id.* Unlike *PSKS,* however, the plaintiffs here have pled facts indicating why wholesale sales of Pool Products by distributors are seen as distinct by market participants. Plaintiffs' definition of Pool Products is also not vague like "women's accessories." *Id.* Because plaintiffs have pled facts indicating a lack of interchangeability between Pool Products sold by distributors and Pool Products sold in other ways, they have sufficiently alleged a product market to survive the motion to dismiss.

Defendants next challenge DPPs allegations of a relevant geographic market. Plaintiffs allege that the relevant geographic market is the United States. For the

following reasons, the Court finds that plaintiffs have alleged sufficient commercial facts to make a national market for Pool Products plausible.

Plaintiffs allege that Pool Products are homogenous, such that there is no significant difference in the distribution of Pool Products across the country.[36] Plaintiffs also allege that Pool conducts business nationally and sets the pricing for its 200 distribution centers on a national basis.[37] The complaint includes allegations that Pool is the only truly national wholesale distributor and thus can exert leverage over the three Manufacturer defendants, who similarly sell nationally.[38] Plaintiffs allege that Pool is the largest nationwide purchaser of Pool Products from manufacturers, accounting for 30% to 50% of such purchases, and that PoolCorp has threatened manufacturers with the loss of its business nationwide if they did business with new entrants who sought to compete in a smaller geographic area.[39] They also allege that Pool has acquired rivals located in several different parts of the U.S., some of which operated in sizable

---

[36] R. Doc. 107 at 8.

[37] *Id.* at 9.

[38] *Id.* at 8-9, 16.

[39] *Id.* at 8-9, 17-21.

23

portions of the country.[40] Based on the authorities below, their allegations suffice to allege a plausible national market.

In *Grinnell*, the Supreme Court found a national market for central station home and commercial alarm and watch services even though the activities of individual stations were local, ordinarily servicing an area within a radius of 25 miles. 384 U.S. at 575. In finding a national market, the Supreme Court relied on its conclusions that the central station business was operated on a national level with national planning, commercial agreements spanning many states, coverage by national insurers, and a national pricing system that could be varied to meet local conditions. *Id.* Taking plaintiffs' factual allegations as true, as in *Grinnell*, Pool operates individual service centers in particular local markets, "but the broader national market ... reflects the reality of the way in which [it] built and conduct[ed] [its] business." *Id.* at 576; *see also Republic Tobacco v. N. Atl. Trading*, 381 F.3d 717 (7th Cir. 2004) (finding national market for roll-your-own cigarette paper supply because suppliers sold to national wholesalers and published national price lists); *Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy*

---

[40] *Id.* at 8-9, 11-12.

24

*Ass'n,* CIV A 3:08-CV-0158-G, 2008 WL 4146022 at *12 (N.D. Tex. Sept. 9, 2008) (the nationwide relevant geographic market for physical therapy was sufficiently alleged because "the alleged anticompetitive conduct takes place on a national scale, and, to the extent it can be proven, stands to affect [athletic trainers] across the country"). Defendants have not shown that plaintiffs' allegations of a national geographic market are insufficient to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

## 2. Monopoly Power

Although DPPs' complaint contains allegations of a relevant market, plaintiffs' claim of monopolization under Section 2 of the Sherman Act fails because plaintiffs have not plausibly alleged that Pool possesses monopoly power in the relevant market. Plaintiffs must plead facts sufficient to support this element to survive a motion to dismiss. *Spanish Broad. Sys.*, 376 F.3d at 1077-78.

A nonconclusory  allegation that a defendant holds a predominant share of the relevant market will usually satisfy the monopoly power element of a monopolization claim. *Grinnell*, 384 U.S. at 571; *U.S. Anchor Mfg. Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 999 (11th Cir. 1993)

(principal measure of monopoly power is market share). The precise market share a defendant must control before it has monopoly power remains undefined, but, the case law supports the conclusion that a market share of more than 70 percent is generally sufficient to support an inference of monopoly power. *See, e.g., Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 481 (1992) (factfinder can infer monopoly power from an 80 percent market share); *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 n. 3 (8th Cir. 1994) (share of more than 80 percent sufficient); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 981 (5th Cir. 1977) (71-76 percent share sufficient); *Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 893 F.Supp. 1207, 1217-18 (S.D.N.Y.1994) (70 percent market share generally adequate at the pleading stage); *see also* ABA Section of Antitrust Law, Antitrust Law Developments 230-31 (7th ed.2012) (collecting cases).

In contrast, courts almost never find monopoly power when market share is less than about 50 percent. *American Telephone & Telegraph Co. v. Delta Commc'ns Corp.,* 408 F.Supp. 1075, 1107 (S.D. Miss. 1976), *aff'd per curiam,* 579 F.2d 972 (5th Cir. 1978) (adopting district court opinion), *modified on other grounds,* 590 F.2d 100 (5th Cir. 1979) (41% share of local prime time television market insufficient to

subject television network to Section 2 monopolization scrutiny); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) ("market share at or less than 50% is inadequate as a matter of law to constitute monopoly power"); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share"). The Fifth Circuit adheres to Judge Learned Hand's widely accepted rule of thumb that "while a 90 percent market share definitely is enough to constitute monopolization, 'it is doubtful whether 60 or 64 percent would be enough; and certainly, 33 percent is not.'" *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984) (citing *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), *approved and adopted*, *American Tobacco Co. v. United States*, 328 U.S. 781, 811–14 (1946).

Leading scholars concur that "it would be rare indeed to find that a firm with half of a market could individually control price over any significant period." 3 Areeda & Hovenkamp ¶ 532c, at 250 (2007). The Department of Justice agrees that "as a practical matter, a market share of greater than fifty percent has been necessary for courts to find the existence of monopoly power." Department of Justice

27

Guide/Report, COMPETITION AND MONOPOLY: SINGLE-FIRM CONDUCT
UNDER SECTION 2 OF THE SHERMAN ACT 2008 WL 4606679 (D.O.J.),
24 (noting that the DOJ is not aware of any court that has
found that a defendant possessed monopoly power when its
market share was less than fifty percent).

Nowhere in the complaint do plaintiffs allege that Pool
Defendants possess any specific share of the Pool Products
Distribution Market. But the facts indicative of market
share that are included in the complaint suggest a market
share less than 50 percent. Plaintiffs allege that,
according to *Zacks Investment Research*, "PoolCorp has a
dominant position, by reason of its market share, in the
distribution of Pool Products sold to Pool Dealers."[41] They
also allege that Pool is "the only truly national wholesale
distributor focused on the swimming pool industry in the
United States."[42] Plaintiffs also say that Pool "often
represent[s] 30 to 50 percent of a manufacturer's total
sales," and that collectively, "the Manufacturer Defendants

---

[41] R. Doc. 107 at 9. The court may consider the *Zacks* report
at the motion to dismiss state because it is extensively relied
upon in the complaint and its authenticity is not challenged. *See
Alt. Energy, Inc. v. St. Paul Fire & Marine IllS. Co.,* 267 F.3d 33
(1st Cir. 2001) (on a Rule 12 motion, the court may consider
official public records, documents central to the plaintiffs'
claim, and documents (the authenticity of which is not challenged)
sufficiently referred to in the complaint).

[42] R. Doc. 107 at 9.

represent more than 50 percent of sales of Pool Products at
the wholesale distribution level."[43] These allegations do
not amount to an allegation of a market share because they
do not indicate how "often" Pool represents any specific
percentage of a manufacturer's sales, or what percentage of
sales through distribution any manufacturer's sales
constitutes.[44] In any event, plaintiffs would fail to allege
a factual basis for a market share of *more* than 50% even if
sales to Pool *always* made up 50% of every manufacturer's
sales to distributors, which is not alleged. Further, even
assuming that Pool *always* represented 30 to 50 percent of
Manufacturer Defendants' sales at wholesale, this would
allow only the inference that sales through Pool represented
more than 15 to 25 percent of sales of Pool Products at the
wholesale distribution level.

    The *Zacks* report that plaintiffs refer to in the
complaint provides the only explicit estimate of Pool's
national market share, stating that PoolCorp "controls
approximately one-third of the pure-pool domestic market
share sold through distribution."[45] Other statements in the

---

    [43] *Id.* at 9, 7.

    [44] Because Pool's purchases from manufacturers are for
resale, the share of Pool's purchases from manufacturers is a
proxy for Pool's share of the distribution market.

    [45] R. Doc. 141-4 at 3.

*Zacks* report contradict plaintiffs argument that Pool possesses monopoly power nationally, including that "Pool faces intense competition from many regional and local distributors," that "competition is particularly severe in its four large and high density markets in California, Florida, Texas and Arizona," and that "barriers to entry in the industry are relatively low."[46]

Because the complaint includes no specific allegations of a dominant market share and no allegations that allow such an inference, the Court turns to the plaintiffs' argument that they have pleaded direct evidence of Pool's monopoly power. Plaintiffs are correct that evidence that a defendant has actually set prices or excluded competition can sometimes establish monopoly power. *See American Tobacco Co. v. United States,* 328 U.S. 781, 789 (1946) (upholding jury finding of monopolization based on exclusion of competitors). However, conduct is rarely sufficient to show monopoly power without the existence of a high market share. A leading treatise explains the difficulty of demonstrating monopoly power with a defendant's conduct:

> Some conduct benefits actors only if it supports supracompetitive prices. Because such conduct would be irrational for the perfectly competitive firm, its

---

[46] *Id.* at 4.

> occurrence indicates that the defendant has (or
> believes it has) some degree of market power. ...
>      Though unassailable, this proposition has
> extremely limited practical utility in assessing market
> power. Conduct indicating that a market is not
> perfectly competitive does not indicate that market
> power is substantial and persistent, which antitrust
> ordinarily demands. ... Even when we succeed in
> classifying conduct as non-competitive, the degree of
> market power implied can still be minor.
>      Our general conclusions are, first, that conduct
> alone rarely suffices to establish single-firm market
> power, and certainly not to show how substantial it is.
> Secondly, however, certain types of conduct in
> oligopoly markets can show that a market is not
> performing optimally. As a result, conduct is somewhat
> more relevant to assessing power in cases involving
> mergers or joint ventures than it is in assessing
> single-firm conduct.

3 Areeda & Hovenkamp ¶ 520 at 206 (2006).

Plaintiffs do not cite any authority that requires the Court to find their conduct allegations sufficient to establish monopoly power. Indeed, in *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 530-31 (5th Cir. 1982), the Fifth Circuit found that the defendant exercised a significant degree of control over price during 1971-72, yet concluded that the conduct alone was insufficient to overcome the presumption against monopoly power implied by its market shares of 17 and 24 percent in the relevant markets. In sum, plaintiffs' conduct allegations are insufficient for the Court to find monopoly power in the face of a market share in the neighborhood of 33 percent, which is suggested by the complaint and the *Zacks* Report.

The Court must therefore dismiss the Section 2 monopolization claim.

*B. Attempted Monopolization under Section 2 of the Sherman Act*

In addition to prohibiting monopolization, Section 2 of the Sherman Act forbids attempts to monopolize. 15 U.S.C. § 2. "The traditional claim for attempted monopolization arises when the danger of monopolization is clear and present, but before a full blown monopolization has necessarily been accomplished." *Alaska Airlines v. United States*, 948 F.2d 536, 541-42 (9th Cir. 1991). The elements of attempted monopolization are that the defendant (1) engaged in predatory or anticompetitive conduct, (2) with the specific intent to monopolize, and (3) with "a dangerous probability" of achieving monopoly power. *Spectrum Sports*, 506 U.S. at 456.

1. Dangerous Probability of Success

Plaintiffs' claim of attempted monopolization requires a showing that the defendant has a dangerous probability of successfully lessening or destroying competition in a relevant market. *Id.* Because an attempted monopolization claim cannot survive when the market in question is not

vulnerable to monopolization, the Court will address the dangerous probability of success issue as a threshold matter before discussing the other elements of an attempted monopolization claim. *See United States v. Microsoft*, 253 F.3d 34, 81 (D.C. Cir. 2001), *cert. denied*, 534 U.S. 952 (2001) (addressing market definition for dangerous probability of success element first).

In appraising whether there is a dangerous probability of success, courts focus principally on the defendant's share of the relevant market. *See, e.g., Pastore v. Bell Tel. Co.*, 24 F.3d 508, 513 (3d Cir. 1994). Market definition is a necessary component of this analysis. "Defining a market for an attempted monopolization claim involves the same steps as defining a market for a monopoly maintenance claim." *Microsoft,* 253 F.3d at 81. For the reasons discussed in detail in the monopolization section of this opinion, plaintiffs' allegations of a relevant market suffice to survive a motion to dismiss.

The Fifth Circuit has held that a market share below ten percent, absent a showing of special market conditions, is insufficient as a matter of law to establish an attempted monopolization claim. *Domed Stadium,* 732 F.2d at 491. However, the market share required for an attempted monopolization claim is not as high as that required for a

33

claim of maintenance of monopoly power. *See, e.g., McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1505 (11th Cir. 1988) ("Determining whether a defendant possesses sufficient market power to be dangerously close to achieving a monopoly requires analysis and proof of the same character, but not the same quantum, as would be necessary to establish monopoly power for an actual monopolization claim."). Although a share of less than fifty percent is insufficient for actual monopolization, it "may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present." *Domed Stadium,* 732 F.2d at 490-91 (citing cases).

Pool argues that plaintiffs' market share allegations are not sufficient to meet the dangerous probability of monopolization element of attempted monopolization. Although plaintiffs do not specifically allege a specific market share in the complaint, they refer to and rely on a *Zacks Investment Research* report which estimates that Pool "controls approximately one-third of the pure-pool domestic market share sold through distribution."[47] This 33 percent market share is consistent with other allegations in the

---

[47] R. Doc. 141-4 at 3.

34

complaint.[48] Further, Pool relies on the one-third estimate

in its argument for dismissal of the monopolization claim.[49]

A market share of 33 percent can be sufficient to

establish a dangerous probability of monopolization when

other market factors are present and when a defendant's

conduct suggests that actual monopolization is likely. *See M*

*& M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp.,*

*Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) (attempted

monopolization claim survived motion for summary judgment).

The *M & M* court described a set of benchmark market shares

for attempted monopolization:

> (1) [C]laims of less than 30% market shares should
> presumptively be rejected; (2) claims involving between
> 30% and 50% shares should usually be rejected, except
> when conduct is very likely to achieve monopoly or when
> conduct is invidious, but not so much so as to make the
> defendant per se liable; (3) claims involving greater
> than 50% share should be treated as attempts at
> monopolization when the other elements for attempted
> monopolization are also satisfied.

*M & M*, 981 F.2d at 168 (citing 3 Areeda & Turner ¶ 835c, at

350). The Fifth Circuit agrees that a market share of less

than 50 percent can support an attempt claim if other

---

[48] Other allegations include that Pool has a dominant
position; and that Pool "often represent[s] 30 to 50 percent of a
manufacturer's total sales," and that collectively, "the
Manufacturer Defendants represent more than 50 percent of sales
of Pool Products at the wholesale distribution level."  R. Doc.
107 at 9, 7.

[49] R. Doc. 141-1 at 15.

circumstances are present. *See Dimmitt*, 679 F.2d at 532.
With the complaint supporting a market share of 33 percent,
the Court must look holistically at the market
characteristics and Pool's conduct to determine whether
plaintiffs have alleged an attempted monopolization claim.

First, plaintiffs have alleged a pattern of
acquisitions that suggest that Pool's market share has been
increasing. The complaint describes 13 instances from 1995
to 2009 when Pool purchased all or some of the assets of
existing Pool Products distributors or suppliers in the
U.S.[50] Plaintiffs allege that the rivals that Pool acquired
tended to have many distribution centers and significant
regional presences.[51] The complaint also alleges that "over
a third of PoolCorp's cash since the company's inception has
been used for these and other competitor acquisitions."[52]

Courts have also looked at the strength of competitors
as an important indicator of whether a defendant has a
dangerous probability of monopolization. *See Domed Stadium,*

---

[50] R. Doc. 107 at 11-12.

[51] *See Id.* (mentioning, for example, acquisitions of: a
company with 39 service centers in FL, CA, and AZ; a company with
eleven service centers in the Northeast; a company with 20
service centers in 14 states; a company with 19 service centers
in CA, AZ, and NV; and, in 2002, Pool's then-largest competitor
with operations in 16 states).

[52] *Id.* at 12.

732 F.2d at 490-91. Plaintiffs have alleged that Pool is the largest buyer of Pool Products and is the only distributor with national reach.[53] They further allege that while Pool operated more than 200 distribution centers, "[t]he next largest U.S. distributor operated less than 40."[54] That Pool allegedly outsizes and outreaches its rivals significantly, makes it plausible that existing competitors are not likely to have the capacity to increase their output in the short run to a level necessary to compete with Pool. *See Smith Wholesale Co. v. Phillip Morris USA, Inc.,* 219 F. App'x 398, 410 (6th Cir. 2007) (holding that defendant had no probability of successful monopolization because its competitors had the capacity to produce almost half of the excess capacity for production of cigarettes in the U.S. and could increase production to undercut a price increase); *E. Portland Imaging Ctr., P.C. v. Providence Health Sys.-Oregon*, 280 F. App'x 584, 586 (9th Cir. 2008) (rivals' inability to increase short term capacity contributes to dangerous probability of monopolization).

Plaintiffs also allege that Pool's exclusionary agreements with manufacturers have created an entry barrier

---

[53] *Id.*

[54] *Id.* at 9.

in the distribution market.[55] Entry barriers are "factors []
that prevent new rivals from timely responding to an
increase in price above the competitive level." *Microsoft*,
253 F.3d at 51. Entry barriers are another significant
factor in a determination of whether a dangerous probability
of monopolization exits. *See Dial A Car, Inc. v. Transp.,
Inc.*, 82 F.3d 484, 488 (D.C. Cir. 1996) (complaint failed to
allege Section 2 violation when it did not allege any
barriers that would prevent entry into the market by
competitors); *Am. Cent. E. Texas Gas Co. v. Union Pac. Res.
Group, Inc.*, 93 F. App'x 1, 8 (5th Cir. 2004) (long-term
contracts created a barrier to entry which supported finding
Section 2 violation). Although Pool has argued that entry
into the Pool Products distribution market requires only a
warehouse and a truck, plaintiffs have alleged that Pool's
widespread use of restrictive agreements made it difficult
for new entrants to obtain the necessary supplies from
manufacturers. The inability to buy from Manufacturers at
competitive prices plausibly represents a barrier to entry

---

[55] The details of Pool's exclusionary conduct are discussed
below in the context of the third element of attempted
monopolization - exclusionary conduct. Courts have noted that
although the three elements of an attempted monopolization claim
are discrete, they are often interdependent. *See, e.g., Twin City
Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d
1291, 1308 (9th Cir. 1982). ("proof of one of the three elements
may provide circumstantial evidence or permissible inferences of
the other elements").

for potential rivals and creates a greater risk of Pool's establishing monopoly power.

Although a 33 percent market share is on the low end of the range of market shares found sufficient by the case law, together with market factors and Pool's conduct, the court finds that plaintiffs have pled a dangerous probability of monopolization. The allegations of Pool's position as the only national distributor, with more than four times as many service centers as its biggest remaining competitor (after acquiring the previous second place competitor in 2002), and its market-wide use of restrictive agreements with manufacturers give rise to the reasonable inference that Pool is dangerously likely to achieve monopoly. Further, its alleged establishment of an artificial barrier to entry is the type of "invidious conduct" that can elevate a firm with a market share of less than 50% to a dangerous probability of monopolization. *M & M*, 981 F.2d at 168 (citing 3 Areeda & Turner ¶ 835c, at 350).

2. Exclusionary or Anticompetitive Conduct

The next requirement of an attempted monopolization claim is that the defendant engaged in exclusionary or anticompetitive conduct. Plaintiffs challenge Pool's initiation of vertical restraints by which it prevented

39

manufacturers from supplying its rivals. Plaintiffs allege
that Pool used its PVP to get "virtually" all Pool Products
manufacturers to agree to cut off sales to rival
distributors when asked.[56] Plaintiffs identify eight rival
distributors that were denied supply from manufacturers
because Pool required that they be foreclosed.[57] Plaintiffs
allege that these are but examples of a pattern of conduct.
Plaintiff's allege that Pool conditioned participation in
the PVP on manufacturers' agreement to cut off Pool's rivals
from the supply they needed to compete. The complaint
alleges that manufacturers took Pool's demands to exclude
rivals seriously out of fear that Pool would discontinue
purchases from that manufacturer. Allegedly, Pool would
threaten to discontinue sales of a manufacturer's products
nationwide, even if the rival that Pool wanted the
manufacturer to exclude operated only in a small geographic
area.[58] Plaintiffs allege that if Pool learned of a rival's
offering a manufacturer's products for prices below those
charged by Pool, Pool demanded that the manufacturer prevent
the rival from doing so, and manufacturers complied.[59] The

---

[56] R. Doc. 107 at 15.

[57] *Id.* at 17-20, 22.

[58] *Id.* at 14.

[59] *Id.* at 22.

complaint alleges that Pool most often used its PVP to get manufacturers to exclude new entrants in the distribution market rather than existing rivals because new entrants "were more likely to compete aggressively on price to earn new business."[60] The complaint alleges that without access to a substantial share of manufacturers, excluded rivals experienced increased costs of business which lessened their ability to act as a constraint on Pool's pricing and sometimes drove them out of business.[61] Plaintiffs allege that PoolCorp's exclusionary conduct "was designed to, and did, allow PoolCorp to maintain its dominance in the industry".[62] For the following reasons, the court finds that the conduct alleged is anticompetitive.

The same principles apply to determining whether conduct is anticompetitive, regardless of whether it is in the monopolization context or the attempted monopolization context. *See Id.* In its discussion of the actual monopolization claim, the Court did not address whether the exclusionary conduct element was met because the Court found that Pool's lack of monopoly power doomed the claim. The Court now addresses this requirement.

---

[60] *Id.*

[61] *Id.* at 21.

[62] *Id.*

Courts have struggled to define a clear test of whether conduct is of the competitive type - which the law seeks to promote - or the anticompetitive type - which the law seeks to prohibit. *See Spectrum Sports*, 506 U.S. at 458-59 ("It is sometimes difficult to distinguish robust competition from conduct with long-term anticompetitive effects."). The guiding principle is that "[t]he law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Id* at 458 (citations omitted). To be condemned as exclusionary, an act "must have an 'anticompetitive effect'[;] [t]hat is, it must harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58-59. "In contrast, harm to one or more *competitors* will not suffice." *Id.*

Vertical restrictions limiting competitors access to supplies have sometimes, but not always, qualified as exclusionary conduct to which Section 2 of the Sherman Act applies. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108 (3d Cir. 2010) ("a firm engages in anticompetitive conduct when it attempts to exclude rivals on some basis other than efficiency ... or the merits." (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *Lepage's Inc. v. 3M*, 324 F.3d 141,

42

162 (3d. Cir. 2003))). In *Lorain Journal Co.* v. *United States*, 342 U.S. 143 (1951), the Supreme Court held that a newspaper publisher's attempt to monopolize the market for local advertising dollars by forcing advertisers to boycott the newspaper's only real rival, a competing radio station, violated Section 2. In *Lorain Journal*, the defendant could not offer any business justification for its conduct other than a desire to eliminate competition. *Id.* at 154 n.8. Similarly, in *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005), the Third Circuit held that a dominant manufacturer of artificial teeth violated Section 2 by prohibiting distributors from carrying teeth made by competing manufacturers. Dentsply had a policy of terminating distributors that sold competitors' products in defiance of Dentsply's wishes. *Id.* at 185. The court held that despite the "legal ease with which the relationship can be terminated," dealers had "a strong economic incentive to continue carrying Densply's teeth." *Id.* at 194. The court found that the challenged conduct severely restricted the "market's ambit" and that there was no plausible procompetitive justification for Dentspy's loyalty program. *Id.* at 191, 196.

Although *Lorain Journal*, *Dentsply*, and other cases have found vertical restraints to violate Section 2 when their

43

impact was on interbrand competition, no court has held that they constitute *per se* illegal conduct. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998). To the contrary, courts are unlikely to find a Section 2 violation when the allegedly exclusive conduct has offsetting procompetitive benefits or when a restriction is unlikely to foreclose competition in a substantial share of the relevant market. *See, e.g., Dentsply Int'l,* 399 F.3d at 196; *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327-28 (1961). In *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36 (1977), the Supreme Court held that vertical non-price restrictions may "promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products" and that "[t]he market impact of vertical restrictions is complex because of their potential for simultaneous reduction of intrabrand competition and stimulation of interbrand competition." 433 U.S. at 54, 51.

Based on the complaint's allegations that Pool provided PVP members with marketing and product support, Pool argues that the PVP promoted interbrand competition by providing manufacturers with services that increased the value of their products. At first glance, the argument makes sense - an individual manufacturer might desire a restrictive

dealing arrangement to induce a distributor to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of its product. *See GTE Sylvania Inc.,* 433 U.S. at 55 (explaining, "[b]ecause of market imperfections such as the so-called "free rider" effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did."). Inducing a distributor to provide these services could add value to a product making it more competitive with products marketed by other manufacturers. However, the complaint contains plausible indications that the promotion of interbrand competition would not justify the allegedly exclusionary arrangements.

First, plaintiffs' allege that manufacturers would have preferred to have two or more distributors selling their product in each local geographic market in order to ensure competitive service and prices.[63] Plaintiffs allege that the Manufacturer Defendants went along with the exclusionary conditions of joining Pool's PVP because it would have been disastrous for any manufacturer to lose Pool – by far the largest distributor and the only one with national coverage

---

[63] R. Doc. 107 at 8.

- as a distributor.[64] This theory is supported by the allegation that Pool imposed the restrictive arrangements on the manufacturers, not the other way around. If the primary purpose of a restriction were to satisfy a manufacturer's desire to eliminate a free rider effect and induce distributors to promote and support its products, then one would expect the manufacturer to be the impetus for the arrangement. 3 Areeda & Hovenkamp ¶ 1604, at 39, 47, 52-53 (2006) (explaining that a dealer's claim that a vertical restraint is necessary to achieve effective distribution, even at the expense of interbrand competition, should be doubted when the restraint is imposed by the dealer rather than the manufacturer itself). "Whatever the social benefits of a distribution restraint that serves a manufacturer's self-interest, a competition limiting restraint extracted by dealer power can be anticompetitive," and a "beneficial effect must be doubted in situations where a manufacturer does not itself desire it." *Id.* at 39.

A similar situation led the Seventh Circuit to discredit a procompetitive explanation of vertical restrictive dealing agreements in *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000). In that case, Toys "R" Us entered into agreements requiring that toy manufacturers

---

[64] *Id.* at 16.

46

not sell certain items to warehouse club stores, which had been cutting into Toy "R" Us' sales. Toys "R" Us argued that its policy was a legitimate response to combat free riding by the club stores. *Id.* at 937. It argued that manufacturers benefitted because Toys "R" Us provided amenities, such as full line stocking, attractive premises, and trained sales people, which were jeopardized by the club stores' sales of the same toys without the amenities. In rejecting this theory, the court relied on evidence showing that "the manufacturers wanted a business strategy under which they distributed their toys to as many different kinds of outlets as would accept them." *Id.* at 938. This showed that the restrictive agreements did not serve the purpose of keeping down manufacturers' costs, which would promote consumer interests, but were instead an anticompetitive means to hurt competitors of Toys "R" Us. *Id.; See also Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 893-94 (2007)(discussing how a dominant distributor could abuse vertical price restrictions when a manufacturer was pressured into accepting the restraints to maintain access to the defendant's distribution network).

Next, plaintiffs allege that Pool had restrictive agreements with "a substantial share of manufacturers."[65]

---

[65] *Id.* at 21.

This is also inconsistent with the promotion of interbrand competition.

> When used by all manufacturers, distribution restraints could severely narrow interbrand competition at the dealer level and thereby increase the restraint's attractiveness to the dealers and magnify any adverse welfare consequences the restraint might have. On the other hand, widespread use might merely reflect a common business problem which all manufacturers faced and solved with a vertical restraint. Nevertheless, widespread coverage indicates a significant likelihood that the restraint serves anticompetitive dealer interests, and even those who are sympathetic to vertical distribution restraints acknowledge that this danger increases with market coverage.

3 Areeda & Hovenkamp ¶ 1604, at 62-63.

With Pool allegedly providing the same promotional and product support services to the three largest manufacturers as well as many others, the arrangements were not likely to increase differentiation and interbrand competition among products of different manufacturers. *See* Warren S. Grimes*, The Path Forward After Leegin: Seeking Consensus Reform of the Antitrust Law of Vertical Restraints*, 75 Antitrust L.J. 467, 484-85 (2008-2009). Professor Grimes explains that when "a restraint is widely employed, no supplier may benefit from its use;" "the collective interest of suppliers might be for all suppliers to abandon the vertical restraints, but no supplier may be willing to act unilaterally because of a concern with loss of market share if rivals do not follow."

48

The complaint plausibly alleges that Pool's exclusionary agreements had anticompetitive effects without counterbalancing procompetitive benefits.[66] Further, the complaint plausibly alleges that the effect of these arrangements was to reduce output and increase prices by excluding new entrants and raising existing rivals' costs. Plaintiffs have plausibly alleged that by raising rivals costs market-wide, Pool prevented rival distributors from providing a competitive constraint on the allegedly supracompetitive prices charged by Pool, which in turn harmed plaintiffs, Pool's customers. *See, generally*, *Aspen Skiing*, 472 U.S. at 604 n.31 ("By disturbing optimal distribution patterns one rival can impose costs upon another, that is, force the other to accept higher costs"), (quoting R. Bork, The Antitrust Paradox 156 (1978)); Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 YALE L.J. 209, 224 (1986) (describing conditions under which exclusionary rights agreements can raise rivals costs, which in turn gives the possessor of the exclusionary

---

[66] In addition to the instances of vertical restraints, plaintiffs allege that PoolCorp entered into agreements with rival distributors to refrain from competing with each other. R. Doc. 107 at 21-22. The complaint provides one specific example of a non-compete agreement in which Pool agreed with a Pennsylvania distributor not to compete for customers on products they both sold. *Id*.

49

rights the power to raise prices in its output market). In sum, plaintiffs have alleged facts that allow the Court to draw the reasonable inference that Pool's conduct was anticompetitive.

3. Specific Intent

The final element of an attempted monopolization claim is satisfied when a defendant "had a specific intent to destroy competition or build a monopoly." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626 (1953). Specific intent may be shown by inference from evidence that a defendant engaged in anticompetitive conduct. *Aspen Skiing*, 472 U.S. at 603 ("Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended"), (quoting Bork at 160); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 453 (4th Cir. 2011) (finding specific intent to monopolize based on inference from evidence of defendant's anticompetitive conduct). Because plaintiffs have plausibly alleged anticompetitive agreements, the Court finds that plaintiffs have plausibly alleged that Pool had a specific intent to monopolize. For the foregoing reasons, the Court finds that plaintiffs have adequately pleaded their attempted monopolization claim under Section 2 of the Sherman Act.

50

*C. Claims under Sherman Act Section 1*

DPPs also allege that Pool and Manufacturer Defendants engaged in an unlawful combination and conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. A Section 1 claim has the following elements: (1) a contract, combination, or conspiracy among two or more separate entities that (2) unreasonably restrains trade in a particular market and (3) affects interstate or foreign commerce. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 312 (5th Cir. 2000). In addition, plaintiffs must suffer antitrust injury from the violation, which is to say "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

1. No *Per Se* Section 1 Violation Alleged

The Supreme Court has determined that when a "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output," rather than "one designed to increase economic efficiency and render markets more, rather than less, competitive," it is considered "*per se* illegal" and may be condemned without further analysis. *Broad. Music, Inc. v. CBS*, 441 U.S. 1, 19-

51

20 (1979) (internal quotation omitted). Plaintiffs argue that they have alleged a group boycott, which is *per se* illegal under the antitrust laws.

Supreme Court precedent makes clear that for a boycott claim to merit consideration under the *per se* rule, there must be a horizontal agreement among competitors. As the Supreme Court stated in *NYNEX Corp. v. Discon., Inc.,* 525 U.S. 128, 135 (1998), "[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors." *See also Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 412 (5th Cir. 2007) (following *NYNEX*). A horizontal agreement is one made by competitors at the same level of distribution. To bring its Section 1 claim within the *per se* rule, then, plaintiffs must point to a horizontal conspiracy, "in other words, a conspiracy between competitors," rather than several vertical conspiracies between firms at different levels of distribution. *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001).

Plaintiffs have not done so. They argue that they have alleged a *per se* illegal group boycott in which the manufacturers, through Pool, agreed to exclude or restrict sales to certain of Pool's rivals. But the complaint lacks any allegation that manufacturers colluded with each other.

52

Indeed, the complaint does not specifically allege *any* contacts among or between manufacturers. *See Twombly*, 550 U.S. at 564-70 (dismissing Sherman Act Section 1 claim when no plausible allegations of a horizontal conspiracy).

Further, the cases relied on by plaintiffs are inapposite or distinguishable. Several of the cases concern Section 2 violations. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563 (1966) (restrictive agreements and pricing practices along with monopoly power led to § 2 violation in central station alarm service market); *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911) (anticompetitive exercise of monopoly power led to § 2 violation). Section 2 claims do not require allegations of an agreement. Plaintiffs also refer to several group boycott cases in which courts found *per se* Section 1 violations. But in each of these cases there was a horizontal element to the claim. *See, e.g., United States v. General Motors Corp.*, 384 U.S. 127, 145 (1966) (*per se* rule applied to group boycott with vertical agreements as well as horizontal agreements among car dealers to disadvantage other car dealers); *American Airlines, Inc. v. Travelport Ltd.*, No. 4:11-CV-244-Y, 2012 WL 3737037 (N.D. Tex. Aug. 7, 2012) (plaintiff alleged a *per se* illegal horizontal boycott consisting of agreements between competing flight information

distributors); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
359 U.S. 207 (1959) (wide combination of manufacturers,
distributors, and a retailer to drive another retailer out
of business was a *per se* violation); *In re Elec. Books
Antitrust Litig.*, No. 11 MD 2293, 2012 WL 1946759, at *4-5
(S.D.N.Y. May 15, 2012) (complaint alleging that major
publishers had agreed among themselves, along with Apple, to
adopt a joint strategy to force an increase in the price of
eBooks made out a *per se* § 1 claim). Here, plaintiffs have
failed to allege a horizontal agreement, which as the cases
above indicate, is a prerequisite to *per se* illegality in a
boycott case. *See NYNEX,* 525 U.S. at 134.

The closest case to this one, *Toys "R" Us, Inc. v.
F.T.C.*, 221 F.3d 928 (7th Cir. 2000), is likewise
distinguishable. In *Toys "R" Us*, the Seventh Circuit
affirmed the FTC's finding of a *per se* illegal group boycott
when the evidence indicated that Toys "R" Us had acted as
the coordinator of a horizontal agreement among a number of
toy manufacturers to restrict output to warehouse club
stores. There was no direct evidence that the manufacturers
agreed with each other to engage in the scheme. Instead, the
Seventh Circuit held that a horizontal agreement had been
established based on evidence that the manufacturers
abruptly shifted their practice of selling to the warehouse

54

clubs; that there was direct evidence of communication among the manufacturers; and there was evidence that they agreed to Toys "R" Us' demands only *on the condition* that their competitors also agreed to go along with it. *Id.* at 932-33, 935-36. Plaintiffs have alleged no similar facts suggestive of a horizontal agreement. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 111 (2d Cir. 2002) (viewing *Toys "R" Us* as representing a minimum evidentiary threshold for a horizontal agreement). This case is more like *Pepsico* in which the Second Circuit refused to find a *per se* Section 1 violation when Coca-Cola Co. secured vertical agreements from its independent food service distributors (IFDs) not to also sell Pepsi. *Id.* at 110. There, the court observed: "PepsiCo offered no evidence of direct communications among the IFDs; its 'offer of proof' of an agreement was simply that Coca-Cola assured the IFDs that the loyalty policy would be uniformly enforced and encouraged them to report violations." *Id.*

Nor can the plaintiffs escape the horizontal agreement requirement by labeling the scheme a hub-and-spoke conspiracy. As demonstrated by *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, allegations of horizontal agreements - or a "wheel" connecting the conspirators - is required in order to plead a *per se* illegal Section 1 violation. 615

55

F.3d 412, 420 (5th Cir. 2010). In *Leegin,* the plaintiffs
attempted to establish a hub and spoke conspiracy based upon
a manufacturer's agreements with retailers that they follow
the manufacturer's pricing recommendations. *Id.* The Fifth
Circuit held that plaintiff's attempt to characterize the
arrangement as a *per se* illegal hub-and-spoke conspiracy was
misguided because, "[i]n the absence of an assertion that
retailers agreed to RPM [resale price maintenance] among
themselves, there is no wheel and therefore no hub-and-spoke
conspiracy." *Id.; see also Howard Hess Dental Labs. Inc. v.
Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010)
(dismissing complaint charging that artificial tooth
manufacturer engaged in a hub-and-spoke conspiracy with
dealers to exclude other manufacturers because "complaint
lacks any allegation of an agreement among the Dealers
themselves"). Because plaintiffs fail to allege a horizontal
agreement among manufacturers, the Court must dismiss the
claim that defendants' engaged in a *per se* illegal group
boycott. Plaintiffs' Section 1 claim must therefore by
judged under the rule of reason.


2. Rule of Reason

*a. Contract, Combination, or Conspiracy*

Section 1 claims under the rule of reason, like *per se* claims, require plausible allegations of an agreement. 15 U.S.C. § 1. In addition to arguing that plaintiffs have failed to allege a horizontal agreement, the defendants contend that the complaint fails to allege a plausible vertical conspiracy or agreement.[67] The modern standard for determining whether parties reached an agreement for antitrust purposes is set by *Monsanto Co. V. Spray-Rite Service Corp.,* 465 U.S. 752 (1984). The Supreme Court held that there must be a "conscious commitment to a common scheme" demonstrated by "direct or circumstantial evidence" "that tends to exclude the possibility of independent action." *Id.* at 768. At the motion to dismiss stage, plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

Applying this standard in *Monsanto,* the Supreme Court concluded that Monsanto's termination of a distributor was pursuant to a price-fixing agreement with a rival

---

[67] *See* R. Doc. 169 at 8; R. Doc. 168 at 1.

57

distributor. Before the manufacturer terminated the
distributor, the rival distributor had complained about
plaintiff's discounting of agricultural chemicals. The Court
held that although the complaints alone could not establish
an agreement, along with additional circumstantial evidence,
there was sufficient evidence to permit a jury to infer an
agreement. 465 U.S. at 765-68 (other evidence included
testimony that one distributor told Monsanto it would
maintain its prices after Monsanto threatened to withhold
supplies unless it lowered prices; testimony that another
distributor was terminated after not raising its prices in
response to explicit threats; and a newsletter from one
distributor with language that the court interpreted as
referring to a price maintenance agreement).

The Supreme Court in *Monsanto* also considered whether a
plaintiff's acquiescence in a course of conduct that a
defendant imposes might itself constitute an agreement that
satisfied Section 1's concerted action requirement. *Id.* at
761. The Court found that acquiescence alone would not be
sufficient unless the manufacturer had requested and
received assurances of such acquiescence. *Id.* at 764 n.9
("The concept of 'a meeting of the minds' or 'a common
scheme' in a distributor-termination case includes more than
a showing that the distributor conformed to the suggested

price[,] ... [i]t means ... evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer.").[68]

Here, plaintiffs have alleged that "Pool has foreclosed competition ... through various agreements with manufacturers, including the Manufacturer Defendants."[69] The complaint alleges that the Manufacturer Defendants participated in Pool's PVP in which participants agreed not to sell Pool Products to Pool's rivals if Pool so directed as a condition of membership.[70] Elsewhere, the complaint alleges that PoolCorp told the Manufacturer Defendants that it would drop them as Preferred Vendors and not deal with them on a national basis if they supplied Pool Products to certain new distributors.[71] The plaintiffs also specifically allege that the Manufacturer Defendants and other

---

[68] But compare, Grimes, 75 ANTITRUST L.J. at 491, explaining academic consensus that the current formulation of the unilateral conduct defense to the agreement element in vertical restraint cases is unwise and that "liability should turn on whether the conduct is anticompetitive, not on whether the conduct can be repackaged to appear more unilateral in nature."

[69] R. Doc. 107 at 14.

[70] *Id.* at 15.

[71] *Id.* at 16. (also alleging that "PoolCorp directed such refusals to deal, and its Preferred Vendors - including the Manufacturer Defendants - agreed to implement them").

manufacturers agreed with Pool in 2003 to shut out Hilton Distribution, a Pool rival in Baton Rouge, Louisiana. The complaint also alleges that Manufacturer Defendants told a Midwest distributor that they could not sell to it because of PoolCorp's restrictions.[72] In that instance, Hayward's Director of National Accounts, Carlo Buffa, allegedly told the rival distributor that Hayward could not sell to it because of Hayward's agreement with Pool.[73] Plaintiffs also allege that the Manufacturer Defendants told an Indiana Distributor, Only Alpha, that they could not sell to Only Alpha because of their agreements with Pool.[74] They specifically allege the names of the employees of the three Manufacturer Defendants that refused to sell to Only Alpha pursuant to agreements between the Manufacturer Defendants and PoolCorp.[75] The complaint identifies three other regional rival distributors that the Manufacturer Defendants allegedly refused to sell to pursuant to their PVP agreement

---

[72] *Id.* at 18.

[73] *Id.*

[74] *Id.*

[75] *Id.* ("Among others, Carlo Buffa, Jack Mayer and Bruce Fisher of Hayward, Vincent Gillete of Zodiac, and Dave Murphy, Bill Whitehurst and Gary Golden of Pentair, all refused to sell products to Only Alpha pursuant to Manufacturer Defendants' agreements with PoolCorp.").

with Pool.[76] Finally, the complaint alleges that Carlo Buffa
of Hayward agreed with PoolCorp's CEO, Manny Perez, that
Hayward would have Imperial, a Pool rival, raise its prices
for Hayward products to avoid undercutting PoolCorp.[77]

Pool Defendants argue that these allegations are
insufficient to demonstrate an agreement under Section 1.[78]
But plaintiffs have alleged more than allegations that Pool
announced a unilateral policy to which the Manufacturer
Defendants acquiesced. *See Monsanto*, 465 U.S. at 761 (citing
*United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).
Plaintiffs have alleged that Pool directed the Manufacturer
Defendants not to deal with specific competitors, and the
Manufacturer Defendants agreed not to do so. Plaintiffs have
satisfied the *Monsanto* standard by alleging facts indicating
that Pool conditioned membership in the PVP program on an
agreement to exclude rival distributors when asked by Pool,
and that the Manufacturer Defendants communicated their
agreement with Pool's conditions. *Monsanto*, 465 U.S. at 764
n.9. Moreover, "the 'combination or conspiracy' element of a

---

[76] *Id.* at 19-20.

[77] *Id.* at 22.

[78] R. Doc. 141-1 at 8. The Manufacturer Defendants seem to
concede the existence of individual agreements between Pool and
each of the Manufacturer defendants. R. Doc. 154-9 at 24 ("the
Amended Complaints allege only separate agreements between
"manufacturers of Pool Products" and a distributor, PoolCorp.").

61

section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly or only in response to coercion." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002); *Duplan Corp. v. Deering Milliken Inc.*, 594 F.2d 979, 982 (4th Cir. 1979) ("Where, as here, the [defendants] were knowing participants in a scheme whose effect was to restrain trade, the fact that their motives were different from or even in conflict with those of the other conspirators is immaterial."). Accordingly, plaintiffs allegations are sufficient at the motion to dismiss stage to set forth three vertical conspiracies between Pool and Hayward, Pool and Zodiac, and Pool and Pentair.


*b. Unreasonable Restraints of Trade*

The Court now addresses whether plaintiffs have alleged facts, which accepted as true, make it plausible that the agreements between Pool and each Manufacturer Defendant, considered individually, involved unreasonable restraints of trade. *Cont'l Airlines*, 277 F.3d at 508. Vertical restraints are tested by the rule of reason. *Leegin,* 551 U.S. at 907 (overruling *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911), and extending application of rule of reason to all vertical restraints). Under the rule of

62

reason, "the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Dickson v. Microsoft*, 309 F.3d at 206. Justice Brandeis explained the rule of reason in *Chicago Bd. of Trade v. United States*:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

246 U.S. 231, 238 (1918). This analysis requires a showing of "anticompetitive effect" resulting from the challenged agreement. To have an "anticompetitive effect," conduct "must harm the competitive process and thereby harm consumers." *Microsoft*, 253 F.3d at 58. "[H]arm to one or many competitors will not suffice." *Id.* "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Id.* (internal quotation marks omitted).

An inquiry into the lawfulness of the restraint begins "by identifying the ways in which a challenged restraint might possibly impair competition." 3 Areeda & Hovenkamp ¶ 1503a, at 390. After identifying the type of possible harm to competition alleged, the Court must proceed "to determine whether that harm is not only possible but likely and significant," which requires "examination of market circumstances," including market power and share. 7 id. ¶¶ 1503a, 1503b, at 374-77.

Plaintiffs allege that Pool's agreements with the Manufacturer Defendants foreclosed rival distributors from buying Pool Products directly from the major manufacturers, which raised rivals costs and allowed for supracompetitive pricing in the Pool Products distribution market. The question at this stage, is whether plaintiffs have alleged enough facts to give rise to the reasonable inference that those impairments of competition occurred, were substantial, and were not outweighed by procompetitive justifications. Deciding whether plaintiffs have plausibly alleged that the three vertical agreements at issue, considered individually, caused substantial anti-competitive harm, requires an analysis of the defendants' role in the relevant market. *See Dickson v. Microsoft*, 309 F.3d at 207.

I. Market Power

     Under the rule of reason, plaintiffs must plausibly allege that defendants have sufficient market power to restrain competition substantially in a relevant market. *See Leegin*, 615 F.3d at 417-19. Plaintiffs have alleged facts sufficient to create a reasonable inference of Pool's market power in the relevant Pool Products distribution market. The inquiry into market power begins with the definition of a relevant product and geographic market. For the reasons discussed in detail in the monopolization section, plaintiffs' allegations of a relevant market suffice to survive the motion to dismiss stage. The starting point for finding market power in the relevant market is market share. *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 689 (8th Cir. 1993). The Court has already found that plaintiffs have alleged that Pool had sufficient market share for an attempted monopolization claim. For the same reasons, plaintiffs have adequately alleged that Pool has sufficient market power for a Section 1 violation. As discussed earlier, the complaint and supporting materials suggest Pool has a market share of about 33 percent which,[79] along with allegations of other market characteristics, can meet the pleading standards for market power. The complaint also

---

[79] R. Doc. 107 at 9.

alleges that Pool is the only Pool Products distributor with a national reach, with the next largest distributor having 40 distribution centers compared to the more than 200 operated by Pool, and that manufacturers could not replace Pool because of its size.[80] These facts support the allegation that Pool has a "dominant" position in Pool Products distribution market, as stated in the *Zacks* report.[81] In sum, the complaint alleges that Pool possesses sufficient market power for a Section 1 violation.

In addition to plausibly alleging Pool's market power, plaintiffs plead factual content that allows the Court to draw the reasonable inference that the three Manufacturer Defendants had substantial clout in the industry. In a Section 1 case, a plaintiff must plead facts which allow the reasonable inference that an agreement has a substantial impact on the market, not just that one participant has market power. *See Dickson v. Microsoft*, 309 F.3d at 208. In *Dickson,* the plaintiff had alleged the market power of Microsoft in the relevant software markets but had not alleged facts about the market power of the computer manufacturers with which Microsoft formed allegedly anticompetitive agreements. *Id.* at 207-209. The Fourth

---

[80] *Id.* at 9-10.

[81] *Id.*

Circuit held that without allegations of each conspirator's
market power, it could not find that the agreements
foreclosed a substantial share of the software market. *Id.;
see also Spectators' Commc'n Network*, 253 F.3d at 225
(noting that the issue is "whether the combination or
conspiracy, not each individual conspirator, has the
[market] power to hurt competition in the relevant
market."); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460,
106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("[T]he purpose of the
inquiries into market definition and market power is to
determine whether an *arrangement* has the potential for
genuine adverse effects on competition." (emphasis added)).

Unlike in *Dickson*, plaintiffs have specifically alleged
that the three Manufacturer Defendants were the largest in
the industry.[82] They also allege that each of the
manufacturer defendants promotes itself as either the
leading Pool Products manufacturer in the world or one of
the world leaders.[83] Plaintiffs further allege the

---

[82] R. Doc. 107 at 5 ("Hayward, Pentair, and Zodiac – the
'Manufacturer Defendants' – are the three largest manufacturers
of Pool Products in the United States. They are the only U.S.
manufacturers that each sell nearly all the pool products
necessary to install, operate, and maintain a pool.").

[83] *Id.* at 4-5 ("Hayward is the largest manufacturer of
residential swimming pool equipment in the world, according to
its website"; "Pentair asserts that it 'is the world's leading
manufacturer of pool and spa equipment and accessories,' and 'the
global leader in swimming pool, spa and aquatic equipment'";

Manufacturer Defendants are the only full-line manufacturers of Pool Products and that together "the Manufacturer Defendants represent more than 50 percent of sales of Pool Products at the wholesale distribution level."[84] They allege that the Manufacturer Defendants are "'must have' inputs for wholesale distributors because of the volume of Pool Products that they represent, the breadth of their product offerings, and the considerable consumer demand for their Pool Products that Dealers strive to satisfy."[85] Plaintiffs also allege that selling the Pool Products of the Manufacturer Defendants is essential to compete effectively as a distributor.[86] Considering the substantial market clout of each Manufacturer Defendant combined with Pool's market power, the allegations allow the Court to draw the reasonable inference that Pool's agreements with each Manufacturer Defendant, even when considered individually, are capable of causing substantial harm to competition.

In sum, the allegations are sufficient to permit the Court to continue to the question of whether plaintiffs have

---

"According to Zodiac's website, 'Zodiac is a leading global manufacturer of differentiated pool and spa products.'").

[84] *Id.* at 7.

[85] *Id.*

[86] *Id.* at 7-8.

plausibly alleged that the restraints are exclusionary and likely to impair competition.

ii. Exclusionary Conduct

As noted, the Supreme Court has recognized that the antitrust laws are designed to protect competition, not competitors. *Spectrum Sports*, 506 U.S. at 458. Allegations that a challenged practice affected a rival firm's business are insufficient to plead an unreasonable restraint, absent plausible allegations that this effect also substantially impairs competition market wide. *NYNEX*, 525 U.S. at 139 (1998) (allegation that firm was harmed "does not automatically show injury to competition"). Further, having found that the complaint alleges three separate conspiracies between Pool and each of the Manufacturer Defendants, only acts taken in furtherance of each alleged conspiracy "are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible conspiracies." *Dickson v. Microsoft*, 309 F.3d at 211 ("likewise, it is untrue that Compaq and Dell, as alleged co-conspirators of Microsoft, are responsible for all of Microsoft's unilateral acts with other OEMs [original equipment manufacturers] who were not members of the alleged

69

conspiracies."). Thus, to state a viable Section 1 claim, plaintiffs must make plausible allegations that each Manufacturer Defendant's individual agreements with Pool were likely to result in an anticompetitive effect. *Id.*

Plaintiffs' allegations suffice to make it plausible that the three vertical restraints at issue harmed competition. As discussed above, the complaint alleges an agreement between Pool and each manufacturer to exclude rivals of Pool. Courts have recognized this type of agreement as anticompetitive in the absence of counter-weighing procompetitive benefits. *See W. Penn Allegheny Health Sys.*, 627 F.3d at 108 ("a firm engages in anticompetitive conduct when it attempts to exclude rivals on some basis other than efficiency ... or the merits.") (quotations omitted). Plaintiffs have alleged facts, including that Pool imposed the agreements on the manufacturers, which otherwise would have allowed any credit-worthy distributor with a physical warehouse and knowledgeable personnel to sell their products, which suggest that a counterbalancing procompetitive benefit is unlikely. The agreements allegedly resulted in the reduction of output by each manufacturer and denials of needed supplies to Pool's competition. Considering the structure of the market and the characteristics of the three vertical agreements,

the allegations in the complaint are sufficient to state a
plausible Section 1 claim against Pool and each Manufacturer
Defendant.

D. *Antitrust Injury*

In order to recover for an antitrust violation, a
plaintiff must suffer injuries caused by the violation "of
the type that the antitrust laws were intended to prevent,"
namely, injury to the market as a whole. *Pueblo Bowl-O-Mat*,
429 U.S. at 489. Allegations of antitrust injury must appear
in the complaint. *See, e.g., Mahone v. Addicks Util. Dist.
of Harris County*, 836 F.2d 921, 939 (5th Cir. 1988) ("In
pleading an antitrust claim for damages under section 4 of
the Clayton Act ... a plaintiff must allege, either directly
or inferentially, that he has suffered an anticompetitive
injury as a result of the defendants' antitrust violation").
Here, plaintiffs have plausibly alleged antitrust injury by
alleging that defendants' anticompetitive conduct led to a
decrease in output and the charging of supracompetitive
prices for Pool Products. Plaintiffs have alleged a scheme
by which Pool's rivals' costs were raised, which forced some
rivals out of business and prohibited remaining rivals from
serving as a check to Pool's ability to raise prices. Higher
prices to purchasers and lower output are exactly the types

of harm that the antitrust laws are meant to prevent. *See Id.; Pueblo Bowl-O-Mat*, 429 U.S. 477. For the foregoing reasons, the Court finds that plaintiffs have adequately pleaded the antitrust injury element of their Sherman Act claims against Pool and each Manufacturer Defendant.


*E. Timeliness of Sherman Act Claims*

An antitrust action must be brought within four years from the date on which it accrues. *See* Clayton Act § 4B, 15 U.S.C.A. § 15b. An antitrust cause of action generally accrues, and the statute of limitations begins to run "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research*, Inc., 401 U.S. 321, 338 (1971); *see also Bell*, 847 F.2d at 1186-87. Generally, a plaintiff may recover for losses suffered in the four year limitations period. *See Zenith*, 401 U.S. at 338; *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979); *See also Rx.com v. Medco Health Solutions, Inc.*, 322 F. App'x 394, 396-98 (5th Cir. 2009). In this case, plaintiffs have alleged overt anticompetitive acts and resulting injury to plaintiffs in the form of overcharges for Pool Products within the limitations period. For example, plaintiffs allege that in 2009, the Manufacturer Defendants agreed with Pool not to sell to Gulf

72

Coast Pool Supply in Naples, Florida, which drove Gulf Coast
out of business.[87] Plaintiffs may therefore recover for
overcharges paid in the four-year period before filing suit.
The statute of limitations bars claims for overcharges outside
of the four-year period unless fraudulent concealment applies.

*F. Fraudulent Concealment*

Plaintiffs also seek damages for injuries suffered
before the four-year limitations period by alleging
fraudulent concealment. They argue that they should receive
damages for the entire duration of the illegal practices
because defendants fraudulently concealed their illegal
conduct, and plaintiffs did not discover the scheme until
2011 when the FTC investigation and consent decree were made
public.

At the pleading stage, a plaintiff must allege
fraudulent concealment with the particularity required by
Rule 9(b) of the Federal Rules of Civil Procedure. *See* Fed.
R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must
state with particularity the circumstances constituting
fraud or mistake."); *Shushany v. Allwaste, Inc.,* 992 F.2d
517, 521 (5th Cir. 1993) (noting that "allegations of fraud
must meet a higher, or more strict, standard than the basic

---

[87] R. Doc. 107 at 19-20.

notice pleading required by Rule 8."); *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) ("Under Rule 9(b)'s heightened pleading standard, allegations of ... fraudulent concealment for tolling purposes, must be pleaded with particularity."). Plaintiffs complaint has no such specific allegations of fraudulent concealment.

The doctrine of fraudulent concealment has two elements: first, that the defendants concealed the conduct complained of, and second, that the plaintiffs failed, despite the exercise of due diligence, to discover the facts that form the basis of the claims. *State of Tex. v. Allan Const. Co., Inc.*, 851 F.2d 1526, 1528 (5th Cir. 1988); *In re Beef Indus. Antitrust Litig.,* MDL Docket No. 248, 600 F.2d 1148, 1169 (5th Cir. 1979). The first element is satisfied "only if the defendant has engaged in affirmative acts of concealment." *Allan Const.*, 851 F.2d at 1528-29. Concealment by silence is not enough; "the defendant 'must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry.'" *Id.* at 1529 (quoting *Wood v. Carpenter*, 101 U.S. 135, 143 (1879). When the antitrust violation is of such a character as to conceal itself, fraudulent concealment can be alleged without a showing of affirmative acts of concealment. *See Allan Const.,* 851 F.2d at 1528-31 (accepting the D.C. Circuits' definition of a "self

74

concealing" conspiracy as "one in which deception is an essential element for some purpose other than merely to cover up the [wrongful] act."). Further, in pleading fraudulent concealment, it is not necessary for the "acts that demonstrate fraudulent concealment ... [to] be wholly separate from the acts underlying the wrong itself." *Id.* at 1531.

Plaintiffs urge the Court to conclude that the restrictive dealing agreements between Pool and Manufacturer Defendants were a "secret *quid pro quo*."[88] They point to their conclusory allegation that Manufacturer Defendants gave false or pretextual reasons for refusing to supply Pool's rivals. This allegation is insufficient to satisfy the pleading requirements of fraudulent concealment. To begin with, other allegations in the complaint indicate that the restrictive dealing agreements between manufacturers and Pool were not secret. For example, plaintiffs allege that "Hayward[] told [a] Midwest company that Hayward could not sell to [it] because of [Hayward's] agreement with PoolCorp," and that another Pool rival, "Pool Source[,] was informed that PoolCorp had sent letters to at least 25 vendors, including the Manufacturer Defendants, directing

---

[88] R. Doc. 165 at 50.

75

them not to sell Pool Products to Pool Source."[89] Further, the complaint lacks specific allegations that Pool and the Manufacturers attempted to keep their agreements secret, or even intended their agreements to be secret. *Cf. In re Catfish Antitrust Litig.,* 826 F. Supp. 1019, 1030-31 (N.D. Miss. 1993). This is not a case like *In re Catfish* in which the Court found that plaintiffs "alleged a pattern of conduct by defendants which included face-to-face meetings and telephone calls—all conducted under the cloak of secrecy in furtherance of the conspiracy to fix the price of catfish." *Id.* at 1031; *see also Greenhaw v. Lubbock County Beverage Ass'n*, 721 F.2d 1019, 1030 (5th Cir. 1983) (upholding jury finding of fraudulent concealment based on evidence of covert price-setting sessions and secret agreements in furtherance of the underlying price-setting conspiracy).

Further, plaintiffs argue that defendants committed acts of concealment by not publicly disclosing the

---

[89] *See also* R Doc. 107 at 18-20 (other allegations include: "PoolCorp's Preferred Vendors told Only Alpha that they could not sell to Only Alpha because of PoolCorp's restrictions"; "ATX learned from vendors ... that ... PoolCorp, had told vendors that if they sold to ATX, PoolCorp would send their products back"; "One member of PoolCorp's Preferred Vendor Program, Brenntag, informed Gulf Coast that it could not supply Gulf Coast because PoolCorp threatened to drop Brenntag as a Preferred Vendor if Brenntag sold products to Gulf Coast").

restrictive dealing conditions of the PVP. But even ignoring
the allegations that defendants did in fact disclose their
agreements, failure to self disclose anticompetitive conduct
does not amount to fraudulent concealment. *Rx.com*, 322 F.
App'x at 398 (5th Cir. 2009) ("[C]oncealment by defendant
only by silence is not enough.") (internal quotations
omitted).

Plaintiffs also argue that the defendants committed
overt acts of concealment by holding themselves out as *bona
fide* competitors when they were in fact participants in
illegal agreements. But the Fifth Circuit has rejected the
argument that a defendant is subject to fraudulent
concealment when it engages in conduct that "purports to be
competitive when in fact it is collusive." *Allan Const.*, 851
F.2d at 1531. "Any price charged for a product ... purports
to be competitive at least insofar as it purports to be
lawful," and "Congress, in writing the ... statute of
limitation, could [not] have intended for the fraudulent
concealment doctrine to apply to every price fixing case."
*Id.*

Nor have plaintiffs alleged an antitrust violation that
is self-concealing, such that they need not allege
affirmative acts of concealment. The Fifth Circuit defines
self-concealing as a wrong "in which deception is an

77

essential element for some purpose other than merely to cover up the act." *Id.* at 1530. Plaintiffs have not alleged an agreement of which deception was an essential element. Instead, the allegations in the complaint indicate that the PVP and the alleged agreements between Pool and manufacturers were disclosed to Pools rivals. Plaintiffs' allegations that defendants did not keep their agreements secret belie their arguments that defendants took actions to conceal their anticompetitive conduct and that their conduct was of a self-concealing nature. Plaintiffs are therefore limited to damages inflicted within the four-year limitations period.

## IV. Conclusion

For the reasons above, the motion to dismiss DPPs' claims is granted in part and denied in part. The Court grants defendants' motion to dismiss plaintiffs' Sherman Act Section 2 monopolization claim and plaintiffs' claim that defendants engaged in a *per se* illegal group boycott under Section 1 of the Sherman Act. The Court denies the motion to dismiss plaintiffs' Sherman Act Section 2 attempted monopolization claim and plaintiffs' Sherman Act Section 1 claims under the rule of reason. The Court also dismisses

plaintiffs' claim that defendants fraudulently concealed

their antitrust offenses.


New Orleans, Louisiana, this ___11th___ day of April, 2013


_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE