UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET ANTITRUST                SECTION: R(2)
LITIGATION

JUDGE VANCE
MAG. JUDGE
WILKINSON

**THIS DOCUMENT RELATES TO ALL INDIRECT-PURCHASER PLAINTIFF CASES**

**ORDER AND REASONS**

Before the Court are defendants'[1] motions to dismiss indirect-purchaser plaintiffs' state law claims.[2] For the following reasons, defendants' motions are granted in part and denied in part.

**I. Background**

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against Pool and Manufacturer Defendants. On April 11, 2013, the Court

---

[1] One motion to dismiss was filed jointly by defendants Pool Corporation, SCP Distributors LLC, and Superior Pool Products (collectively the "Pool Defendants", "Poolcorp", or "Pool"); a second motion to dismiss was filed jointly by Hayward Industries, Inc., Pentair Water Pool and Spa, Inc., and Zodiac Pool Systems, Inc. (collectively the "Manufacturer Defendants").

[2] R. Doc. 141; R. Doc. 159.

1

issued a ruling on the federal law claims brought by DPPs.[3] The Court granted defendants' motion to dismiss plaintiffs' Sherman Act Section 2 monopolization claim and plaintiffs' claim that defendants engaged in a *per se* illegal group boycott under Section 1 of the Sherman Act. The Court denied the motion to dismiss plaintiffs' Sherman Act Section 2 attempted monopolization claim and plaintiffs' Sherman Act Section 1 claims under the rule of reason. The Court also dismissed plaintiffs' claim that defendants fraudulently concealed their antitrust offenses. In this Order and Reasons the Court addresses defendants' motions to dismiss the IPPs' complaint.[4]

IPPs are owners of pools who indirectly purchased Pool Products[5] manufactured by the Manufacturer Defendants and distributed by Pool. The named IPPs and their state citizenship are: Jean Bove (CA), Kevin Kistler (AZ), Lorraine O'Brien (FL), and Ryan Williams (MO). IPPs allege violations of state laws on behalf of classes of individuals and entities who purchased Pool Products not for resale in California, Arizona, Florida, and Missouri. IPPs allege a nationwide conspiracy in which Pool conspired with the Manufacturer Defendants and other Pool Products manufacturers to restrict the supply of Pool Products to

---

[3] R. Doc. 221.

[4] R. Doc. 149.

[5] *See infra* page 5.

Pool's rival distributors. They allege that defendants' conduct resulted in higher prices, reduced output, and reduced customer choice for Pool Products sold indirectly to IPPs.[6]

IPPs allege that Pool and the Manufacturer Defendants' conduct violated various antitrust and deceptive trade practices laws of California, Arizona, Florida, and Missouri. The IPPs seek compensatory damages under the Unfair Competition Law, §§ 17200, *et seq.,* of the California Business & Professional Code; the state antitrust provisions of Ariz. Rev. Stat. §§ 44-1401, *et seq.;* the consumer protection provisions of the Florida Deceptive and Unfair Trade Practices Act, Fl. Stat. §§ 501.201, *et seq.,* including §501.204; and of the Missouri Merchandising Practices Act, §§ 407.010, *et seq.,* R.S.M.[7] The IPPs also seek certification of a California Class, an Arizona Class, a Florida Class, and a Missouri Class pursuant to Federal Rule of Civil Procedure 23. Each class is defined as "all individuals and entities residing in [the class state] who indirectly purchased and not for resale swimming pool products manufactured by Pentair, Hayward, or Zodiac and distributed by [Pool] Defendants' [*sic*] from January 1, 2003 through the present."[8]

---

[6] R. Doc. 149 at 3.

[7] *Id.* at 2.

[8] *Id.* at 36-38. The Missouri class definition differs slightly in referring to swimming pool products "purchased primarily for personal, family, or household purposes, and not

3

*The Specifics of Indirect-Purchaser Plaintiffs' Claims*

The claims brought by IPPs are based on allegations of the same underlying conduct alleged by DPPs in their Sherman Act claims. Like DPPs, IPPs allege that Pool pursued a deliberate strategy to restrain trade and monopolize through the acquisition of competitors and through the foreclosure of actual and potential competition by conditioning access to its distribution network on promises by manufacturers not to supply Pool's rivals. They allege that PoolCorp is the world's largest Pool Products distributor with roughly $1.8 billion in net sales revenue in 2011 and the only Pool Products distributor that operates nationwide.[9] Pool is alleged to operate more than 200 distribution centers throughout the country, with the next largest U.S. distributor operating less than 40.[10] The IPPs allege that PoolCorp "prices its products on a national basis and controls its pricing from its headquarters."[11] They allege that Pool's anticompetitive conduct occurred in a relevant market consisting of Pool Products distribution in the United States, or

---

for resale." *Id.*

[9] *Id.* at 15.

[10] *Id* at 16.

[11] *Id.*

alternatively in California, Arizona, Florida, and Missouri.[12] They allege that the relevant product market is the wholesale distribution of Pool Products, which they define as "the equipment, products, chemicals, parts or materials for the construction, maintenance, repair, renovation or service of residential and commercial swimming pools."[13]

IPPs generally allege that the Manufacturer Defendants, the only full-line Pool Products vendors, agreed with Pool Defendants to eliminate existing distribution competitors and prevent new entrants from obtaining the products necessary to compete. IPPs allege that the Manufacturer Defendants collectively represent more than 50 percent of sales of Pool Products at the wholesale distribution level and that as the only Manufacturers carrying a full line of pool products, they are "must have" inputs for wholesale distributors.[14] They allege that each of the three Manufacturer Defendants markets itself as either the leading manufacturer of Pool Products in the world or one of the world's leaders.[15]

IPPs allege that Pool eliminated competition by acquiring rivals. Specifically, the IPP's complaint describes 12 instances

---

[12] *Id.* at 12.

[13] *Id.* at 11-12.

[14] *Id.* at 12-13.

[15] *Id.* at 7-8.

5

from 1995 to 2009 when Pool purchased all or some of the assets
of existing Pool Products distributors or suppliers in the U.S.[16]

IPPs also allege that Pool entered into exclusionary
agreements with manufacturers. Pool allegedly "often represent[s]
30 to 50 percent of a manufacturer's total sales."[17] IPPs allege
that Pool used the leverage of its high volume purchasing to
induce manufacturers, including Manufacturer Defendants, to
agree to exclude Pool's rivals upon Pool's command. IPPs allege
that Pool "conditioned access to its distribution network on
promises by manufacturers not to supply PoolCorp's rivals."[18] The
complaint alleges that Pool carried this out primarily through a
Preferred Vendor Program (PVP). The complaint describes the PVP
as a program by which Pool promoted member manufacturers' goods
to customers, and provided advertising and marketing programs and
product support.[19] IPPs allege that Pool informed PVP members,
including the three Manufacturer Defendants and "virtually all of
the other major Pool Products manufacturers," that they were to
discontinue favorable pricing or sales of Pool Products
altogether to rival distributors if Pool Corp so directed.[20] They

---

[16] *Id.* at 18–19.

[17] *Id.* at 17.

[18] *Id.* at 20.

[19] *Id.* at 21–22.

[20] *Id.* at 22.

allege that manufacturers, including the Manufacturer Defendants, complied with this condition because they feared losing Pool's business since no other distributor could replace Pool's volume and geographic coverage. IPPs allege that when a new entrant sought to distribute Pool Products in a particular geographic area, Pool threatened to refuse to sell the manufacturers' products throughout the U.S., not just in the geographic area of the new entrant. The complaint includes allegations of eight rival distributors that were denied supply from manufacturers because Pool demanded that they be foreclosed.[21] IPPs allege that one of those companies went out of business, while the others allegedly experienced increased costs because of Pool's actions.[22] IPPs cite these instances as "examples" of a broader pattern of conduct.

IPPs allege that Pool tended to target new entrants into the Pool Products distribution industry because new entrants "represented a unique threat to PoolCorp because they were more likely to compete aggressively on price to earn new business."[23]

IPPs also specifically allege that, in the mid-2000s, Mareva, a manufacturer of specialty chemicals in Florida, entered into an agreement to sell exclusively to PoolCorp and not to any

---

[21] *Id.* at 24-29.

[22] *Id.*

[23] *Id.* at 27.

other Pool Products distributor.[24] They allege that Mareva would have preferred to sell to more distributors but could not afford to risk losing PoolCorp's substantial business.[25] IPPs allege that PoolCorp entered into agreements with rival distributors to refrain from competing with each other, such as a 2002 agreement with Cardinal Systems in Pennsylvania to avoid competition "for each other's customers on products they both sold."[26]

The IPP's complaint alleges that Pool's agreements with preferred vendors generally included a most favored nation (MFN) clause, by which the supplier agreed to give PoolCorp prices and terms that were at least as favorable as any provided to other purchasers with the same or similar volume levels as those of PoolCorp.[27] IPPs allege that the MFNs operated to suppress the ability of competitors to compete on price with Pool because they established a price floor for products bought from manufacturers.[28]

Finally, IPPs allege that the conduct of Pool and the Manufacturer Defendants "substantially impaired and foreclosed competition from PoolCorp's rivals in the relevant market, ...

---

[24] *Id.* at 29.

[25] *Id.*

[26] *Id.* at 30.

[27] *Id.*

[28] *Id.*

raised barriers to entry for potential rivals," "enabled PoolCorp to establish and maintain artificially high, supra-competitive prices," and reduced product output and choice.[29] IPPs allege that they were injured because defendants' conduct caused them to pay higher prices for Pool Products than they would have otherwise paid absent defendants' illegal practices. They allege they suffered losses in the form of overcharges paid for Pool Products. IPPs also allege that defendants fraudulently concealed their illegal conduct until November 2011 when a Federal Trade Commission investigation and related consent decree made public the nature of Pool's anticompetitive conduct.

In addition to the allegations made by both DPPs and IPPs, the IPP complaint includes the following additional allegations. IPPs allege that Pool operates 11 sales centers in Arizona, 45 in California, 37 in Florida, and 5 in Missouri."[30] The IPP complaint quotes Pool's 2010 annual report as stating that Pool conducts "operations through 291 sales centers in North America and Europe," with "primary markets, which have the highest concentration of swimming pools, [in] California, Florida, Texas and Arizona, representing approximately 50% of [its] net sales in 2010."[31] IPPs allege that "PoolCorp sold approximately $750

---

[29] *Id.* at 34.

[30] *Id.* at 10.

[31] *Id.*

9

million of Pool Products in 2010 in these four states."[32] They allege that in the local geographic markets of Alabama, Louisiana, Missouri, Oklahoma, Tennessee, and Texas, Pool is "the only or most dominant distributor in the area, and has maintained a market share of approximately 80 percent or higher for at least the past five years."[33] IPPs further allege that any price increases charged by Pool are passed on by Pool Dealers to indirect consumers who own residential or commercial swimming pools, such as IPPs.[34] IPPs claim to have suffered damages from defendants' conduct in the form of passed-on overcharges they paid for Pool Products as a result of defendants' conduct. They allege that the overcharges are "identifiable and traceable between the manufacturer, distributor, dealer (retailer) or service company and the ultimate consumer, such as Plaintiffs and Class Members in Arizona, California, Florida, and Missouri."[35]

## II. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1960

---

[32] *Id.* at 16.

[33] *Id.* at 16-17.

[34] *Id.* at 11.

[35] *Id.*

(2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1940. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 129 S.Ct. at 1949.

A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true. *Id.* It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly,* 550 U.S. at 555. In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 256. If there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007), the claim must be dismissed.

## II. Discussion

Pool and Manufacturer Defendants move to dismiss IPPs' complaint arguing that: (1) the IPPs lack standing to sue under the laws of California, Arizona, Florida, and Missouri; and (2) the IPPs fail to state plausible state antitrust and consumer protection claims with the specificity required by *Twombly*, 550 U.S. at 555-556. As a threshold issue, defendants argue that IPPs, as indirect purchasers, lack standing and are not the proper parties to bring the state law claims. IPPs do not dispute that *Illinois Brick* Co. *v. Illinois* bars indirect purchasers from suing under the federal antitrust laws. 431 U.S. 720, 728-29 (1977); *See also Hanover Shoe v. United Shoe. Mach.*, 392 U.S. 481 (1968) (barring antitrust violators from asserting defense that illegal overcharges had been passed on by direct purchaser to indirect purchasers). But for each of IPPs' claims, the question remains whether there is a barrier to indirect-purchaser standing under the state laws at issue. *See California v. ARC America Corp.*, 490 U.S. 93, 101-02 (*Illinois Brick* rule limiting federal antitrust recoveries under Sherman Act to direct purchasers does not preempt indirect purchasers from recovering under state antitrust laws that permit indirect purchasers). Defendants argue that under each of the state laws at issue, the IPPs should be dismissed for lack of standing or because they are improper

parties to bring suit. Because the law differs in each state, the Court addresses IPPs' standing and the sufficiency of the pleadings under each state's laws separately.


*A. California*

1. Standing

The proposed California class of IPPs presents claims under two different California laws: California's antitrust law, the Cartwright Act, Cal Bus. & Prof. Code § 16720, *et seq.*, and the California Unfair Competition Law (UCL), Cal. Bus. & Prof Code § 17200, *et seq.* Indirect-purchasers have standing under both.

The Cartwright Act expressly permits indirect purchasers to recover damages for state antitrust law violations. Cal. Bus. & Prof. Code § 16750(a) ("This action may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt *directly or indirectly* with the defendant." (emphasis added)); see also *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 763 (2010) ("In 1978, in direct response to *Illinois Brick*, the [California] Legislature amended the state's Cartwright Act to provide that unlike federal law, state law permits indirect purchasers as well as direct purchasers to sue." (citations omitted)). The IPPs have

13

alleged that they were indirectly injured by defendants'
antitrust violations in the form of overcharges for Pool
Products. The allegations satisfy the standing requirements of
the Cartwright Act. *See In re Flash Memory Antitrust Litig.*, 643
F. Supp. 2d 1133, 1153-56 (N.D. Cal. 2009) (Indirect purchasers
of products containing NAND Flash Memory had standing under
California antitrust laws and risk of duplicative recovery was
inapposite given California's *Illinois Brick* repealer); *In re
Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 659 (E.D.
Mich. 2011) (Indirect purchasers [end consumers] who purchased
packaged ice in California had standing to sue under California
antitrust law).

The UCL allows suit to be brought by any "person who has
suffered injury in fact and has lost money or property as a
result of the unfair competition." Cal. Bus. & Prof. Code §
17204. The California Supreme Court has stated that the law
provides standing for those "who *had* had business dealings with a
defendant and had lost money or property as a result of the
defendant's unfair business practices." *Clayworth*, 49 Cal. 4th at
788. In *Clayworth, the* California Supreme Court permitted
indirect-purchaser pharmacies that were overcharged for
pharmaceuticals to sue drug manufacturers under the UCL and the
Cartwright Act even though wholesalers served as intermediaries
between pharmacies and manufacturers. *Id.* at 788-89, 690. IPPs

14

meet the *Clayworth* standard. Products made by the Manufacturer Defendants and distributed by Pool are sold to Pool dealers who sell the products to not-for-resale consumers such as IPPs. IPPs were the end purchasers of Pool Products distributed by Pool and thus had business dealings with Pool within the meaning of *Clayworth*. *See id.* ("To distribute their pharmaceuticals, Manufacturers depend on a network of wholesalers and retailers[;] pharmacies acted as retailers for Manufacturers' drugs and thus had indirect business dealings with Manufacturers"). The IPPs have alleged that they were overcharged for Pool Products and that they paid more than they otherwise would have because of restrictive dealing agreements in violation of California law. These allegations establish standing under the UCL. *See id.*

Defendants argue that although IPPs' California claims are not barred outright under *Illinois Brick*, the Court should dismiss their claims for failure to satisfy the standing requirements laid out in *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535–44 (1983) ("*AGC*"). *AGC* instructs federal courts to consider several factors in determining whether a federal antitrust plaintiff has standing: (1) the nature of plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws; (2) the directness with which the alleged market restraint caused the asserted injury; (3) the

speculative nature of the damages; and (4) the risk of
duplicative recovery or complexity in apportioning damages. The
*AGC* factors apply to standing inquiries under state antitrust
laws only to the extent that a state has adopted them. *See
California v. ARC Am. Corp.*, 490 U.S. 93, 105, 109 S. Ct. 1661,
1667, 104 L. Ed. 2d 86 (1989) (noting that *Associated General
Contractors* construed federal law and did not impose a federal
standard on state causes of action). In *Clayworth*, the California
Supreme Court found that indirect-purchaser pharmacies had
standing to bring suit under the Cartwright Act and the UCL
without addressing the *AGC* factors. *See* 49 Cal. 4th at 781-87.
Defendants refer to earlier decisions from federal courts and
inferior California courts that applied the *AGC* factors to
standing under California antitrust laws. *See, e.g.*, *In re
Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011,
1023 (N.D. Cal. 2010) (applying *AGC* factors); *Vinci v. Waste
Mgmt., Inc.*, 43 Cal. Rptr. 2d 337 (Cal. Ct. App. 1995) (same).
These authorities cannot overcome the California Supreme Court's
decision in *Clayworth* to allow suit by indirect purchasers under
the Cartwright Act and the UCL without applying the *AGC* factors.
*See, e.g., Paolella v. Browning-Ferris*, 158 F.3d 183, 189 (3d
Cir. 1998) (federal court sitting in diversity may only consider
decisions from lower state courts in the absence of definitive
statement from highest court). Indeed, even before *Clayworth,*

courts had permitted suits by indirect purchasers under California Law without applying the *AGC* factors. *See, e.g., In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 158-60 (E.D. Pa. 2009) (permitting suit by indirect purchasers of once-a-day antidepressant drug under the Cartwright Act and the California UCL without mentioning or applying the *AGC* factors). *Union Carbide Corp. v. Superior Court*, 36 Cal. 3d 15, 23, 35 (1984) (permitting suit by indirect gas purchasers under the Cartwright Act without mentioning *AGC* factors).

2. IPPs' California Allegations Meet the Pleading Standards of *Twombly*

IPPs have stated a claim under the Cartwright Act analogous to DPPs' Sherman Act Section 1 claim under the rule of reason. As acknowledged by the Manufacturer Defendants, "the Cartwright Act contains specific prohibitions that, in substance, track Sherman Act Section 1's more general prohibition of unlawful restraints of trade."[36] *Compare* Cal Bus. & Prof. Code § 16720, *with* 15 U.S.C.A. § 1. Federal antitrust doctrine, including the distinction between the *per se* rule and the rule of reason, applies to the Cartwright Act. *See Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925, 930 (1976) ("A long line of California cases has concluded that the Cartwright Act is

---

[36] R. Doc. 159-4 at 41.

patterned after the Sherman Act and both statutes have their
roots in the common law. Consequently, federal cases interpreting
the Sherman Act are applicable to problems arising under the
Cartwright Act"). The Cartwright Act's ban on anticompetitive
combinations parallels Sherman Act Section 1, but the Cartwright
Act does not bar unilateral acts covered by Sherman Act Section
2's anti-monopolization provisions. *Asahi Kasei Pharma Corp. v.*
*CoTherix, Inc.*, 204 Cal. App. 4th 1, 8 (2012) ("The Cartwright
Act bans combinations, but single firm monopolization is not
cognizable under the Cartwright Act") (citing *Freeman v. San*
*Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 202 (1999)).
Therefore, IPPs do not have a cognizable claim for monopolization
or attempted monopolization under the Cartwright Act akin to
DPPs' attempted monopolization claim under Section 2 of the
Sherman Act.

In attacking IPPs' allegations of anticompetitive agreements
in violation of the Cartwright Act, defendants rely on the same
arguments they made in their motions to dismiss the DPPs'
complaint. For the same reasons that the Court rejected those
arguments in denying the motions to dismiss DPPs' Sherman Act
Section 1 claim under the rule of reason, it rejects them here.[37]
The Court previously determined that DPPs plausibly alleged three

---

[37] *See* R. Doc. 221 at 51-72 (discussing in detail the
plausibility of the DPPs Sherman Act antitrust claims under the
pleading requirements of *Twombly*).

18

vertical conspiracies between Pool and each Manufacturer Defendant to eliminate competition in the national market of wholesale distribution of Pool Products.[38] For the same reasons, which the Court incorporates herein, the Court finds that IPPs have alleged analogous rule of reason claims under the Cartwright Act, to the extent they are predicated on a national market.[39] *See Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 198 Cal. App. 4th 1366, 1374, 131 Cal. Rptr. 3d 519, 525 (2011) ("Under both Cartwright Act and Sherman Act case law, some restraints of trade are treated as *per se* unlawful, while others are analyzed under the 'rule of reason'"); *See also In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 659 (E.D. Mich. 2011) (Rejecting argument that indirect plaintiffs' Cartwright Act claim fails under *Twombly* for the same reasons the court rejected this argument regarding direct purchasers' Sherman Act Section 1 claims). However, IPPs' complaint lacks any factual allegations that would allow the Court to draw a reasonable inference that California represents a relevant geographic submarket or market.

IPPs also allege that defendants engaged in a *per se* illegal group boycott. That claim is dismissed for the same reasons the Court dismissed DPPs' *per se* claim, namely that plaintiffs have

---

[38] *Id.*

[39] *Id.* at 56-72.

19

not alleged a horizontal agreement.[40]

Defendants argue that the Cartwright Act claim should be dismissed because IPPs allege a nationwide conspiracy without specific examples of exclusions in California. But allegations of specific illegal conduct within California are not essential to a Cartwright Act claim when plaintiffs allege injury in California. *See Id.* at 662-63. In *In re Packaged Ice,* the U.S. District Court for the Eastern District of Michigan held that indirect purchasers had adequately pled claims under the Cartwright Act when they alleged a plausible nationwide conspiracy and that each indirect plaintiff suffered an injury by purchasing ice in California at higher prices than would have prevailed absent that conspiracy. *Id.* The court found that the plaintiffs had met their burden of pleading a claim under the Cartwright Act:

> In addition to pleading sufficient facts to plausibly allege a nationwide conspiracy, the [complaint] alleges that IP Plaintiff Desmond resides in and purchased packaged ice in California, that as a result of the nationwide conspiracy each of the IP Plaintiffs has suffered injury in that they have paid more for packaged ice than they would have paid absent the conspiracy and that they have thereby suffered an injury. These facts are sufficient under *Twombly* to sustain the IP Plaintiffs' burden at the pleading stage to plausibly suggest a claim under the Cartwright Act.

*Id.* IPPs have alleged that indirect-purchaser plaintiff Jean Bove resides in and purchased Pool Products in California and as a result of the nationwide conspiracy each of the IPPs has suffered

---

[40] *Id.* at 51-56.

injury in that they have paid more for Pool Products than they would have paid absent the conspiracy. *Id.* These allegations, along with the plausible allegations of a nationwide conspiracy, are sufficient to state an antitrust claim under California law.

IPPs have also plausibly alleged a claim under the UCL. The UCL prohibits "any unlawful, unfair or fraudulent business act or practice...." Cal. Bus. & Prof. Code § 17200. The Supreme Court of California has held that the UCL "embraces anything that can properly be called a business practice and that at the same time is forbidden by law." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). A claim for compensation under the UCL "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under the UCL." *In re Wellbutrin*, 260 F.R.D. at 160. IPPs have alleged a "violation of California antitrust law, which may stand as the basis of a claim under the 'unlawful' or 'unfair' prongs of the UCL if such conduct caused the plaintiffs' injuries." *Id.* (citing *In re Ditropan XL Antitrust Litig.*, 529 F.Supp.2d 1098, 1105 (N.D.Cal. 2007). Thus, the Court holds that IPPs have alleged violations of the "unfair" and "unlawful" prongs of the California UCL based on their allegations of exclusionary vertical agreements between Pool and each Manufacturer Defendant.

Although IPPs have alleged a UCL claim and a rule of reason Cartwright Act claim based on anticompetitive vertical

agreements, they have not alleged facts supporting other
conclusory allegations included in their complaint. For example,
IPP's allege that defendants committed omissions,
misrepresentations, non-disclosures, and fraudulent business
practices constituting unlawful acts under the UCL.[41] To the
extent that IPPs allege that the UCL was violated by fraudulent
or deceptive actions, these claims are dismissed as
insufficiently pleaded. Allegations of fraud must meet the
heightened pleading requirements of Rule 9(b). Fed. R. Civ. P. 9
("In alleging fraud or mistake, a party must state with
particularity the circumstances constituting fraud or mistake").
The complaint lacks any factual allegations which allow the
reasonable inference that Pool or the Manufacturer Defendants
took affirmative acts to keep their agreements secret or even
intended their agreements to be secret. Further, the complaint
lacks any particularized allegations of affirmative
misrepresentations or any of the other elements of fraud or
misrepresentation. Instead, as discussed in the previous order,
the complaints indicate that the restrictive dealing agreements
between manufacturers and Pool were not secret.[42]

---

[41] R. Doc. 149 at 44.

[42] *See, e.g., id.* at 25-27 (plaintiffs allege that
"Hayward[] told [a] Midwest company that Hayward could not sell
to [it] because of [Hayward's] agreement with PoolCorp," and that
another Pool rival, "Pool Source[,] was informed that PoolCorp
had sent letters to at least 25 vendors, including the
Manufacturer Defendants, directing them not to sell Pool Products

*B. Arizona*

1. Standing

The proposed Arizona class of IPPs presents claims under the Arizona Antitrust Act ("AAA"), Ariz. Rev. Stat. §§ 44-1401, *et seq.* Under the AAA, "[a] person ... injured in his business or property by a violation of this article may bring an action for ... damages sustained." *Id.* § 44-1408(b). A "person" is defined as an "individual, corporation, business trust, partnership, association or any other legal entity." *Id.* § 44-1401. The statute contains a harmonization clause, which states that it is "the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." *Id.* § 44-1412.

The Arizona Supreme Court has rejected *Illinois Brick* and concluded that an indirect-purchaser of goods and services has standing to sue under the AAA. *See Bunker's Glass Co. V. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003) (noting that nothing in the AAA precludes indirect purchaser claims). Defendants

_____

to Pool Source"; "PoolCorp's Preferred Vendors told Only Alpha that they could not sell to Only Alpha because of PoolCorp's restrictions"; "ATX learned from vendors ... that ... PoolCorp, had told vendors that if they sold to ATX, PoolCorp would send their products back"; "One member of PoolCorp's Preferred Vendor Program, Brenntag, informed Gulf Coast that it could not supply Gulf Coast because PoolCorp threatened to drop Brenntag as a Preferred Vendor if Brenntag sold products to Gulf Coast").

argue, however, that IPPs must still satisfy the *AGC* factors to have standing under the AAA. But in *Bunker's Glass,* the majority permitted suit by indirect purchasers of flat glass and tobacco based on allegations of passed on overcharges without applying the *AGC* factors, though the dissent found that *AGC* applied. Defendants rely on one Arizona trial court that did apply the *AGC* factors. *Luscher v. Bayer*, CV 2004-01835 at *1-2 (Ariz. Super. Ct. Maricopa Cty. Sept. 14, 2005) (applying *AGC* factors to prohibit suit against synthetic rubber manufacturers by indirect purchasers of end products containing the synthetic rubber). But given the Arizona Supreme Court's failure to apply *AGC* in *Bunker's Glass*, the trial court's *Luscher* decision is unpersuasive. *See D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 489 (E.D. Pa. 2006)("notwithstanding the *Luscher* decision, this Court predicts that the Arizona Supreme Court would apply its traditional standing approach, rather than an *AGC* analysis."); *In re: G-Fees Antitrust Litigation*, 584 F.Supp. 2d 26, 38 (D.D.C. 2008)("Given the opinion in *Bunker's Glass*, it appears that if presented squarely with the question, the Arizona court would reject the use of the *AGC* factors").

Instead of the *AGC* factors, the Court must apply Arizona's traditional standing doctrine: a litigant has standing when he suffers an injury in fact that is "distinct and palpable," and possesses an interest in the outcome of the controversy. *Aegis of Arizona v. Town of Marana*, 206 Ariz. 557, 81 P.3d 1016, 1021-1022

(2003); *see also Armory Park Neighborhood Assoc. v. Episcopal Community Services In Arizona*, 148 Ariz. 1, 712 P.2d 914, 919 (1985). The Court finds that IPPs have satisfied Arizona's standing requirement because they have alleged a distinct injury in the amount of an overcharge that was passed on to IPPs as a result of defendants' anticompetitive conduct. *See Bunker's Glass*, 75 P.3d at 102.


2. IPPs' Arizona Allegations Meet the Pleading Standards of *Twombly*

   The AAA is modeled after the Uniform State Antitrust Act and contains a provision directing courts to "use as a guide interpretations given by federal courts to comparable federal antitrust statutes," in construing the AAA. *Bunker's Glass*, 206 Ariz. at 12; Ariz. Rev. Stat. Ann. § 44-1412. Like Sherman Act Section 1, § 44-1402 of the AAA prohibits any "contract, combination or conspiracy ... in restraint of ... trade." Arizona courts apply federal antitrust doctrine in distinguishing between *per se* illegal agreements and agreements that fall under the rule of reason when applying § 44-1402 of the AAA. *See, e.g., Three Phoenix Co. v. Pace Indus.*, Inc., 135 Ariz. 113, 115, 659 P.2d 1258, 1260 (1983). Given the harmony between the AAA and the Sherman Act, for the same reasons discussed in the DPP Order and Reasons, which are incorporated herein, IPPs have stated claims of three vertical agreements in restraint of trade in the

relevant national market of wholesale distribution of Pool Products under the rule of reason under § 44-1402.[43] By the same token, they have not stated a claim of a *per se* illegal group boycott under § 44-1402 because the complaint has no allegations of a horizontal agreement.[44] The IPPs' complaint also lacks factual allegations that would allow the Court to draw a reasonable inference that Arizona represents a relevant geographic submarket or market.

The AAA also prohibits monopolization and attempted monopolization. Like Sherman Act Section 2, § 44-1403 of the AAA prohibits the establishment of a monopoly "or an attempt to establish a monopoly of trade or commerce." Arizona courts "analyze the requirements necessary to prove a violation of section 44-1403 under federal case law interpreting § 2 of the Sherman Act." *Pasco Indus., Inc. v. Talco Recycling, Inc.*, 195 Ariz. 50, 57, 985 P.2d 535, 542 (Ct. App. 1998). Thus, for the reasons discussed in the DPP Order and Reasons and incorporated herein, IPPs have plausibly alleged an attempted monopolization claim, but not a monopolization claim, under § 44-1403.[45]

*C. Florida*

---

[43] R. Doc. 221 at 56-72.

[44] *Id.* at 51-56.

[45] *Id.* at 10-50.

26

1. Standing

The proposed Florida class of IPPs presents claims under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fl. Stat. §§ 501.201, *et seq*. The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204. In *Mack v. Bristol-Myers Squibb Co.*, an intermediate Florida court held that "the Florida DTPA clearly expresses the legislative policy to authorize consumers (that is, indirect purchasers) to bring actions under the Florida DTPA for price-fixing conduct." 673 So. 2d 100, 109 (Fla. Dist. Ct. App. 1996) (parenthetical in original). The *Mack* court based its conclusion on the requirement that the FDUTPA "shall be construed liberally to promote" the policy of protecting "the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id*. § 501.202. The Court agrees (and defendants do not contest) that indirect plaintiffs are not barred from bringing suit by the standing rule of *Illinois Brick*. *See also In re Packaged Ice*, 779 F. Supp. 2d at 665 ("indirect purchasers may sue under the FDUTPA"); *In re Florida Microsoft Antitrust Litig.*, 99-27340, 2002 WL 31423620 at *2 (Fla. Cir. Ct. Aug. 26, 2002) ("indirect purchasers of a monopolist's or price fixer's products, such as

Plaintiffs here, may bring suit under the Florida DTPA").

Defendants argue instead that the *AGC* factors should apply to the indirect-purchaser claims under the FDUTPA. But defendants fail to identify any Florida case in which a court applied the *AGC* factors to determine standing under the FDUTPA. In the absence of authority to the contrary, the Court concludes that IPPs have standing. *See In re Wellbutrin*, 260 F.R.D. at 158-60 (permitting suit by indirect purchasers [end consumers] of once-a-day antidepressant drug under the FDUTPA without applying *AGC* factors)

2. IPPs' Florida Allegations Meet the Pleading Standards of *Twombly*

IPPs allege that defendants "engaged in unfair, unconscionable, deceptive or fraudulent acts or practices" in violation of the FDUTPA. The IPP complaint contains boilerplate allegations that "[d]efendants' unconscionable trade conduct was based on a disparity of bargaining power between the Defendants and consumers in Florida," and "[d]efendants' unconscionable trade conduct affronted Plaintiff's and Class Members' sense of justice, decency, or reasonableness, and Defendants' trade conduct violated state public policy or statute, such as Florida's antitrust provisions, and Federal Trade Commission Act

provisions."[46]

Based on the factual allegations discussed above and in the
DPP Order and Reasons, incorporated herein, IPPs have stated a
claim for unfair methods of competition and practices under the
FDUTPA. The FDUTPA prohibits "[u]nfair methods of competition,
unconscionable acts or practices, and unfair or deceptive acts or
practices in the conduct of any trade or commerce." Fla. Stat.
Ann. § 501.204. Section 501.204(2) provides that in determining
what constitutes an "unfair method of competition" under
subsection 501.204(1), "due consideration and great weight shall
be given to the interpretations of the Federal Trade Commission
and the federal courts relating to § 5(a)(1) of the Federal Trade
Commission Act, 15 U.S.C. 45(a)(1)." The FTC Act, in turn,
encompasses violations of the antitrust laws. *See* Federal Trade
Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1); *FTC v. Indiana
Federation of Dentists*, 476 U.S. 447, 454–55 (holding that
antitrust violations are unfair methods of competition under the
FTC Act). Thus, the acts proscribed by subsection 501.204(1)
include the antitrust violations alleged by IPPs, specifically
the attempted monopolization and anticompetitive vertical
agreements that lie at the heart of all of plaintiffs' claims.[47]

---

[46] *See* R. Doc. 149 at 49.

[47] R. Doc. 221 at 10-72. Although IPPs have alleged
antitrust violations in a relevant national geographic market,
their FDUTPA claims are dismissed to the extent they rely on
antitrust violations with Florida as the relevant market because

Therefore, the FDUTPA claim based on unfair methods of competition survives the motion to dismiss.

To the extent that IPPs allege that defendants violated the FDUTPA through deceptive acts or practices, those allegations are conlclusory and the claims are dismissed as insufficiently pleaded. In order to plead an FDUTPA claim based on fraud, a plaintiff must meet the heightened pleading requirements of Rule 9(b). Fed. R. Civ. P. 9 ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake"); *See Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002) (applying Rule 9(b) to FDUTPA claim based in fraud and listing cases doing the same). IPPs have not stated with particularity the who, what, where, when, and how of any fraud or deceptive act committed by defendants. To the contrary, IPPs allege that the restrictive dealing agreements between Manufacturer Defendants and Pool were not secret and that manufacturers repeatedly disclosed that they could not sell to particular distributors because of their agreements with Pool.[48]

---

their complaint lacks any factual allegations that would allow the Court to draw a reasonable inference that Florida represents a relevant geographic submarket or market.

[48] *See, e.g.*, R. Doc. 149 at 25-27. (DPPs allege that "Hayward[] told [a] Midwest company that Hayward could not sell to [it] because of [Hayward's] agreement with PoolCorp," and that another Pool rival, "Pool Source[,] was informed that PoolCorp had sent letters to at least 25 vendors, including the Manufacturer Defendants, directing them not to sell Pool Products to Pool Source").

Thus, IPP's FDUTPA claim survives this motion to dismiss only to the extent it is based on unfair methods of competition and not fraud or deceptive acts or practices.

*D. Missouri*

Missouri's antitrust laws follow *Illinois Brick* and prohibit recovery by indirect purchasers. *See Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s*, 998 S.W.2d 821, 825 (Mo. Ct. App. 1999)(citing *Associated General Contractors* and *Illinois Brink* in denying indirect plaintiff's recovery under Missouri's antitrust law). In order to avoid the state law antitrust prohibition on indirect-purchaser suits, IPPs bring claims under Missouri's consumer protection statute, the Missouri Merchandising Practices Act ("MMPA"), Mo. Ann. Stat. § 407.020. Defendants argue that the *Illinois Brick* prohibition on indirect antitrust plaintiffs extends to the MMPA when the challenged conduct also gives rise to an antitrust claim.

The Missouri Supreme Court has not directly addressed whether the *Illinois Brick* prohibition on indirect plaintiffs applies to claims based on allegations of antitrust conspiracies brought under the MMPA. In the context of a case that involved no allegations of an antitrust conspiracy, the Missouri Supreme Court held that consumers making claims under the MMPA did not require privity with the defendant. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007) ("The statute's broad language

...contemplates that other parties, besides the direct purchaser or contracting party, who suffer damages resulting from the violator's prohibited conduct under the Act are included among those eligible to receive restitution."). In *Gibbons*, the plaintiff, purchaser of a defective car, was allowed to recover from the car wholesaler for allegedly failing to disclose to the car dealership (from which the plaintiff bought the car) that the car had been in an accident.

Before *Gibbons*, a decision of the United States District Court for the District of Maine held in 2004 that *the Illinois Brick* prohibition on indirect antitrust plaintiffs applies to both Missouri's consumer protection statute and its antitrust statute. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 192 (D. Me. 2004). In that case, in which the plaintiff alleged violations of the consumer protection statute but not the antitrust statute, the court held that the plaintiffs could not avoid the state law prohibition on indirect-purchaser antitrust suits by "making the same claim under Missouri's consumer protection statute." *Id.*

The Court concludes, based on *Gibbons*, that if faced with the issue today, the Missouri Supreme Court would allow indirect suits under the MMPA when a plaintiff has otherwise made out an MMPA claim. To reach the opposite conclusion would be inconsistent with the Missouri Supreme Court's holding in *Gibbons* that the MMPA "contemplates that other parties, besides the

direct purchasers or contracting party, who suffer damages
resulting from the violator's prohibited conduct under the Act
are included in those eligible to receive restitution." 216
S.W.3d at 668. Further, the reasoning of the Missouri Court of
Appeals in extending *Illinois Brick* to Missouri antitrust claims
does not apply to extending *Illinois Brick* to the MMPA. *See
Duvall*, 998 S.W.2d at 825 (applying *Illinois Brick* doctrine to
Missouri antitrust law). The *Duvall* opinion relied on a federal
harmonization clause in the Missouri antitrust statute. *Id.* at
824 (citing Section 416.141, RSMo 1994). The *Duvall* court
incorporated *Illinois Brick* into Missouri's antitrust law in
order to satisfy the Missouri antitrust statute's requirement of
construction "in harmony with ruling judicial interpretations of
comparable federal antitrust statutes." *Id.* at 824 (citing Mo.
Ann. Stat. § 416.031). The MMPA lacks a federal harmonization
clause. *See* Mo. Ann. Stat. § 407.020; *State ex rel. Nixon v.
Telco Directory Pub.*, 863 S.W.2d 596, 601-02 (Mo. 1993) ("In
1986, the legislature removed any reference to federal law from
[the MMPA], instead granting the attorney general authority to
promulgate rules setting out the exact scope of Missouri's law
and the meaning of the words employed in the Merchandising
Practices Act."). Because the Missouri legislature has expressed
no intent to incorporate federal antitrust standing limits into
the MMPA and the Missouri Supreme Court has expressly allowed
suit by indirect purchasers under the MMPA, the Court finds that

33

IPPs' MMPA suit is not barred under *Illinois Brick* and *AGC*.


2. IPPs' Missouri Allegations Meet the Pleading Standards of *Twombly*

The MMPA prohibits:

[t]he act, use or employment by any person of any
deception, fraud, false pretense, false promise,
misrepresentation, unfair practice or the concealment,
suppression, or omission of any material fact in
connection with the sale or advertisement of any
merchandise in trade or commerce or the solicitation of
any funds for any charitable purpose, as defined in
section 407.453, in or from the state of Missouri, is
declared to be an unlawful practice.

Mo. Ann. Stat. § 407.020. IPPs allege that defendants have

violated the MMPA by engaging in "the act, use, and employment of

deception, false pretense, misrepresentation, unfair practice,

and the concealment, suppression, and omission of material facts

in connection with the offering for sale of merchandise to direct

and indirect purchasers." The Court finds that IPPs have alleged

facts sufficient to state a claim under the MMPA based on unfair

practices. The Missouri Attorney General has defined an "unfair

practice" as:

any practice which ... [o]ffends any public policy as
it has been established by the Constitution, statutes
or common law of this state, or by the Federal Trade
Commission, or its interpretive decisions; or ... [i]s
unethical, oppressive, or unscrupulous; and ...
[p]resents a risk of, or causes, substantial injury to
consumers.

*Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240

(Mo. 2001) (quoting attorney general regulation, 15 CSR 60-8.02). For the reasons discussed in the DPP Order and Reasons, incorporated herein, IPPs have plausibly alleged antitrust violations based on defendants' engaging in anticompetitive agreements to exclude Pool's rivals and Pool's attempted monopolization, which led to increased costs and reduced output of Pool Products in the relevant national market.[49] Antitrust violations are deemed unfair methods of competition under the FTC Act. *See* 15 U.S.C.A. § 45(a)(1); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 454-55. IPPs allegations of antitrust violations are therefore sufficient to make out a claim of unfair practices under the MMPA. *See Ports Petroleum*, 37 S.W.3d at 240 (Mo. 2001) (affirming that the MMPA is "all-encompassing and exceedingly broad").

Nevertheless, the IPPs' MMPA claim is limited to one based on unfair practices. Rule 9(b) applies to IPP's allegations that defendants violated the MMPA by engaging in "the act, use, and employment of deception, false pretense, misrepresentation, ... and the concealment, suppression, and omission of material facts." *See Griggs v. Credit Solutions of Am., Inc.*,

---

[49] R. Doc. 221 at 10-72. Although IPPs have alleged antitrust violations in a relevant national geographic market, their MMPA claims are dismissed to the extent they rely on antitrust violations with Missouri as the relevant market because their complaint lacks any factual allegations that would allow the Court to draw a reasonable inference that Missouri represents a relevant geographic submarket or market.

310-CV-1291-D, 2010 WL 2976209 at *3 (N.D. Tex. July 28, 2010)
(heightened pleading standard of Rule 9(b) applies to MMPA claims
sounding in fraud or mistake). Under Rule 9(b), plaintiffs "must
provide some representative examples of [defendant]'s alleged
fraudulent conduct, specifying the time, place, and content of
its acts and the identity of the actors." *Id.* IPPs fail to
provide anything but conclusory allegations that defendants
engaged in deception or misrepresentation, and to the contrary,
the IPP complaint indicates that defendant's illegal agreements
were not kept secret.[50] For that reason, IPPs' claim that
defendants violated the MMPA by engaging in "deception, false
pretense, misrepresentation, ... and the concealment,
suppression, and omission," is dismissed. IPP's surviving MMPA
claim is limited to their allegations that defendants engaged in
unfair practices.


*E. Statute of Limitations*

    Defendants attack IPPs allegations that the state statutes
of limitations have been tolled by the doctrine of fraudulent
concealment. Like the Sherman Act, California and Arizona law
limit antitrust claims to those based on actions within four
years of filing. Cal Bus. & Prod. Code § 17208;  Ariz. Rev. Stat.
§ 44-1410. For the reasons discussed in the DPP Order and

---

    [50] *See* R. Doc. 149 at 25-27.

Reasons, plaintiffs' allegations are woefully inadequate to plead fraudulent concealment.[51] Allegations of fraudulent concealment are subject to Rule 9(b). *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) ("Under Rule 9(b)'s heightened pleading standard, allegations of ... fraudulent concealment for tolling purposes, must be pleaded with particularity"). Plaintiffs have not alleged with particularity any acts of concealment that would allow tolling based on fraudulent concealment. Thus, under California and Arizona antitrust laws, the statute of limitations bars claims for overcharges outside of the four-year period.

Regarding IPPs' claims under the Florida Deceptive and Unfair Trade Practices Act and the Missouri Merchandising Practices Act, no party has briefed what statute of limitations applies. While the Court rules that IPPs have not alleged fraudulent concealment, it makes no determination about the applicable statutes of limitations on these claims. Accordingly, to the extent that IPPs eventually prove their claims, they are limited to recovering damages occurring in the statutory period provided by state law.

**V. Conclusion**

For the reasons above, the Court denies the motion to dismiss IPPs' state law claims except that the Court dismisses

---

[51] R. Doc. 221 at 73-78.

37

IPPs' California Unfair Competition Law, Florida Deceptive and
Unfair Trade Practices Act, and Missouri Merchandising Practices
Act claims that are based on the theory that defendants engaged
in fraud or misrepresentation. The Court also dismisses IPPs'
claim that defendants fraudulently concealed their illegal
conduct.

New Orleans, Louisiana, this __24th__ day of May, 2013

_____

**SARAH S. VANCE**

**UNITED STATES DISTRICT JUDGE**

38