UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  POOL PRODUCTS DISTRIBUTION MARKET ANTITRUST LITIGATION | ) ) ) MDL DOCKET NO. 2328 |
| | ) |
| This document relates to: | ) SECTION:  R(2) |
| | ) |
| ALL DIRECT PURCHASER CASES | ) CHIEF JUDGE VANCE |
| | ) |
| | ) MAG. JUDGE WILKINSON |
| | ) |
| | ) **JURY TRIAL DEMANDED** |

**DIRECT PURCHASER PLAINTIFFS'**
**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page

I.  SUMMARY OF THE CASE ........................................................................................... 1

II.  JURISDICTION AND VENUE ..................................................................................... 3

III.  THE PRODUCTS ........................................................................................................... 4

IV.  THE PARTIES ............................................................................................................... 4

    A.  Plaintiffs .............................................................................................................. 4

    B.  Defendants and their Products .......................................................................... 5

        i.  PoolCorp ................................................................................................. 5

        ii.  The Manufacturer Defendants .............................................................. 6

V.  INTERSTATE TRADE AND COMMERCE ................................................................ 7

VI.  FACTUAL BACKGROUND ......................................................................................... 7

    A.  Distribution of Pool Products ............................................................................ 7

    B.  PoolCorp Is The Largest Distributor of Pool Products in the U.S. ...................... 10

    C.  PoolCorp Eliminated Competition by Acquiring Rivals ...................................... 12

    D.  PoolCorp's Preferred Vendor Program ............................................................. 15

    E.  Defendants' Conspiratorial Conduct .................................................................. 18

        (i)  PoolCorp and the Manurfacturer Defendants Agreed To Inflate Prices Which Protected PoolCorp's Prices, Margins and Market Share ............................................................................................................. 19

        (ii)  PoolCorp and the Manufacturer Defendants Agreed to Restrict Buying Groups ...................................................................................... 21

        (iii)  PoolCorp and the Manufacturer Defendants agreed to Foreclose PoolCorp's Rivals .................................................................................. 25

        (iv)  Other Anticompetitive Agreements and Conduct of PoolCorp and the Manufacturer Defendants ................................................................. 32

VII.  ANTICOMPETITIVE EFFECTS .................................................................................. 37

VIII.  THE RELEVANT MARKET ......................................................................................... 39

IX.    DAMAGES..................................................................................................... 39

X.     CLASS ACTION ALLEGATIONS ............................................................... 40

XI.    FRAUDULENT CONCEALMENT.................................................................. 42

FIRST CLAIM
       Conspiracy by All Defendants to Restrain Trade in Violation of Section 1 of the
       Sherman Act, 15 U.S.C. §1................................................................................ 44

SECOND CLAIM
       Attempted Monopolization by PoolCorp in Violation of Section 2 of the Sherman
       Act, 15 U.S.C. §2............................................................................................. 46

XII.   RELIEF SOUGHT.......................................................................................... 47

XIII.  JURY DEMAND............................................................................................. 49

Direct Purchaser Plaintiffs ("Plaintiffs"), individually and on behalf of a class of all those similarly situated, bring this action for damages and equitable relief under the antitrust laws of the United States against Defendants, and for their Second Consolidated Amended Complaint ("SCAC") allege, based on personal knowledge of their own acts and on information and belief as to the acts of others, as follows[1]:

## I.      SUMMARY OF THE CASE

1.      This action arises from the unlawful conduct of PoolCorp and the Manufacturer Defendants (Hayward Industries, Inc., Pentair Water Pool and Spa, Inc. and Zodiac Pool Systems, Inc.) which affected the market for wholesale distribution of residential and commercial swimming pool products in the United States (the "Pool Products Distribution Market").[2]

2.      As set forth hereafter, PoolCorp used its market power to enter into a conspiracy with the Manufacturer Defendants which protected PoolCorp's market share and margins and the prices that PoolCorp charged to its customers.  Indeed, because of this conspiracy, during the Great Recession of 2008 and thereafter, PoolCorp was able to increase its market share and margins and to maintain its prices at supra-competitive levels at a time of significantly decreased demand.

3.      Among other things, PoolCorp pressured the Manufacturer Defendants to raise prices to PoolCorp competitors and to discourage dealers (who otherwise would have been

---

[1] Plaintiffs are filing this Second Consolidated Amended Complaint pursuant to and consistent with the Court's Order and Reasons filed on April 11, 2013 (Dkt. No. 221) determining Defendants' motion to dismiss and without waiving any of Plaintiffs' rights respecting review of that Order.  In addition, by refraining from repleading any factual matter, Plaintiffs do not concede that those prior allegations either when previously filed or now lacked a basis.  Plaintiffs reserve their rights as to such allegations.

[2] As set forth below, "PoolCorp" refers to defendant Pool Corporation and its subsidiaries. *See* ¶¶ 19-24.  Other capitalized terms are defined at various points in the SCAC (e.g. ¶5 for the definition of "Manufacturer Defendants").

PoolCorp customers) from making purchases through buying groups, which were formed to avoid PoolCorp's monopoly prices.  As part of the conspiracy, the Manufacturer Defendants communicated directly with each other and also with PoolCorp.  As a result, each Manufacturer Defendant knew that PoolCorp was soliciting agreements from the others.  For example, in 2007 and 2008 PoolCorp conspired with the Manufacturers Defendants so that they would to increase from $10,000 to $20,000 the dollar amount of an order to qualify for "free freight."  This agreement was achieved by direct communications among the Manufacturer Defendants and among PoolCorp and the Manufacturer Defendants.  This increase insulated PoolCorp's pricing, margins, profits and market share, because PoolCorp was able to place orders of $20,000, while many of its rivals could not.

4.     PoolCorp was focused on maintaining and gaining market share and maintaining its margins and prices.  In addition to fixing prices as set forth hereafter, PoolCorp also aggressively acquired competitors in order to gain market share and to raise prices at the distribution level.  PoolCorp also communicated with competitors concerning pricing to customers to inhibit price competition and conspired with the Manufacturer Defendants to eliminate PoolCorp's competitors that were cutting price in order to gain market share.

5.     As part of a deliberate strategy to unlawfully restrain trade and to attempt to monopolize, PoolCorp, among other things: (1) acquired numerous competitors throughout the United States, thereby establishing itself as the only Pool Products distributor able to offer national coverage; (2) foreclosed actual and potential competitors by threatening to refuse to deal with Pool Products manufacturers if they sold to the new distributors or to distributors that sought to obtain market share by cutting prices; and (3) engaged in a conspiracy with the Manufacturer Defendants and committed other anticompetitive acts that artificially inflated the prices of Pool Products at the distribution level throughout the United States.  With the

2

collaboration and agreement of the only full-line Pool Products manufacturers, Hayward

Industries, Inc. ("Haywood"), Pentair Water Pool and Spa, Inc. ("Pentair"), and Zodiac Pool

Systems, Inc. (also known as Jandy) ("Zodiac") (collectively, "the Manufacturer Defendants"),

PoolCorp eliminated various existing distribution competitors, and prevented other would-be

rivals and alternative channels of distribution from obtaining the products necessary to compete

at a competitive price, blocking them from penetrating the market and raising their costs to

obtain Pool Products.  Defendants' unlawful conduct resulted in higher prices, reduced output,

and reduced customer choice for Pool Products sold to Plaintiffs and the members of the Class.

6.     The anticompetitive conduct by PoolCorp and the Manufacturer Defendants has

caused antitrust injury common to the Plaintiffs and to the members of the Class.

## II.     JURISDICTION AND VENUE

7.     The claims set forth in this Complaint arise under Sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1, 2.  Plaintiffs seek treble damages and equitable relief pursuant to

Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

8.     This Court has jurisdiction pursuant to Sections 4 and 12 of the Clayton Act, 15

U.S.C. §§ 15(a) and 22, and pursuant to 28 U.S.C. §§ 1331 and 1337.

9.     Personal jurisdiction over each Defendant is proper in this District pursuant to

Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because each Defendant resides, is

found, transacts business, or has an agent in this District.

10.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton

Act, 15 U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. § 1391(b) and (c).  Defendants are located in,

licensed to do business in or do business in this District, and a substantial part of the events or

occurrences giving rise to the claims alleged occurred in this District.

### III.    THE PRODUCTS

11.    As used in this SCAC, "Pool Products" are the equipment, products, parts or materials used for the construction, renovation, maintenance, repair or service of residential and commercial swimming pools.  Pool Products include, among other goods, pumps, filters, heaters, cleaners, covers, drains, fittings, diving boards, steps, rails, pool liners, pool walls, chemicals, cleaning tools, and "white goods" (the parts necessary to maintain pool equipment).  Pool Products do not include pool toys or games, generic building materials, or products used solely for landscaping or irrigation, Olympic-style pools, or pools used in commercial water parks.

### IV.    THE PARTIES

#### A.    Plaintiffs

12.    Plaintiff Aqua Clear Pools & Decks ("Aqua Clear") is a North Carolina corporation with its principal place of business in Midland, North Carolina.  During the Class Period, Aqua Clear purchased Pool Products directly from PoolCorp.

13.    Plaintiff A Plus Pools Corp. ("A Plus") is a Florida corporation with its principal place of business in Pompano Beach, FL.  During the Class Period, A Plus purchased Pool Products directly from PoolCorp.

14.    Plaintiff Liquid Art Enterprises d/b/a Carl Boucher – The Pool PhD ("Liquid Art") is a California corporation with its principal place of business in Encinitas, California. During the Class Period, Liquid Art purchased Pool Products directly from PoolCorp.

15.    Plaintiff Oasis Pool Service, Inc. ("Oasis") is a Louisiana corporation with its principal place of business in Caddo Parish, Louisiana.  During the Class Period, Oasis purchased Pool Products directly from PoolCorp.

16.     Plaintiff Pro Pool Services ("Pro Pool") is an Illinois sole proprietorship with its principal place of business in Wonder Lake, Illinois.  During the Class Period, Pro Pool purchased Pool Products directly from PoolCorp.

17.     Plaintiff SPS Services, LLC d/b/a Premier Pools & Spas ("SPS Services") is a Louisiana company with its principal place of business in Mandeville, Louisiana.  During the Class Period, SPS Services purchased Pool Products directly from PoolCorp.

18.     Plaintiff Thatcher Pools, Inc. ("Thatcher") is a Minnesota corporation with its principal place of business in Rochester, MN.  During the Class Period, Thatcher purchased Pool Products directly from PoolCorp.

### B.     Defendants and their Products

#### i.     PoolCorp

19.     Defendant Pool Corporation is a Delaware corporation with its principal place of business in Covington, Louisiana.

20.     Defendant SCP Distributors LLC ("SCP"), formerly known as South Central Pools, is a Delaware corporation with its principal place of business in Covington, Louisiana.

21.     Defendant Superior Pool Products LLC ("Superior") is a Delaware corporation with its principal place of business in Anaheim, California.

22.     SCP is a wholly owned subsidiary of Defendant Pool Corporation, and Superior is a wholly owned subsidiary of SCP.

23.     Pool Corporation distributes Pool Products through SCP and Superior.  Both SCP and Superior operate throughout the United States and distribute similar lines of Pool Products.

24.     Other members of the Pool Corporation corporate family include Splash Holdings, Inc.; Alliance Trading, Inc.; Superior Commerce, LLC; SCP International, Inc.; Pool Development LLC; Horizon Distributors, Inc.; POOLCORP Financial, Inc.; POOLCORP

Financial Mortgage LLC; Poolfx Supply LLC; and Cypress, Inc.  These other members, together with Pool Corporation, SCP and Superior are referred to collectively as "PoolCorp."

### ii.    The Manufacturer Defendants

25.    Defendant Hayward Industries, Inc. ("Hayward") is a New Jersey corporation with its principal place of business in Elizabeth, New Jersey.  Hayward is the largest manufacturer of residential swimming pool equipment in the world, according to its website.[3] Hayward sells its products throughout the United States to support "millions of satisfied pool owners who use Hayward equipment."[4]

26.    Defendant Pentair Water Pool and Spa, Inc. ("Pentair") is a Delaware corporation with its principal place of business in Sanford, North Carolina.  Pentair asserts that it "is the world's leading manufacturer of pool and spa equipment and accessories,"[5] and "the global leader in swimming pool, spa and aquatic equipment."[6]  According to Pentair's website, "[w]e built our company so the pool professional and, by extension, the pool owner can secure all the best products from a single source."[7]

27.    Defendant Zodiac Pool Systems, Inc. ("Zodiac") is a Delaware corporation with its principal place of business in Vista, California.  According to Zodiac's website, "Zodiac is a leading global manufacturer of differentiated pool and spa products."[8]  Zodiac asserts that it is

---

[3] *About Us*, HAYWARDINDUSTRIES.COM, http://www.haywardindustries.com/webapp/wcs/stores/servlet/HaywardIndustriesInfo_10201_10054_-1_about-us (visited June 29, 2012).

[4] *Id.*

[5] *About Us*, PENTAIRPOOL.COM, http://www.pentairpool.com/pool-pro/about-us/ (visited June 29, 2012).

[6] PENTAIR, http://www.pentairpool.com/index.htm (last visited June 29, 2012).

[7] *About Us*, PENTAIRPOOL.COM, http://www.pentairpool.com/pool-pro/about-us/ (visited June 29, 2012).

[8] *About*, ZODIACPOOLSYSTEMS.COM, http://www.zodiacpoolsystems.com/About.aspx (visited June 29, 2012).

"the provider of choice for millions of people worldwide."[9]  Zodiac sells Pool Products under the brand names "Zodiac," "Jandy" and "Polaris."[10]

28.   Hayward, Pentair, and Zodiac – the "Manufacturer Defendants" – are the three largest manufacturers of Pool Products in the United States.  They are the only U.S. manufacturers that each sell nearly all the Pool Products necessary to install, operate, and maintain a pool.  They are also three of the largest suppliers to PoolCorp.

## V.   INTERSTATE TRADE AND COMMERCE

29.   Throughout the Class Period, the Manufacturer Defendants and PoolCorp manufactured, sold and shipped substantial quantities of Pool Products in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including within this District.  Defendants' unlawful activities that are the subject of this SCAC were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

## VI.   FACTUAL BACKGROUND

### A.   Distribution of Pool Products

30.   There are over nine million residential pools in the United States, and over 250,000 commercial pools operated by hotels, country clubs, apartment buildings, municipalities, and others.  In 2010, the distribution of Pool Products was an estimated $3 billion industry in the United States.

31.   Pool distributors, such as PoolCorp, purchase Pool Products from manufacturers, warehouse them, and then resell those Products to pool builders, pool retail stores and pool service and repair companies (collectively, "Pool Dealers" or "Dealers").  Pool Dealers then sell

---

[9] *Id.*

[10] In 2004 Zodiac S.A. acquired Polaris Pool Systems, Inc. and in 2007 the combined Zodiac/Polaris entity merged with Jandy Pool Products, Inc., with the surviving entity being renamed Zodiac Pool Systems, Inc.

the Pool Products to the ultimate consumer: owners of residential and commercial pools.  Each Plaintiff and member of the Class is a Pool Dealer.

32.    Manufacturers of Pool Products consider wholesale distributors to be a unique and essential channel for the efficient distribution of their Products.  Because a product manufacturer would incur added distribution expenses to bypass a wholesale distribution network and access Pool Dealers and other customers, the wholesale distribution network is the most efficient way for manufacturers to reach customers.

33.    Distributors purchase and warehouse significant volumes of Pool Products throughout the year, allowing manufacturers to operate their factories year-round notwithstanding the seasonal nature of the pool industry.  Distributors also provide one-stop shopping, timely delivery, and the extension of credit to thousands of Dealers, thereby providing Dealers and manufacturers with significant transactional efficiencies.  Additionally, distributors often help manufacturers administer their Dealer rebate and warranty programs, and provide answers to the Dealers' product-related questions.  By displaying the Pool Products of particular manufacturers, distributors are also able to afford manufacturers product visibility and help to create and maintain brand recognition among industry participants generally.

34.    Manufacturers cannot easily expand their operations into direct distribution because of the costs, their lack of expertise in distribution, and the difficulty of obtaining products to distribute from competing manufacturers.  Thus, distributors are the primary source of Pool Products for the vast majority of Dealers, which tend to be small operations that lack the resources and customer base to purchase Pool Products in volume directly from manufacturers.

35.    Some Dealers, in an attempt to obtain more favorable pricing and to avoid PoolCorp's monopoly pricing, joined buying groups, trying to leverage their collective volume of purchases to negotiate directly with manufacturers of Pool Products, thus bypassing PoolCorp.

8

Some of these buying groups were nationwide in scope.  However, as set forth below, because of PoolCorp's pressure, the Manufacturer Defendants conspired with PoolCorp to raise prices to, impose disadvantageous terms upon, and otherwise limit the ability of buying groups to become a viable alternative source of distribution for Dealers.

36.     While distributors generally endeavor to carry a wide-range of brands of Pool Products to satisfy orders from their Dealer customers, the Pool Products of the Manufacturer Defendants are "must have" inputs for distributors because of the volume of Pool Products that they represent, the breadth of their product offerings, and the considerable consumer demand for their Pool Products that Dealers strive to satisfy.  To compete effectively as a distributor,  it is essential to sell the Pool Products of at least one of the Manufacturer Defendants.  A positive relationship with these manufacturers is critical to the success of a Pool Products distributor.

37.     The nature of the industry places high value on distributors that can provide the broadest range of Pool Products, representing as many manufacturers as possible, as quickly and conveniently as possible.  Among those purchasing Pool Products are pool builders, renovators, repairers, and servicers.  These purchasers need products on a timely basis to get a job done as quickly as possible for their own residential and commercial customers.  Distributors that do not consistently have specific products available, made by specific manufacturers, especially the Manufacturer Defendants, may not be viewed as reliable sources from which to purchase.

38.     In a free and competitive market, manufacturers would be willing to sell their Pool Products through any credit-worthy distributor that has a physical warehouse and personnel with knowledge of the pool industry, as distribution services are a relatively homogenous offering.  Absent collective, action, it would be in the Manufacturer Defendants' individual business self-interest to have two or more distributors selling their Pool Products to ensure that their Dealer customers receive competitive service and prices.

9

**B.      PoolCorp Is The Largest Distributor of Pool Products in the U.S.**

39.      PoolCorp is "the world's largest wholesale distributor of swimming pool supplies, equipment and related leisure products,"[11] selling to roughly 80,000 customers, such as Plaintiffs and the members of the Class.  Moreover, unlike other distributors that operate in a few local markets or a specific region, PoolCorp is "the only truly national wholesale distributor focused on the swimming pool industry in the United States."[12]  PoolCorp has a dominant position in the distribution of Pool Products sold to Pool Dealers and its market share has grown significantly. In 2009 Pool Corp's market share of the United States Pool Products Distribution Market was 38.4%, which was an increase of 2.7% above its 2008 market share, even as the country experienced the effects of the Great Recession.  In 2011 and 2012, PoolCorp had, respectively, roughly $1.8 billion and $2.0 billion in net sales revenue.

40.      PoolCorp prices its products on a centralized basis and monitors and controls its pricing from its headquarters.  PoolCorp sells to its largest customers, known as "National Accounts," with standardized pricing on quoted products.  PoolCorp's pricing system, known as "Prelude," is used by all PoolCorp branches and sales centers.  PoolCorp uses the Prelude system to monitor and direct pricing to its customers throughout the United States from its headquarters and to track the destination of product Stock-Keeping-Units or SKUs.  Manny Perez, PoolCorp's President and Chief Executive Officer, and John Murphy, a PoolCorp executive, regularly sent pricing emails to all PoolCorp General and Senior Managers throughout the United States directing them to increase margins on Pool Products.  Perez specifically instructed PoolCorp's sales force to eliminate sales of Pool Products at low margins (e.g. less then 10% above cost before rebates), and reviewed reports showing compliance levels with his direction down to the

---

[11] Pool Corporation, 2012 Annual Report (Form 10-K) at 1.

[12] *Id.* at 6.

10

individual branch level.  PoolCorp strove to achieve margins of 20% or more above gross cost on its sales of PoolProducts.

41.     Through a series of acquisitions, set forth below, PoolCorp has grown its market share and currently operates approximately 280 distribution and sales centers throughout the United States.  By way of comparison, the next largest U.S. distributor operates fewer than 40 centers throughout the United States.

42.     PoolCorp's dominance was enhanced by its status as the largest nationwide buyer of Pool Products, representing a large percentage of a manufacturer's sales, and as the only Pool Products distributor with national reach.  If PoolCorp ceased to handle a manufacturer's products, that manufacturer could not shift its business to a single substitute distributor, but would need, instead, to try to identify and sell to a number of suitable substitutes.  For such a manufacturer to achieve efficient and timely substitute distribution in many parts of the country would be challenging and problematic, if not unfeasible altogether.  Without spending tens of millions of dollars to enter dozens of geographic areas simultaneously, it is virtually impossible for any new potential Pool Products distributor to offer an economic incentive to manufacturers that could compete with the nationwide purchasing and distribution power that PoolCorp can provide.  Loss of sales to PoolCorp could have significant adverse financial consequences for even the largest manufacturers of Pool Products.  Thus, PoolCorp has significant ability to obtain adherence by suppliers to its demands, including agreements with the Manufacturer Defendants.

43.     Beginning in the 1990s, PoolCorp engaged in a multi-pronged strategy of anticompetitive conduct to restrain trade and attempt to monopolize distribution in the Pool Products industry.  It reduced existing competition by purchasing distributors whom it perceived as actual or potential threats.  It also conspired with the Manufacturer Defendants to artificially inflate prices at the distribution level and to reduce actual and potential competition from

existing rivals and new entrants through agreements with Pool Products suppliers, including the Manufacturer Defendants.  PoolCorp conditioned access to its distribution network on promises by manufacturers to cooperate with Pool Corp in protecting PoolCorp's pricing, margins and market share and to agree not to supply PoolCorp's rivals that cut prices to gain customers. These agreements were designed to cut off supplies to actual and potential distribution rivals. And PoolCorp conspired with the Manufacturer Defendants to have them inflate the costs of PoolCorp's rivals, which enabled PoolCorp to inflate the prices paid by Plaintiffs and members of the Class.  PoolCorp's competitors and potential competitors had their costs increase or were either acquired or foreclosed from becoming viable rivals.

44.     Defendants' conduct was intended to enable, and has enabled, PoolCorp to unlawfully attempt to acquire, maintain and exercise monopoly power in the Pool Products Distribution Market, and to increase prices paid by Plaintiffs and members of the Class.  The foreclosure of PoolCorp's rivals represents a significant barrier to entry in the Pool Products Distribution Market.  Defendants' conduct has restrained competition and caused injury to Plaintiffs and members of the Class.

### C.     PoolCorp Eliminated Competition by Acquiring Rivals

45.     Since 1995, PoolCorp has acquired numerous competitors:

•     In November 1995, PoolCorp acquired Allied Pool & Spa, and Pool Mart of Nevada, leading distributors of Pool Products in Arizona and Nevada.

•     In July 1996, PoolCorp acquired 39 service centers in 12 states from Great Lakes Chemical Corp's Biolab Inc. unit, a Pool Products distributor known as BLN.  At the time of the acquisition, PoolCorp stated that the transaction "would expand the Company's presence in the Florida, California and Arizona markets."[13]

•     In November 1997, PoolCorp acquired the assets of Bicknell Huston Distributors, Inc., a distributor of Pool Products with eleven service centers in six states in the Northeast.

---

[13] SCP Pool Corporation's 1996 Quarterly Report (Form 10-Q) (filed August 7, 1997) at 6.

- In February 1998, PoolCorp acquired certain assets of Valve Engineering Acquisition Company, a privately-owned distributor of Pool Products located in Glendale, California. At the time of the acquisition, the Chairman of PoolCorp stated that "[t]his transaction offered the opportunity to increase our market penetration in the greater Los Angeles area."[14]

- In January 1999, PoolCorp acquired substantially all of the assets of Benson Pump Company, a privately owned Pool Products supplier with 20 service centers in 14 states.

- In August 2000, PoolCorp acquired substantially all of the assets of Superior Pool Products, Inc., a distributor of Pool Products with a network of 19 service centers in California, Arizona and Nevada. At the time of this acquisition, the President of PoolCorp touted the company's aggressive acquisition strategy, "[t]his transaction extends our established strategy of complementing the Company's ongoing internal growth through the purchase of additional service centers."[15]

- In October 2000 PoolCorp acquired Pool-Rite, Inc. which operated two service centers in Miami-Dade County, Florida.

- In January 2001, PoolCorp acquired substantially all of the assets of Hughes Supply, Inc., a Pool Products company with 31 service centers in the eastern half of the United States. This acquisition allowed PoolCorp to "further penetrate existing markets and enter new markets."

- In August 2002, PoolCorp acquired Fort Wayne Pools, Inc. ("FWP"), a large regional pool distributor with 22 service centers in 16 states. FWP was PoolCorp's then-largest competitor.

- In September 2003, PoolCorp acquired the assets of Litehouse Products' distribution division. Litehouse's primary business was the retail sales of swimming pool and other leisure Products in Ohio, Pennsylvania and Michigan.

- In November 2005, PoolCorp announced the acquisition of the assets of Direct Replacements, Inc., a Marietta, Georgia packaged pool distributor.

- In March 2008, PoolCorp acquired National Pool Tile Group, Inc., a wholesale distributor of pool tile and composite pool finishes with 15 distribution sales centers.

---

[14] SCP Pool Corporation Acquires Additional Service Center; Transaction Expands California Locations to 14, BUSINESS WIRE, Feb. 19, 1998, available at http://www.thefreelibrary.com/SCP+Pool+Corporation+Acquires+Additional+Service+Center%3B+Transaction...-a020313598

[15] *SCP Pool Corporation Acquires 19 Additional Service Centers; Acquisition Expected to Increase Market Penetration*, BUSINESS WIRE, Aug. 1, 2000, *available at* http://findarticles.com/p/articles/mi_m0EIN/is_2000_August_1/ai_63784252/

• In October 2009, PoolCorp announced the acquisition of General Pool & Spa Supply, Inc. ("GPS") a leading regional Pool Products distributor based in Northern California and Arizona that operated 10 sales centers.

46.     In deciding whether to acquire a competitor, PoolCorp considered the target's market position in the areas in which it operated, and the extent to which it competed with PoolCorp.  For example, before approving the acquisition of GPS, PoolCorp's Board of Directors specifically considered that the transaction would "[s]trengthen[] our market leading position by … eliminating our top competitor in these California and Arizona markets…" and would result in the "[e]limination of price competition between GPS and POOL."

47.     In several instances, after acquiring distribution companies, PoolCorp closed or consolidated service centers it acquired that had competed with PoolCorp's service centers, including more than 55 service centers following its acquisitions of BLN, Benson, FWP, and NPT.

48.     Nearly one-third of PoolCorp's cash since the company's inception has been used for these and other competitor acquisitions.  *See* Figure 1.



**Figure 1.  (source: PoolCorp 2012 Annual Report at 2).**

### D.      PoolCorp's Preferred Vendor Program

49.      PoolCorp reinforced its market power through its "Preferred Vendor Program," which it began in 1999.  The Manufacturer Defendants were and are members of the Preferred Vendor Program.  PoolCorp worked with its Preferred Vendors to develop programs and services that not only concentrated on PoolCorp's purchasing activities, but that also promoted the manufacturer's sales to PoolCorp's customers.  Among other things, PoolCorp provided PoolCorp's Preferred Vendors with advertising and marketing programs, and product support generally, in an effort to increase the vendor's brand recognition to purchasers of Pool Products.

50.      Part of the reason that PoolCorp created the program was to encourage PoolCorp's employees to purchase products from a smaller number of vendors.  PoolCorp's employees were encouraged not to purchase from manufacturers who were not in the Preferred Vendor Program.  In turn, PoolCorp conditioned manufacturer participation in its Preferred

Vendor Program on receiving acceptable pricing and rebate commitments from the manufacturer.  The program was also designed to encourage manufacturers to use PoolCorp as their preferred distributor of Pool Products, and to discourage manufacturers from selling directly or through alternate channels of distribution.

51.     PoolCorp selected those manufacturers that participated in the Preferred Vendor Program, and it also had the right to terminate a manufacturer's participation.  In addition to the Manufacturer Defendants, virtually all of the other major Pool Products manufacturers were members of the PoolCorp Preferred Vendor Program.

52.     The Preferred Vendor Program was headed by John Murphy, a PoolCorp executive, who established about a dozen purchasing committees covering various product groups, which became known as "Murphy's committees."  As Murphy stated, one purpose of the Preferred Vendor Program was to "instill more discipline."  PoolCorp achieved this discipline by informing the members of the Preferred Vendor Program, including the Manufacturer Defendants, that they were not to sell Pool Products to its rival distributors if PoolCorp so directed.  A Preferred Vendor's failure to agree to PoolCorp's instruction meant that PoolCorp could punish the manufacturer by reducing or delaying purchases or by dropping it from the Preferred Vendor Program.  PoolCorp similarly used manufacturer Preferred Vendor status to eliminate price competition by rival distributors.  If a rival distributor sold the product of a PoolCorp Preferred Vendor at prices below a price acceptable to PoolCorp, PoolCorp called on the Preferred Vendor to agree to stop the rival's pricing.  Murphy and his group vetted Preferred Vendors so that PoolCorp could control their actions when it sought to do so to disadvantage rival distributors.

53.     Because of PoolCorp's dominant position as the only national distributor of Pool Products, it was essential for product manufacturers to become members of PoolCorp's Preferred

Vendor Program, and to remain in the Program.  Although a vendor could attempt to reach Pool

Dealers and users through direct sales, thus bypassing PoolCorp's distribution network, as noted

earlier, various considerations discouraged manufacturers from engaging in direct distribution.

Furthermore, PoolCorp has used its Preferred Vendor Program to inhibit members of the

Program from making sales to Pool Dealers directly or through buying groups in competition

with PoolCorp.

54.     PoolCorp used its Preferred Vendor Program, together with its power as a

national distributor, to exclude competition from actual and potential distributors seeking to

compete in distributing Pool Products to Plaintiffs and the members of the Class especially if the

rival cut prices to gain customers.  More specifically, when a new distributor attempted to enter a

particular geographic area, or when PoolCorp sought to eliminate an existing distributor,

PoolCorp told manufacturers, including the Manufacturer Defendants, that it would drop them as

a Preferred Vendor and not deal with them if they also supplied Pool Products to the rival.

PoolCorp's threatened refusal to distribute the manufacturer's Pool Products applied to all of

PoolCorp's distribution centers located throughout the United States – not just those centers

covering the geographic area  in which the rival did business or sought to enter.

55.     For a manufacturer, the loss of Preferred Vendor status as well as the loss of

PoolCorp's purchases generally would be economically disadvantageous – and particularly so

for the three Manufacturer Defendants.  No other distributor could replace PoolCorp's large

volume purchases, or offer the national geographic coverage that PoolCorp alone provided.

56.     PoolCorp directed such refusals to deal and increased costs to PoolCorp's rivals.

Its Preferred Vendors – including the Manufacturer Defendants – agreed to implement them.  As

a result, PoolCorp's actual and potential competitors were foreclosed from obtaining the Pool

Products necessary to compete on sales to Plaintiffs and members of the Class, which resulted in

higher Pool Product prices and reduced choices of Pool Products offerings.  Therefore, PoolCorp was able to condition a manufacturer's Preferred Vendor status on the manufacturer's refusal to sell Pool Products to other distributors when PoolCorp called for such action.

57.     PoolCorp's actions occurred throughout the United States.  Due to its national distribution network and Preferred Vendor Program, PoolCorp was able to drive distribution rivals out of business or to significantly impair their ability to compete.

**E.     Defendants' Conspiratorial Conduct**

58.     PoolCorp not only dwarfs its nearest competitors in size, it used its dominance to insulate its margins and prices, and to enhance its attempts to monopolize the market by conspiring with the Manufacturer Defendants to raise prices and by conditioning access to its distribution network on agreements not to supply its distribution rivals – that is, by requiring Pool Products manufacturers, including the Manufacturer Defendants, to agree to exclude PoolCorp's rivals.  Because of PoolCorp's national presence and purchasing clout, Pool Products manufacturers take PoolCorp's demands quite seriously and fear losing business if they do not comply with PoolCorp's wishes and agree to exclude PoolCorp's competitors.

59.     Additionally, PoolCorp used its dominance to instigate the Manufacturer Defendants to conspire with each other to raise the prices of Pool Products to other distributors, effectively protecting PoolCorp's market share, prices and margins and to disadvantage PoolCorp's rivals, which was a horizontal, per se price fix resulting in higher prices at the distributor level.

60.     According to a former Marketing Sales Representative at PoolCorp, many manufacturers believed that if they did not do what PoolCorp demanded, PoolCorp would terminate its purchases from that manufacturer and obtain its Pool Products from competing manufacturers.  Indeed, several manufacturers personally told this Sales Representative that if

they did not accept PoolCorp's pricing or proposed exclusionary arrangements, PoolCorp would

hurt their business by obtaining Pool Products from rival manufacturers.

>    **i.    PoolCorp and the Manufacturer Defendants Agreed to Inflate Prices
>           Which Protected PoolCorp's Prices, Margins and Market Share**

61.     In addition to conspiring with the Manufacturer Defendants to boycott PoolCorp's

rivals and would-be rivals, at the instigation of PoolCorp, the Manufacturer Defendants

communicated directly among themselves and jointly and severally with PoolCorp to raise the

prices of Pool Products to their customers and other rivals of PoolCorp, which disadvantaged

PoolCorp's rivals, and insulated PoolCorp's prices, margins and market share, and artificially

inflated prices at the distribution level, the level at which PoolCorp sold.

62.     An example of such conduct occurred in the autumn of 2007.  Prior to that time

the Manufacturer Defendants provided customers with free freight for orders of $10,000 or more.

PoolCorp complained bitterly to the Manufacturer Defendants that the dollar purchase amount

for free freight should be increased substantially.  In the autumn of 2007, in conjunction with

PoolCorp, all three Manufacturer Defendants entered into an agreement to double the required

dollar purchase amount for an order to qualify for free freight from $10,000 to $20,000.  Due to

PoolCorp's volume of purchases, it could easily obviate the effects of this increase.  However,

the cost of transportation of goods purchased was a significant expense for other Pool Products

distributors, and this was, in effect, a price increase for PoolCorp's rivals. The agreement among

the Manufacturer Defendants and PoolCorp to raise the minimum free freight limit was a per se

violation of the Sherman Act.  The agreement among PoolCorp and the Manufacturer

Defendants enabled PoolCorp to protect its prices, margins, profits and market share.

63.     The Manufacturer Defendants were aware that the others would announce this

increase before any public announcement had been made.  Pentair announced this increase on or

about September 11, 2007.  The next day, September 12, 2007 Hayward announced an identical

increase. Zodiac was facing a weak business environment and wanted to delay its announcement. However, Defendants knew that the agreement would fall apart if Zodiac did not also increase the purchase amount for free freight to $20,000.  In September 2007, shortly after Hayward had announced its increase, Bruce Fisher of Hayward spoke with Bob Rasp, Zodiac's North America CEO, about Zodiac's internal business matters.  Thereafter, on or about December 7, 2007, Zodiac announced its "free freight" increase to $20,000.

64.     However, at least one week earlier, on November 30, 2007, Manny Perez de la Mesa, PoolCorp's CEO, in an e-mail to PoolCorp executives, confirmed that "Pentair, Hayward and Jandy [Zodiac] have all agreed to the $20,000 freight minimum with NO exceptions," and he asked his subordinates to monitor the agreement, stating that he "needs to know if anyone does not comply." PoolCorp continued to monitor the $20,000 free freight agreement.  On June 17, 2008, Manny Perez, wrote to his staff, "Are they (Pentair) enforcing the $20K prepaid freight minimum?"

65.     Defendants' conspiracy was successful. On July 27, 2010, a Pool Product Dealer wrote, "ever since the prepaid freight floor increases we have seen a constant erosion" of the benefits of buying group membership.  The increase in the purchase amount to qualify for free freight disadvantaged PoolCorp's rivals and inflated prices at the wholesale level, including prices charged by PoolCorp.

66.     Moreover, PoolCorp pressured its vendors, including the Manufacturer Defendants, to raise their prices to distributors, because PoolCorp was able to pass on those increases to its customers after adding a markup percentage, thus resulting in increased profits. For example, Bruce Fisher of Hayward sent an email stating that Pentair and Raypak were increasing prices 3% to 6%, that Jandy was increasing by 3%, and that "[t]he range of 3-6% is all

about PoolCorp wanting as much room as possible to raise prices."  At the same time, these

increases inhibited PoolCorp's rivals from cutting prices to compete with PoolCorp.

68.     On numerous occasions when PoolCorp raised its prices, falsely citing to its

customers the manufacturers' price increases as the reason, PoolCorp had reached secret

agreements with manufacturers to delay the increase to PoolCorp or to offset the increase

through secret rebates for a period of time.  As a result, PoolCorp was able to charge its

customers more, even though PoolCorp's costs had not risen, and to tack on a profit margin to

the fictitious cost increase.

<b>(ii)     PoolCorp and the Manufacturer Defendants Agreed to<br>Restrict Buying Groups</b>

68.     As part of if its efforts to maintain its dominant position in the market, PoolCorp

targeted buying groups by pressuring its vendors, included the Manufacturer Defendants, to

make buying group membership less beneficial.  At a meeting with Pentair in April 2004, Manny

Perez told Pentair to provide PoolCorp with prices that were advantageous compared to prices

charged to buying groups.  An April 2006 Pentair internal report explained that PoolCorp

"deeply resent[s] any actions that manufacturers might take to legitimize or support" buying

groups.   In February 2007, Manny Perez instructed John Murphy to speak with the

Manufacturer Defendants and confirm that PoolCorp's purchasing terms were favorable

compared to those of the buying groups.

69.     Although Hayward would have preferred to develop and expand its business with

buying groups, it agreed with PoolCorp and the other Manufacturer Defendants to impose terms

of sales upon buying groups that were more onerous than they otherwise would have been.

70.     In April 2009, Robert Rankin, General Manager of PoolCorp's Southern

California division, wrote an email to all three Manufacturer Defendants, including Dave Murray

of Pentair (V.P. of Sales), George Metkovich of Hayward (West Coast V.P. of Sales), and Bob

21

Rasp of Zodiac (CEO), complaining that PoolCorp was being asked to match prices against buying groups, which made him "cringe."  In that same email, Rankin asked the Manufacturer Defendants why they supported buying groups and stated that PoolCorp should "not have to compete like this."  Rankin demanded that the Manufacturer Defendants eliminate their "free goods programs" from the buying group membership.

71.     Rankin forwarded his email to Manny Perez who responded that "this is a high priority in discussions with the big three equipment manufacturers," and that he and Dave Cook "will continue to work on this . . . ."

72.     PoolCorp also targeted buying groups through its agreement with the Manufacturer Defendants to raise the minimum freight requirements.  PoolCorp intended that, by increasing the cost of doing business through a buying group, dealers would revert to purchasing through PoolCorp.  For example, in a 2007 quarterly report, General Manager Tom Burba explained that the increased freight minimums announced by vendors would help motivate buying group members back to distribution.  Similarly, in February 2009, Kenny St. Romain emailed numerous General Managers explaining that increased freight requirements by the Manufacturer Defendants would drive many buying group members back to distribution.

73.     In late 2009, Pentair imposed onerous terms on members of Carecraft, one of the largest buying groups, in order to participate in its "Early Buy" program.  Typically, "Early Buy" programs allow Pool Products customers to buy goods in advance of the pool-use season, and often ahead of a price increase.  Pentair's terms in 2009 included a $70,000 minimum purchase, as well as the $20,000 minimum purchase for free freight.  On December 9, 2009, Dave Cook of PoolCorp sent an email to all salespeople and General Managers stating:  "Pentair is trying to make it better for us (distribution) to compete with the direct program by raising the freight and qualifying $ for terms.  This opens the door for us to write this business."

22

74.     The Manufacturer Defendants also utilized PoolCorp to enforce agreements among the Manufacturer Defendants, knowing that PoolCorp would do so to ensure high prices at the wholesale level.  For example, on March 20, 2010, Dave Murray of Pentair wrote to Manny Perez of PoolCorp complaining that Hayward and Zodiac were offering higher rebates to buying groups. Manny Perez replied, "You have my commitment that we will do our utmost to ensure that Hayward and Zodiac move in the same direction to support distribution as their preferred channel to market. This is a point of much greater emphasis as part of the updated vendor agreements to qualify as a preferred vendor."

75.     On March 21, 2010, Dave Cook of PoolCorp responded to Manny Perez's email, "you and I need to get the attention of Calvin and Davis/Silber."[16] Perez responded, "Agreed; have a call with Calvin on Thursday and had conversation with Bruce [Fisher of Hayward] last Friday."

76.     On April 18, 2010, Bruce Fisher of Hayward e-mailed Lawrence Silber of Hayward, about the telephone call he received from Manny Perez:

> U.S.: buying groups. He jumped on this subject with both feet. Said he had copies of both the Pentair and Zodiac programs for both Aquatech and Carecraft. Gave me the highlights.  Bottom line: Zodiac is only paying for growth--supposedly there is no longer the automatic 3% for marketing allowance from this competitor. In addition, new members don't count in the growth in year one as this creates a windfall for the buying groups as they recruit new dealers.  With respect to Pentair, they have cut back their program to about 1% of sales at the corporate level and no longer give marketing allowances.  In addition, Pentair has supposedly raised their prices via charges for transaction costs.

77.     In or about June 2010, Dave Cook of PoolCorp met with representatives of Hayward and Zodiac to discuss their pricing terms for buying groups. PoolCorp wanted the Manufacturer Defendants to change their policies to make it even more difficult for buying groups to receive discounts and other incentives and to compete with PoolCorp.

---

[16] Calvin Johnston succeeded Bob Rasp as CEO of Zodiac Pool Systems – Americas. Lawrence Silber was Hayward's COO, and Robert Davis was Hayward's President and CEO.

78.     Dave Cook of PoolCorp subsequently met with Dave Murray of Pentair on or about July 13, 2010 at the Grand Hyatt Hotel in Dallas to discuss the same agenda from his meeting with Hayward and Zodiac.  Cook admitted to Murray that it was the same agenda he used for the meeting with Hayward and Zodiac.

79.     One of the topics discussed at the meeting was the impending changes to the 2011 buying group programs.  Dave Murray of Pentair had written an email to his colleagues on June 24, 2010 stating that with respect to the change of programs to the buying groups, "we need to have a long discussion about immediate support from PoolCorp."

80.     In July 2010, following the meeting with PoolCorp, Pentair announced major changes to the terms and conditions on which it would deal with buying groups, effective October 1, 2010, making it more expensive for their purchases and further insulating PoolCorp from competition.  The changes included a minimum annual purchase amount for members of the buying groups.

81.     On August 21, 2010, Pentair, Hayward and Zodiac attended a PoolCorp Senior Management Meeting, where they discussed price increases, among other things.

82.     Following that meeting, on August 25, 2010, Zodiac announced changes to its buying group programs. The main reason for Zodiac's policy changes was "to discourage anyone buying less than $10,000 a year from buying through the groups, and divert them to a distributor."

83.     Hayward also announced changes to its buying group programs effective October 1, 2010. Among other things, Hayward also implemented a $10,000 minimum purchase for customers.

84.     The Manufacturer Defendants policed each other and reported any policy violations to PoolCorp. PoolCorp in turn policed the Manufacturer Defendants to make sure they

were enforcing their policies.  As a result of the conspiracy, PoolCorp was insulated from

competition and was able to artificially inflate its margins and the prices it charged to its

customers.

> **(iii)** **PoolCorp and the Manufacturer Defendants agreed To Foreclose PoolCorp's Rivals**

85.     PoolCorp conspired with the Manufacturer Defendants to protect PoolCorp's

margins, prices and market share.  Through various agreements with manufacturers, including

the Manufacturer Defendants, and other conduct, PoolCorp has foreclosed competition by

existing distributors and would-be new entrants by preventing or restricting these actual and

potential rivals from purchasing Pool Products directly from manufacturers, especially where the

rival tried to gain market share by cutting prices.  For example, when a distributor attempted to

enter a particular geographic area, PoolCorp told manufacturers that it would not deal with them

or would otherwise punish them if they also supplied Pool Products to the new entrant.

PoolCorp's threatened reduction in purchases or refusal to distribute the manufacturer's Pool

Products applied to *all* of PoolCorp distribution centers located throughout the United States –

not just those centers covering the geographic area that the new entrant sought to serve.

86.     The agreement among PoolCorp and the Manufacturer Defendants is a *per se*

violation of Section 1 of the Sherman Act.  Each Manufacturer Defendant knew that it was not in

its self-interest to refuse to deal with a PoolCorp rival or disadvantage that rival unless the other

Manufacturers Defendants also did so.  If any individual Manufacturer Defendant alone refused

to deal, the rival could shift its business to those that were willing to fill its orders.

Moreover,each Manufacturer Defendant knew that when PoolCorp solicited it to not sell to or to

disadvantage a PoolCorp rival, Pool Corp was also soliciting the other Manufacturer Defendants

to do the same, and that joint action was required to be successful.  Therefore, the Manufacturer

Defendants agreed among themselves to not sell to and to disadvantage PoolCorp rivals.  The following sets forth some examples of this conduct.

87.     In early 2003, Hilton Distribution opened in Baton Rouge, Louisiana.  The owners of Hilton previously had operated as a Pool Dealer, which purchased Pool Products from PoolCorp.  After opening at the distribution level, however, Hilton repeatedly had difficulty securing suppliers and having its orders filled on a consistent basis.  By agreement with PoolCorp, the Manufacturer Defendants and other Pool Products manufacturers refused to sell to Hilton the supplies it needed.

88.     Shortly after Hilton opened in the spring of 2003, PoolCorp executives visited Hilton's facilities and were shown around.  Among the products on site observed by PoolCorp executives were a line of custom-molded plastics for pool use, which the manufacturer also sold to PoolCorp.  Soon after PoolCorp visited Hilton, the product manufacturer told Hilton that it could not sell to Hilton.  In yet another instance, a California company that manufactured pool brushes and vacuum hoses told Hilton that PoolCorp had promised a large order if the company refrained from filling an order from Hilton.  At the time, PoolCorp did not even purchase from the California company.

89.     Hilton's owner learned from various manufacturers that Kenneth G. St. Romain, PoolCorp's Group Vice President, and Tom Canaday, General Manager for PoolCorp's Central Division, had contacted manufacturers, including the Manufacturer Defendants.  If those manufacturers failed to comply with PoolCorp's warnings, PoolCorp told them that it would terminate its purchases and sales of their Pool Products.  Hilton tried but was unable to obtain Pool Products from Hayward and Pentair.  Dan Porter of Pentair specifically told Hilton that Pentair could not sell to it because of PoolCorp.  The Manufacturer Defendants agreed with PoolCorp and with each other not to sell to Hilton. Hilton's owner contacted PoolCorp

representatives to complain, who responded that it was just business.  In addition, other manufacturers Hydra, Jacuzzi and Raypak told Hilton that they could not sell to him because of pressure from PoolCorp.

90.    PoolCorp similarly used its exclusionary agreements with members of its Preferred Vendor Program to harm another distributor of Pool Products in the Midwest.    In or around March 2009, BT2, a new Midwest distributor, announced its intention to enter the market.  BT2's pricing to dealers was viewed by PoolCorp as "extremely aggressive," and as low as 15-20% below market.  By May 2009, it had secured one of PoolCorp's largest customers.  PoolCorp employees followed closely BT2's attempts to gain access to vendors, including a chemical manufacturer named Haviland.  In September 2009,  Ted Sylvester, a PoolCorp Regional Manager, reported that he received information that BT2 was working with Haviland on a line of chemicals.  In December 2009, Bill Shuherk of BT2 called Sylvester to complain that vendors had told Shuherk that PoolCorp had threatened them that "if you sell to Shuherk you can kiss our business good buy (sic)," and mentioned "Dave O'Brian from Haviland and Allan Schwartz from Spa Naturally."  Sylvester reported: "I felt like he was trying to bait me into telling him what we have said to vendors like Haviland so I did not confirm to him that we even have an exclusive arrangement with regard to ProTeam."

91.    Another new entrant into the distribution market, Alpha 3 was also the victim of PoolCorp's exclusionary arrangements with suppliers.  In mid-2006, Alpha 3 entered the market as an in-ground pool kit manufacturer and sold products that competed with those sold by PoolCorp.  Alpha 3's prices were reported by a PoolCorp Regional Manager to be "alarming" and "difficult to compete with profitably."  In or around January 2008, Bill Cook, General Manager for PoolCorp's then North Division, indicated that Alpha 3 was going to enter the distribution market.  On November 21, 2008, Bill Cook told Dave Cook, a PoolCorp Vice

President, that Alpha 3 had approached vendors, including Pentair and Champion Chemicals, but was "shut out."  Bill Cook wrote "[m]y intention is just to alert your radar in the event we need to put pressure on key vendors."  Dave Cook replied "Alpha 3 has approached vendors and they have all said no."  PoolCorp's Preferred Vendors told Alpha 3 that they could not sell to Alpha 3 because of PoolCorp's restrictions.  Among others, Carlo Buffa, Jack Mayer and Bruce Fisher of Hayward, Vincent Gillette of Zodiac, and Dave Murphy, Bill Whitehurst and Gary Golden of Pentair, all refused to sell products to Alpha 3 pursuant to the Manufacturer Defendants' agreements.  Each Manufacturer Defendant knew that PoolCorp was soliciting the other Manufacturer Defendants not to sell to Alpha 3 and that all were refusing to sell to it.

92.     In 2009, Alpha 3 attempted to purchase products through Carecraft, a buying group based in California.  Alpha 3 received an email from Greg Howard, a Carecraft executive, stating that before agreeing to Alpha 3's request, he first needed to check with Dave Cook of PoolCorp.

93.     Similarly, around April 2008, Hayward approached PoolCorp to question why PoolCorp had decreased its purchases from Hayward.  According to a report to Mike Massa, Hayward's V.P. of Sales, Jeff Hughes, a District Sales Manager, was informed by Nofie Alonso, PoolCorp's Regional Manager of its Central Division, that the reduction was because Hayward continued to sell to Shoreline Distributors, a distributor of Pool Products in Jackson, Mississippi.  As a result, approximately six months later, in October 2008, Tom Dissinger (Hayward's Southeast Regional Manager) emailed Bruce Fisher (Hayward's Vice President of Sales and Marketing) informing him that Hayward decided to "cut-off" Shoreline.  Dissinger's email further stated that opening any new distributors in the Jackson market would be a "step back" and would "upset some of the gains we've made in this market on the Pool side."

94.     Pool Source, a distributor of Pool Products in Nashville Tennessee, was yet another victim of PoolCorp's exclusionary agreements with members of its Preferred Vendor Program, including the Manufacturer Defendants.  In 2010 Pool Source sought to purchase Pool Products from various manufacturers , but they declined to sell to it.  Pool Source was informed that PoolCorp had sent letters to at least 25 vendors, including the Manufacturer Defendants, directing them not to sell Pool Products to Pool Source.  Dale O'Dell, a PoolCorp Regional Manager, reported to his superior, Tommy Canaday, a PoolCorp General Manager, in February 2010 that "Jandy , Pentair, Hayward, Latham, AOS, Tara, Cardinal, SR. Smith are all telling us that they have been contacted [by Pool Source] and are refusing to do business with them." Because of these agreements between PoolCorp and its vendors, including the Manufacturer Defendants, Pool Source was unable to do business with the industry's leading manufacturers, including the Manufacturer Defendants.  In an effort to stay in business, Pool Source had to buy products through third parties, and pay an extra five percent on top of freight charges.

95.     ATX Pool & Supply LLC ("ATX"), an Austin, Texas distributor of Pool Products, was another victim of the exclusionary agreements among PoolCorp and its Preferred Vendors, including the Manufacturer Defendants.  ATX learned from vendors whom it had known for years that Paul Walter, PoolCorp's Regional Manager in San Antonio, and Mike O'Neill, also of PoolCorp, had told vendors that if they sold to ATX, PoolCorp would send their products back.  As recounted by Bill Knox, the President of WEK & Associates, Inc., a Pool Products manufacturer's sales representative based in Texas, Walter and O'Neill said that ATX was not to receive Pool Products.  In October 2008, Mike O'Neil, PoolCorp General Manager, reported to Kenny St. Romain and Dave Cook, two PoolCorp Group Vice Presidents, that he had called "Pentair, Hayward, Duhammell and Stellar to gauge their position on selling" to ATX and that "[a]ll have said they would not."  In September 9, 2009, Dave Cook of PoolCorp contacted

29

Dave Murray of Pentair and told him that Crystal Clear, a dealer in Austin, was re-selling Pentair products to ATX. Murray responded: "We will be contacting him [Crystal Clear] this morning and seeing him tomorrow to rectify this issue – it will stop." The next day, Murray reported back to Cook, stating:

> We spoke to Crystal Clear. He claims he sold no equipment to ATX – who knows…Anyway he is on record not to sell our products but to use them on jobs only. All in all a good call as it allowed us to set the record straight with this dealer.

In addition, in November 2009, Paul Walter, another PoolCorp Regional Manager, reported to Ernesto Salas, PoolCorp's Sourcing Director, that "[s]o far Pentair, Hayward, Zodiac and Raypack have told [ATX] no" (i.e. that they would not sell to ATX). As a result, ATX was hampered in its ability to buy the products it needed to compete.

96.     In the summer of 2008, Gulf Coast Pool Supply ("Gulf Coast") began distributing Pool Products in Naples, Florida. PoolCorp and the Manufacturer Defendants drove Gulf Coast out of business. PoolCorp directed PoolCorp's Preferred Vendors, including the Manufacturer Defendants, not to supply Gulf Coast with any of their products. In a May 2008 Monthly Managers Report, Tracy Thompson of PoolCorp, reporting on the opening of Gulf Coast, stated, "[e]verything in our power is being done to stop manufacturers from supporting the venture." In the July 2008 Report, Ms. Thompson wrote, "Gulf Coast Distributors is open and is pounding the market hard….I along with Rick Postoll [PoolCorp's General Manager for South Florida] have been asking for our Sourcing Department to send a strong message to our vendors to not support Gulf Coast." In his General Manager's Report for the Second Quarter of 2008, PoolCorp's Rick Postoll reported that "[a]ll major suppliers have agreed not to open [Gulf Coast] up or ship them direct." The Manufacturer Defendants were among those who agreed with PoolCorp not to sell to Gulf Coast to retain their status on PoolCorp's Preferred Vendor list. One member of PoolCorp's Preferred Vendor Program, Brenntag, informed Gulf Coast that it could not supply

30

Gulf Coast because PoolCorp threatened to drop Brenntag as a Preferred Vendor if Brenntag sold products to Gulf Coast.  Another manufacturer, Aquastar, told Gulf Coast that PoolCorp delivered the same message – PoolCorp would drop Aquastar as a Preferred Vendor if Aquastar sold to Gulf Coast.

97.     In January 2009, Gulf Coast attempted to obtain Pool Products to distribute by joining the buying group Carecraft which sent out an announcement of its new member.  The same day that Carecraft announced that Gulf Coast was joining the buying group, Greg Howard, head of Carecraft, sent an email to PoolCorp's Dave Cook apologizing for the error and assuring Cook that Gulf Coast's membership would be cancelled without mentioning "that PoolCorp even knew about this."  Howard then forwarded the email to Pentair's Dave Murray.  Gulf Coast closed its doors in June 2009.

98.     PoolCorp's exclusionary conduct was particularly targeted against new entrants which represented a unique threat to PoolCorp because they were more likely to compete aggressively on price to earn new business.  Existing competitors who tried to compete on price were also targeted by PoolCorp  and faced similar difficulties in securing supplies.  Faced with the inability to obtain Pool Products from manufacturers some existing distribution rivals and new-entrants sought to purchase Pool Products from other distributors, effectively paying two markups – one by the manufacturer and another by the distributor – plus added freight charges. But as a general rule, distributors did not sell Pool Products to other distributors.  Even when they did, this sourcing alternative was not a viable long-term strategy because it substantially increased a distributor's costs and lessened its quality of service.

99.     For example, buying Pool Products from another distributor forces the existing distributor or new entrant to pay transportation costs from the distributor's location, rather than receiving free shipping under manufacturer programs.  These higher costs prevent the rival

distributor from being able to compete aggressively on price. Additionally, the availability of product from an existing distributor could be uncertain or subject to volume limits. As a consequence, this inefficient work-around means that the rival lacks full control of its inventory, which hampers the rival's ability to provide timely and quality service to its Pool Dealer customers. Further, purchases from other distributors do not qualify for manufacturer rebate programs, thus again putting these rivals at a pricing disadvantage.

100.     Foreclosing and restricting actual and potential distribution rivals from access to a substantial share of manufacturers' products results in anticompetitive effects when, as here, the ability of rivals to acquire key inputs – in this case, Pool Products – raises their costs of doing business. PoolCorp's exclusionary conduct, in which the Manufacturer Defendants participated, denied actual and potential rival distributors necessary inputs directly from Pool Products manufacturers and lessened their ability to act as a constraint on PoolCorp's pricing. This conduct was designed to, and did, allow PoolCorp to maintain its dominance in the industry and to protect its prices, margins and market share.

> **(iv)     Other Anticompetitive Agreements and Conduct of PoolCorp and the Manufacturer Defendants**

101.     For various vendors of specialty pool products, PoolCorp used its market power to leverage access to its national distribution network by forcing the vendor to deal exclusively with PoolCorp. The effect of this practice was to foreclose competition, both from rival distributors and from the vendor itself. Any effort by the vendor to sell its products to PoolCorp rivals was met with threats that purchases from PoolCorp would be cut off.   For example, APi, a Florida manufacturer of specialty chemicals had acceded to PoolCorp's demand to sell its products exclusively to PoolCorp, except in areas where PoolCorp chose not to support the product. In October 2009, APi sought to open its product line to additional distributors in the Midwest. Bill Cook, PoolCorp's Midwest General Manager, told APi's Jim Stuart that "if he did

he could kiss our business goodbye." Thus, APi's choice was either to risk the loss of access to PoolCorp's distribution network, or else to abandon its plans to open its own product line to new customers. APi chose to drop its plan to sell to additional distributors in the Midwest.

102.    During the summer of 2003, Manny Perez, President and Chief Executive Officer of PoolCorp, learned that another distribution competitor, Baystate, was opening a facility in northern New Jersey. In August 2003, Perez wrote an email to all PoolCorp General Managers instructing Murphy to contact Mark Laven, an executive at Pacific Pools, a PoolCorp Preferred Vendor, to remind him that PoolCorp had the exclusive distribution rights for Pacific Pool's products, and to instruct Laven not to sell Pacific Pool's products to Baystate. Pacific Pools agreed to stop selling.

103.    If PoolCorp learned that a competing distributor was undercutting PoolCorp's prices, PoolCorp used the leverage of its Preferred Vendor Program to eliminate such price competition. For instance, in 2003, Perez and Murphy learned that a PoolCorp competitor, Imperial, was selling Hayward products below PoolCorp prices for the items. In February 2003, Perez wrote an email to all PoolCorp General Managers instructing them to inform headquarters if Imperial continued to offer low prices for Hayward products. Perez also communicated with Carlo Buffa of Hayward, and Hayward agreed to have Imperial rescind its low price quotes. Imperial subsequently rescinded its low quotes.

104.    PoolCorp also entered into agreements with rivals to refrain from competing with each other. For instance, in 2002, PoolCorp executives Perez and Murphy met with Skip Bradley and Terry Maurer of Cardinal Systems, located in Schuylkill Haven, Pennsylvania. Cardinal Systems manufactures and sells steel pools and panels, and supplies aluminum coping used in pools. As a result of the meeting, PoolCorp and Cardinal Systems agreed not to compete for each other's customers on products that they both sold.

105.     Another example of Defendants' cooperative anti-competitive conduct related to a company called Aquastar that began selling replacement parts for certain Hayward Pool Products at very low prices.  PoolCorp was concerned that if sales of these replacement parts expanded, its margins on these items would drop from 28% to about 8%.  Robert Rankin, PoolCorp's General Manager in Southern California, emailed Ernesto Salas, PoolCorp's Sourcing Director responsible for dealing with PoolCorp's vendors, expressing concern that

> [Aquastar] will sell a lot if we don't work together to contain it.  Hayward will most definitely feel this pain.  We are going to have two choices.  Get Hayward to help us or take on Aquastar's product.

Salas responded:  "Got it.  I think Hayward will work with us on this.  I'll let you know." Thereafter, Salas reported to Manny Perez, PoolCorp's CEO, Dave Cook, Group Vice President, and Tom Burba, General Manager of the Mountain Division, that Hayward had implemented steps to counter the threat from Aquastar, including telling "any distributor or major retailer that sells [Aquastar's competing parts] will lose their rebates."

106.     PoolCorp also targeted established competitors when they attempted to expand their geographical presence in the market by undercutting PoolCorp's prices.  For example, Aquagon was a competitor based in Chicago with a single physical location.  In early 2009, PoolCorp became concerned that Aquagon was planning to expand into St. Louis and that the head of Aquagon had entered into a partnership with BT2, a new distributor in Minneapolis. General Manager Bill Cook sent an email to Group Vice President Kenneth St. Romain: "If Aquagon does open in St. Louis this year and potentially opens in Minneapolis in 2010 depending on Shuherk's [of BT2] success, they will certainly impact our margins in both markets and undoubtedly get some minor share of business from people that want a choice other than POOL in St. Louis."  The next day, Regional Manager John Yeftich sent Cook an email asking him to make sure PoolCorp puts "pressure on [Aquagon's] accounts in Chicago," and

advised that he had set a meeting with another PoolCorp Regional Manager for the next day "to discuss our *combined strategy* with the vendors as we have seen some behavior that is alarming already from the Pentair rep. in the market." (emphasis added)  On April 8, 2009, Dale O'Dell, a PoolCorp Regional Manager, reported to Tommy Canaday, a General Manager, that "Hayward continues to hold their position on not selling to Aquagon.  We as a company should be commending and reward them for this stance…."

107.    In 2009, Cinderella was a distributor with two physical locations, both in Michigan.  In the third quarter of 2009, PoolCorp learned that Cinderella hired Rebecca Morelock, as a sales person in Indiana.  Morelock attempted to gain customers in Indiana by undercutting PoolCorp's pricing.  When PoolCorp General Manager Bill Cook learned in February 2010 that a representative of Tara Manufacturing, a long-time supplier of PoolCorp, was accompanying Morelock on sales calls, he told the representative that "if he continues to travel with Rebecca and she continues to throw stupid prices into the market that we would have a major issue . . . I told him more than once that she was stupid, ignorant and irresponsible with her pricing."  In his General Manager's Report for the same period, Cook wrote "[w]e will do whatever is necessary to keep [Cinderella] from gaining market share and in turn investing in brick and mortar in the market."

108.    PoolCorp and the Manufacturer Defendants met together jointly to discuss, among other things, products, supply issues, and promotions.  For example, on May 6, 2009, Robert Rankin, PoolCorp General Manager in Southern California, hosted a seven hour meeting attended by Zodiac, Pentair, Hayward and others (which Rankin referred to as "our partners"), at which presentations were made and discussions and Q&A sessions were held among the participants.  After the meeting, Rankin wrote to the Manufacturer Defendants' representatives:

> My goal was to send a clear signal to my branch managers and to
> you and your teams.  That message is that PoolCorp is your partner

> and we want to be you (sic) first choice when it comes to getting
> your product to market.  Your attendance and participation did just
> that.

109.     PoolCorp also communicated directly with competitors concerning pricing to customers in order to restrict price competition.  For example, in February 2010 Tim Bowers, a PoolCorp Regional Manager, sent a report to the Administrative Assistant to Manny Perez (CEO) and Mark Joslin (CFO) of PoolCorp stating that there had been "near constant calls from our sales teams to our competitors" to verify pricing to customers.  These calls violated PoolCorp's Antitrust Compliance Guide, and inhibited other distributors from lowering prices, because PoolCorp would be able to match them, thus preventing the rival from gaining customers based on price.  This conduct protected PoolCorp's market share and margins and enabled it to maintain higher prices in the absence of price competition.

110.     PoolCorp's agreements with Preferred Vendors and other manufacturers typically included a "most favored nation's" or "MFN" provision, by which the supplier agreed to give PoolCorp prices, rebates, and other terms and conditions of sale that were at least as favorable as those that the supplier made available to other Pool Products purchasers with the same or similar volume levels as those of PoolCorp.  Thus, if a manufacturer gave a PoolCorp rival more favorable pricing, the manufacturer also had to make the same pricing available to PoolCorp.

111.     Because PoolCorp was the highest volume customer for many manufacturers, the MFN reduced the incentive for manufacturers to sell to PoolCorp rivals under pricing terms that allowed the rivals to engage in price competition.  Once the manufacturer provided PoolCorp with the same favorable pricing that the PoolCorp rival received, the rival was unlikely to capture sales from PoolCorp.  At the same time, the manufacturer itself would receive lower revenue from both PoolCorp and the rival.

112.     As a result, PoolCorp's MFN operated to suppress price competition from rivals. In turn, PoolCorp's customers – Plaintiffs and the members of the Class – were denied the opportunity to shop for lower prices from other distributors.

113.     Defendants' aforementioned conduct had the specific purpose and effect of not only restraining trade in the distribution of Pool Products, but also of maintaining and enhancing PoolCorp's market power, market share and margins.  Defendants' conduct resulted in higher prices and reduced output.  Also, by denying supplies to rivals, Defendants' conduct reduced the opportunities of PoolCorp's rivals to develop particular Pool Product offerings and terms of sale to attract business.  Thus, customers, such as Plaintiffs and members of the Class, had fewer choices and were forced to pay higher prices for Pool Products.

## VII.   ANTICOMPETITIVE EFFECTS

114.     PoolCorp has purchased one rival after another over a period of more than ten years.  In addition, through its agreements with the Manufacturer Defendants, PoolCorp has used its power in the market for the wholesale distribution of residential and commercial Pool Products to conspire with the Manufacturer Defendants to raise prices at the distribution level and to foreclose existing distributors and entrants from obtaining necessary supplies from a substantial share of manufacturers, and from competing generally on sale to Plaintiffs and the members of the Class.

115.     In antitrust cases concerning foreclosure of rivals, the share of a given market or distribution channel foreclosed by the conduct at issue is a significant consideration.  Antitrust authorities have concluded that foreclosure of a given percentage, typically between 20 and 40 percent, may be presumed to have anticompetitive effects.  PoolCorp's rivals  were foreclosed from supplies at levels above those recognized as unlawful.

116.     The effects of Defendants' anticompetitive conduct have been to enable PoolCorp to establish and maintain artificially high, supra-competitive prices for Pool Products sold generally and specifically to Plaintiffs and the members of the Class and to unlawfully attempt to acquire, maintain, and exercise monopoly power in the relevant market.  Defendants' conduct has substantially impaired and foreclosed competition from PoolCorp's rivals in the relevant market, and significantly raised barriers to entry for potential rivals seeking to distribute Pool Products in the United States.

117.     Defendants' conduct had the purpose, capacity, tendency, and effect of impairing competition by PoolCorp's rivals, of raising such rivals' costs, and of deterring and impeding their market entry.  Defendants' unlawful conduct has contributed significantly to PoolCorp's attempt to acquire, maintain, and exercise monopoly power.

118.     Defendants' conduct adversely affected competition by: (a) increasing or maintaining prices for Pool Products at artificially high, supra-competitive levels; (b) reducing the output of Pool Products; (c) eliminating or significantly reducing price competition for Pool Products sold by distributors; (d) deterring, delaying and impeding the ability of actual or potential competitors seeking to enter or to expand their distribution of Pool Products; and (e) reducing the choices of Pool Products offerings available to Plaintiffs, members of the Class, and end users generally.

119.     Absent Defendants' anticompetitive conduct and the substantial foreclosure and reduction of effective competition caused by such conduct, PoolCorp would have faced greater competition and reduced the prices that it charged for Pool Products purchased by Plaintiffs and the members of the Class.

120.     Moreover, had actual or potential Pool Products distributors not been prevented by Defendants' anticompetitive conduct from competing in the distribution of Pool Products,

those actual or potential competitors would have sold more Pool Products and achieved economies of scale and scope that could have further driven down prices for Pool Products sold to Plaintiffs and the members of the Class.

121.    By unlawfully excluding, impairing and otherwise restricting competition, Defendants' conduct has caused Plaintiffs and the members of the Class to pay higher prices to purchase Pool Products than they otherwise would have paid absent Defendants' unlawful conduct.

## VIII.   THE RELEVANT MARKET

122.    The relevant product market is the Pool Products Distribution Market.

123.    Pool Products are designed and manufactured specifically for residential and commercial swimming pools.  There are no close substitutes for Pool Products, and no other products significantly constrain their pricing.

124.    Practical industry indicia recognize the sale of Pool Products by distributors, such as PoolCorp, as a distinct line of commerce.

125.    The relevant geographic market is the Pool Products Distribution Market in the United States, its territories and possessions, including Puerto Rico.

## IX.   DAMAGES

126.    In the absence of Defendants' unlawful conduct, Plaintiffs and the members of the Class would have been able to purchase Pool Products for lower prices than they in fact paid for such Products, and there would have been greater product choice than existed by reason of Defendants' illegal acts.

127.    Because of Defendants' anticompetitive practices, Plaintiffs and the members of the Class, who purchased Pool Products, paid artificially high, supra-competitive prices.  As a consequence, they have sustained losses and damage to their business and property in the form of

overcharges for Pool Products purchased.  The full amount of such damages will be calculated

after discovery and presented as proof at trial.

## X.      CLASS ACTION ALLEGATIONS

128.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure

23(a), (b)(1) and (b)(3), on their own behalf and as representatives of the following class of

persons and entities (the "Class"):

> All persons or entities that purchased Pool Products in the United
> States directly from PoolCorp (as defined earlier) at any time
> between August 1, 2002 and November 21, 2011 (the "Class
> Period").  Excluded from the Class are Defendants and their
> subsidiaries, parents, or affiliates, whether or not named as a
> Defendant in this Complaint, and government entities.

129.    The Class is individually so numerous that joinder of all members is

impracticable.  While the exact number of members of the Class is unknown to Plaintiffs at this

time, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that

there are at least hundreds of members in the Class and that their identities can be learned from

records in PoolCorp's possession, custody or control.

130.    Class members are geographically dispersed throughout the United States.

131.    Plaintiffs' claims are typical of the claims of the other members of the Class.

132.    Plaintiffs and the members of the Class have all sustained damage in that, during

the Class Period, they purchased Pool Products directly from PoolCorp at artificially high, supra-

competitive prices.  PoolCorp's anticompetitive conduct and that of the Manufacturer

Defendants, the effects of such violations, and the relief sought raise questions that are common

to Plaintiffs and the Class members.

133.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class, and they have retained counsel competent and experienced in class action and antitrust

litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the other Class members.

134.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

135.   The questions of law and fact common to the Class include, but are not limited to:

(a)   whether the Pool Products Distribution Market in the United States constitutes a relevant market;

(b)   whether PoolCorp attempted to monopolize the Pool Products Distribution Market;

(c)   whether Defendants entered into a combination and conspiracy that unreasonably restrained trade;

(d)   whether PoolCorp charged artificially high, supra-competitive prices for Pool Products, and restricted output and reduced the choices of Pool Products available for purchase;

(e)   whether, and to what extent, Defendants' conduct caused Plaintiffs and Class members to pay supra-competitive prices for Pool Products and, thereby, suffered antitrust injuries; and

(f)   whether Plaintiffs and Class members are entitled to damages and, if so, the appropriate measure of damages.

136.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable.

137.   The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and the parties, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action will

41

achieve substantial economies of time, effort and expense, and will assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.  Given the size of the likely damages for any given plaintiff relative to the cost of suing individually, a class action is the only way that the victims of Defendants' anticompetitive conduct will secure redress.  There will be no material difficulty in the management of this action as a class action on behalf of the Class.

## XI.    FRAUDULENT CONCEALMENT

138.    Plaintiffs and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, the existence of Defendants' unlawful conspiracy and anticompetitive conduct, alleged above, until November 21, 2011 when the Federal Trade Commission  (FTC) first made public its investigation and related consent decree.

139.    Because Defendants' unlawful conspiracy and agreements, understandings, and conduct were not disclosed until November 21, 2011, before that time Plaintiffs and members of the Class were unaware of Defendants' wrongdoing, and they did not know before then that they were paying artificially high, supra-competitive prices for Pool Products throughout the United States during the Class Period.  While certain would-be rivals of PoolCorp may have learned that PoolCorp was engaged in exclusionary conduct, these rivals were distributors and not members of the Class of Pool Dealers, the members of which were unaware of the exclusionary practices.

140.    The affirmative acts of Defendants, including the unlawful conspiracy and anticompetitive conduct alleged above, were wrongfully concealed and carried out in a manner that precluded detection.  Among other things, Defendants engaged in secret meetings and communications to prevent Plaintiffs and the members of the Class from learning sufficient facts relating to the actual bases for the high prices they were paying for Pool Products.

141.    In addition, Defendants engaged in affirmative acts of concealment of the unlawful conspiracy and agreements, including but not limited to the following:

(a) The Manufacturer Defendants gave false or pretextual reasons for refusing or declining to sell Pool Products to PoolCorp's competitors.

(b) PoolCorp concealed the nature of its Preferred Vendor Program, and did not publicly disclose conditions that participants in the Program refuse to deal with PoolCorp's competitors when PoolCorp requested that they do so.

(c) The Manufacturer Defendants gave false or pretextual reasons to PoolCorp competitors for increasing their prices.

(d) PoolCorp gave false or pretextual reasons for price increases for Pool Products, including that those increases were due to increases by its vendors when (i) PoolCorp had urged its vendors to raise prices so it could generate more revenue based upon its markup, and/or (ii) PoolCorp and its vendors had secretly agreed to delay the increases or to offset them through rebates to PoolCorp.

(e) PoolCorp and the Manufacturer Defendants communicated and met in secret to effectuate their unlawful conspiracy.

142.    Before November 2011, Plaintiffs reasonably considered the Pool Products Distribution Market to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been put on notice to investigate the lawfulness or legitimacy of PoolCorp's Pool Products prices before November 2011.

143.    Plaintiffs and the members of the Class could not have discovered by the exercise of reasonable diligence the alleged attempted monopolization, or unreasonable restraints of trade at an earlier date because of the deceptive practices and techniques of secrecy that Defendants used to avoid detection of, and fraudulently to conceal, their anticompetitive conduct.

43

144.     Because Defendants affirmatively concealed their unlawful conspiracy and anticompetitive conduct, Plaintiffs and members of the Class had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate whether PoolCorp or the Manufacturer Defendants were engaging in wrongdoing until November 2011, when reports of the FTC's investigation of such conduct were first publicly disseminated.

145.     As a result of Defendants' fraudulent concealment, the running of any statute of limitations has been tolled with respect to all claims that Plaintiffs and the members of the Class have alleged in this SCAC.

## FIRST CLAIM
### Conspiracy by All Defendants to Restrain Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

146.     Plaintiffs incorporate by reference the preceding allegations.

147.     Beginning at least as early as August 1, 2002 and continuing until at least November 21, 2011, PoolCorp and the Manufacturer Defendants agreed to and did participate in anticompetitive conduct that unreasonably restrained trade and commerce.  Thus, Defendants engaged in an unlawful combination and conspiracy and violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

148.     The Manufacturer Defendants entered into exclusive or otherwise restrictive dealing arrangements with PoolCorp, by which PoolCorp controlled the distributors to whom the Manufacturer Defendants sold their Pool Products in the United States.

149.     As a result of these arrangements, Manufacturer Defendants agreed not to sell Pool Products to PoolCorp's competitors if so directed by PoolCorp.  This conduct that not only enhanced PoolCorp's dominance in the distribution of Pool Products, but also increased the prices charged for Pool Products purchased by Plaintiffs and the members of the Class and reduced both output and choices available to Plaintiffs and the Class.

44

150.    The Manufacturer Defendants had the incentive to and did facilitate PoolCorp's dominant position in distribution of Pool Products because if they did not, PoolCorp would not sell the Manufacturer Defendants' Pool Products.  Because PoolCorp is the only national distributor of Pool Products in the United States, no other distributor could replace the large volume of sales lost by the Manufacturer Defendants if PoolCorp ceased or reduced purchasing from one or more of them.

151.    The Manufacturer Defendants conspired together to raise the prices of Pool Products to PoolCorp's rivals which protected PoolCorp's prices, margins and market share, and to disadvantage PoolCorp's rivals, while simultaneously increasing their own profit margins.

152.    Defendants' anticompetitive conduct is a per se violation of Section 1 of the Sherman Act.

153.    Alternatively, if Defendants' anticompetitive conduct may be judged under the antitrust Rule of Reason, there is no legitimate business justification for Defendants' actions and the conduct through which they adopted and implemented their unlawful combination and conspiracy.  Moreover, the anticompetitive effects of Defendants' conduct far outweigh any conceivable procompetitive benefits or justifications.  Even if such a justification had existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives.

154.    As a direct and proximate result of Defendants' unlawful combination and conspiracy, Defendants have unreasonably restrained trade and commerce.  They have unlawfully excluded actual and potential competition from the relevant market, and profited from their anticompetitive conduct which enabled PoolCorp to establish and maintain artificially high, supra-competitive prices for Pool Products sold to its customers, including Plaintiffs and the members of the Class.

155.    As a direct and proximate result of Defendants' unlawful combination and conspiracy, Plaintiffs and members of the Class have been injured in their business or property. The injury to Plaintiffs and the Class consists of paying artificially inflated and supra-competitive prices for Pool Products purchased directly from PoolCorp – prices higher than they would have paid absent Defendants' unlawful combination and conspiracy.  Their injury is the type that the antitrust laws were designed to prevent and flows directly from Defendants' unlawful conduct.

**SECOND CLAIM**
**Attempted Monopolization by PoolCorp in Violation of Section**
**2 of the Sherman Act, 15 U.S.C. § 2**

156.    Plaintiffs incorporate by reference the preceding allegations.

157.    PoolCorp unlawfully attempted to acquire monopoly power in the relevant market during the Class Period, with the specific intent of doing so, through the anticompetitive conduct set forth above, including, but not limited to: (a) entering into exclusive dealing arrangements with manufacturers of Pool Products, including Manufacturer Defendants; (b) adopting, implementing and enforcing a policy of refusing or threatening to refuse to deal with manufacturers, including the Manufacturer Defendants, that failed to follow PoolCorp's directions to not sell Pool Products to competing Pool Products distributors; and (c) acquiring, with an anticompetitive purpose and effect, various competitor-distributors of Pool Products.

158.    To the extent that PoolCorp has not already acquired, maintained and exercised monopoly power in the relevant market during the Class Period, the conduct alleged in this SCAC resulted in a dangerous probability that it would acquire, maintain and exercise such monopoly power.

159.    PoolCorp has unlawfully excluded actual and potential competition from the relevant market by limiting the ability of rivals to distribute Pool Products, and having done so,

46

PoolCorp has established and maintained artificially high, supra-competitive prices for Pool Products sold to its customers, including Plaintiffs and the members of the Class, and has otherwise reaped financial benefits from its unlawful attempt to acquire, maintain and exercise monopoly power.

160.    There is no legitimate business justification for PoolCorp's anticompetitive conduct.  The anticompetitive effects of PoolCorp's conduct outweigh any conceivable pro-competitive benefit or justification.  Even if such a justification had existed, any possible pro-competitive benefits could have been obtained by less restrictive alternatives.

161.    As a direct and proximate result of PoolCorp's anticompetitive conduct, Plaintiffs and the members of the Class have been injured in their business or property.  Plaintiffs and the members of the Class have paid artificially high, supra-competitive prices for Pool Products purchased directly from PoolCorp – prices higher than they would have paid absent PoolCorp's unlawful attempt to monopolize the relevant market.  Their injury is the type that the antitrust laws were designed to prevent and flows directly from PoolCorp's unlawful conduct.

## XII.   RELIEF SOUGHT

Accordingly, Plaintiffs respectfully request that the Court grant the following relief:

A.    Certifying the Class defined in this Complaint pursuant to Federal Rule of Civil Procedure 23(a), (b)(1) and (b)(3), and designating Plaintiffs as the representatives for the Class and the members of Plaintiffs' Executive Committee as counsel for the Class;

B.    Adjudging and decreeing that all Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Adjudging and decreeing that PoolCorp violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

D.      Awarding Plaintiffs and the Class such damages as they may prove at the trial of this action to have sustained, trebled as provided by law, and directing that judgment in favor of Plaintiffs and the Class be entered against Defendants, jointly and severally, together with interest at the maximum rate allowable by law;

E.      Directing equitable relief enjoining PoolCorp from: (1) conspiring to fix, raise and maintain prices for Pool Products at supra-competitive levels; (2) foreclosing or threatening to foreclose new or existing distributors of Pool Products from competing with PoolCorp; (3) threatening or attempting to threaten manufacturers of Pool Products in order to cause manufacturers to refuse to sell to competitors of PoolCorp; and (4) conditioning any manufacturer's participation in PoolCorp's Preferred Vendor Program or PoolCorp's distribution of any manufacturer's Pool Products on the manufacturer's refusal to sell to competitors of PoolCorp;

F.      Directing equitable relief enjoining the Manufacturer Defendants from refusing or declining to sell Pool Products to PoolCorp's competitors, or otherwise foreclosing or threatening to foreclose PoolCorp's competitors, based on demands made by PoolCorp;

G.      Directing that Plaintiffs and the Class recover the costs of this suit, including reasonable attorneys' fees, as provided by law; and

H.      Granting to Plaintiffs and the Class such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

## XIII.   JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs respectfully

demand a trial by jury on all matters so triable.

May 20, 2013                              Respectfully submitted,


/s/Leonard A. Davis                       /s/ Camilo K. Salas, III.
Russ M. Herman                            Camilo Kossy Salas, III
Leonard A. Davis                          **SALAS & CO., LC**
**HERMAN, HERMAN & KATZ L.L.C**           650 Poydras St.
820 O'Keefe Avenue                        New Orleans, LA 70130
New Orleans, LA 70113                     504-799-3080
504-581-4892


| | | |
|---|---|---|
| Robert N. Kaplan | Ronald J. Aranoff | Jay L. Himes |
| Gregory K. Arenson | Dana Statsky Smith | Robin van der Meulen |
| Richard J. Kilsheimer | Tania T. Taveras | **LABATON SUCHAROW** |
| Elana Katcher | **BERNSTEIN LIEBHARD** | **LLP** |
| **KAPLAN FOX &** | **LLP** | 140 Broadway |
| **KILSHEIMER  LLP** | 10 East 40th Street | New York, NY 10005 |
| 850 Third Avenue | New York, NY 10016-0201 | 212-907-0700 |
| New York, NY 10022 | 212-779-1414 | |
| 212-687-1980 | | |

**Liaison Counsel and Executive Committee Counsel
for the Direct Purchaser Plaintiffs and the Class**

| | |
|---|---|
| Matthew B. Moreland | Douglas G. Thompson, Jr. |
| **Becnel Law Firm, LLC** (Reserve) | **Finkelstein Thompson LLP** |
| 106 Seventh St. | 1077 30th St., NW |
| P.O. Drawer H | Suite 150 |
| Reserve, LA 70084 | Washington, DC 20007 |
| 985-536-1186 | 202-337-8000 |
| | |
| Linda P. Nussbaum | Vincent J. Esades |
| **Grant & Eisenhofer, PA** | **Heins, Mills & Olson, PLC** |
| 484 Lexington Avenue | 310 Clifton Ave. |
| New York, NY 10017 | Minneapolis, MN 55403 |
| 646-722-8500 | 612-338-4605 |

Arnold Levin
**Levin, Fishbein, Sedran & Berman**
510 Walnut St.
Suite 500
Philadelphia, PA 19106
215-592-1500

Scott R. Bickford
**Martzell & Bickford**
338 Lafayette St.
New Orleans, LA 70130
504-581-9065

Richard J. Arsenault
**Neblett, Beard & Arsenault**
P.O. Box 1190
2220 Bonaventure Ct.
Alexandria, LA 71309-1190
318-487-9874

Daniel W. Krasner
**Wolf, Haldenstein, Adler, Freeman & Herz, LLP**
270 Madison Avenue
New York, NY 10016
212-545-4600

*Plaintiff Steering Committee*

Andrew Allen Lemmon
**Lemmon Law Firm** (Hahnville)
15058 River Rd.
P.O. Box 904
Hanville, LA 70057
985-783-6789

Derriel Carlton McCorvey
**Law Office of Derriel C. McCorvey, LLC**
115 W. Main St., Suite 14
P.O. Box 2473
Lafayette, LA 70502
337-291-2431

Benjamin D. Bianco
**Frank & Bianco LLP**
275 Madison Ave.
8th floor
New York, NY 10016
212-682-1818

Joseph P. Guglielmo
**Scott + Scott LLP**
500 Fifth Avenue, 40th Floor
Suite 1000
New York, NY 10110
212-223-6444

W. James Singleton
**Singleton Law Firm**
4050 Linwood Ave.
Shreveport, LA 71108
318-631-5200

Brian C. Gudmundson
**Zimmerman Reed PLLP**
80 South 8th Street
Minneapolis, MN  55402
612-341-0400

Thordore J. Leopold
**Leopold Law**
2925 PGA Boulevard
Palm Beach Gardens, FL 33410
561-515-1400

Jason S. Kilene
**Gustafson Gluek PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
612-333-8844

*Additional Plaintiffs' Counsel*