UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET ANTITRUST
LITIGATION                                SECTION: R(2)

JUDGE VANCE
MAG. JUDGE WILKINSON

**THIS DOCUMENT RELATES TO ALL DIRECT-PURCHASER PLAINTIFF CASES**

**ORDER AND REASONS**

All of the defendants move to dismiss the direct purchaser plaintiffs' claims of a *per se* illegal horizontal conspiracy and fraudulent concealment.[1] Defendants Pool Corporation, SCP Distributors LLC, and Superior Pool Products (collectively "Pool") jointly filed one motion, and manufacturer defendants Hayward Industries, Inc., Pentair Water Pool and Spa, Inc., and Zodiac Pool Systems, Inc. (collectively "Manufacturer Defendants") jointly filed a second motion. For the following reasons, the Court GRANTS the motions IN PART and DENIES them IN PART.

**I.    BACKGROUND**

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against

---

[1]    R. Docs. 296, 298.

Pool and Manufacturer Defendants. Pool is the country's largest distributor of products used for the construction and maintenance of swimming pools ("Pool Products").[2][3] Manufacturer Defendants are the three largest manufacturers of Pool Products in the United States.[4] Pool buys Pool Products from manufacturers, including the three Manufacturer Defendants, and in turn sells them to DPPs, which include pool builders, pool retail stores, and pool service and repair companies (collectively referred to as "Dealers" in the SCAC).[5]

DPPs initially alleged (1) that Pool monopolized and attempted to monopolize the Pool Products distribution market in the United States in violation of Section 2 of the Sherman Act by acquiring rival distributors and by entering into agreements with manufacturers to exclude Pool's rivals; (2) that Pool and the Manufacturer Defendants violated Section 1 of the Sherman Act by engaging in an unlawful conspiracy to exclude Pool's competitors; and (3) that defendants fraudulently concealed their illegal conduct and thus are liable for damages outside of the statutory limitations period. Plaintiffs claimed that the defendants'

---

[2]     Second Consolidated Am. Class Action Compl. (hereinafter "SCAC"), R. Doc. 284, ¶ 39.

[3]     R. Doc. 284.

[4]     *Id.* ¶ 28.

[5]     *Id.* ¶ 31.

allegedly illegal conduct caused plaintiffs to pay more for Pool Products than they would have absent the unlawful activity.

The Court issued an earlier order dismissing certain of plaintiffs' claims.[6] First, the Court dismissed the DPPs' monopolization claim because they did not allege that Pool possesses monopoly power in the relevant market.[7] Second, the Court dismissed DPPs' claim that defendants engaged in a *per se* illegal boycott because only horizontal conspiracies among competitors can give rise to *per se* liability under Supreme Court precedent, and "the complaint lack[ed] any allegations that manufacturers colluded with each other."[8] Finally, the Court dismissed DPPs' allegation of fraudulent concealment because plaintiffs failed to assert that defendants concealed the allegedly unlawful agreements, or that defendants engaged in a "self-concealing" antitrust violation.[9]

DPPs thereafter sought leave to file an amended complaint.[10] In support of that motion, DPPs asserted that "[a]fter filing the CAC [first Consolidated Amended Complaint], DPPs discovered new information demonstrating communications between Defendants --

---

[6]     R. Doc. 221.

[7]     *Id.* at 25.

[8]     *Id.* at 52.

[9]     *Id.* at 73-78.

[10]    R. Doc. 240.

including communications among the Manufacturer Defendants themselves -- that persuasively support a *per se* Section 1 claim and Defendants' fraudulent concealment of their misconduct."[11] Following the Court's grant of the DPPs' motion,[12] the DPPs filed the SCAC.[13] Pool Defendants and Manufacturer Defendants now move again to dismiss plaintiffs' horizontal conspiracy and fraudulent concealment claims.[14]

The SCAC is substantially similar to the DPPs' original complaint in all but two respects: (1) the SCAC does not contain a Section 2 monopolization claim; and (2) the SCAC contains more extensive allegations of horizontal agreements among the Manufacturer Defendants and of "secret" agreements among all defendants. DPPs contend that the latter allegations suffice to state a claim for both a *per se* Section 1 violation and fraudulent concealment. In accordance with Pretrial Order #18, defendants have limited the arguments in their motions to dismiss to the issues of *per se* liability and fraudulent concealment.[15]

---

[11]    R. Doc. 240-1 at 3-4.

[12]    R. Doc. 281.

[13]    R. Doc. 284.

[14]    R. Docs. 296, 298.

[15]    R. Doc. 282 at 2 (defendants' motions to dismiss the SCAC may not "raise any issues that the Court ruled on in its order partially dismissing DPPs' original complaint except for fraudulent concealment and DPPs' claim that defendants engaged in a *per se* illegal conspiracy under Section 1 of the Sherman Act").

Accordingly, the Court will discuss only the allegations of the SCAC relevant to these two claims.

## A.   Allegations of a Horizontal Conspiracy

DPPs contend that "Manufacturer Defendants communicated directly with each other and also with PoolCorp" in order to facilitate an antitrust conspiracy that "protected PoolCorp's market share and margins and the prices that PoolCorp charged to its customers."[16] This conspiracy allegedly allowed PoolCorp to "increase its market share and margins and maintain its prices at supra-competitive levels" even in the wake of the Great Recession of 2008, "a time of significantly decreased demand."[17]

Specifically, DPPs allege that defendants conspired to raise prices for Pool Products and to eliminate Pool's competitors through a scheme in which Pool conditioned access to its distribution network on promises by manufacturers not to supply Pool's rivals.[18] Manufacturer Defendants allegedly agreed with Pool to eliminate Pool's existing competitors and to prevent new entrants into the distribution market from obtaining the products necessary to compete.[19] Plaintiffs allege that because Pool is

---

[16]    SCAC ¶¶ 2-3.

[17]    *Id.* ¶ 2.

[18]    *Id.* ¶ 5.

[19]    *Id.*

the country's largest buyer of Pool Products, it "has significant ability to obtain adherence by suppliers to its demands, including agreements with the Manufacturer Defendants."[20]

DPPs allege that Pool used its dominance to instigate a conspiracy among the Manufacturer Defendants and Pool "to raise the prices of Pool Products to other distributors" and sometimes to refuse to sell to other distributors altogether.[21] DPPs state that a conspiracy was necessary to achieve this result because it would not be in the Manufacturer Defendants' individual business interest to refuse to sell to Pool's rivals.[22] According to the DPPs, in a competitive market the Manufacturer Defendants would want Pool's rivals to flourish, because "hav[ing] two or more distributors selling [the Manufacturer Defendants'] Pool Products

---

[20]     *Id.* ¶ 42; *see also id.* ¶ 60 ("[M]any manufacturers believed that if they did not do what PoolCorp demanded, PoolCorp would terminate its purchases from that manufacturer and obtain its Pool Products from competing manufacturers."); *id.* ¶ 150 ("The Manufacturer Defendants had the incentive to and did facilitate PoolCorp's dominant position in distribution of Pool Products because if they did not, PoolCorp would not sell the Manufacturer Defendants' Pool Products.").

[21]     *Id.* ¶¶ 58–59; *see also id.* ¶ 61 ("[T]he Manufacturer Defendants communicated directly among themselves and jointly and severally with PoolCorp to raise the prices of Pool Products to their customers and other rivals of PoolCorp . . . ."); *id.* ¶ 89 ("The Manufacturer Defendants agreed with PoolCorp and with each other not to sell to [PoolCorp's rival distributor] Hilton.").

[22]     *Id.* ¶ 38.

[would] ensure that their Dealer customers receive competitive service and prices."[23]

DPPs newly describe two specific types of allegedly conspiratorial conduct on the part of the Manufacturer Defendants, one concerning free freight minimums and one concerning buying groups. Otherwise, the SCAC's horizontal conspiracy allegations are the same as those in DPPs' original complaint, which the Court has found insufficient to state a *per se* claim. Accordingly, the Court will limit its analysis to these two specific categories of horizontal conspiracy allegations.

1.   *Free Freight Minimums*

DPPs allege that, in 2007, Manufacturer Defendants each raised the required dollar purchase amount for an order to qualify for free freight from $10,000 to $20,000 in the course of a three-month period.[24] This allegedly occurred in response to Pool's "bitter[]" complaint "to the Manufacturer Defendants that the dollar purchase amount for free freight should be increased substantially."[25] Pentair announced the increase on September 11, 2007, and Hayward followed suit the next day.[26] Then, later that

---

[23]    *Id.*

[24]    *Id.* ¶ 62.

[25]    *Id.*

[26]    *Id.* ¶ 63.

month, a Hayward executive spoke with a Zodiac executive "about Zodiac's internal business matters."[27] The e-mail upon which this allegation is based was written by Bruce Fisher of Hayward, and it states, "Chatted with Bob Rasp [of Zodiac] and he advised that business is still very weak for them and he cannot afford to cut anymore people. Interestingly enough, he admitted to being over staffed to begin with."[28]

On November 30, 2007, Pool's CEO told other Pool executives that Pentair, Hayward, and Zodiac had "all agreed to the $20,000 freight minimum with NO exceptions."[29] A week later, on December 7, 2007, Zodiac publicly announced that it was increasing its free freight minimum to $20,000.[30] The SCAC alleges that each Manufacturer Defendant was aware that the others would announce these increases before any public announcements were made.[31] DPPs also allege that the increases were not in the Manufacturer Defendants' independent self-interest. The raising of the minimums essentially operated as a price increase for Pool's smaller rivals.[32] But, according to the DPPs, "absent collective

---

[27]   *Id.*

[28]   R. Doc. 298-4 at 1.

[29]   SCAC ¶ 64.

[30]   *Id.* ¶ 63.

[31]   *Id.*

[32]   *Id.* ¶ 62.

action," the Manufacturer Defendants would not want to disadvantage Pool's rivals, because the manufacturers would prefer "to have two or more distributors selling their Pool Products to ensure that their Dealer customers receive competitive service and prices."[33]

## 2.   *Buying Groups*

DPPs also allege that the Manufacturer Defendants and Pool conspired to place restrictions on "buying groups," collectives that Dealers formed to "try[] to leverage their collective volume of purchases to negotiate directly with manufacturers of Pool Products, thus bypassing PoolCorp" and "avoid[ing] PoolCorp's monopoly pricing."[34]

Pool was strongly opposed to the presence of buying groups in the market.[35] As early as 2004, Pool "told Pentair to provide [it] with prices that were advantageous compared to prices

---

[33]   *Id.* ¶ 38; *see also id.* ("In a free and competitive market, manufacturers would be willing to sell their Pool Products through any credit-worthy distributor that has a physical warehouse and personnel with knowledge of the pool industry, as distribution services are a relatively homogeneous offering.").

[34]   *Id.* ¶ 35.

[35]   *Id.* ¶ 68 (noting that an April 2006 Pentair internal report stated that Pool "'deeply resent[ed] any actions manufacturers might take to legitimize or support' buying groups").

charged to buying groups."[36] Then, in 2007, a Pool executive noted with approval that the Manufacturer Defendants' increased free freight minimums would make it more difficult for Dealers to purchase through the buying groups.[37] In April 2009, a Pool executive allegedly wrote an email to the three Manufacturer Defendants stating that Pool "should 'not have to compete'" with buying groups and "demand[ing]" that the Manufacturer Defendants stop allowing the buying groups to participate in "free goods programs."[38] The next month, Pool and the Manufacturer Defendants attended a meeting at which they "discuss[ed], among other things, products, supply issues, and promotions."[39] After the meeting, Pool wrote to the Manufacturer Defendants that it wanted to be their "first choice when it comes to getting [their] product to market."[40]

According to DPPs, the Manufacturer Defendants agreed with Pool and with each other "to impose terms of sales upon buying

---

[36]    *Id.*

[37]    *Id.* ¶ 72.

[38]    *Id.* ¶ 70. DPPs and Manufacturer Defendants dispute whether this e-mail was actually sent to the Manufacturer Defendants. The Court need not resolve this dispute for purposes of this motion, as it does not affect the Court's analysis of the sufficiency of DPPs' *per se* claim of a conspiracy to disadvantage buying groups.

[39]    *Id.* ¶ 108.

[40]    *Id.*

groups that were more onerous than they otherwise would have been."[41] The Manufacturer Defendants allegedly used Pool to enforce this agreement.[42]

Specifically, DPPs allege that, in late 2009, "Pentair imposed onerous terms on members of Carecraft, one of the largest buying groups . . . to participate in its 'Early Buy' Program."[43] The "Early Buy Program" was attractive to Pentair's buyers because participants were able to purchase goods in advance of the pool season, "often ahead of a price increase."[44] Pentair's terms allegedly included a $70,000 minimum purchase requirement and a $20,000 minimum purchase for free freight.[45] In December 2009, Pool circulated an e-mail praising Pentair's actions with respect to Carecraft because they made "it better for us (distribution) to compete with the direct program" -- that is, the buying groups.[46]

Several months later, in March 2010, Dave Murray of Pentair sent an e-mail to Manny Perez of Pool regarding buying groups.[47]

---

[41]   *Id.* ¶ 69.

[42]   *Id.* ¶¶ 74, 84.

[43]   *Id.* ¶ 73.

[44]   *Id.*

[45]   *Id.*

[46]   *Id.*

[47]   *Id.* ¶ 74.

DPPs allege that in this e-mail Murray "complain[ed] that Hayward and Zodiac were offering higher rebates to buying groups,"[48] but that characterization is not strictly accurate. Murray wrote,

> Manny[,] I am sharing with you an email I have sent to our RSM's [regional sales managers]. . . . The purpose of this email is, as our largest customer, it is always important for you to know any directional changes we are making as we go to market and for you to understand both the negative and positive reactions from customers to Pentair.[49]

Below that message, Murray copied the e-mail he had sent to Pentair's RSMs. The e-mail discussed Murray's dislike of buying groups, specifically the buying group Aquatech. Murray had several "issues" with Aquatech:

> redistribution of product by [Aquatech] members, all members no matter their Pentair volume receiving our best pricing, our BASE pricing being given out to prospective dealers even if they do not use our product, members using our pricing to negotiate with distribution and eroding our distribution channel margins, etc. Noen [*sic*] of this is good for Pentair short or long term as it undermines our most important channel of distribution.[50]

Murray was particularly concerned with the buying groups' potential to erode the distribution channel. Distribution, Murray wrote, "is 90% of our business -- they turn our lights on everyday."[51] Pentair preferred dealing with distributors because

---

[48]   *Id.*

[49]   R. Doc. 298-9 at 1.

[50]   *Id.* at 2.

[51]   *Id.*

that channel allowed Pentair to send out "larger orders, palletized to one location."[52] Selling to "small dealers within Aquatech," in contrast, "cause[d] [Pentair] shipping problems."[53] Murray noted that Hayward and Zodiac had been dealing with buying groups on favorable terms, but he viewed this as "burning the candle at both ends" and stated that "Pentair will not operate this way."[54] Murray closed by stating that Pentair would make "changes in prices and programs" by October 1, 2010.[55]

Perez responded to Murray's email with a message stating that Pool would "do [its] utmost to ensure that Hayward and Zodiac move in the same direction to support distribution as their preferred channel to market."[56] Pool stated that this would be a "point of much greater emphasis as part of the updated vendor agreements to qualify as a preferred vendor."[57]

In April 2010, Bruce Fisher of Hayward received a phone call from Perez.[58] Describing that phone call in an e-mail, Fisher stated as follows:

---

[52]   *Id.*

[53]   *Id.*

[54]   *Id.* at 1.

[55]   *Id.* at 2.

[56]   SCAC ¶ 74.

[57]   *Id.*

[58]   *Id.* ¶ 76.

[B]uying groups. . . . Said he [Perez] had copies of both the Pentair and Zodiac programs for both Aquatech and Carecraft. . . . Bottom line: Zodiac is only paying for growth -- supposedly there is no longer the automatic 3% marketing allowance from this competitor. In addition, new members don't count in the growth in year one as this creates a windfall for the buying groups as they recruit new dealers. With respect to Pentair, they have cut back their program to about 1% of sales at the corporate level and no longer give marketing allowances. In addition, Pentair has supposedly raised their prices via charges for transaction costs.[59]

Then, in June 2010, Pool allegedly met with Hayward and Zodiac to discuss pricing terms for buying groups.[60] The SCAC suggests that Pool conveyed to Hayward and Zodiac that it "wanted the Manufacturer Defendants to change their policies to make it even more difficult for buying groups to receive discounts and other incentives and to compete with PoolCorp."[61] On July 13, 2010, Pool met with Pentair to discuss buying groups.[62] Pool allegedly used the same agenda that it had used with Hayward and Zodiac.[63] Soon after the meeting, "Pentair announced major changes to the terms and conditions on which it would deal with

---

[59]    *Id.*

[60]    *Id.* ¶ 77.

[61]    *Id.*

[62]    *Id.* ¶ 78.

[63]    *Id.; see also* R. Doc. 298-11 at 1 (e-mail from Dave Murray of Pentair stating that Dave Cook of Pool "confessed" to using the same agenda for each meeting).

14

buying groups, effective October 1, 2010"[64] -- consistent with the intention Murray expressed in his March e-mail.[65] These changes included a minimum purchase requirement for buying group members.[66]

On August 21, 2010, the Manufacturer Defendants all allegedly attended a "PoolCorp Senior Management Meeting, where they discussed price increases, among other things."[67] On August 25, 2010, Zodiac announced "changes to its buying group programs" designed "to discourage anyone buying less than $10,000 a year from buying through the groups, and divert them to a distributor."[68] Sometime in the fall of 2010, Hayward also made changes to its buying group programs, which included "a $10,000 minimum purchase for customers."[69] The changes took effect October 1.[70]

DPPs allege that manufacturers did not favor direct distribution to dealers because of the attendant costs, because of their lack of expertise in distribution, and because the

---

[64]    SCAC ¶ 80.

[65]    *See* R. Doc. 198-9 at 2.

[66]    SCAC ¶ 80.

[67]    *Id.* ¶ 81.

[68]    *Id.* ¶ 82.

[69]    *Id.* ¶ 83.

[70]    *Id.*

manufacturers that did not sell full lines of Pool Products had difficulty obtaining products to distribute from competing manufacturers.[71] Thus, the SCAC suggests that it may have been in the Manufacturer Defendants' self-interest to put buying groups at a disadvantage, in order to preserve their preferred channel to market. This account is corroborated by Dave Murray's e-mail explaining why buying groups were not good for Pentair's business. On the other hand, the SCAC generally alleges that Hayward, in particular, wanted to "develop and expand its business with buying groups."[72]

## B.    Allegations of Fraudulent Concealment

DPPs allege that they "did not discover, and could not discover through the exercise of reasonable diligence, the existence of Defendants' unlawful conspiracy and anticompetitive conduct . . . until November 21, 2011 when the Federal Trade Commission (FTC) first made public its investigation [of Pool for allegedly anticompetitive practices] and related consent decree."[73] In support of this allegation, DPPs state that "the Defendants engaged in secret meetings and communications" to

---

[71]    *Id.* ¶ 34; *see also id.* ¶ 32 ("Manufacturers of Pool Products consider wholesale distributors to be a unique and essential channel for the efficient distribution of their Products."); *id.* ¶ 53.

[72]    *Id.* ¶ 69.

[73]    *Id.* ¶ 138.

prevent the DPPs from "learning sufficient facts relating to the actual bases for the high prices they were paying for Pool Products."[74] They also allege that the defendants gave false or pretextual reasons for their anticompetitive conduct.[75] For example, the SCAC states that Pool told its customers that price increases for Pool Products were a result of increases by vendors, when in fact Pool had convinced the vendors to raise prices so that Pool could "generate more revenue based on its markup."[76]

DPPs admit, however, that "certain would-be rivals of PoolCorp may have learned that PoolCorp was engaged in exclusionary conduct."[77] Indeed, elsewhere in the SCAC, DPPs allege that the Manufacturer Defendants told Pool's rivals that they could not sell to the rivals "because of PoolCorp."[78]

---

[74]   *Id.* ¶ 140; *see also id.* ¶ 141(e) ("PoolCorp and the Manufacturer Defendants communicated and met in secret to effectuate their unlawful conspiracy.").

[75]   *Id.* ¶ 141.

[76]   *Id.* ¶ 141(d); *see also id.* ¶ 67 ("On numerous occasions when PoolCorp raised its prices, falsely citing to its customers the manufacturers' price increases as the reason, PoolCorp had reached secret agreements with manufacturers to delay the increase to PoolCorp or to offset the increase through secret rebates for a period of time.").

[77]   *Id.* ¶ 139.

[78]   *Id.* ¶ 89; *see also id.* ¶ 91 ("PoolCorp's Preferred Vendors told [Pool's rival] Alpha 3 that they could not sell to Alpha 3 because of PoolCorp's restrictions.").

Moreover, Pool allegedly told manufacturers (including, but not limited to, the Manufacturer Defendants) that the manufacturers risked losing Pool's business if they sold Pool Products to Pool's rivals.[79] At least one of the Manufacturer Defendants relayed this message to others in the industry, including Dealers.[80] Nevertheless, DPPs state that they were unable to learn of the alleged antitrust violations until 2011 and thus that the running of the limitations period on their claims has been tolled under the doctrine of fraudulent concealment.[81]

## II.  THE SUFFICIENCY OF PLAINTIFFS' *PER SE* CLAIM

### A.  *Per Se* Claims Under the Sherman Act

Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. It has long been recognized that this provision prohibits only "unreasonable" restraints of trade. *Nat'l Collegiate Athletic Ass'n v. Bd. of*

---

[79]  *Id.* ¶ 90; *see also id.* ¶ 94 ("PoolCorp had sent letters to at least 25 vendors . . . directing them not to sell Pool Products to [Pool's rival] PoolSource."); *id.* ¶ 101 ("Any effort by [a] vendor to sell its products to PoolCorp rivals was met with threats that purchases from PoolCorp would be cut off.").

[80]  *Id.* ¶ 105 ("Hayward had implemented steps to counter the threat from [Pool's rival] Aquastar, including 'telling any distributor or major retailer that sells [Aquastar's competing parts] [that it] will lose [its] rebates.'" (second alteration in original)).

[81]  *Id.* ¶¶ 144-45.

*Regents*, 468 U.S. 85, 98 (1984). When a business "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output," or a "naked restrain[t] of trade with no purpose except stifling of competition," it is deemed *per se* unreasonable -- and thus *per se* illegal -- under Section 1, and condemned without further analysis. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979) (internal quotation marks omitted) (alteration in original); *see also Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work . . . .").

DPPs have alleged that defendants engaged in a conspiracy to disadvantage Pool's rivals, which they contend is a *per se* violation of Section 1.[82] As noted in the Court's earlier order, in order for the *per se* rule to apply to such a claim, there must be a horizontal agreement among competitors. *NYNEX Corp. v. Discon., Inc.*, 525 U.S. 128, 135 (1998); *Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 412 (5th Cir. 2007) (following *NYNEX*); *see also PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412, 420 (5th Cir. 2010) (plaintiff alleging a "hub-and-spoke" conspiracy must allege a horizontal

---

[82]   SCAC ¶¶ 151-52.

agreement -- or a "wheel" connecting the conspirators -- in order to plead a *per se* illegal Section 1 violation). If the conduct involves only vertical agreements, the practice must be evaluated under the Rule of Reason, which deems a restraint illegal if it has an anticompetitive impact on the relevant market. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002). Absent any agreement, there is no Section 1 claim, because an anticompetitive agreement is the *sine qua non* of a Section 1 violation.

In order to prove an agreement for antitrust purposes, the plaintiff must present direct or circumstantial evidence of a "conscious commitment to a common scheme" that "tends to exclude the possibility of independent action." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). "'[C]onscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007) (second and third alterations in original) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)).[83]

---

[83]    *But cf. generally* Louis Kaplow, *An Economic Approach to Price Fixing*, 77 Antitrust L.J. 343 (2010) (arguing that the legal doctrine's focus on proscribing only express and tacit agreements is inconsistent with the economic principles underlying oligopolistic coordination).

The question at issue here is whether DPPs have pled sufficient facts in support of their claim of a horizontal antitrust agreement among the Manufacturer Defendants to survive defendants' Rule 12(b)(6) motion to dismiss DPPs' *per se* claim. Before focusing on the merits of this issue, the Court must address a preliminary procedural matter.

**B.  Consideration of Documents Outside the Complaint**

Manufacturer Defendants ask that the Court consider certain documents referred to in the SCAC in resolving this motion.[84] Manufacturer Defendants have attached the documents as exhibits to their motion to dismiss. DPPs object to the Court's consideration of these documents.[85]

In considering a motion to dismiss for failure to state a claim, a court must typically limit itself to the contents of the pleadings, including their attachments. Fed. R. Civ. P. 12(d); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). But a court deciding a Rule 12(b)(6) motion may "consider documents attached to a motion to dismiss that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Kopp v. Klein*, 722 F.3d 327, 333 (5th Cir. 2013); *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015,

---

[84]    R. Doc. 298-2 at 6.

[85]    *See* R. Doc. 335.

1017 (5th Cir. 1996) ("[I]n deciding a motion to dismiss for
failure to state a claim, courts must limit their inquiry to the
facts stated in the complaint and the documents either attached
to or incorporated into the complaint.").

DPPs do not dispute that the documents attached to
Manufacturer Defendants' motion to dismiss are in fact the
documents that DPPs relied on in drafting the complaint. Instead,
the DPPs object to the Court's consideration of these documents
on three other grounds: (1) the documents are not "central" to
the SCAC's claims; (2) DPPs have additional documents supporting
those claims; and (3) Manufacturer Defendants have asked the
Court to draw inferences from the documents adverse to DPPs.[86]
Manufacturer Defendants respond that the documents are in fact
"central" to the SCAC because those documents were the basis upon
which the Court granted DPPs leave to file a second amended
complaint.[87]

Manufacturer Defendants have the better of this argument.
DPPs represented to the Court that, after filing their first
amended complaint, they "discovered information demonstrating
communications between Defendants -- including communications
among the Manufacturer Defendants themselves -- that persuasively
support a *per se* Section 1 claim and Defendants' fraudulent

---

[86]     *See id.*

[87]     R. Doc. 336-1 at 1.

concealment of their misconduct."[88] To the extent DPPs have referred to these newly-discovered documents in the SCAC, those documents form the primary basis of their *per se* and fraudulent concealment allegations, and so it is appropriate for the Court to consider them. *See Global Oil Tools, Inc. v. Barnhill*, No. 12:1507C/W12-3041, 2013 U.S. Dist. LEXIS 84696, at *28 (E.D. La. June 14, 2013) (court may consider documents "directly referenced" in the complaint that "form the basis of [plaintiffs'] claims"); *see also Lovelace*, 78 F.3d at 1017 (court may consider "documents either attached to or incorporated into the complaint"); *cf. Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (Bankr. N.D. Tex. 2011) ("[D]ocuments are central when they are necessary to establish an element of one of the plaintiff's claims.").

Although DPPs cite *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533 (5th Cir. 2003), in support of their argument that the documents are not "central" to their claims, that case is distinguishable. In *Scanlan*, the Fifth Circuit held that the district court should not have considered the Final Report of a commission convened to investigate an accident at a bonfire because (1) the Final Report was not attached to the defendants' motion to dismiss; (2) "the plaintiffs did not accept the Final Report as true"; and (3) the document was "much more central to the [defendants'] defenses"

---

[88]     R. Doc. 240-1 at 3-4.

than to the plaintiffs' claims. *Id.* at 536-37. Here, in contrast, the documents in question were referred to (in some cases, directly quoted) in the SCAC and attached to Manufacturer Defendants' motion to dismiss; DPPs do not challenge the documents' authenticity; and the documents form the basis of DPPs' *per se* illegality and fraudulent concealment claims. Accordingly, the Court will consider them in deciding this motion. *See Borders v. Chase Home Fin. L.L.C.*, No. 09-3020, 2009 WL 1870916, at *5 (E.D. La. June 29, 2009) (considering documents attached to motion to dismiss because they were "referenced in Plaintiff's complaint, central to . . . plaintiff's claims, and because Plaintiff ha[d] not challenged the substantive validity of the documents").

The DPPs' latter concerns are misplaced. The Court will construe both DPPs' factual allegations and the documents in question in the light most favorable to DPPs. *See Scanlan*, 343 F.3d at 537. As is always the case at the motion to dismiss stage, the Court will draw all reasonable inferences in favor of the plaintiffs.

C.   **Legal Standard**

Federal Rule of Civil Procedure 8(a)(2) provides that a plaintiff's complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme

24

Court explained at length the requirements of Rule 8 in the context of a horizontal conspiracy claim under Section 1 of the Sherman Act. *Twombly* held that, in order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must provide "enough factual matter (taken as true) to suggest that an agreement was made," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

The Court made clear that, in a complaint alleging a horizontal conspiracy under Section 1 of the Sherman Act, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.; see also id.* at 555 ("[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." (internal quotation marks omitted) (second alteration in original)). Yet the Court stressed that it was not "impos[ing] a probability requirement at the pleading stage"; rather, it was simply requiring that the plaintiff state "plausible grounds to infer an agreement." *Id.* at 556. Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.*

Applying this standard to the facts before it, the *Twombly* Court held that the plaintiff had failed to state a Section 1 claim because the complaint contained only descriptions of parallel conduct and conclusory assertions of agreement. *Id.* at 564. The allegations of agreement were "merely legal conclusions" not entitled to a presumption of truth, *id.*, and the parallel conduct described in the complaint was not indicative of conspiracy because there was nothing alleged to suggest that the conduct was "anything more than the natural, unilateral" action of each defendant. *Id.* at 566-68. Accordingly, "the plaintiffs [had] not nudged their claims across the line from conceivable to plausible," which meant that their complaint must be dismissed. *Id.* at 570.

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court reaffirmed and further elaborated on the pleading standard set forth in *Twombly*. It held that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, taken as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). *Iqbal* confirmed that, while courts must accept all facts pleaded in the complaint as true on

a motion to dismiss, courts are *not* required to presume the truth of "a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555). After *Twombly* and *Iqbal*, courts evaluating a complaint for sufficiency under Rule 8 must begin by identifying "conclusory" and "formulaic" assertions in the complaint that are not entitled to an assumption of truth, and then examine the remaining allegations "to determine if they plausibly suggest an entitlement to relief." *Iqbal*, 556 U.S. at 680-81.

In considering conspiracy claims based on allegations of parallel conduct, courts also consider whether the plaintiff has pled facts in addition to parallelism that support an inference of concerted action -- so-called "plus factors." 2 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 307 (3d ed. 2010). "[E]xistence of these plus factors tends to ensure that courts punish 'concerted action' -- an actual agreement -- instead of the 'unilateral, independent conduct of competitors.'" *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004). Plus factors identified by courts and commentators include (1) actions that would be against the defendants' self-interest if the defendants were acting independently, but consistent with their self-interest if they were acting in concert; (2) a motive to conspire; (3) an opportunity to conspire; (4) market concentration and structure conducive to collusion; (5)

pretextual explanations for anticompetitive conduct; (6) sharing of price information; (7) signaling; and (8) involvement in other conspiracies. ABA Section of Antitrust Law, Proof of Conspiracy Under Federal Antitrust Laws 69-91 (2010) [hereinafter "Proof of Conspiracy"] (collecting cases). There is no finite or exhaustive list of plus factors, and different courts articulate the relevant factors in different ways. *Id.* at 69; *see also Burtch v. Milberg Factors*, 662 F.3d 212, 227 (3d Cir. 2011) ("[W]e have identified at least three types of facts, often referred to as 'plus factors,' that tend to demonstrate the existence of an agreement: '(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy.'"). A plausible allegation that the parallel conduct was not in the alleged conspirators' independent self-interest absent an agreement is generally considered the most important "plus factor." Proof of Conspiracy, *supra*, at 70 (collecting cases); *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009) (noting that, "[o]rdinarily," this plus factor "will consistently tend to exclude the likelihood of independent conduct" (quoting *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999))); *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436, 1999 WL 691840, at *10 (4th Cir. 1999) (unpublished)

28

("Evidence of acts contrary to an alleged conspirator's economic interest is perhaps the strongest plus factor indicative of conspiracy."). When, as here, the plaintiff relies on circumstantial evidence that the defendants engaged in concerted action, plus factors are generally necessary in order to plead a plausible Section 1 claim. *See, e.g.*, *Burtch*, 662 F.3d at 227; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010) (noting that, because *Twombly* rejected the proposition that parallel conduct, standing alone, could give rise to an inference of conspiracy, it "necessarily required the pleading of plus factors").

## D.  Discussion

Following the dictates of *Iqbal* and *Twombly*, the Court must first identify and discard any conclusions of law "couched as factual allegation[s]" contained in the SCAC. These include conclusory assertions that the Manufacturer Defendants "agreed with each other" or "conspired together" in order to effectuate the alleged boycott of Pool's Rivals. *See Twombly*, 550 U.S. at 564 & n.9 (noting that allegations that the defendants entered into a "conspiracy" or an "agreement" are "merely legal conclusions" not entitled to a presumption of truth); *Mayor & Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013) ("The ultimate existence of an 'agreement'

under antitrust law . . . is a legal conclusion, not a factual allegation.").

Once these "legal conclusions" are removed from the analysis, DPPs' claims of a horizontal conspiracy rest on two primary bases: the allegations of an agreement to raise free freight limits and the allegations of agreements concerning onerous minimum purchase requirements for buying groups. The Court will address each in turn. Ultimately, the Court finds that DPPs have adequately pled a horizontal conspiracy to raise free freight limits, but they have not sufficiently alleged a horizontal agreement to impose disadvantageous terms on buying groups.

1.   *Allegations of Agreements Concerning Free Freight*

As an initial matter, the SCAC clearly alleges parallel conduct: The Manufacturer Defendants raised the free freight minimums by an identical amount within a three-month period. But the DPPs' complaint goes well beyond that in several respects and sufficiently "nudge[s] [plaintiffs'] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570.

a.   *Parallel Action Against Independent Self-Interest*

First, and most importantly, the SCAC plausibly alleges that Manufacturer Defendants' parallel conduct was contrary to their independent self-interest. DPPs are clearly correct that the

raised freight minimums were, in effect, price increases for
Pool's smaller rivals that could not afford to buy $20,000 worth
of goods at a time.[89] *Cf. Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643, 648 (1980) (holding that an "agreement to terminate
the practice of giving credit" is appropriately characterized as
a price-fixing agreement because "[i]t is virtually self-evident
that extending interest-free credit for a period of time is
equivalent to giving a discount equal to the value of the use of
the purchase price for that period of time"). Thus, the raised
minimums made it harder for Pool's rivals to compete with Pool.
But plaintiffs plausibly allege that the Manufacturer Defendants
did not *want* to make it harder on Pool's rivals; rather, they
would have preferred "to have two or more distributors selling
their Pool Products to ensure that their Dealer customers receive
competitive service and prices."[90]

Each Manufacturer Defendant had a reason not to raise their
prices to Pool's rivals unilaterally. Absent parallel action by
the other Manufacturer Defendants, such an increase in prices on
the part of one manufacturer would risk a loss of market share to
the other manufacturers. *See In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 671, 683-84 (S.D.N.Y. 2012) (noting that each of
the defendants would not want to raise their prices unilaterally

---

[89]    *See* SCAC ¶ 62.

[90]    *Id.* ¶ 38.

because that would entail pricing higher than its competitors,
which could cause a loss in market share); 6 Areeda & Hovenkamp,
*supra*, § 1415c (noting generally that "one cannot profitably
increase its price above that charged by rivals unless they
follow the price-raiser's lead"). Thus, it is plausible to infer
that the Manufacturer Defendants had a motive to conspire -- that
is, they were unwilling to raise their prices to Pool's rivals
absent assurance that all would do the same. *See In re Elec.
Books*, 859 F. Supp. 2d at 684; *In re Ins. Brokerage*, 618 F.3d at
337 (finding that complaint plausibly alleged a horizontal
conspiracy involving a "bid rotation scheme" because it suggested
that "each bid-rigging defendant's decision not to compete was
conditioned on an expectation of reciprocity from its
competitors"); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 932 (7th
Cir. 2000) (upholding FTC's finding of horizontal boycott among
toy manufacturers when the evidence showed that each manufacturer
"agreed to join in the boycott '*on the condition that their
competitors would do the same*'").

It is true, of course, that the Manufacturer Defendants
raised the free freight minimums after Pool's "bitter" complaints
that the minimums were too low.[91] And elsewhere in the complaint,
DPPs suggest that Pool's leverage over the Manufacturing
Defendants was so substantial that each Manufacturer Defendant

---

[91]     *Id.* ¶ 62.

might have complied with Pool's demands even without assurance of similar action by the other manufacturers.[92] Thus, it is perhaps plausible that each Manufacturer Defendant individually agreed with Pool, in response to Pool's complaints, to raise the free freight minimums, and readily did so without any agreement with the other manufacturers that they would follow suit.

But "[t]he question at the pleading stage is not whether there is a plausible *alternative* to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) (quoting *Anderson News*, 680 F.3d at 189-90). "The choice between two plausible alternative inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News*, 680 F.3d at 185. Instead, the Court must accept the plaintiff's version of events, so long as that version is plausible, and it may not dismiss the complaint "merely because [it] finds a different version more plausible." *Id.*

*Toys "R" Us* is instructive in this regard. There, the Seventh Circuit affirmed the FTC's finding of a *per se* illegal

---

[92]    *See id.* ¶ 58 ("Because of PoolCorp's national presence and purchasing clout, Pool Products manufacturers take PoolCorp's demands quite seriously and fear losing business if they do not comply with PoolCorp's wishes and agree to exclude PoolCorp's competitors."); *accord id.* ¶¶ 42, 55, 60, 150.

group boycott when the evidence indicated that Toys "R" Us had
acted as the coordinator of a horizontal agreement among a number
of toy manufacturers to restrict output to warehouse club stores.
There was no direct evidence that the manufacturers agreed with
each other to engage in the scheme, but the Seventh Circuit held
that a horizontal agreement had been established. In making that
determination, the Seventh Circuit observed that it would be
"suspicious for a manufacturer to deprive itself of a profitable
sales outlet." *Id.* at 935. Documents gathered by the FTC had
suggested that "the manufacturers were trying to expand, not to
restrict, the number of their major retail outlets and to reduce
their dependence on [Toys "R" Us]." *Id.* at 932. Toys "R" Us had
disputed this finding, arguing that "each manufacturer in its
independent self-interest had an incentive to limit sales to the
clubs" because the manufacturers all wanted to "maintain[] a good
relationship with the 100-pound gorilla of the industry, [Toys
"R" Us], and make far more sales." *Id.* at 935. The Court
acknowledged that TRU's interpretation of the evidence was
reasonable, but found that the FTC's inference of conspiracy was
plausible as well. *Id.* Thus, the FTC's finding prevailed.[93]

---

[93]    Defendants contend that *Toys "R" Us* is distinguishable
because the Seventh Circuit was applying the deferential
"substantial evidence" standard of review to the FTC's decision.
The Court finds this argument unpersuasive. Under the
"substantial evidence" standard, a reviewing court essentially
asks whether the agency's analysis was "implausible." *See Toys
"R" Us*, 221 F.3d at 935. "Plausibility" is also the relevant

So it is here. The SCAC plausibly alleges that each Manufacturer Defendant would not have had an incentive to raise their free freight minimums absent assurance that the others would do the same. This factor weighs strongly in favor of the sufficiency of the SCAC's allegation of a horizontal conspiracy to raise free freight minimums.

    b.   *Opportunity to Conspire*

The SCAC also plausibly alleges that the defendants had an opportunity to form a horizontal conspiracy. After two of the Manufacturer Defendants (Hayward and Pentair) implemented identical free freight increases within a day of each other, executives of Hayward and Zodiac met, and thus had an opportunity to conspire about the freight limits. Manufacturer Defendants contend that DPPs mischaracterized the substance of this meeting as relating to "internal business matters," when in fact it concerned "*only* Zodiac's internal staffing level."[94] But, regardless of what Fisher said in his e-mail about the substance of the meeting, the fact remains that he had an *opportunity* to speak with Rasp about free freight minimums. (It is not likely that Fisher would have put in writing that he engaged Rasp in a

_____

benchmark on a Rule 12(b)(6) motion.

    [94]    R. Doc. 298-2 at 15.

discussion about price-fixing, if in fact such a discussion took place.)

Of course, an allegation of an opportunity to conspire, standing alone, is insufficient to raise an inference of conspiracy. *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 53 (3d Cir. 2007); *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 827 (11th Cir. 1990) (collecting cases). But, when added to the SCAC's allegations that the parallel conduct was against the Manufacturer Defendants' individual self-interest, the existence of an opportunity to effectuate the alleged conspiracy takes on additional weight. *See In re Wellpoint, Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1026 (C.D. Cal. 2011) (allegations of opportunities to conspire "demonstrate[] how and when Defendants had opportunities to exchange information or make agreements," and can give rise to plausible inference of conspiracy when joined with allegations of other plus factors (alteration in original)).

c.   *Industry Conditions*

DPPs do not include any specific allegations in the SCAC suggesting that conditions in the Pool Products industry were ripe for collusion. But the e-mail from Bruce Fisher described above states that, at the time the freight minimum increases were

occurring, business was "weak" and he was overstaffed.[95]
"Normally, reduced demand and excess supply are economic
conditions that favor price cuts, rather than price increases."
*In re Flat Glass*, 385 F.3d at 361. Thus, indications that the
Pool Products market was weak at the time of the freight minimum
changes, which were equivalent to price increases, strengthen the
inference that those increases were the product of collusion.
*See, e.g.*, *Am. Tobacco Co. v. United States*, 328 U.S. 781, 804-06
(1946) (affirming defendants' conviction for conspiracy to fix
prices where defendants had uniformly raised prices during times
of low demand); *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*,
804 F. Supp. 2d 419, 426 (D. Md. 2011) ("Of critical importance
to the plausibility of Plaintiffs' complaint [alleging a price-
fixing conspiracy in the titanium dioxide market] is the fact
that the various price increases implemented by Defendants
occurred at a time when demand for titanium dioxide was dwindling
. . . .").

   d. Pool E-mail

   In the SCAC, DPPs quote an e-mail from Pool's CEO to Pool
executives stating that "Pentair, Hayward and Jandy [Zodiac] have
all agreed to the $20,000 freight minimum with NO exceptions."[96]

---

[95]   R. Doc. 298-4 at 1.

[96]   SCAC ¶ 64.

Plaintiffs contend that this document is a "smoking gun" providing direct evidence of conspiracy among the Manufacturer Defendants and Pool, while defendants argue that it suggests, at worst, that each Manufacturer Defendant had individually agreed with Pool to raise the freight minimums.

Plaintiffs' interpretation is plausible. The e-mail could mean that the Manufacturer Defendants "agreed" with each other and with Pool to raise the freight limits, particularly in light of the other plus factors the Court described above. That defendants' interpretation of the document may also be plausible does not foreclose plaintiffs' interpretation at this stage. *Anderson News*, 680 F.3d at 185, 190 (choice of inferences to be drawn from ambiguous evidence "is a question for the factfinder"); *see also Evergreen Partnering Grp.*, 720 F.3d at 45-46. Further, the language of the document (Manufacturer Defendants "have all agreed") was chosen by Pool. The use of the word "agreed" is not a conclusion plaintiffs have interposed in a pleading drafted after the fact.

### e.  *Who, What, When, and Where*

Pool Defendants contend that the SCAC falls short of stating a claim for conspiracy to fix free freight minimums because it does not state who made the agreement, or where and when it was

made.[97] But antitrust plaintiffs are "not required to mention a specific time, place, or person involved in each conspiracy allegation." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010). Instead, a complaint need only "allege the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible." *Evergreen Partnering Grp.*, 720 F.3d at 46. The SCAC clearly alleges that the Manufacturer Defendants conspired to increase the free freight minimums from $10,000 to $20,000 in the fall of 2007, and it suggests that the September meeting between Fisher and Rasp was a locus of the agreement. Moreover, the Pool e-mail gives rise to a plausible inference that the agreement had definitively coalesced by November 30, 2007. The "general contours" of the alleged agreement are sufficiently clear for the motion to dismiss stage.

   f.   *Conclusion*

   In sum, the Court finds that the SCAC, viewed as a whole, plausibly alleges parallel conduct "in a context that raises a suggestion of a preceding agreement," *Twombly*, 550 U.S. at 557; *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) (courts considering a conspiracy claim must evaluate the alleged conspiracy as a whole, "without tightly

---

[97]     *See* R. Doc. 296-1 at 11.

39

compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"). The plus factors described above -- allegations that the parallel conduct was against the defendants' self-interest absent similar action on the part of the other defendants, allegations of opportunities to conspire, and evidence that demand was falling while the parallel price increases were occurring -- in conjunction with arguably direct evidence of agreement render the SCAC sufficient under *Twombly*. *Cf. Evergreen Partnering Grp.*, 720 F.3d at 47-50 (plaintiff had sufficiently pled a *per se* illegal group boycott because it alleged (1) parallel actions taken by the defendants after a meeting at which they were all present; (2) "circumstantial evidence to establish a context for plausible agreement in the form of industry information and facilitating practices"; and (3) facts plausibly suggesting that the parallel conduct was contrary to the defendants' independent business interests); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) (affirming district court's refusal to dismiss complaint alleging a horizontal conspiracy because the complaint "allege[d] a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion").

To be sure, the plaintiffs' allegations do not establish the existence of a horizontal conspiracy, or even that it is more likely than not that such a conspiracy occurred. There are

alternative explanations for virtually every fact alleged in the SCAC. But DPPs' allegations do give rise to a plausible inference of a horizontal conspiracy, and under Rule 8 and *Twombly*, that is sufficient. The SCAC's claim of a *per se* illegal conspiracy among the Manufacturer Defendants and Pool to fix free freight minimums may go forward.

## 2.  *Allegations of Agreements Concerning Buying Groups*

DPPs have not adequately alleged that the Manufacturer Defendants conspired with each other to disadvantage buying groups. This is true for two primary reasons. First, the SCAC does not plausibly allege that such conduct would be contrary to the Manufacturer Defendants' independent self-interest. Second, the SCAC's factual allegations purporting to show a conspiracy to impose onerous terms on buying groups are impermissibly vague, and at times inconsistent with the proposition that the Manufacturer Defendants colluded regarding the terms upon which they dealt with buying groups.

### a.  *Parallel Actions Against Independent Self-Interest*

Buying groups consisted of dealers, not wholesale distributors. Significantly, the SCAC alleges that "the wholesale distribution network is the most efficient way for manufacturers to reach customers."[98] According to DPPs, manufacturers prefer to

---

[98]    SCAC ¶ 32.

sell to distributors, rather than directly to dealers, because of
the ensuing costs, the Manufacturer Defendants' "lack of
expertise in distribution," and the difficulty the manufactures
have obtaining products to distribute from competing
manufacturers.[99]

This account is corroborated by Pentair's own reasoning in
adopting restrictions on buying group sales beginning in 2009.
(The complaint does not allege that Pentair acted in concert with
the other Manufacturer Defendants in imposing these 2009
restrictions.) Pentair imposed a $70,000 minimum purchase
requirement on members of Carecraft, one of the largest buying
groups.[100] Dave Murray of Pentair justified that action in an e-
mail he sent to Pentair's regional sales managers and then
forwarded to Manny Perez of Pool in March 2010.[101] Murray
described Pentair's perception of its self-interest as follows:
selling to buying groups "undermine[d] [Pentair's] most important
channel of distribution," "erode[d] [its] distribution channel
business," and caused it to "los[e] trust from [its] distribution
partners."[102] The distribution channel was exceptionally important

---

[99]    *Id.* ¶ 34; *see also id.* ¶ 53 ("[V]arious considerations
discouraged manufacturers from engaging in direct
distribution.").

[100]    *Id.* ¶ 73.

[101]    *See* R. Doc. 298-9.

[102]    *Id.* at 2.

to Pentair, Murray explained, because distribution "is how we are set up operationally to go to market -- larger orders, palletized to one location."[103]

Murray was particularly exasperated with one buying group, Aquatech, that had been buying from Pentair and then reselling Pentair's Pool Products to Dealers at Pentair's "base" price level.[104] Murray wrote, "No[ne] of this is good for Pentair short or long term as it undermines our most important channel of distribution. We might as well publish our BASE pricing in Pool and Spa News."[105] Based on these concerns, Pentair had "continually made" changes to the terms upon which it dealt with Aquatech, changes which had "create[d] tension between Aquatech and Pentair."[106]

Pentair clearly did not want to favor buying groups with the same terms as those offered to distributors, whether or not the other Manufacturer Defendants did. Indeed, Murray wrote that "Hayward and Zodiac are burning the candle at both ends [that is, by trying to appease both distributors and buying groups] . . . . Pentair will not operate this way. We always must look out for

---

[103]    *Id.*

[104]    *Id.*

[105]    *Id.*

[106]    *Id.* at 1.

the best interests of Pentair and our business."[107] Thus, Pentair was clearly willing and able to place restrictions on buying groups independently of Hayward and Zodiac.

Importantly, plaintiffs do not allege that the Manufacturer Defendants cut off buying groups completely, but rather that they required the buying groups to make substantial minimum purchases. Minimum purchase requirements made good business sense for manufacturers of Pool Products, because the requirements minimized transaction costs associated with shipments. *Cf. Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 104 (3d Cir. 1992) (noting that "dealing in large volumes" minimizes transaction costs). Manufacturers of Pool Products preferred to deal in bulk. This is clear from the passage in Murray's e-mail complaining that the orders Pentair was receiving from "small dealers within Aquatech" were causing Pentair "shipping problems."[108]

To summarize, the minimum purchase requirements, far from being contrary to the Manufacturer Defendants' independent self-interest, benefitted them in two ways. First, the requirements encouraged Dealers to buy through the manufacturers' preferred channel to market -- distributors. Second, the requirements ensured that, if the Dealers did choose to buy through the

---

[107]   *Id.*

[108]   R. Doc. 298-9 at 2.

groups, they would purchase in sufficiently large volumes to avoid causing the manufacturers shipping headaches.

DPPs do suggest in a general way that at least one Manufacturer Defendant, Hayward, wanted to expand its business with buying groups.[109] But, given the allegations elsewhere in the complaint that the Manufacturer Defendants preferred selling through distributors, this allegation at best suggests an idiosyncratic attitude toward buying groups on the part of Hayward. Viewing the SCAC as a whole, it is simply implausible to infer that the Manufacturer Defendants uniformly believed that selling to buying groups on equal terms with their distributor network was in their best interest. To the contrary, because there is no indication that buying groups provided the Manufacturer Defendants with benefits comparable to those provided by distributors' networks, it made business sense for them to receive less advantageous terms.

Moreover, Pool clearly made it known to the Manufacturer Defendants that it wanted them to stop treating buying groups favorably.[110] And the SCAC is replete with allegations that,

---

[109]    SCAC ¶ 69.

[110]    *See id.* ¶ 74 (noting that Pool assured Pentair that it would "do [its] utmost to ensure" that Hayward and Zodiac would not support the buying group model); *id.* ¶ 77 ("In or about June 2010, Dave Cook of PoolCorp met with representatives of Hayward and Zodiac to discuss their pricing terms for buying groups. PoolCorp wanted the Manufacturer Defendants to change their policies to make it even more difficult for buying groups to

because of Pool's market power, a manufacturer's refusal to bow to Pool's demands could have devastating consequences.[111]

Given these alleged facts, it is not plausible that the Manufacturer Defendants' treatment of buying groups stemmed from anything but their perception of their own best interests. First, this ensured that the Manufacturer Defendants' preferred channel to market would not be undermined and that they could continue to deal in large quantities of Pool Products.[112] Second, it ensured that they would appease Pool and continue to have Pool's business. *See* 6 Areeda & Hovenkamp, *supra*, ¶ 1415 (noting that "one might refrain from taking an otherwise profitable step because someone else has the power to make it unacceptably costly," and concluding that such inaction serves the decisionmaker's "long-run interest, taking the third party's power into account"); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (noting that the inference of conspiracy from parallel conduct is weakened if the alleged conspirators were each prompted to engage in the conduct

---

receive discounts and other incentives . . . .").

[111]    *See id.* ¶¶ 42, 55, 56, 60, 150.

[112]    *See* R. Doc. 298-9 at 2 (Murray's statement that selling through buying groups was not "good for Pentair short or long term as it undermines our most important channel of distribution"); *id.* ("[O]ur distribution channel is 90% of our business -- they turn our lights on everyday. This channel is also how we are set operationally to go to market -- large orders, palletized to one location.").

by a customer). Thus, the Court finds that the Manufacturer Defendants' parallel conduct in imposing minimum purchase requirements on buying groups does not give rise to a strong inference of conspiracy.

This is the key difference between the SCAC's allegations of a conspiracy to increase free freight minimums and its allegations of a conspiracy to impose minimum purchase requirements on buying groups. True, the freight minimums applied to buying groups, and they tended to incentivize Dealers to buy through distribution rather than through the groups.[113] But the freight minimums *also* had a deleterious effect on the manufacturers' distribution network, because they operated as a price increase for Pool's rival distributors.[114] The minimum purchase requirements, in contrast, are alleged to apply to the buying groups,[115] and thus they did not negatively affect the distribution network. Indeed, they prevented that network from being "undermine[d]."[116] This is why the freight minimum increases were plausibly contrary to the Manufacturer Defendants' independent self-interest, but the minimum purchase requirements imposed on buying groups were not.

---

[113]   *See* SCAC ¶ 72.

[114]   *Id.* ¶ 62.

[115]   *Id.* ¶¶ 80, 82, 83.

[116]   R. Doc. 298-9 at 2.

As noted above, allegations plausibly suggesting that parallel conduct was contrary to the defendants' independent self-interest are one of the most important components of a valid Section 1 complaint. The absence of such allegations here is damaging to plaintiffs' effort to plead a horizontal conspiracy to impose minimum purchase requirements on buying groups. *See Twombly*, 550 U.S. at 568 (dismissing allegations of conspiracy in part because "the complaint itself g[ave] reasons to believe" that the alleged conspirators would have unilaterally chosen to adopt the challenged course of action). Indeed, in each of the three primary cases upon which DPPs rely in their opposition to the motions to dismiss, the court found an inference of conspiracy plausible only when the alleged parallel conduct was contrary to the defendants' independent self-interest absent agreement to engage in the conduct. *See Evergreen Partnering Grp.*, 720 F.3d at 48; *Anderson News*, 680 F.3d at 171; *Toys "R" Us*, 221 F.3d at 932.

b. *Vague and Inconsistent Allegations*

The factual allegations concerning buying groups are implausible for another reason: they are impermissibly vague, and at times inconsistent with the proposition that the defendants colluded regarding buying group terms. The Court is unable to infer from these allegations the "general contours" of when the alleged agreement was made or even what, precisely, the agreement

was. True, the SCAC's allegations suggest that the Manufacturer Defendants engaged in somewhat similar conduct in changing the terms on which they dealt with buying groups. But the SCAC does not state that those changes were the same, and the timeline of events belies the contention that the changes were the product of collusion.

Pentair increased its minimum purchase requirements for Carecraft, one of the largest buying groups, in late 2009.[117] Then, in March 2010, Murray forwarded to Manny Perez an e-mail about buying groups that he had sent to his regional sales managers.[118] This e-mail did not "complain[] that Hayward and Zodiac were offering higher rebates to buying groups," as DPPs claim in the SCAC.[119] Rather, Murray explained why he thought buying groups were bad for business (they undermined Pentair's preferred channel of distribution) and stated that, no matter what actions Hayward and Zodiac took with respect to the buying groups, Pentair would favor distribution because that was in "the best interests of Pentair and our business."[120] Murray stated that

---

[117]    SCAC ¶ 73.

[118]    *Id.* ¶ 74; R. Doc. 298-9.

[119]    SCAC ¶ 74.

[120]    R. Doc. 298-9 at 1.

Pentair would be making changes to its buying group programs effective October 1, 2010.[121]

Perez responded to Murray's e-mail by stating that Pool would "do [its] utmost to ensure that Hayward and Zodiac move in the same direction to support distribution as their preferred channel to market."[122] Around the same time, Perez spoke separately with representatives of Zodiac and Hayward about buying groups.[123] In an e-mail sent on April 18, 2010, Bruce Fisher of Hayward described his phone call with Perez as follows:

> U.S.: buying groups. He jumped on this subject with both feet. Said he had copies of both the Pentair and Zodiac programs for both Aquatech and Carecraft. . . . Bottom line: Zodiac is only paying for growth -- supposedly there is no longer the automatic 3% marketing allowance from this competitor. In addition, new members don't count in the growth in year one as this creates a windfall for the buying groups as they recruit new dealers. With respect to Pentair, they have cut back their program to about 1% of sales at the corporate level and no longer give marketing allowances. In addition, Pentair has supposedly raised their prices via charges for transaction costs.[124]

Fisher's e-mail makes clear that, as of April 2010, Zodiac and Pentair were already beginning to change the terms upon which they dealt with buying groups, and the changes were not the same.

---

[121]    *Id.* at 2.

[122]    SCAC ¶ 74.

[123]    *Id.* ¶ 75.

[124]    *Id.* ¶ 76.

Moreover, Hayward did not already know about these changes -- it had to be apprised of them by Pool.

In June and July 2010, Dave Cook of Pool serially met with representatives of Hayward, Zodiac, and Pentair.[125] Buying groups were among the topics discussed at those meetings. Then, "[i]n July 2010, following the meeting with PoolCorp, Pentair announced major changes to the terms and conditions on which it would deal with buying groups, effective October 1, 2010 . . . includ[ing] a minimum annual purchase amount for buying groups."[126] It is not plausible that Pentair's changes were the product of collusion with Pool, Hayward, or Zodiac, because Murray had mentioned that he intended such changes four months earlier, in his March 2010 e-mail, and stated that they would become effective on October 1.[127]

It was still later that Zodiac and Hayward allegedly altered their minimum purchase requirements for buying groups,[128] and, even then, the SCAC does not allege that the changes were actually the same. Zodiac took actions designed "to discourage anyone buying less than $10,000 a year from buying through the

---

[125]   *Id.* ¶¶ 77-78; *see also* R. Doc. 298-10.

[126]   SCAC ¶ 80.

[127]   R. Doc. 298-9 at 2.

[128]   SCAC ¶¶ 82-83.

groups, and divert them to a distributor,"[129] while Hayward simply implemented a "$10,000 minimum purchase."[130] The SCAC also suggests that the three Manufacturer Defendants implemented other, unidentified changes to their buying group programs.[131]

The Court is unable to discern from the foregoing what, precisely, the Manufacturer Defendants are alleged to have agreed upon with respect to buying groups, or when the alleged agreement occurred. Pentair started making changes to its buying group programs long before any meetings between the defendants are alleged to have occurred. As of April 2010, Pentair and Zodiac each had different plans in place concerning buying groups, plans about which Hayward knew nothing until its conversation with Pool. In the summer of 2010, more changes in buying group programs followed -- but the substance of those changes is unclear, save that they all involved minimum purchase requirements. It is implausible that these changes were the result of collusion, given that at least two of the Manufacturer Defendants had begun putting buying groups at a disadvantage, independently of one another, much earlier.

In sum, whereas the substance of the alleged free freight agreement is clear, and the timeline of events consistent with

---

[129]    *Id.* ¶ 82.

[130]    *Id.* ¶ 83.

[131]    *See id.* ¶¶ 81-83.

the allegation of conspiracy, the buying group allegations are murky and internally inconsistent. Such vague conspiracy claims rarely pass muster under Rule 8 and *Twombly*. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (affirming dismissal of antitrust conspiracy allegations because the complaint did "not answer the basic questions: who, did what, to whom (or with whom), where, and when?"); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (affirming dismissal of complaint that defendants conspired to defame and libel plaintiffs because allegations offered "no factual description of the substance of the statements or who made the statements that 'defamed and libeled,' 'coerced and threatened,' and 'blacklisted' Plaintiffs"); *Credit Bureau Servs., Inc. v. Experian Info. Solutions, Inc.*, No. 12-2146, 2013 WL 3337676, at *8 (C.D. Cal. June 28, 2013) (noting that, based on a survey of the cases decided since *Twombly*, "a 'distinguishing factor between the[] [viability of antitrust complaints before the courts] has been the inclusion of specific allegations concerning time, place, and person versus general allusions to "secret meetings," "communications," or "agreements"'" (alterations in original) (quoting *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1256-57 (W.D. Wash. 2009))); Proof of Conspiracy, *supra*, at 172 (noting that, since *Twombly*, most

courts have required antitrust plaintiffs to state "detailed specific facts of the who, what, where, when, and how of the conspiracy"). A complaint must be sufficiently detailed that the defendant will "know what to answer." *Twombly*. 550 U.S. at 565. The SCAC's buying group allegations do not meet this standard.

At best, the SCAC plausibly alleges that defendants had opportunities to conspire regarding buying groups. DPPs allege a meeting in August 2010 that all of the defendants attended, and meetings in June and July 2010 that some of the defendants attended. But DPPs do not allege that the Manufacturer Defendants actually formed any specific agreements at those meetings. (Indeed, as noted above, such a claim would be implausible, because the facts alleged in the SCAC suggest that the Manufacturer Defendants began changing their buying group programs, independently of one another, before the meetings took place.) And it is well settled that allegations of opportunities to conspire "do[] not, standing alone, permit the inference of conspiracy." *Todorov*, 921 F.2d at 1456; *see also Cosmetic Gallery*, 495 F.3d at 53; Proof of Conspiracy, *supra*, at 76 (noting that the "opportunity to conspire" plus factor "is given relatively little weight"). DPPs have not plausibly alleged that defendants' presence at the aforementioned meetings was anything more than "lawful, free-market behavior." *In re Travel Agent Comm'n*, 583 F.3d at 911 (noting that defendants' presence at

trade association meetings did not give rise to a plausible inference of conspiracy); *cf. Viazis*, 314 F.3d at 764 (even though a trade association "involves collective action by competitors," it is "not by its nature a 'walking conspiracy'").

   *c.   Conclusion*

   In sum, DPPs have failed to allege facts that plausibly suggest a horizontal conspiracy among the Manufacturer Defendants to raise minimum purchase amounts for buying groups.

## III. THE SUFFICIENCY OF PLAINTIFFS' FRAUDULENT CONCEALMENT ALLEGATIONS

   A federal antitrust action must be brought within four years from the date on which it accrues. *See* 15 U.S.C. § 15b. In this case, DPPs seek damages for injuries allegedly suffered before the four-year limitations period, contending that defendants fraudulently concealed their illegal conduct and that plaintiffs did not discover the scheme until 2011 when the FTC investigation and consent decree were made public.

## A.   Legal Standard

   At the pleading stage, a plaintiff must allege fraudulent concealment with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Shushany v.*

*Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir. 1993) (noting that "allegations of fraud must meet a higher, or more strict, standard than the basic notice pleading required by Rule 8."); *see also Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) ("Under Rule 9(b)'s heightened pleading standard, allegations of . . . fraudulent concealment for tolling purposes, must be pleaded with particularity."); *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 970-71 (5th Cir. 1981) (same). The Fifth Circuit "interprets Rule 9(b) strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (internal quotation marks omitted). In other words, "Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003). Moreover, a complaint alleging fraud may not group the defendants together; instead, it must plead specific facts that satisfy the Rule 9(b) requirements as to each defendant. *Lang v. DirecTV*, 735 F. Supp. 2d 421, 437 (E.D. La. 2010); *cf. Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (holding that a plaintiff alleging securities fraud must plead fraud with particularity with respect to each defendant).

56

The doctrine of fraudulent concealment has two elements: first, that the defendants concealed the conduct alleged, and second, that the plaintiffs failed, despite the exercise of due diligence, to discover the facts that form the basis of the claims. *State of Tex. v. Allan Const. Co., Inc.*, 851 F.2d 1526, 1528 (5th Cir. 1988). The first element is satisfied "only if the defendant has engaged in affirmative acts of concealment." *Id.* at 1528-29. Concealment by silence is not enough; "the defendant 'must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry.'" *Id.* at 1529; *accord Rx.com v. Medco Health Solutions*, 322 F. App'x 394, 398 (5th Cir. 2009). "[G]enerally speaking, denial of wrongdoing is no more an act of concealment than is silence." *Allan Const.*, 851 F.2d at 1532.

When the antitrust violation is of such a character as to conceal itself, fraudulent concealment can be alleged without a showing of affirmative acts of concealment. *See Allan Const.,* 851 F.2d at 1528-31 (accepting the D.C. Circuit's definition of a "self concealing" conspiracy as "one in which deception is an essential element for some purpose other than merely to cover up the [wrongful] act"). Further, in pleading fraudulent concealment, it is not necessary for the "acts that demonstrate fraudulent concealment . . . [to] be wholly separate from the acts underlying the wrong itself." *Id.* at 1531.

**B.   Discussion**

The section of the SCAC entitled "Fraudulent Concealment" is identical to the corresponding section of the DPP's first amended complaint, except that the following sentences were added to the SCAC:

- "While certain would-be rivals of PoolCorp may have learned that PoolCorp was engaged in exclusionary conduct, these rivals were distributors and not members of the Class of Pool Dealers, the members of which were unaware of the exclusionary practices."[132]

- "Among other things, Defendants engaged in secret meetings and communications to prevent Plaintiffs and the members of the class from learning sufficient facts relating to the actual bases for the high prices they were paying for Pool Products."[133]

- "PoolCorp gave false or pretextual reasons for price increases for Pool Products, including that those increases were due to increases by its vendors when (i) PoolCorp had urged its vendors to raise prices so it could generate more revenue based upon its markup, and/or (ii) PoolCorp and its vendors had secretly agreed to delay the increases or to offset them through rebates to PoolCorp."[134]

- "PoolCorp and the Manufacturer Defendants communicated and met in secret to effectuate their unlawful conspiracy."[135]

The Court finds the SCAC's fraudulent concealment allegations deficient for the following reasons.

---

[132]   SCAC ¶ 139.

[133]   *Id.* ¶ 140.

[134]   *Id.* ¶ 141(d).

[135]   *Id.* ¶ 141(e).

    1.   *The Attempted Monopolization and Unlawful Vertical*
        *Agreement Claims*

Plaintiffs have alleged that Pool attempted to monopolize the Pool Products distribution market by acquiring rival distributors and entering into agreements with manufacturers to exclude Pool's rivals. The SCAC also alleges that Pool's vertical agreements with each Manufacturer Defendant violated Section 1 of the Sherman Act. The SCAC does not plausibly allege that defendants fraudulently concealed these offenses, for three reasons.

First, as the Court noted in its earlier order, and as DPPs admit in the first addition to the SCAC listed above, other allegations in the complaint indicate that the restrictive dealing agreements among manufacturers and Pool were not secret. For example, DPPs allege that the Manufacturer Defendants told Hilton, a nascent rival of Pool, they could not sell to the rivals "because of pressure from PoolCorp."[136] Additionally, "PoolCorp's Preferred Vendors told [Pool's rival] Alpha 3 that they could not sell to Alpha 3 because of PoolCorp's restrictions."[137] And Pool itself allegedly told manufacturers that they risked losing Pool's business if they sold Pool

---

[136]    *Id.* ¶ 89.

[137]    *Id.* ¶ 91.

Products to Pool's rivals.[138] Hayward then spread this message to others in the industry -- most significantly, to companies at the Dealer level -- in an effort to secure Pool's dominance.[139] These allegations belie any claim by DPPs that the defendants' conduct was kept secret. Many industry players, including other Dealers like plaintiffs, were explicitly told about Pool's practices. It is thus not plausible that the defendants concealed their anticompetitive conduct, or that DPPs could not discover through the exercise of reasonable diligence that conduct until the FTC made its investigation public.

Second, there are no specific allegations of who participated in the allegedly secret and/or fraudulent communications that purportedly concealed Pool's exclusionary conduct, where and when the communications took place, or what was actually communicated. Indeed, nearly all of the allegations of fraud and "secret agreements" contained in the SCAC are completely conclusory. The one arguable exception is the

---

[138]   *Id.* ¶ 94 ("PoolCorp had sent letters to at least 25 vendors . . . directing them not to sell Pool Products to [Pool's rival] PoolSource."); *see also id.* ¶ 101 ("Any effort by [a] vendor to sell its products to PoolCorp rivals was met with threats that purchases from PoolCorp would be cut off.").

[139]   *Id.* ¶ 105 (noting that, apparently in response to urging from Pool, Hayward "implemented steps to counter the threat from [Pool's rival] Aquastar, including telling 'any distributor or major retailer that sells [Aquastar's competing parts] [that it] will lose [its] rebates." (second alteration in original)).

allegation that Pool "reached secret agreements with manufacturers" to offset price increases for Pool Products, even though Pool was citing those increases as a reason to raise the prices Pool charged to Dealers.[140] But the SCAC does not explain who made the false statements, to which customers, and when. Further, the alleged reason for the falsity of the statements is "secret agreements" reached between Pool and unnamed manufacturers at some unspecified time. Accordingly, even this allegation is deficient under Rule 9(b). *See Benchmark Elecs.*, 343 F.3d at 723-24 (5th Cir. 2003) ("At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."); *cf. In re Catfish Antitrust Litig.,* 826 F. Supp. 1019, 1031 (N.D. Miss. 1993) (upholding fraudulent concealment allegation where plaintiffs "alleged a pattern of conduct by defendants which included face-to-face meetings and telephone calls -- all conducted under the cloak of secrecy in furtherance of the conspiracy to fix the price of catfish"); *Greenhaw v. Lubbock Cnty. Beverage Ass'n*, 721 F.2d 1019, 1030 (5th Cir. 1983)

---

[140]    *Id.* ¶ 67 ("On numerous occasions when PoolCorp raised its prices, falsely citing to its customers the manufacturers' price increases as the reason, PoolCorp had reached secret agreements with manufacturers to delay the increase to PoolCorp or to offset the increase through secret rebates for a period of time."); *see also id.* ¶ 141(d).

(upholding jury finding of fraudulent concealment based on evidence of covert price-setting sessions and secret agreements in furtherance of the underlying price-setting conspiracy).

Third, DPPs have impermissibly grouped the defendants together in their allegations of fraud. *See Boutain v. Radiator Specialty Co.*, No. 11-1907, 2011 WL 6130754, at *7-8 (E.D. La. Dec. 8, 2011) (noting that "[p]laintiffs must plead specific facts as to each defendant for each of the Rule 9(b) requirements" and rejecting fraud claim because the plaintiffs failed to differentiate claims against the various defendants). A blanket allegation that all of the Manufacturer Defendants communicated with Pool in secret to cover up the alleged wrongdoing is insufficient under Rule 9(b).

The SCAC's allegations also make clear that the alleged attempted monopolization and illegal vertical agreements were not self-concealing, such that plaintiffs need not allege affirmative acts of concealment. That is, deception was obviously not an "essential element" in the conduct at issue, because the conduct was allegedly disclosed to myriad other market participants. *Cf. Allan Const.,* 851 F.2d at 1530.

### 2.   *The Horizontal Conspiracy Claim*

The Court also finds that DPPs have not adequately alleged that defendants fraudulently concealed the alleged horizontal conspiracy to increase the free freight minimums. The section of

the SCAC describing the free freight increases contains no
allegations that the agreement was meant to be secret, much less
that the defendants affirmatively concealed it.[141] The Fifth
Circuit has held that a price-fixing conspiracy is not by its
nature self-concealing, which means that plaintiffs must allege
that defendants took "efforts aimed at keeping the price-fixing
activities secret." *Allan Const.*, 851 F.2d at 1530-32; *see also*
*Detrick v. Panalpina, Inc.*, 108 F.3d 529, 541 (4th Cir. 1997)
(reaffirming that "price-fixing is not inevitably deceptive or
concealing"). DPPs have failed to do so. The SCAC alleges, at
most, that defendants engaged in communications that were not
disclosed to outsiders. That is insufficient: "Concealment by
silence is not enough. [The defendant] must be guilty of some
trick or contrivance tending to exclude suspicion and prevent
inquiry." *Allan Const.*, 851 F.2d at 1529; *see also Rx.com*, 322 F.
App'x at 397-98 (rejecting plaintiff's argument that "the secret
communications between the Defendants while they each claimed
they were making unilateral decisions and publicly stated they
were horizontal competitors constitute[d] fraudulent
concealment").

---

[141]   *See* SCAC ¶¶ 62-65.

3.   *Defendants' Request to Relax the Rule 9(b) Standard*

DPPs contend that the Rule 9(b) standard should be relaxed here because the facts of the alleged fraud are "peculiarly within the perpetrator's knowledge." While it is true that fraud may be pled on information and belief in these circumstances, the plaintiff must still "set[] forth the factual basis for his belief." *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999), *overruled on other grounds by United States ex rel. Eisenstein v. New York*, 556 U.S. 928 (2009). Relaxation of the Rule 9(b) requirements "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). Yet conclusory statements are all that DPPs have offered in support of their allegation of fraudulent concealment. They have not alleged, even on information and belief, particularized allegations of fraud with respect to any of the defendants. Their complaint is thus deficient under Rule 9(b). *See United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 723 (5th Cir. 2008) ("Pleading on information and belief does not otherwise relieve a . . . plaintiff from the requirements of Rule 9(b)."). This conclusion is buttressed by the fact that, in drafting the SCAC, DPPs had the benefit of discovery of millions of documents, including all of those that defendants produced to the FTC, as

64

well as depositions of some of defendants' personnel. They thus had somewhat of a window into the corporate mind.

### 4. *Conclusion*

Accordingly, the SCAC's claim of fraudulent concealment must be dismissed. Plaintiffs will be able to recover only those damages inflicted during the four-year limitations period.

## IV. CONCLUSION

For the reasons above, the Court GRANTS IN PART and DENIES IN PART defendants' motions to dismiss DPPs' claims of a horizontal conspiracy and fraudulent concealment. DPPs' claim of a horizontal conspiracy to raise free freight minimums may go forward, but plaintiffs' claim of a horizontal conspiracy to impose onerous terms on buying groups is dismissed. The SCAC's fraudulent concealment allegation is dismissed.

New Orleans, Louisiana, this __18th__ day of December, 2013.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE