UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET ANTITRUST
LITIGATION                                    SECTION: R(2)

                                              JUDGE VANCE
                                              MAG. JUDGE WILKINSON


**THIS DOCUMENT RELATES TO ALL CASES**


<u>**ORDER AND REASONS**</u>

Direct Purchaser Plaintiffs move the Court for permission to take the deposition of Scott Ferguson, an officer of defendant Zodiac Pool Systems, Inc., after the close of fact discovery.[1] Zodiac opposes the motion. Because the Court finds that DPPs have not shown good cause to modify the scheduling order in this case, the Court DENIES the motion.


**I.    BACKGROUND**

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against the following defendants: Pool Corporation, SCP Distributors LLC, and Superior Pool Products (collectively "Pool"); and Hayward Industries, Inc., Pentair Water Pool and Spa, Inc., and Zodiac

---

[1]    R. Doc. 390.

Pool Systems, Inc. (collectively "Manufacturer Defendants"). Pool is the country's largest distributor of products used for the construction and maintenance of swimming pools ("Pool Products").[2] Manufacturer Defendants are the three largest manufacturers of Pool Products in the United States.[3] Pool buys Pool Products from manufacturers, including the three Manufacturer Defendants, and in turn sells them to DPPs, which include pool builders, pool retail stores, and pool service and repair companies (collectively referred to as "Dealers" in the SCAC).[4]

DPPs allege, among other things, that Pool and the Manufacturer Defendants violated the Sherman Act by agreeing with each other to exclude Pool's rival distributors from the Pool Products market.[5] Plaintiffs claim that the defendants' conduct caused plaintiffs to pay more for Pool Products than they would have absent the unlawful activity.

The Court's scheduling orders in this case provided that the deadline for completing all fact and class certification

---

[2]     R. Doc. 284, ¶ 39.

[3]     *Id.* ¶ 28.

[4]     *Id.* ¶ 31.

[5]     *See, e.g., id.* ¶ 3; *see also* R. Doc. 390 at 2 ("[P]art of [DPPs'] claim alleges that the Manufacturer Defendants . . . unlawfully refused to deal with distributors who tried to challenge PoolCorp's distribution-level dominance and inflated product pricing.").

discovery was February 10, 2014.[6] DPPs now seek permission to take the deposition of Zodiac's Scott Ferguson after this deadline. They submit that the need for Ferguson's deposition did not become apparent until February 12, 2014, when DPPs deposed Scott Frost, who was Zodiac's Vice President of Sales in 2011.[7] The Court will briefly summarize the progression of discovery leading to DPPs' request.

On February 18, 2011, Ferguson circulated a document entitled "Customer Operations Memo"[8] to Zodiac's sales team, service team, and customer support people -- in Frost's words, "basically everybody that interacts with the external customers."[9] The "re" line of the memo reads "Confirmation of Our Longstanding Distributor Application Process."[10] The memo directed Zodiac's sales force to refer requests from companies wishing to become a wholesale distributor of Zodiac Pool Products to the Vice President of Sales (at the time, Scott Frost).[11]

---

[6]     R. Doc. 334 at 2 (Pretrial Order No. 20, dated October 21, 2013); R. Doc. 282 at 3 (Pretrial Order No. 18, dated June 21, 2013).

[7]     In December, the Court granted DPPs' motion for a two-day extension of the fact discovery period for the limited purpose of taking Frost's deposition. R. Doc. 348.

[8]     *See* R. Doc. 390-4.

[9]     R. Doc. 390-5 at 7.

[10]     R. Doc. 390-4 at 4.

[11]     *Id.*

According to the memo, the Vice President would then proceed to obtain a credit application from the prospective distributor, as well as a formal request to do business with Zodiac that included a summary of the prospective distributor's business plan.[12] The Vice President would submit those materials to several Zodiac officers and schedule a meeting to discuss the request.[13] Finally, "[a]fter careful review and consideration of market saturation, credit risk, and other business fundamentals," Zodiac would notify the prospective distributor in writing of its decision whether to accept or reject the application.[14]

According to Zodiac, this memo was produced to DPPs on May 31, 2013. In July 2013, DPPs deposed Anthony Prudhomme, Zodiac's President in 2011, and asked him about the document. Prudhomme testified that he "recognize[d] the business practice" set forth in the memo and that he was "involve[d] in the creation of th[at] business practice."[15] According to Prudhomme, the procedures set forth in the memo were in place before Ferguson circulated the

---

[12]    *Id.*

[13]    *Id.*

[14]    *Id.*

[15]    R. Doc. 390-9 at 6-7.

4

document, but "[t]hey were informal, and informality brings risk that this document was intended to address."[16]

In December 2013, DPPs deposed Troy Franzen, Zodiac's Executive Vice President in 2011. Franzen testified that he did not remember seeing Ferguson's memo.[17] He characterized the document as a "procedural update."[18]

Finally, on February 12, 2014, DPPs took the deposition of Frost. Frost testified that he did not remember reading Ferguson's memo and that he had not reviewed the memo before Ferguson circulated it.[19] Otherwise, Frost's testimony was largely consistent with Prudhomme's. He stated that the "distributor application process" outlined in the memo was not formally in place at Zodiac at the time.[20] According to Frost, the actual "process" for considering distributor applications was

---

[16]    *Id.* at 8; *see also id.* at 7 ("[W]hat I just described to you about our process of evaluating a distributor is -- is exactly what's [in the memo]. And the . . . fact that this is memorialized and . . . communicated . . . is to make sure that all our business decisions that we're making, I want to -- I want to give the -- the teams in the field the power to be a business within a business and want to educate them as to what -- what are the appropriate criteria as a business manager that you're to view these things.").

[17]    R. Doc. 390-10 at 4.

[18]    *Id.* at 6.

[19]    R. Doc. 390-7 at 1-2.

[20]    *Id.* at 3.

significantly more informal;[21] the memo was intended to "formalize a policy" that was already loosely followed by the company.[22] Specifically, Frost noted that when he received a request from a company to become a Zodiac distributor, he would analyze the market and determine whether there was a need for another distributor in that market, and if so, decide whether the distributor had the resources to successfully distribute Zodiac's products.[23]

DPPs argue that there exists good cause to reopen discovery for the purpose of taking Ferguson's deposition because "[t]he significance of Mr. Ferguson as a witness became apparent only after Mr. Frost . . . was deposed on February 12."[24] More specifically, DPPs assert that, because "Zodiac's witnesses to date have not been able to confirm the company's adoption or implementation of the process Mr. Ferguson described" in his memo, "Mr. Ferguson should be examined regarding the circumstances in which he prepared and circulated company-wide

---

[21]    *Id.* at 3-11.

[22]    *Id.* at 8-9 ("[W]hat Scott is trying to do is formalize a policy. . . . Scott, when I look at this today . . . what he was trying to do was formalize it and say, okay, these are the things we'd like to have. . . . [T]his is how we would do it. . . . [T]he customers didn't follow that piece, but we asked them those questions.").

[23]    R. Doc. 390-7 at 8-9.

[24]    R. Doc. 390-4 at 8.

his Customer Operations Memo as a 'confirmation' of Zodiac's
process."[25] According to DPPs, it is now apparent that Ferguson's
testimony is highly relevant to the "core issue" of whether the
Manufacturer Defendants refused to deal with Pool's rival
distributors.[26]

Zodiac responds that DPPs have no excuse for failing to
notice Ferguson's deposition before the close of fact discovery.
In support of its argument, Zodiac notes that (1) Ferguson was
identified as knowledgeable about Zodiac's process of approving
potential distributors in Zodiac's response to the FTC's Civil
Investigative Demand, which was produced to plaintiffs in 2012;
(2) DPPs have known of Ferguson's memo since at least July 2013,
yet chose not to notice the deposition of its author; and (3)
Frost gave the same account of the memo's origin and purpose as
did Prudhomme, who was deposed more than six months before the
close of fact discovery.[27] Zodiac also contends that Ferguson's
deposition would subject it to undue prejudice and produce, "at
best, marginally probative information."[28]

---

[25]    *Id.*

[26]    *Id.* at 2, 8.

[27]    *Id.*

[28]    *Id.* at 8-9.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 16(b) "authorizes the district court to control and expedite pretrial discovery through a scheduling order." *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990); *accord Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996). Under that Rule, a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The good cause standard requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003) (quoting 6A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 1522.1 (2d ed. 1990)).

In *Geiserman*, the Fifth Circuit laid down a four-factor balancing test to determine whether good cause existed for an untimely designation of expert witnesses, ruling that courts must consider (1) the explanation for the failure to adhere to the deadline; (2) the importance of the proposed modification of the scheduling order; (3) the potential prejudice that could result from allowing the modification; and (4) the availability of a continuance to cure that prejudice. 893 F.2d at 791 (citing *Bradley v. United States*, 866 F.2d 120, 125 (5th Cir. 1989)); *accord Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir.

2007). The Fifth Circuit has since used this test to determine whether good cause exists for an untimely submission of expert reports, *see Reliance Ins. Co. v. La. Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997), an untimely amendment of the pleadings, *see S&W Enters.*, 315 F.3d at 536, and a failure to produce discovery to the opposing party in accordance with a court-imposed deadline, *see Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 390 (5th Cir. 2009). The Fifth Circuit has suggested that the *Geiserman* test is also the appropriate method of analysis where, as here, a party seeks to re-open discovery after the deadline has passed. *See Colonial Freight Sys., Inc. v. Adams & Reese, L.L.P.*, 524 F. App'x 142, 145 (5th Cir. 2013). Moreover, several district courts in this circuit have analyzed such requests under *Geiserman*. *See, e.g.*, *Hernandez v. Mario's Auto Sales, Inc.*, 617 F. Supp. 2d 488, 493 (S.D. Tex. 2009); *Rollins v. St. Jude. Med.*, Civil Action No. 08-0387, 2009 WL 2601376, at *3 (W.D. La. Aug. 24, 2009); *United States v. McFerrin*, Civil Action No. H-05-3730, 2007 WL 4353709, at *1 (Dec. 11, 2007); *Carmona v. Carmona*, No. Civ.A. H-06-0228, 2006 WL 3839851, at *1 (S.D. Tex. Dec. 8, 2006). Accordingly, the Court will analyze the four *Geiserman* factors to determine whether DPPs have shown good cause for their request to depose Ferguson after the close of fact discovery.

## III. DISCUSSION

After weighing the four *Geiserman* factors, the Court concludes that DPPs have not shown good cause for their request to modify the Court's scheduling order to take Ferguson's deposition.

With regard to the first factor, DPPs have not provided a convincing explanation for their failure to notice Ferguson's deposition before the discovery deadline. As Zodiac correctly notes, Zodiac identified Ferguson as a person knowledgeable about the distributor application process in its response to the FTC's CID.[29] DPPs have had that response since July of 2012, and accordingly had over a year to notice Ferguson's deposition had they wished to do so.

Moreover, DPPs cannot plausibly contend that Frost's deposition testimony revealed new information that suddenly put them on notice that Ferguson's testimony was necessary. To the contrary, Zodiac's CID response, Prudhomme's testimony, and Frost's testimony are, in the main, consistent in their description of Zodiac's distributor application process. The CID response states that "[t]here are no processes or requirements to purchase products from or become a customer of Zodiac," but then goes on to describe an informal process: requests from potential

---

[29]   R. Doc. 390-8 at 3, 5 (noting that Ferguson assisted in preparing Zodiac's response to a question about Zodiac's distributor application process).

distributors were referred to Frost, who would "evaluate whether the addition of a distributor to a market will lead to additional business/profit for Zodiac."[30] Prudhomme and Frost both confirmed that Zodiac had no formal distributor application process in place at the time Ferguson circulated his memo, and they both explained that the memo was intended to "formalize" the process that was already loosely in place.[31] To whatever limited extent Ferguson's memo describing a "Longstanding Distributor Application Process" is inconsistent with Zodiac's response to the CID, DPPs have been aware of the inconsistency for months. Put another way, DPPs have no information now that they did not have after deposing Prudhomme in July. Accordingly, DPPs' contention that they did not know of the need for Ferguson's deposition until February rings hollow. DPPs had ample opportunity to notice Ferguson's deposition at an earlier date, and they simply chose not to do so. The first *Geiserman* factor thus weighs against modification of the scheduling order. *See*

---

[30]    R. Doc. 390-8 at 3.

[31]    *See* R. Doc. 390-7 at 8-9 (Frost deposition) ("[W]hat Scott is trying to do is formalize a policy. . . . Scott, when I look at this today . . . what he was trying to do was formalize it and say, okay, these are the things we'd like to have. . . . [T]his is how we would do it. . . . [T]he customers didn't follow that piece, but we asked them those questions."); R. Doc. 390-9 at 8 (Prudhomme deposition) ("Q: Were the procedures set forth in this document . . . in place prior to the creation of the document? A: Yes. They were informal, and informality brings risk that this document was intended to address.").

*Hernandez*, 617 F. Supp. 2d at 494 (party's "lack of diligence with regard to scheduling [a] witness's deposition preclude[d] it from having the opportunity to depose th[e] witness outside of the discovery period").

Turning to the second factor, the Court finds that the testimony sought is of moderate importance. On one hand, DPPs are correct that Zodiac's distributor application process is closely related to the "core issue" of whether Zodiac chose not to appoint distributors who would compete with Pool. On the other hand, DPPs have already deposed several other Zodiac officers who were involved in distributor applications, and DPPs have questioned those individuals about Ferguson's memo. At trial, DPPs can, if they wish, explore any inconsistencies between the memo and the witnesses' description of Zodiac's distributor application process. Moreover, DPPS' failure to notice Ferguson's deposition in the months after they obtained his memo belies their argument that his testimony is critical to their case. It seems obvious that a good source of information about the contents of a memo is the person who wrote it, and plaintiffs' failure to notice Ferguson's deposition earlier suggests that they deliberately chose not to do so. These considerations suggest that the additional probative value of Ferguson's testimony may be minimal.

The Fifth Circuit originally interpreted a finding of importance to weigh in favor of exclusion, because it is arguably more important to enforce scheduling orders when the proposed modification could materially prejudice one party's case. *See Barrett*, 95 F.3d at 381; *Geiserman*, 893 F.2d at 791. Recently, though, the court has reversed course, holding that a finding of importance weighs in favor of the party seeking to modify the scheduling order. *Betzel*, 480 F.3d at 707-08. Nonetheless, the *Betzel* court emphasized that importance "cannot singularly override the enforcement of local rules and scheduling orders." *Id*. at 708 (emphasis omitted) (quoting *Barrett*, 95 F.3d at 381).

Here, given the modest importance of Ferguson's testimony, the Court finds that the second *Geiserman* factor does not weigh in favor of modification of the scheduling order. At best, this factor is neutral.

The third *Geiserman* factor requires the court to determine whether the proposed modification would prejudice any party. Zodiac would suffer at least some degree of prejudice if Ferguson's deposition is allowed to proceed. Zodiac and its counsel will incur significant costs, in terms of both time and expense, if they must prepare for and conduct a deposition at this late date. *See Hernandez*, 617 F. Supp. 2d at 497 ("Whenever additional depositions are conducted, both parties must expend additional resources and invest time in conducting them. Thus,

13

prejudice generally results to the party opposing additional depositions.") The Court accordingly finds that this factor weighs slightly against modification of the scheduling order.

Finally, turning to the fourth *Geiserman* factor, the Court finds that a continuance is unnecessary. The parties do not suggest that any other deadlines would need to be extended even if the Court were to allow DPPs to take Ferguson's deposition. And, in any event, a continuance would not cure the prejudice to Zodiac identified above. Accordingly, the Court finds that this factor, too, weighs slightly against modification of the scheduling order.

Based on the above analysis, the Court holds that DPPs have not shown good cause for their request to depose Ferguson after the discovery deadline. DPPs' failure to articulate a convincing explanation for their failure to notice Ferguson's deposition earlier weighs heavily in the Court's determination. *Cf. Borden v. United States*, 537 F. App'x 570, 575 (5th Cir. 2013) ("Good cause to modify a scheduling order is said to exist only where the schedule 'cannot reasonably be met despite the diligence of the party seeking the extension.'" (quoting Fed. R. Civ. P. 16(b) advisory committee's note (1983)).

## IV.  CONCLUSION

For foregoing reasons, the Court DENIES DPPs' motion for permission to take Ferguson's deposition.

New Orleans, Louisiana, this __21st__ day of March, 2014.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE