UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET ANTITRUST            SECTION: R(2)
LITIGATION                               JUDGE VANCE
                                         MAG. JUDGE WILKINSON


**THIS DOCUMENT RELATES TO ALL DIRECT-PURCHASER PLAINTIFF CASES**


**ORDER AND REASONS**

Direct-Purchaser Plaintiffs (DPPs) move the Court to grant final approval of a class action settlement between DPPs and Hayward and a class action settlement between DPPs and Zodiac.[1] In addition, Class Counsel for DPPs move the Court to approve the deduction of common benefit litigation expenses from the fund.[2] The Court has considered all of the evidence submitted at the fairness hearing held on May 14, 2015, as well as the legal memoranda submitted by the parties. For the reasons stated more fully below, the Court finds the settlement of this class action to be fair, reasonable, and adequate, and the Court awards expenses as provided in this order.

---

[1]    R. Doc. 624.

[2]    R. Doc. 625.

I.    **Background**

    A.    **Factual Background**

    This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against Pool and Manufacturer Defendants.  Pool is the country's largest distributor of products used for the construction and maintenance of swimming pools (Pool Products).[3]  Manufacturer Defendants are the three largest manufacturers of Pool Products in the United States: Hayward Industries, Inc. (Hayward), Pentair Water Pool and Spa, Inc. (Pentair), and Zodiac Pool Systems, Inc. (Zodiac).[4]

    As defined in DPPs' Second Consolidated Amended Class Action Complaint (SCAC), Pool Products are the equipment, products, parts and materials used for the construction, renovation, maintenance, repair, and service of residential and commercial swimming pools. Pool Products include pumps, filters, covers, drains, fittings, rails, diving boards, and chemicals, among other goods.  Pool buys Pool Products from manufacturers, including the three Manufacturer Defendants, and in turn sells them to DPPs, which include pool builders, pool retail stores,

---

[3]    R. Doc. 284, ¶ 39.

[4]    *Id.* ¶ 28.

and pool service and repair companies (collectively referred to as "Dealers" in the SCAC).[5]

## B.  Procedural History

On November 21, 2011, the Federal Trade Commission (FTC) announced that it had conducted an investigation into unfair methods of competition by Pool and had entered a consent decree with Pool resolving the matter.  Shortly after the FTC's announcement, several plaintiffs filed suit in this district and in several other districts.  On April 17, 2012, the Judicial Panel on Multidistrict Litigation consolidated the suits for pretrial purposes in this court.[6]  Plaintiffs later added their claims against the Manufacturer Defendants.

DPPs filed their first Consolidated Amended Complaint (CAC) on June 29, 2012.[7]  DPPs initially alleged (1) that Pool monopolized and attempted to monopolize the Pool Products distribution market in the United States in violation of Section 2 of the Sherman Act by acquiring rival distributors and by entering into agreements with manufacturers to exclude Pool's rivals; (2) that Pool and the Manufacturer Defendants violated Section 1 of the Sherman Act by engaging in an unlawful

---

[5]     *Id.* ¶ 31.

[6]     R. Doc. 1.

[7]     R. Doc. 107.

conspiracy to exclude Pool's competitors; and (3) that defendants fraudulently concealed their illegal conduct and thus are liable for damages outside of the statutory limitations period. Plaintiffs claimed that the defendants' allegedly illegal conduct caused plaintiffs to pay more for Pool Products than they would have absent the unlawful activity.

On April 11, 2013, the Court issued an order dismissing certain of DPPs' claims from the CAC.[8]  First, the Court dismissed the DPPs' monopolization claim because DPPs did not allege that Pool possessed monopoly power in the relevant market.[9]   Second, the Court dismissed DPPs' claim that defendants engaged in a *per se* illegal boycott because only horizontal conspiracies among competitors can give rise to *per se* liability under Supreme Court precedent, and "the complaint lack[ed] any allegations that manufacturers colluded with each other."[10]  Finally, the Court dismissed DPPs' allegation of fraudulent concealment because plaintiffs failed to assert that defendants concealed the allegedly unlawful agreements, or that defendants engaged in a "self-concealing" antitrust violation.[11]

---

[8]    R. Doc. 221.

[9]    *Id.* at 25.

[10]   *Id.* at 52.

[11]   *Id.* at 73-78.

4

The Court allowed the CAC's claim of attempted monopolization under Section 2 of the Sherman Act and the CAC's Section 1 claims under the rule of reason to go forward.[12]

DPPs thereafter sought leave to file an amended complaint.[13] In support of that motion, DPPs asserted that "[a]fter filing the CAC, DPPs discovered new information demonstrating communications between Defendants--including communications among the Manufacturer Defendants themselves--that persuasively support a *per se* Section 1 claim and Defendants' fraudulent concealment of their misconduct."[14]  Following the Court's grant of DPPs' motion,[15] DPPs filed the SCAC, which contained more extensive allegations of horizontal agreements among the Manufacturer Defendants and of "secret" agreements among all defendants.[16]  DPPs did did not reassert the Section 2 monopolization claim in the SCAC.

On December 18, 2013, the Court issued an order dismissing certain of DPPs' claims from the SCAC.[17]  First, the Court

---

[12]    *Id*. at 50, 70-71.

[13]    R. Doc. 240.

[14]    R. Doc. 240-1 at 3-4.

[15]    R. Doc. 281.

[16]    R. Doc. 284.

[17]    R. Doc. 346.

dismissed the SCAC's claim of a *per se* illegal conspiracy among the Manufacturer Defendants to disadvantage buying groups, on the ground that Manufacturer Defendants' parallel actions regarding the buying groups did not give rise to an inference of conspiracy because it was not plausible that their treatment of the buying groups stemmed from anything other than their independent perception of their own best interests.[18]  Second, the Court dismissed the SCAC's claim of fraudulent concealment because the DPPs again failed to assert that defendants concealed their alleged offenses or that defendants engaged in a "self-concealing" antitrust violation.[19]  The Court allowed the SCAC's claim of a *per se* illegal conspiracy among the Manufacturer Defendants and Pool to fix freight minimums to go forward.

>    **C.    Settlement Agreement Background**

>        *1.    Hayward Settlement Negotiations*

Negotiations leading to the Hayward settlement agreement took place over the course of a year.  Class Counsel for DPPs and counsel for Hayward mediated this action before Layn Phillips, a former federal district judge and a respected mediator of antitrust disputes.  The first mediation session,

---

[18]     *Id.* at 41.

[19]     *Id.* at 60-63.

held on July 22, 2013, was unsuccessful.  Counsel continued to engage in settlement discussions in one-on-one teleconference calls and teleconference calls facilitated by the mediator.  On March 20, 2014, the parties held a second mediation session at which they again did not reach a settlement.  After the second mediation session, the parties continued to engage in settlement discussions facilitated by the mediator.  On March 28, 2014, the mediator issued a mediator's proposal using a "double blind" procedure in which neither side would know if the other had accepted the proposal unless both sides accepted.  DPPs and Hayward accepted the mediator's proposal on April 1, 2014.  Over the next few weeks, the parties negotiated the settlement agreement, which they signed on May 13, 2014.

2. *Zodiac Settlement Negotiations*

Negotiations leading to the Zodiac settlement agreement also took place over the course of a year and a half.  Class Counsel for DPPs and counsel for Zodiac also mediated this action before Layn Phillips.  The first mediation session, held on July 22, 2013, was unsuccessful.  On March 20, 2014, the parties held a second mediation session at which they again did not reach a settlement.  Counsel continued to engage in sporadic settlement discussions, including an in-person session on July 23, 2014.  Following the third unsuccessful mediation session,

Class Counsel and Zodiac's counsel continued to engage in settlement discussions, with the mediator's assistance.  On October 2, 2014, the mediator issued a mediator's proposal using the same "double blind" procedure used for the Hayward negotiation.  DPPs and Zodiac accepted the mediator's proposal on October 6, 2014. Over the next few weeks, the parties negotiated the settlement agreement.  The parties submitted a dispute concerning the settlement's terms to the mediator, and the mediator quickly resolved the dispute.  The parties signed the settlement agreement on November 4, 2014.

### 3.   *Preliminary Fairness Determination*

The Court held a preliminary fairness hearing and settlement class certification hearing for the DPP-Hayward Settlement on August 14, 2014.  The Court preliminarily approved the DPP-Hayward settlement and certified its settlement class on September 26, 2014.[20]  The Court preliminarily approved the DPP-Zodiac settlement and certified its settlement class on December 22, 2014.[21]  The settlement classes in the two settlements are identical.  The terms of the two settlements are also similar.

Consistent with the agreements, the Court appointed seven named Class Settlement Representatives: Aqua Clear Pools &

---

[20]     R. Doc. 482.

[21]     R. Doc. 545.

Decks; A Plus Pools Corp.; Liquid Art Enterprises d/b/a Carl
Boucher; Oasis Pool Service, Inc.; Pro Pool Services; SPS
Services, LLC d/b/a Premier Pools & Spas; and Thatcher Pools,
Inc.[22]  The Court approved the firms of Herman, Herman & Katz,
LLC; Bernstein Leibhard LLP; Kaplan Fox & Kilsheimer LLP; and
Labaton Sucharow LLP as Settlement Class Counsel for the
purposes of Rule 23.  The Court also approved Garden City as the
Claims Administrator for the settlement and Citibank as escrow
agent.[23]  The Court further approved the proposed notice and
claim forms, as well as deadlines for submitting claims forms,
opting out, and filing objections.  The Court scheduled a
fairness hearing on May 14, 2015, to determine whether the
settlement is fair and to determine an award of attorneys' fees
and expenses.

> **D.   The Settlement Class**

The Court certified the following settlement class for both
settlements:

> All persons and entities located in the United States
> that purchased Pool Products in the United States
> directly from PoolCorp, during the Class Period from
> November 22, 2007 to November 21, 2011. Excluded from
> the Settlement Class are Defendants and their
> subsidiaries, parents, or affiliates, whether or not

---

[22]   R. Docs. 483 & 547 (procedural orders).

[23]   *Id.*

named as a Defendant in the Second Consolidated Amended Class Action Complaint, and government entities.[24]

Class Members will be each member of the Settlement Class who does not timely elect to be excluded from the Settlement Class. The parties stipulate that certification of the Settlement Class is for settlement purposes only, and they retain all of their respective objections, arguments, and defenses regarding class certification in the event that settlement is not finalized.

###      E.    The Settlement Agreements

Hayward has paid $6.5 million and Zodiac has paid $3.45 million into an Escrow Account controlled by the parties pending final approval of the settlements by the Court.  Interest from the account accrues to the benefit of the settlement class.

The Agreement provides that the $6.5 million and $3.45 million settlement amounts are "all-in" figures, meaning that they reflect the *total* amount Hayward and Zodiac will pay under the Agreements in exchange for the released claims. Accordingly, the settlement amounts have been and will be used to pay: (1) notice and administration costs; (2) attorneys' fees and litigation expenses; (3) incentive awards; (4) class member benefits; and (5) any remaining administration expenses and any

---

[24]     *Id.*

10

other costs of any kind associated with the resolution of the action.

Hayward and Zodiac also agreed to assist plaintiffs' counsel with document authentication and to continue to answer plaintiffs' questions about transactional data previously produced by Hayward and Zodiac during discovery.

The Agreements provide that they are intended to forever and completely release Hayward and Zodiac from all "Released Claims," which are defined as:

> any and all claims, demands, actions, suits, proceedings, causes of action, damages, liabilities, costs, expenses, penalties and attorneys' fees, of any nature whatsoever, whether class, individual, or otherwise in nature, whether directly, representatively, derivatively or in any other capacity, that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating in any way to the Action, which were asserted or that could have been asserted.

Released Claims do not include claims against any Non-Settling Defendant.  The Agreement further specifies that these releases constitute

> a waiver of Section 1542 of the California Civil Code and Section 20-7-11 of the South Dakota Codified Laws, each of which provides that a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor, and a waiver of

any similar, comparable, or equivalent provisions, statute, regulation, rule, or principle of law or equity of any other state or applicable jurisdiction.

**F.   Notice**

Federal Rule of Civil Procedure 23(c)(3) governs the notice requirements for class certification.  Specifically, the notice must state:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(3)(B).  After reviewing the notice here, the Court found in its preliminary approval order that it met the requirements of Rule 23(c)(3).  The Court also found that the proposed dissemination of the notice was the best notice practicable in accordance with Rule 23(c)(2)(B) and that it met the requirements of Due Process.

12

The notice plan was designed to provide members of the settlement class with

    (1)  a clear and detailed description of the terms of the Settlements;

    (2)  the date of this Court's hearing on final approval of the Settlements;

    (3)  the deadlines for opting out of the proposed Settlement Classes or notifying the Court of an objection to the Settlements;

    (4)  phone and internet contact information for the Settlements administrator, to permit members of the proposed Settlement Classes to obtain answers to questions or other information; and

    (5)  notice that, in the event the Court finally approves the Settlements, Class Counsel will seek from the Court reimbursement of costs and expenses the amount not to exceed one-third of each Settlement.[25]

The Notice was accompanied by the Court-approved claim form.

Class Counsel has provided evidence that the notice was disseminated as planned. Garden City mailed settlement notice packets to 74,842 identified class members.[26] By April 22, 2015, Garden City had received 229 packets back from the postal service with forwarding address information.  It promptly re-mailed those packets to the updated addresses.  The Postal

---

[25]    R. Doc. 624-1 at 6.

[26]    *See* R. Doc. 644-1 at 2 (Supplemental Declaration of Jennifer M. Keough Regarding Notice and Settlement Administration).

Service also returned 10,834 packets without forwarding address information.  In total, Garden City sent 64,008 notice packets that were not returned.  Therefore, it calculates that over 85% of the class received mailed notice.

Garden City also arranged for Summary Notice to be published in the January 23, 2015, issue of *Pool & Spa News* and the February 2015 issue of *Aqua*, which DPPs represent are leading sources for industry information.

Garden City also established and maintains a website for the settlements.  The website has been operational since January 15, 2015.  It provides information about the settlements, deadlines, and frequently asked questions.  It also includes copies of important documents, such as the settlement agreements, motions for preliminary approval, the preliminary approval orders, and class counsel's motion for reimbursement of expenses.  As of May 14, 2015, the website had received 508 visits.

In addition, Garden City maintains a toll-free telephone number that is available with an automated answering system 24 hours a day and with customer representatives Monday through Friday from 8 a.m. to 5 p.m. Eastern Standard Time.

Hayward and Zodiac have notified the appropriate State and Federal officials as required by the Class Action Fairness Act.

14

*See* 28 U.S.C. § 1715.  The Act requires notice to be given no later than 10 days after a proposed settlement of a class action is filed in court.  *Id*. § 1715(b).  And, under section 1715(d), a court may not grant final approval of a settlement until ninety days after the appropriate officials have been served with notice.

Here, Zodiac served notice on the necessary State and Federal officials on November 26, 2014, two days after filing its proposed settlement in court.[27]  Hayward, however, did not serve notice until February 6, 2015--months after filing its proposed settlement.[28]  Thus, it did not comply with the Act's requirement of prompt notice.  Nonetheless, more than ninety days have passed since both Hayward and Zodiac served notice on the appropriate officials and no officials have raised complaints or concerns.  Therefore, the Court finds that the notice given satisfies the Act, because the appropriate State and Federal officials have had "sufficient notice and opportunity to be heard" about the settlements.  *In re Processed Egg Products Antitrust Litig.*, 284 F.R.D. 249, 258 n.12 (E.D. Pa. 2012) (collecting cases).

---

[27]     R. Doc. 560.

[28]     R. Doc. 597.

In sum, after reviewing evidence of the actual dissemination of the notice by the Claims Administrator, and the notice provided to State and Federal officials under the Class Action Fairness Act, the Court confirms that the notice complies with the requirements of Rule 23 and Due Process, and with the Act.

G.   **Plan of Allocation and Claims Process**

Under the proposed plan of allocation, the $9.95 million total settlement fund will first be used to pay attorneys' fees and expenses approved by the Court.  In addition, as specified in the Agreement, all settlement notice and administration expenses will also come out of the fund.  Plaintiffs have combined notice and administration for the Hayward and Zodiac settlements to save on costs.

As set forth in DPPs' motions for preliminary approval, the amount that remains of the $9.95 million total settlement fund after all of these costs and expenses are paid is to be distributed on a pro rata basis to class members who submit valid and timely claims.  Specifically, when a class member makes a claim, the claims administrator will review the claim for timeliness, completion, and accuracy, and then "approve" an amount for the claim.  Once all timely and valid claims have been reviewed and any issues with the claims have been resolved,

the total amount of all recognized claims will form the basis for determining each class member's pro rata share of the fund. The proportion that a settlement class member's recognized claim bears to the total amount of all recognized claims will determine the proportion of the settlement fund that the class member will receive.

### H.   Opt-outs, Objections, and Claims

The deadline for opting out of the settlements was April 9, 2015.  Eleven putative class members have requested exclusion. Defense counsel indicated that they have not been able to identify the opt-outs, and in some cases, have not been able to confirm that they were even Hayward or Zodiac customers.  In other words, the opt-outs are not large, known customers of the defendants.  No class members objected to the settlement.

The claims filing deadline is December 11, 2015.  As of May 14, 2015, Garden City had received 1,511 claims.  Those claims report approximately $483 million in Pool Products purchases. Class members will be allowed to recover up to the alleged 4.97% overcharge on their eligible Pool Products purchases.  Thus, if all of the $483 million in purchases reported so far are eligible Pool Products purchases, then the claims filed so far are worth approximately $24 million.  Therefore, claimants will likely recover less than the full amount of their claims,

according to the *pro rata* method set forth above.  The average
claim reports $6,500 in purchases and the median claim reports
$1,050 in purchases.  There are several very large claims,
including one reporting approximately $100 million in purchases
and another reporting $25 million in purchases.  The claims rate
so far is around 2.3%.  None of the named plaintiffs has filed
claims yet.  DPPs expect to receive additional claims through
the December 11, 2015, deadline.

## II.  Fairness Determination

### A.  Legal Standard: Fair, Adequate, and Reasonable

A class action may not be dismissed or compromised without
the approval of the Court and notification to all class members.
Fed. R. Civ. P. 23(e).  Before the Court approves a settlement,
the Court must find that the proposed settlement is "fair,
reasonable, and adequate."  Fed. R. Civ. P. 23(e)(1)(c); *Newby
v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004).

The Court must "ensure that the settlement is in the
interests of the class, does not unfairly impinge on the rights
and interests of dissenters, and does not merely mantle
oppression."  *Ayers v. Thompson*, 358 F.3d 356, 368-69 (5th Cir.
2004) (quoting *Reed v. General Motors Corp.*, 703 F.2d 170, 172
(5th Cir. 1983)).  Because the parties' interests are aligned in

18

favor of a settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) (noting that the class action context "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements"); *see also* Manuel for Complex Litigation (Fourth) § 21.61 (2004).  The Court's duty of vigilance does not, however, authorize it to try the case in the settlement hearings.  *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

The Fifth Circuit has identified six factors that the Court should consider in assessing whether a settlement is fair, adequate, and reasonable: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to plaintiffs prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members. *See Newby*, 394 F.3d at 301; *Ayers*, 358 F.3d at 369; *Reed*, 703 F.2d at 172.

**B.   Discussion**

>     1.   *Settlement obtained by fraud or collusion*

There is no evidence that any fraud or collusion infected the process by which the parties arrived at the settlement agreements.  For both the Hayward and the Zodiac settlement, the parties reached an agreement only after multiple formal mediation sessions with a mediator.  Moreover, each settlement was reached only after the parties agreed to a double-blind mediator's proposal.

In its preliminary approval order, Court reviewed the "Released Claims" provision in each Settlement and found the provisions reasonable. The Agreements provide that they are intended to forever and completely release Hayward and Zodiac from all "Released Claims," which are defined as:

> any and all claims, demands, actions, suits, proceedings, causes of action, damages, liabilities, costs, expenses, penalties and attorneys' fees, of any nature whatsoever, whether class, individual, or otherwise in nature, whether directly, representatively, derivatively or in any other capacity, that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating in any way to the Action, which were asserted or that could have been asserted.[29]

---

[29]   R. Doc. 417-2 at Exhibit 1 ¶¶ 29-30.

20

Released Claims do not include any claims against any Non-Settling Defendant.  Regarding unknown claims, the Agreements further specify that these releases constitute

> a waiver of Section 1542 of the California Civil Code and Section 20-7-11 of the South Dakota Codified Laws, each of which provides that a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor, and a waiver of any similar, comparable, or equivalent provisions, statute, regulation, rule, or principle of law or equity of any other state or applicable jurisdiction.[30]

The Court found that these releases are not impermissibly broad. Courts have consistently approved releases in class action settlements that discharge unknown claims relating to the factual issues in the complaint. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 311-12 (W.D. Tex. 2007) (finding that release of unknown claims was not impermissibly broad); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) ("[A] court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint[.]") (internal citations omitted).  The Fifth Circuit has explained that courts are required to enforce such broad provisions because they

---

[30]     *Id.* ¶ 31.

21

"contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation." *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1312 (5th Cir. 1983).  Thus, the Court found the provisions to be reasonable.

As the Court also noted in its preliminary approval order, the settlement does not give preferential treatment to the named class representatives or any segment of the class.  The allocation plan compensates class members up to the amount that they were allegedly overcharged for qualifying Pool Products purchases.  If class members' claims exceed the Net Settlement Fund, each claimant will be compensated on a *pro rata* basis.  In addition, DPPs do not seek incentive payments for the class representatives.  Thus, the lead plaintiffs will recover on the same basis as all class members.  The Court finds this allocation plan to be fair and unbiased.

That class members received notice of the allocation plan and have not objected to it buttresses the Court's conclusion. Class members received notice that the attorneys would request up to one-third of the settlement, and that notice and administration expenses would come out of the settlement as well.  They also had access, via the settlement website, to the

motions for preliminary approval, which set forth in greater detail the proposed plan for allocating the net settlement fund between claimants.  No class members have objected to the fairness of the settlement, the allocation plan, or the attorneys' request for one-third of the settlement.

Because the Court finds no indication that the settlement is fraudulent or collusive, or that it unfairly discriminates among class members, this factor favors approval of the settlement.

###### 2. Complexity, expense, and likely duration of the litigation

Under this factor, the Court considers whether settling now avoids the risks and burdens of potentially protracted litigation.  *Ayers*, 358 F.3d at 369.  The settlements eliminate the need for DPPs to litigate their substantive claims against Hayward and Zodiac, which will save substantial time and expense.  Moreover, this partial settlement allows the DPPs to mitigate some of the risk inherent in continuing in litigation against the remaining defendants.  It guarantees at least some recovery for class members, however DPPs' claims against the remaining defendants turn out.

The complexity of this particular litigation also favors settlement.  As the ongoing motions practice involving the non-

23

settling defendants indicates, this case involves complex issues of proof in connection with both DPPs' substantive claims and their motion for class certification.  If the Court grants DPPs' motion for class certification, the parties will still likely have to deal with an interlocutory appeal of the Court's class certification order.  A trial in this matter would be lengthy and would require numerous attorneys, paralegals, and witnesses. This case also requires expert testimony to establish market definition, causation, and damages.  After trial, the parties could still expect years of appeals.  Therefore, the complexity and likely duration of this case weigh in favor of finding that partial resolution by settlement is a reasonable option for all parties involved.

### 3. *Stage of the proceedings*

This factor asks whether the parties have obtained sufficient information "to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369.  The question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it.  *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 620-21 (citing *In re Train*

*Derailment Near Amite, La.*, 2006 WL 1561470 at *22 (E.D. La. 2006)).  If the settlement proponents have taken affirmative steps to gather data on the claims at issue, and the terms of the settlement are not patently unfair, the Court may rely on counsel's judgment that the information gathered was enough to support a settlement.  *In re Corrugated Container*, 643 F.2d at 211.

Here, settlement occurred after two years of litigation and extensive fact discovery.  Counsel had taken over eighty fact witness depositions and reviewed over four million documents. Expert discovery had already begun.  And DPPs had defended against two rounds of motions to dismiss.  Because of the advanced stage of the litigation, counsel for all parties were familiar with the factual and legal issues in the case. Therefore, the Court is satisfied that the parties were sufficiently informed to assess the strengths and weaknesses of their positions and to make a reasoned evaluation of whether and on what terms to settle.  This factor favors settlement.

> 4.  *The obstacles to prevailing on the merits*

As the Court summarized in its preliminary fairness order, DPPs face at least four obstacles to prevailing on the merits of their claim.

First, DPPs' claims are subject to complex problems of proof.  In particular, DPPs' attempted monopolization and Section 1 rule of reason claims require market analysis and consideration of potential justifications.  Market definition-- both the geographic and product dimensions--is disputed.  The Court is currently considering summary judgment motions by the non-settling defendants on each of DPPs' substantive claims.

Second, class certification in this case is disputed.  The non-settling defendants oppose DPPs' pending motion for certification of a litigation class.  They challenge, among other things, DPPs' ability to demonstrate commonality and predominance under Rule 23.

Third, DPPs face challenges in connection with the testimony of their expert, upon whom they rely to establish elements of their claims, including the relevant market, impact, and damages.  Moreover, all of the challenges just summarized by the Court are interconnected.  In particular, the exclusion of DPPs' economic expert on certain key issues on *Daubert* grounds would bode ill for plaintiffs on class certification and summary judgment.

In sum, considering the risks DPPs face in surviving summary judgment, attaining class certification, and prevailing

at trial and on appeal, the probability of success factor favors approval of the settlement.

    5.   *Range of possible recovery*

    The Court "must establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair." *In re Corrugated Container*, 643 F.2d at 213.  In particular,  "[p]roof difficulties" are "permissible factors" for a court to consider when evaluating the fairness of a settlement.  *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 240 (5th Cir. 1982).

    The Court considers whether the $9.95 million total settlement fund is pegged at a fair point in the range of potential recovery, taking into account the risks present in this particular litigation.  DPPs' expert suggests that estimated damages for class members during the class period are $266,846,301.[31]  He reaches this figure by multiplying PoolCorp's sales figures during the class period by his calculated overcharge of 4.97%.[32]  Although at first glance it appears that the settlement figure is small in comparison to the universe of

---

[31]    R. Doc. 473-1 at 10.

[32]    *Id.*

potential damages, plaintiffs' projected damages reflect a *best* case scenario for plaintiffs' actual damages.  This damages estimate does not reflect the risks of nonrecovery or diminished recovery faced by plaintiffs in this litigation, as discussed above.  Indeed, the lower boundary of IPPs' range of possible recovery is zero.  The $9.95 million figure provides prompt and certain recovery of at least some of DPPs' alleged losses.

In addition, DPPs noted at the hearing that some of the proof challenges that DPPs face related to impact are potentially more relevant to their claims against the manufacturer defendants.  DPPs also noted that the defendants in this case are subject to joint and several liability.  Therefore, in the event that the case proceeds to trial and DPPs secure a damages award, that award would be trebled before the settlements were backed out.  *See Sciambra v. Graham News Co.*, 841 F.2d 651, 657 (5th Cir. 1988) ("[T]he court should treble the amount of damage award . . . before deducting the amount of the . . . settlement.").  Thus, the settlements do not affect class members' ability to recover the full damages to which they may be entitled.

The class also receives a non-monetary benefit as part of the settlement.  Both Hayward and Zodiac have agreed to cooperate with DPPs to answer questions about their

28

transactional data and to assist with authenticating records. This cooperation will assist DPPs as they proceed against the non-settling defendants.

After evaluating the range of possible recovery in light of the risks of non-recovery, the Court concludes that the $9.95 million total settlement fund is pegged at a fair point in the range. Thus, this factor weighs in favor of settlement.

      6. *Opinions of class counsel, class representatives, and absent class members*

The opinions of the affected parties are generally favorable towards the settlement. The Court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement. *Cotton*, 559 F.2d at 1330. Here, Settlement Class Counsel have expressed their approval of the settlement after over two years of litigation and extensive fact discovery, as discussed above.

Further, the Court has received no objections, and the Claims Administrator has received only ten requests to opt out. Although the Court is careful not too infer too much from a paucity of objectors and opt-outs, the lack of objectors and low number of opt-outs suggest class-wide support for the proposed settlement. *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) (a small number of opt-outs

and objections can be viewed as indicative of the fairness of the settlement); *In re Excess Value Ins. Coverage Litig.*, 2004 WL 1724980 at *11 (S.D.N.Y. 2004) (small number of objectors suggests support for settlement).

In addition, pursuant to the Class Action Fairness Act, Hayward and Zodiac sent notice of the settlement to the Attorneys General of all 50 states and the United States Attorney General.  They received no negative reaction to the settlements in response.  Additionally, 1,511 claim forms had been received as of May 14, 2015 — nearly eight months before the December 11, 2015, deadline.

In sum, because all of the factors weigh in favor of settlement, the Court finds the settlement to be fair, reasonable and adequate under Rule 23(e)(1)(C) of the Federal Rules of Civil Procedure.

## III. Request for Reimbursement of Expenses

### A.    Request

In the notice sent to the class, Class Counsel indicated that they would seek up to one-third of the settlement fund for attorneys' fees and/or for reimbursement of expenses. Consistent with that notice, Class Counsel now request one-third of the settlement fund for reimbursement of expenses.

30

The expenses for which Class Counsel seek reimbursement can be divided into three categories.  First, there are "held" expenses that each firm pays as it incurs them.  Held expenses are typically overhead expenses such as travel and copying costs.  At the hearing, DPPs reported that all of the held expenses incurred to date have been reported by Class Counsel according to court-approved protocol and approved by the court-appointed accountant, Philip A. Garrett.  These expenses total $522,369.74.  Second, there are "shared" costs that have already been paid out of the common litigation fund established by DPPs' co-liaison counsel in accordance with the terms of Pretrial Order No. 9.  All of the costs that have already been paid have been reviewed and approved by Mr. Garrett.  These costs total $1,588,781.35.  Finally, there are shared costs that have already been incurred but have not yet been processed by Mr. Garrett or paid by Class Counsel.  These costs include $1,492,277.70 in expert fees, $142,858.29 in court reporting services, and $13,700.96 for a discovery vendor.  The unpaid shared costs total $1,648,836.95.  All together, the expenses paid and/or incurred by counsel on behalf of the class total $3,759,988.04.  This amount is greater than one-third of the settlement (which would be $3,316,667).  Thus, in seeking one-third of the settlement for reimbursement of expenses, Class

Counsel do not even seek full reimbursement for all of the expenses they have incurred.

At the hearing, Class Counsel represented that, if the Court grants their request, the reimbursement money will be used to replenish the litigation fund used to pay shared expenses. All counsel involved in this case have received notice of Class Counsel's reimbursement request, and none has objected.

In its preliminary fairness determination, the Court concluded that a total attorney award (including both fees and expenses) not exceeding one-third of the fund was in line with other awards approved in this circuit and within the limit of what the Court deems reasonable.  The Court now makes a more detailed inquiry into Class Counsel's request.

## B.   Legal Standard

The Court's power to review the expenses sought by counsel from the settlement fund comes from the Court's responsibility to ensure that the settlement is fair, adequate, and reasonable for the class.  The Fifth Circuit has held that a district court abuses its discretion when it approves a settlement from which expenses may be sought without having any estimate as to what those expenses may be.  *See In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010).  The Court must ensure that expenses will not "cannibalize the entire . . . settlement," and

32

that money will remain for the class after administrative and litigation expenses have been deducted from the fund. *Id*. at 196.

In addition, some district courts have applied the twelve factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), to combined fee and expense requests. *See, e.g.*, *In re Prudential Bache Energy Income Partnerships Sec. Litig.*, No. 888, 1994 WL 202394 (E.D. La. May 18, 1994). But expenses must be distinguished from fees. Typically, class action counsel who create a common fund for the benefit of the class (as counsel have done here), are entitled to reimbursement of reasonable litigation expenses from that fund. *See In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1089 (S.D. Tex. 2012); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, No. CIV. 6:12 1609, 2015 WL 965696, at *11 (W.D. La. Mar. 3, 2015) (unpublished). And, in the non-class context, the Fifth Circuit has disapproved the application of the *Johnson* factors to reduce expenses across-the-board. It explained:

> Fees may be increased above the lodestar; the cost of suit may not be. . . . [T]here appears to be no correlation between the Johnson factors and out-of-pocket expenses. While expenses incurred extravagantly or unnecessarily should be disallowed, this should be done on an item-by-item basis.

*Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1101 (5th Cir. 1982), *overruled in part on other grounds by Int'l Woodworkers of Am., AFL CIO & its Local No. 5 376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986), and *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193 (5th Cir. 1986). This makes sense: unlike fees, expense reimbursements are not a reward. They must be awarded simply to return counsel to the position they were in before the litigation began.

Here, the Court must confirm that the expenses claimed will not "cannibalize the entire . . . settlement," and that money will remain for the class after administrative and litigation expenses have been deducted from the fund. *In re Katrina*, 628 F.3d at 196. In short, the Court will assess whether the net amount remaining for the class after all expenses have been deducted will be fair, adequate, and reasonable for the class. The Court will also review whether the claimed expenses are indeed reasonable. *See In re Heartland*, 851 F. Supp. 2d at 1089.

## C. Discussion

The Court determines that a sum of one-third of the settlement fund for reimbursement of expenses is fair to the class. Here, notice of the settlement informed the class that Class Counsel intended to seek up to one-third of the settlement

34

fund for attorneys' fees and/or for reimbursement of expenses. No class members objected.  This was not for want of class members with large potential claims (and thus ample reason to care about how counsel proposed divvying up the fund): several of the claims already received by the claims administrator are for millions of dollars.  Thus, the lack of objectors provides some indication that the class considers a one-third stake for the attorneys to be fair.

In addition, the expenses incurred have been reasonable. All of the expenses that Class Counsel seek from the fund fall within the categories pre-approved by Pretrial Order No. 9, and all of them have been reviewed and approved by Mr. Garrett (or will be, before they are paid).

The expenses have also been necessary.  Class counsel undertook this case on a contingency basis and have thus far received no payment.  And this case has been expensive to litigate.  DPPs reached a settlement with Hayward only after fact discovery, including the depositions of over eighty fact witnesses, and the review of over four million documents, was complete.  This sort of work requires not only attorney hours but also money--for discovery vendors, travel, copying, and so on.  The expenses sought by Class Counsel also include approximately $2 million in expert fees.  As the Court has

explained above, DPPs' case requires expert testimony.  Thus, without Class Counsel's willingness to front the cost of experts, no class member would be recovering at all.

In sum, the expenses incurred by Class Counsel so far have been both necessary and reasonable.  It is fair to permit Class Counsel to recover these expenses from the settlement fund.  At the same time, a fair portion of the settlement must be reserved for the benefit of the class.  The Court concludes that the one-third sum sought by Class Counsel strikes a fair balance between these competing interests.  Thus, the Court approves Class Counsel's request for $3,316,667 from the fund for reimbursement of litigation expenses.

**VI. Conclusion**

For the foregoing reasons, the Court GRANTS DPPs' Final Approval of the Settlements Between Direct Purchaser Plaintiffs and Hayward Industries, Inc., and Between Direct Purchaser Plaintiffs and Zodiac Pool Systems, Inc.

The Court also orders that Class Counsel receive $3,316,667 from the fund for reimbursement of litigation expenses.

New Orleans, Louisiana, this 2nd day of June, 2015.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE