UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET ANTITRUST          SECTION: R(2)
LITIGATION                             JUDGE VANCE
                                       MAG. JUDGE WILKINSON


**THIS DOCUMENT RELATES TO ALL INDIRECT-PURCHASER PLAINTIFF CASES**


<u>**ORDER AND REASONS**</u>

Indirect-Purchaser Plaintiffs (IPPs), together with Hayward Industries, Inc. (Hayward) and Zodiac Pool Systems, Inc. (Zodiac), move the Court to grant final approval of a class action settlement between IPPs and Hayward and a class action settlement between IPPs and Zodiac.[1] In addition, Class Counsel for IPPs move the Court to approve the deduction of common benefit litigation expenses and class administration expenses from the fund, and to approve their request for attorneys' fees.[2] The Court has considered all of the evidence submitted at the fairness hearing held on May 14, 2015, as well as the parties' legal memoranda and supplemental submissions. For the reasons stated more fully below, the Court finds the settlement of this class action to be

_____

[1]    R. Doc. 622.

[2]    R. Doc. 623.

fair, reasonable, and adequate, and the Court awards attorneys' fees and expenses as provided in this order.

I.   **Background**

A.   **Factual Background**

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against Pool and Manufacturer Defendants.   Pool is the country's largest distributor of products used for the construction and maintenance of swimming pools (Pool Products).[3]   Manufacturer Defendants are the three largest manufacturers of Pool Products in the United States: Hayward, Zodiac, and Pentair Water Pool and Spa, Inc. (Pentair).[4]   As defined in IPPs' Third Amended Class Action Complaint (Complaint), Pool Products are the equipment, products, parts or materials, and chemicals used for the construction, renovation, maintenance, repair, and service of residential and commercial swimming pools.   Pool Products include pumps, filters, covers, drains, fittings, rails, diving boards, and chemicals, among other goods. Pool buys Pool Products from manufacturers, including the three Manufacturer Defendants, and in turn sells them to DPPs, which include pool builders, pool retail stores, and

---

[3]   R. Doc. 290, ¶ 44.

[4]   *Id.* ¶ 22.

2

pool service and repair companies (collectively referred to as "Dealers" in the Complaint).[5]  IPPs are pool owners who indirectly purchased Pool Products manufactured by the Manufacturer Defendants and distributed by Pool.   The IPPs named in the Complaint and their states of citizenship are: Jean Bove (CA), Kevin Kistler (AZ), Peter Mougey (FL), and Ryan Williams (MO).

IPPs allege violations of state laws on behalf of classes of individuals and entities who purchased Pool Products not for resale in California, Arizona, Florida, and Missouri. IPPs allege Pool conspired with each of the Manufacturer Defendants to restrict the supply of Pool Products to Pool's rival distributors. They allege that defendants' conduct resulted in higher prices, reduced output, and reduced customer choice for Pool Products sold indirectly to IPPs.  They allege that the conduct of Pool and the Manufacturing Defendants violated various antitrust and consumer protection laws of California, Arizona, Florida, and Missouri. IPPs further allege that any price increases Pool charged were passed on by Pool Dealers to indirect consumers who own residential or commercial swimming pools, such as IPPs.  IPPs claim to have suffered damages from defendants' conduct in the form of passed-on overcharges they paid for Pool Products as a

---

[5]      *Id.* ¶ 31.

result of defendants' conduct and claim that the overcharges are "identifiable and traceable" through the manufacturer, distributor, dealer (retailer), or service company to the ultimate consumer, such as IPPs in Arizona, California, Florida, and Missouri.

**B.   Procedural History**

On November 21, 2011, the Federal Trade Commission (FTC) announced that it conducted an investigation into unfair methods of competition by Pool and entered a consent decree with Pool resolving the matter.   Shortly after the FTC's announcement, several direct purchaser plaintiffs filed suit in this district and several others.   On April 17, 2012, the Judicial Panel on Multidistrict Litigation consolidated the suits for pretrial purposes in this Court.[6]   On May 17, 2012, IPPs filed their initial consolidated class action complaint in the multidistrict litigation in this Court.

On September 5, 2012, IPPs filed their Second Amended Class Action Complaint.[7]   That Complaint alleged that Pool's and the Manufacturer Defendants' conduct violated various antitrust and deceptive trade practices laws of California, Arizona, Florida, and Missouri.   Specifically, IPPs alleged violations of

---

[6]    R. Doc. 1.

[7]    R. Doc. 149.

4

California's antitrust law, the Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*; the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; the state antitrust provisions of Ariz. Rev. Stat. §§ 44-1401, *et seq.*; the consumer protection provisions of the Florida Deceptive and Unfair Trade Practices Act, Fl. Stat. §§ 501.201, *et seq.*, including § 501.204; and the consumer protection provisions of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*[8] IPPs based their claims on allegations of the same underlying conduct that DPPs alleged in their Sherman Act claims. Specifically, IPPs alleged that Pool pursued a deliberate strategy to restrain trade and monopolize the Pool Product Distribution Market through acquiring competitors and foreclosing actual and potential competition by conditioning access to its distribution network on manufacturers' promises not to supply Pool's rivals. IPPs also alleged that the Manufacturer Defendants agreed with Pool to eliminate existing distribution competitors and prevent new entrants from obtaining the products necessary to compete. IPPs alleged that they were injured because defendants' conduct caused them to pay higher prices for Pool Products than they would have otherwise paid absent defendants' illegal practices. Finally,

---

[8]      *Id.* at 2.

IPPs alleged that defendants fraudulently concealed their illegal conduct until November 2011 when the Federal Trade Commission investigation and related consent decree made public the nature of Pool's anticompetitive conduct.

On May 24, 2013, the Court dismissed IPPs' claims under the California Unfair Competition Law, Florida Deceptive and Unfair Trade Practices Act, and Missouri Merchandising Practices Act that were based on the theory that defendants engaged in fraud or misrepresentation. The Court dismissed IPPs' illegal group boycott claim under the Cartwright Act because IPPs failed to allege a horizontal agreement.[9] The Court also dismissed IPPs' claim that defendants fraudulently concealed their illegal conduct.[10]

The Court allowed IPPs to go forward with their California Unfair Competition Law and rule of reason Cartwright Act claims involving three vertical conspiracies (one between Pool and each Manufacturer Defendant), to the extent that the claims were predicated on a national market.[11] The Court also allowed IPPs to go forward with their Arizona Antitrust Act claims of three vertical conspiracies, to the extent that the claims were

---

[9]    R. Doc. 250 at 19-20.

[10]   *Id.* at 37-38.

[11]   *Id.* at 21-22.

predicated on a national market, and their Arizona Antitrust Act claim of attempted monopolization against Pool.[12]  The Court also found that IPPs stated a claim under the Florida Deceptive and Unfair Trade Practices Act based on their allegations of attempted monopolization (by Pool) and three vertical conspiracies (one between Pool and each Manufacturer Defendant), to the extent that the claims were predicated on a national market.[13]  In addition, the Court found that IPPs stated a claim under the Missouri Merchandising Practices Act (MMPA) based on their allegations of defendants' alleged anticompetitive agreements to exclude Pool's rivals and Pool's alleged attempted monopolization, to the extent that the claims were predicated on a national market.[14]  IPPs then filed their Third Amended Class Action Complaint, which omitted the claims the Court dismissed.

### C.    Settlement Agreement Background

#### 1.    *Hayward Settlement Negotiations*

Negotiations leading to the Hayward settlement agreement took place over the course of a year.  Class Counsel for IPPs and counsel for Hayward mediated this action before the Honorable Layn Phillips, a former federal district judge and a respected mediator

---

[12]    *Id.* at 25-26.

[13]    *Id.* at 29-30.

[14]    *Id.* at 35.

of antitrust disputes.  Settlement negotiations included two full-day, in-person mediation sessions.  The first took place July 22, 2013, and the second occurred nine months later on March 20, 2014. After these sessions, counsel continued to engage in settlement discussions in teleconference calls facilitated by Judge Phillips. The parties came to an agreement on March 31, 2014, and finalized the terms and signed the agreement on May 16, 2014.

   2. *Zodiac Settlement Negotiations*

   Negotiations leading to the Zodiac settlement agreement also took place over the course of a year.  Class Counsel for IPPs and counsel for Zodiac mediated this action before Judge Phillips. Settlement negotiations for the Zodiac settlement included three full-day, in-person mediation sessions.  These sessions occurred on July 22, 2013; March 20, 2014; and October 1, 2014.  After these sessions, counsel continued with extensive telephone settlement discussions, including discussions mediated by Judge Phillips.  The parties finalized and executed the agreement on November 4, 2014.

   After the parties finalized both settlements, IPPs suggested combining the Hayward settlement with the Zodiac settlement for purposes of administration and providing notice to the class.

### 3.   Preliminary Fairness Determination

The Court held a preliminary fairness and settlement class certification hearing on August 14, 2014.  On August 22, 2014, the Court appointed Richard C. Stanley as Special Master, in accordance with Rule 53 of the Federal Rules of Civil Procedure, to assist in implementing any subsequent settlements.[15]  The Court preliminarily approved the IPP-Hayward settlement and the IPP-Zodiac settlement on December 31, 2014.[16]  The terms of the two settlement agreements, with the exception of the settlement amounts, are substantively the same.   In addition, the Court certified identical settlement classes for both settlements.[17]

Consistent with the agreements, the Court appointed plaintiffs Kevin Kistler, Jean Bove, Peter Mougey, and Ryan Williams (collectively "Named Plaintiffs") as Class Representatives of the Settlement Class.   The Court appointed Thomas J.H. Brill (Law Office of Thomas H. Brill) as Lead Counsel for the Class, and Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.; Edgar Law Firm LLC, Sharp McQueen PA; and Brady & Associates as Co-Counsel for the Settlement Class, finding that

---

[15]    R. Doc. 467.

[16]    R. Docs. 551 & 552.

[17]    *Id.*

the appointments satisfied the prerequisites of Rule 23(g).[18]  The Court also approved Angeion Group as the Claims Administrator for the settlement and First NBC Bank as escrow agent.[19]  The Court further approved the proposed notice and claim forms, as well as deadlines for submitting claims forms, opting out, and filing objections.

The Court held a fairness hearing on May 14, 2015, to determine whether the settlement is fair and to determine an award of attorneys' fees and expenses.  Following the fairness hearing, the parties filed a supplemental joint memorandum alerting the Court to the potential for a *cy pres* distribution of any unclaimed settlement funds.  On July 10, 2015, the Court informed the parties that the proposed recipients of *cy pres* funds failed to meet applicable criteria for *cy pres* awards.[20]  On July 16, 2015, the parties identified new proposed beneficiaries for any potential *cy pres* distribution.[21]

### D.   The Settlement Class

The Court certified the following settlement class for both settlements:

---

[18]    *Id.*

[19]    *Id.*

[20]    R. Doc. 660.

[21]    R. Doc. 661.

All individuals residing or entities operating in
Arizona, California, Florida or Missouri, who or which,
between January 1, 2008 and July 16, 2013, purchased
indirectly from PoolCorp (and not for resale) Pool
Products in Arizona, California, Florida or Missouri
manufactured by Hayward, Pentair, or Zodiac. Excluded
from the Settlement Class are (1) individuals residing
or entities operating in Missouri, who or which did not
purchase Pool Products primarily for personal, family,
or household purposes, and (2) Defendants and their
subsidiaries, or affiliates, whether or not named as a
Defendant in this Action, and governmental entities or
agencies.[22]

Also excluded from the class are any putative class members
who excluded themselves by filing a timely, valid request for
exclusion.   The parties stipulated that certification of the
Settlement Class is for settlement purposes only, and they retain
all of their respective objections, arguments, and defenses
regarding class certification in the event that settlement is not
finalized.

   **E.   The Settlement Agreements**

Hayward has paid $1.5 million and Zodiac has paid $500,000
into an Escrow Account pending the Court's final approval of the
settlements.   Interest from the account accrues to the benefit of
the settlement class.

---

[22]   R. Doc. 500-3 ¶ 5 (Hayward settlement agreement addendum);
R. Doc. 500-4 ¶ 5 (Zodiac settlement agreement).

11

The Agreements provide that the settlement amounts are "all-in" figures, meaning that $1.5 million is the total amount Hayward will pay and $500,000 is the total amount Zodiac will pay in exchange for the released claims.[23]  Accordingly, the settlement amounts shall be used to pay: (1) the notice and administration costs; (2) attorneys' fees and litigation expenses; (3) incentive awards; (4) class member benefits; and (5) any remaining administration expenses and any other costs of any kind associated with the resolution of the action.[24]

Hayward and Zodiac also agreed to assist plaintiffs' counsel with document authentication and to continue to answer plaintiffs' questions about transactional data previously produced by Hayward and Zodiac during discovery.[25]

The Agreements provide that they are intended to forever and completely release Hayward and Zodiac from all "Released Claims," which are defined as:

> claims, demands, actions, suits, proceedings, causes of
> action, damages, liabilities, costs, expenses, penalties
> and attorneys' fees, of any nature whatsoever, whether
> class, individual, or otherwise in nature (whether or
> not any person or entity has objected to the settlement
> or makes a claim upon or participates in the Settlement

---

[23]   R. Doc. 500-2 ¶¶ 19 & 22 (Hayward settlement agreement); R. Doc. 500-4 ¶¶ 19 & 22 (Zodiac settlement agreement).

[24]   R. Doc. 500-2 ¶¶ 19 & 22; R. Doc. 500-4 ¶¶ 19 & 22.

[25]   R. Doc. 500-2 ¶ 31; R. Doc. 500-4 ¶ 31.

Fund), whether directly, representatively, derivatively or in any other capacity that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected and unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating to the Action, which were asserted or that could have been asserted, in complaints filed in the Action by the Settling Plaintiffs, including, without limitation, any claims arising under any federal or state antitrust, unjust enrichment, unfair competition, or trade practice statutory or common law, or consumer protection law.[26]

Releasors waive any rights or benefits conferred by Section 1542 of the California Civil Code, which states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."[27] Releasors also waive rights or benefits available under any law of any state or territory of the United States or District of Columbia, or by principle of common law, which is similar, comparable, or equivalent to Section 1542 of the California Civil Code, including but not limited to Section 20-7-11 of the South Dakota Codified Laws.

---

[26]   R. Doc. 500-2 ¶ 17; R. Doc. 500-4 ¶ 17.

[27]   R. Doc. 500-2 ¶ 18; R. Doc. 500-4 ¶ 18.

13

**F.    Notice**

Federal Rule of Civil Procedure 23(c)(3) governs the notice requirements for class certification.    Specifically, the notice must state:

> (i) the nature of the action;
>
> (ii) the definition of the class certified;
>
> (iii) the class claims, issues, or defenses;
>
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
>
> (v) that the court will exclude from the class any member who requests exclusion;
>
> (vi) the time and manner for requesting exclusion; and
>
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(3)(B).    The notice here gave the class information about the terms of the settlements, the date of the final fairness hearing and deadlines for opting out of or objecting to the settlement, and methods for contacting Class Counsel and Angeion.    The notice also informed the class that Class Counsel intended to seek up to one-third of the settlement in attorneys' fees and/or for reimbursement of expenses.    The Court found in its preliminary approval order that the proposed notice met the requirements of Rule 23(c)(3).    The Court also found that the proposed plan for disseminating the notice was the

14

best notice practicable in accordance with Rule 23(c)(2)(B) and that it met the requirements of Due Process.

Class Counsel has provided evidence that the notice was disseminated as planned. Angeion sent email notice to 214,263 individuals and entities, using email addresses gleaned from Hayward's and Zodiac's warranty and rebate databases.[28] The email lists did not include all class members, because many affected class members may have never registered their warranties or submitted a rebate request. Thus, to reach unknown class members, Angeion implemented a three-part, paid notice campaign.

First, Angeion published short-form notice of the settlement in major newspapers in the four states included in the class. The affidavit from Angeion's Executive Vice President includes a chart documenting the particular newspapers and dates of publication. Second, Angeion executed an internet banner advertisement campaign and a Facebook and Google advertisement campaign. Third, Angeion issued a national press release about the settlement.

In addition to the notice campaign, Angeion has established an information website about the settlement. As of March 2015, the website had received approximately 28,000 views. Angeion also

---

[28]   R. Doc. 622-2 (declaration of Steven Weisbrot).

established a toll-free number to permit class members to listen to FAQs and request long-form notice.

Hayward and Zodiac have notified the appropriate state and federal officials as required by the Class Action Fairness Act. *See* 28 U.S.C. § 1715.  The Act requires notice to be given no later than ten days after a proposed settlement of a class action is filed in court. *Id.* § 1715(b).  And, under section 1715(d), a court may not grant final approval of a settlement until ninety days after the appropriate officials have been served with notice.

Here, Zodiac served notice on the necessary State and Federal officials on November 26, 2014, two days after filing its proposed settlement in court.[29]  Hayward, however, did not serve notice until February 6, 2015--months after filing its proposed settlement.[30]  Thus, it did not comply with the Act's requirement of prompt notice.  Nonetheless, more than ninety days have passed since both Hayward and Zodiac served notice on the appropriate officials, and no officials have raised complaints or concerns. Therefore, the Court finds that the notice satisfies the Act, because the appropriate state and federal officials have had "sufficient notice and opportunity to be heard" about the

---

[29]     R. Doc. 560.

[30]     R. Doc. 598.

settlements.  *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 258 n.12 (E.D. Pa. 2012) (collecting cases).

In sum, after reviewing evidence of the Claims Administrator's actual dissemination of the notice, and the notice provided to state and federal officials under the Class Action Fairness Act, the Court confirms that the notice complies with the requirements of Rule 23 and Due Process, and with the Act.

### G.   Plan of Allocation and Claims Process

The Agreements provide that settlement funds will be used to pay attorneys' fees and expenses approved by the Court, all settlement administration expenses, costs for notice, and any other costs associated with the settlement.  Plaintiffs combined notice and administration for the Hayward and Zodiac settlements to save on costs.  IPPs project that after deducting estimated settlement administration expenses ($210,000), and their requested fees and expenses award ($666,666.67), there will be $1,123,333.33 left for the benefit of the class.[31]

The Court also appointed a Special Master for the IPP settlement,[32] and tasked the Special Master with formulating and recommending an allocation protocol that would apportion the settlement proceeds--net of claims administration expenses,

---

[31]   R. Doc. 623-1 at 4.

[32]   *See* R. Doc. 467.

attorneys' fees and costs--to Class Members who submit valid claims from each of the four states involved (CA, AZ, MO, and FL). The Special Master recommended a claims procedure that gives claimants the option to recover under a "Standardized Recovery Model" or an "Itemized Recovery Model," depending on the types of documentation they have available. Consumers without extensive documentation will recover standard amounts for items purchased in particular categories of Pool Products. Consumers with extensive records can submit itemized claims based on their actual purchase prices. In any event, consumers will be able to recover only up to the alleged 4.97 percent overcharge on their eligible Pool Products purchases. After all claims are processed, if the aggregate eligible recovery exceeds the net settlement amount, then eligible claims will be reduced *pro rata*. If the aggregate eligible recovery is less than the net settlement amount, the Special Master recommends that the remaining funds be allocated to a *cy pres* fund, to be distributed at the Court's discretion.

The Special Master later issued a supplemental report, in which he recommended that the two settlements be treated as a single fund of $2,000,000 for the purposes of allocation and distribution. The Special Master's supplemental report also recommended awarding an incentive payment of $2000 to each of the four Named Plaintiffs, who have each served the class by reviewing

the complaints, submitting to a multi-hour deposition, preparing for the deposition, and gathering and submitting documents to Class Counsel.

### H.   Opt-outs, Objections, and Claims

The deadline for opting out of the settlements was April 9, 2015.  That deadline has passed, and no class members requested exclusion.  Nor did any class members object to the settlement.

The claims filing deadline is December 11, 2015.  As of May 22, 2015, Angeion had received 1435 claims.  The average purchase price amount claimed is $2,577.07.  IPPs anticipate that the full amount available for the class will not be claimed and that funds will be left over for a *cy pres* award.

Class Counsel estimates that there are approximately 500,000 class members nationwide, meaning that the claims submitted so far represent approximately 0.3 percent of the class.  Class Counsel also represent that, had Steven Weisbrot of Angeion been called to testify at the fairness hearing, he would have testified that this claims rate is consistent with his experience in other consumer and end-user class settlements.  In addition, at the fairness hearing, IPPs informed the Court that they have reached a settlement with Pentair.  Thus, the class will be "re-noticed" in the coming months, which Class Counsel predicts will lead to an increase in claims.

19

## II. *Cy Pres* Distribution

Because a *cy pres* award of unclaimed settlement funds is likely, the Court will first analyze whether the parties proposed *cy pres* distribution is appropriate. *See Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) ("In addition to asking whether the *class settlement*, taken as a whole, is fair, reasonable, and adequate to all concerned, we must also determine whether the *distribution* of the approved class settlement complies with our standards governing *cy pres* awards." (internal citations and quotation marks omitted)).

### A. Legal Standard

In class actions, federal courts apply the equitable doctrine of *cy pres* to put undistributed or unclaimed settlement funds to their next best compensatory use, "*e.g.*, for the aggregate, indirect, prospective benefit of the class." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (quoting *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir. 2002)); *see also Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007)(internal quotation marks omitted).

The Fifth Circuit requires that two conditions be met before finding that a *cy pres* distribution is appropriate. First, it must be infeasible to make further settlement distributions to

20

class members. *Klier*, 658 F.3d at 475 (citing Am. Law Inst., Principles of the Law of Aggregation Litigation § 3.07 (2010); William B. Rubenstein, *et al.*, Newberg on Class Actions § 10.17 (4th ed. 2002)). It is infeasible to make further distributions when (1) remaining class members cannot be identified or chose not to participate, (2) the claim amounts are too small to make individual distributions economically viable, and/or (3) the class members' damages claims are fully satisfied by the initial distribution. *Id.*; Am. Law Inst., *supra* § 3.07.

Second, the unclaimed funds must "be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated." *Klier*, 658 F.3d at 474 (quoting *In re Airline Ticket Comm'n*, 307 F.3d at 682); *see also In re Lease Oil Antitrust Litig. (No. II)*, MDL No. 1206, 2007 WL 4377835, at *21 (S.D. Tex. Dec. 12, 2007) ("In applying *cy pres* principles, it is appropriate for a court to consider (1) the objectives of the underlying statute(s), (2) the nature of the underlying suit, (3) the interests of the class members, and (4) the geographic scope of the case." (internal citations omitted)). Stated differently, there must be a nexus between the harm that the plaintiffs suffered and the benefit the *cy pres* distribution is expected to provide. *See* Rubenstein, *supra* § 12.33. Only

21

when, after thorough investigation and analysis, the court cannot identify a recipient whose interests reasonably approximate those of the class may a court approve a *cy pres* award to a recipient with more tangential connections. *See id.; see also Diamond Chem. Co., Inc. v. Akzo Nobel Chems. B.V.*, Nos. 01-2118 (CKK), 02-1018 (CKK), 2007 WL 2007447, at *2 (D.D.C. July 10, 2007) ("[T]he doctrine of *cy pres* and the courts' broad equitable powers now permit the use of funds for other public interest purposes by educational, charitable, and other public service organizations." (internal quotation marks omitted)).

### B.   Discussion

The Court finds the proposed *cy pres* distribution in this case to be appropriate based on the unclaimed settlement funds likely to remain at the claims filing deadline and the nexus between the interests of the class members and the proposed beneficiaries.

First, the Court estimates the amount of the settlement funds likely to remain undistributed at the end of the claims filing deadline of December 11, 2015.  Out of a potential class of approximately 500,000 members, only 1435 claimants have filed claims as of May 2015.  With approximately six months left in the claims filing period, Class Counsel predict an increase in claims in coming months because the class will be "re-noticed" in

connection with IPPs' settlement with Pentair.  For the purposes of calculating any potential *cy pres* award, the Court conservatively estimates that only 25 percent more, or 358 additional claims, will be filed by December 2015.

Multiplying the estimated total of 1793 claims by the average purchase price amount claimed of $2,577.07, the claims filed are likely to total approximately $4,620,686.51 in overcharged purchases.  Applying the 4.97 percent overcharge to the total purchase price amount, the total amount claimants would be entitled to recover under the settlement agreements is approximately $229,648.12.  This amount would fully satisfy IPPs' claims.  Subtracting this estimate of total damages, the notice and administration costs ($210,000), and the named plaintiffs' incentive awards ($8000 total) from the total amount of the settlement fund ($2,000,000), leaves approximately $1,552,351.88, exclusive of attorneys' fees and costs, to be distributed *cy pres.* Relying on the current claims information and the estimated projection for the remaining claims period, the Court concludes that it will likely be infeasible to make further distributions of unclaimed funds to the settlement class because the plaintiffs who file claims will be fully compensated by the initial distribution. *See Klier*, 658 F.3d at 475; Am. Law Inst., *supra* § 3.07; *see also In re Heartland Payment Sys., Inc. Customer Data Sec. Breach*,

23

*Litig.*, 851 F. Supp. 2d 1040, 1067 n.18 (S.D. Tex. 2012) (explaining that awarding claimants settlement funds above the amount of their claim provides them with a "huge windfall").

In an effort to distribute the unclaimed funds for a purpose "as near as possible to the legitimate objectives underlying the lawsuit," the parties propose three organizations as potential *cy pres* recipients: the American Antitrust Institute, Consumers Union, and the Institute for Consumer Antitrust Studies at Loyola University of Chicago.[33]   The American Antitrust Institute is a non-profit education, research, and advocacy organization that works to increase the role of competition in the market and to challenge economic abuses.   Consumers Union is the policy and action division of the non-profit organization Consumer Reports. Consumers Union seeks to protect consumers by advocating and promoting consumer protection laws.  Loyola University's Institute for Consumer Antitrust Studies is a non-partisan academic center designed to explore the impact of antitrust enforcement on the individual consumer and to shape policy issues.   Loyola's Institute fulfills its mission by sponsoring symposia, academic colloquia, student fellowships, and the world's first online masters program in global competition law.

---

[33]    R. Doc. 661.

Courts have used the *cy pres* doctrine to disburse unclaimed settlement funds to a wide range of "educational, charitable, and other public service organizations." *See, e.g.*, *In re Infant Formula Multidistrict Litig.*, No. 4:91-CV-00878, 2005 WL 2211312, at *2 (N.D. Fla. Sept. 8, 2005) (quoting *In re Motorsports Merch. Antitrust Litig.*, 106 F. Supp. 2d 1392, 1394 (N.D. Ga. 2001)). In consumer antitrust cases such as this one, courts traditionally award *cy pres* distributions to organizations dedicated to protecting consumers. For example, in *In re Publication Paper Antitrust Litigation*, the court explained, "[b]ecause the plaintiffs' claims here are based on antitrust injury, the next best use for the settlement funds is to disburse those funds to charitable institutions designed to guard against antitrust injury and protect consumers." No. 3-:04 MD 1631 (SRU), 2009 WL 2351724, at *2 (D. Conn. July 30, 2009). The court awarded *cy pres* distributions in varying amounts to the American Antitrust Institute, Public Justice, Class Action, Preservation Project, and Consumer Watchdog. *Id.* Similarly, following a class action settlement in an illegal tying arrangement dispute, the Eastern District of New York awarded *cy pres* distributions to the American Antitrust Institute, Consumers Union, and U.S. Public Interest Research Group. *In re Visa Check/MasterMoney Antitrust Litig.*,

No. 96-cv-5238(JG), 2011 WL 5029841, at *9 (E.D.N.Y. Oct. 24, 2011).

Here, IPPs allege that the Manufacturer Defendants abused their economic power by unlawfully conspiring with Pool to increase prices for Pool Products in various states. IPPs assert that they were injured because defendants' conduct caused them to pay higher prices for Pool Products than they would have otherwise paid absent defendants' illegal practices. Considering the objectives underlying the lawsuit and the interests of the class and those similarly situated, the Court finds that Consumers Union and Loyola's Institute for Consumer Antitrust Studies are appropriate *cy pres* beneficiaries for the work to benefit consumers. Each organization is dedicated to a worthy cause that will serve the interests of the consumer class members. Consumers Union is dedicated to protecting consumers. Its mission statement, available online, provides, "We stand firmly behind the principle that consumer products must be safe, effective, reliable, and *fairly priced*." Consumers Union, https://consumersunion.org/about/mission/ (last visited July 19, 2015) (emphasis added). Additionally, Loyola's Institute for Consumer Antitrust Studies touts itself as "the only academic organization of its kind" dedicated to exploring the impact that antitrust and consumer protection laws have on the individual

consumer. Loyola University Chicago School of Law, http://www.luc.edu/law/centers/antitrust/mission.html (last visited July 19, 2015). These organizations can put any *cy pres* award to good use, resulting in an aggregate, indirect, prospective benefit to the IPP class. *See Klier*, 658 F.3d at 474 (quoting *In re Airline Ticket Comm'n*, 307 F.3d at 682.). Therefore, if settlement funds remain after distribution to the class members, the Court will award any unclaimed funds in the following amounts: 50 percent to Consumers Union and 50 percent to Loyola University's Institute for Consumer Antitrust Studies.

## III. Fairness Determination

### A.    Legal Standard: Fair, Adequate, and Reasonable

A class action may not be dismissed or compromised without the Court's approval and notification to all class members. Fed. R. Civ. P. 23(e). Before the Court approves a settlement, the Court must find that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(c); *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004).

The Court must "ensure that the settlement is in the interests of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Ayers v. Thompson*, 358 F.3d 356, 368-69 (5th Cir.

27

2004) (quoting *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)).  Because the parties' interests are aligned in favor of settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings.  *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) (noting that the class action context "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements"); *see also* Manual for Complex Litigation (Fourth) § 21.61 (2004).  The Court's duty of vigilance does not, however, authorize it to try the case in the settlement hearings.  *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

The Fifth Circuit has identified six factors that courts should consider in assessing whether a settlement is fair, adequate, and reasonable: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to plaintiffs prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members. *See Newby*, 394 F.3d at 301; *Ayers*, 358 F.3d at 369; *Reed*, 703 F.2d at 172.

###### B.   Discussion

####### 1.   Settlement Obtained by Fraud or Collusion

There is no evidence that any fraud or collusion infected the process by which the parties arrived at the settlement agreements. For both the Hayward and the Zodiac settlements, the parties reached an agreement only after multiple formal sessions of arm's length mediation with Judge Phillips.

Next, the terms of the agreements do not signal fraud or collusion. In its preliminary approval order, the Court reviewed the "Released Claims" provision in each Settlement and found the provisions reasonable.  Both Agreements provide, in identical language, that they are intended to forever and completely release Hayward and Zodiac from all "Released Claims," which are defined as:

> claims, demands, actions, suits, proceedings, causes of action, damages, liabilities, costs, expenses, penalties and attorneys' fees, of any nature whatsoever, whether class, individual, or otherwise in nature (whether or not any person or entity has objected to the settlement or makes a claim upon or participates in the Settlement Fund), whether directly, representatively, derivatively or in any other capacity that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected and unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating to the Action, which were asserted or that could have been asserted, in complaints filed in the Action by the Settling Plaintiffs, including, without limitation, any claims arising under any federal or

> state antitrust, unjust enrichment, unfair competition, or trade practice statutory or common law, or consumer protection law.[34]

Regarding unknown claims, the Agreements further specify that these releases constitute a waiver of class members' rights under Section 1542 of the California Civil Code, which provides for a release against unknown claims, and "any other rights or benefits available under any law of any state or territory of the United States or District of Columbia, or by principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, including but not limited to Section 20-7-11 of the South Dakota Codified Laws."[35]

The Court finds that these releases are not impermissibly broad. Courts have consistently approved releases in class action settlements that discharge unknown claims relating to the factual issues in the complaint. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 311-12 (W.D. Tex. 2007) (finding that release of unknown claims was not impermissibly broad); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) ("[A] court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact

---

[34]   R. Doc. 500-2 at ¶ 17; R. Doc. 500-4 at ¶ 17.

[35]   R. Doc. 500-2 at ¶ 18; R. Doc. 500-4 at ¶ 18.

set forth or referred to in the complaint."). As the Fifth Circuit explains, courts are required to enforce such broad provisions because they "contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation." *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1312 (5th Cir. 1983). Thus, the Court finds the provisions to be reasonable.

As the Court also noted in its preliminary approval order, the settlement does not give preferential treatment to the named class representatives or any segment of the class. The special master has recommended a modest incentive award of $2000 for each Named Plaintiff, to compensate them for the assistance they have provided to Class Counsel in developing the facts in the case. In addition, to the extent that class members' claims exceed the net settlement fund, the special master recommends that each claimant be compensated *pro rata* according to the claimant's calculated loss under the allocation plan. The Court found this suggested allocation plan to be fair and unbiased.

That class members received notice of the allocation plan and have not objected to it buttresses the Court's conclusion. Class members received notice that the attorneys would request up to one-third of the settlement and that notice and administration

31

expenses would come out of the settlement.  They also had access, via the settlement website, to the special master's reports, which set forth in greater detail the proposed plan for allocating the net settlement fund among claimants.  No class member has objected to the fairness of the settlement, the allocation plan, or the attorneys' request for one-third of the settlement.

Because the Court finds no indication that the settlement is fraudulent or collusive, or that it unfairly discriminates among class members, this factor favors approving the settlement.

### 2. *Complexity, Expense, and Likely Duration of the Litigation*

Under this factor, the Court considers whether settling now avoids the risks and burdens of potentially protracted litigation. *Ayers*, 358 F.3d at 369.  The settlements eliminate the need for IPPs to litigate their claims against Hayward and Zodiac, which will save substantial time and expense.  Moreover, this partial settlement allows IPPs to mitigate some of the risk inherent in continuing in litigation against the remaining defendants.  It guarantees at least some recovery for class members, regardless of how IPPs' claims against the remaining defendants may be resolved.

The complexity of this litigation also favors settlement.  As the ongoing motions practice involving the non-settling defendants indicates, this case involves complex issues of proof in

connection with both IPPs' substantive claims and their motion for
class certification.  If the Court grants IPPs' motion for class
certification, the parties will still likely have to withstand an
interlocutory appeal of the Court's class certification order.  A
trial in this matter would be lengthy and would require numerous
attorneys, paralegals, and witnesses.  This case also requires
expert testimony to establish market definition, causation,
damages (including, for IPPs, pass-through).  After trial, the
parties could still expect years of appeals.  Therefore, the
complexity and likely duration of this case weigh in favor of
finding that partial resolution by settlement is a reasonable
option for all parties involved.

3.   *Stage of the Proceedings*

This factor asks whether the parties have obtained sufficient
information "to evaluate the merits of the competing positions."
*Ayers*, 358 F.3d at 369.  The question is not whether the parties
have completed a particular amount of discovery, but whether the
parties have obtained sufficient information about the strengths
and weaknesses of their respective cases to make a reasoned
judgment about the desirability of settling the case on the terms
proposed or continuing to litigate it. *In re Educ. Testing Serv.*
*Praxis Praxis Principles of Learning & Teaching, Grades 7-12*
*Litig.*, 447 F. Supp. 2d 612, 620-21 (E.D. La. 2006) (citing *In re*

33

*Train Derailment Near Amite, La.*, MDL No. 1531, 2006 WL 1561470, at *22 (E.D. La. May 24, 2006)).  If the settlement proponents have taken affirmative steps to gather data on the claims at issue, and the terms of the settlement are not patently unfair, the Court may rely on counsel's judgment that the information gathered was enough to support a settlement.  *In re Corrugated Container*, 643 F.2d at 211.

Here, settlement occurred after two years of litigation and extensive fact discovery.  Counsel participated in or attended over eighty fact witness depositions and reviewed over four million documents.  Expert discovery had already begun.  And IPPs defended against a complicated motion to dismiss.  Because of the advanced stage of the litigation, counsel for all parties were familiar with the factual and legal issues in the case. Therefore, the Court is satisfied that the parties were sufficiently informed to assess the strengths and weaknesses of their positions and to make a reasoned evaluation of whether and on what terms to settle.  This factor favors settlement.

   *4.   The Obstacles to Prevailing on the Merits*

As the Court summarized in its preliminary fairness order, IPPs face obstacles to prevailing on the merits of their claim, which IPPs acknowledge in their motion for final approval of these settlements.

34

First, IPPs' claims are subject to complex problems of proof. Regarding liability, no claim is subject to a theory of *per se* illegality, which makes proof of anticompetitive conduct more difficult.  Further, reports from the non-settling defendants' experts indicate that IPPs will face proof challenges on the issues of impact and damages, including pass-through.

Second, class certification in this case is disputed.  The non-settling defendants oppose IPPs' pending motion for certification of a litigation class.  They challenge, among other things, IPPs' ability to demonstrate commonality and predominance under Rule 23.

Finally, the parties are presently engaged in a heated dispute over expert testimony.  The Court is currently considering motions to exclude not only IPPs' economic expert, but also DPPs' economic expert, upon whose analysis IPPs' substantive claims and bid for class certification depend.

Moreover, even if IPPs survive summary judgment and receive class certification, the certification decision will be subject to interlocutory appeal.  In sum, considering the risks IPPs face in surviving summary judgment, attaining class certification, and prevailing at trial and on appeal, the probability of success factor favors approving the settlement.

5.   *Range of Possible Recovery*

The Court "must establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair." *In re Corrugated Container*, 643 F.2d at 213.  In particular, "[p]roof difficulties" are "permissible factors" for a court to consider when evaluating the fairness of a settlement. *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 240 (5th Cir. 1982).

The Court considers whether the $2 million total settlement fund is pegged at a fair point in the range of potential recovery, taking into account the risks present in this particular litigation.  IPPs' expert suggests that estimated damages for class members during the class period are $23,951,893.[36]  Although at first glance the settlement figure appears small in comparison to the universe of potential damages, plaintiffs' projected damages reflect a *best* case scenario for plaintiffs' actual damages.  This damages estimate does not reflect the substantial risks of nonrecovery or diminished recovery plaintiffs face in this litigation, as discussed above.  Indeed, the lower boundary

---

[36]    R. Doc. 500-1 at 27 n.10.

of IPPs' range of possible recovery is zero.  The $2 million figure provides prompt and certain recovery of at least some of IPPs' alleged losses.

In addition, IPPs noted at the hearing that some of the proof challenges that they face on showing impact are potentially more relevant to their claims against the Manufacturer Defendants. Plaintiffs generally regard the claims against Pool to be the stronger claims.  IPPs further note that, while this settlement amounts to approximately 8.5 percent of IPPs' best case projection for actual damages, that percentage will increase if additional settlements (such as the recently reached settlement with Pentair) are added to the pot.  *Cf. Newby*, 394 F.3d at 303 (observing that the "numerator" and "denominator" of partial settlements change as additional partial settlements are added to the overall settlement amount).

The Court must also consider the effect of the proposed *cy pres* distribution.  With class settlements, the Court's primary concern is assuring the claimants will receive some monetary benefit from the settlement.  *See In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196 (5th Cir. 2010).  The more likely the claimants are to receive full compensation for their damages, the better.  *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1067 n.18 (noting that once claimants have been paid, *cy pres*

distributions are a reasonable and fair means to avoid awarding a small number of claimants a windfall of remaining funds).  Here, no *cy pres* distribution will be made until after class members have had ample time to file their claims.  Thus, the *cy pres* distribution will not divert settlement funds that class members would otherwise be entitled to recover.  *See id.* at 1067-68.  Indeed, based on the current claims information, it appears highly likely that all plaintiffs who file claims will recover the full distribution to which they are entitled under the terms of the settlement agreement.

The class will also receive a non-monetary benefit as part of the settlement.  Both Hayward and Zodiac have agreed to cooperate with IPPs to answer questions about their transactional data and to assist with authenticating records.   This cooperation will assist IPPs as they proceed against the non-settling defendants.

After evaluating the range of possible recovery in light of the risks of non-recovery, the Court concludes that the $2 million total settlement fund is pegged at a fair point in the range.  Thus, this factor weighs in favor of settlement.

### 6. *Opinions of Class Counsel, Class Representatives, and Absent Class Members*

The opinions of the affected parties are generally favorable towards the settlement.   The Court is entitled to rely on the

judgment of experienced counsel in its evaluation of the merits of a class action settlement. *Cotton*, 559 F.2d at 1330. Here, Settlement Class Counsel have expressed their approval of the settlement after over two years of litigation and extensive fact discovery, as discussed above.

Further, no objections have been filed, and no class members have asked to opt out of the settlement. Although the Court is careful not too infer too much from an absence of objectors and opt-outs, the lack of objectors and opt-outs suggests class-wide support for the proposed settlement. *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) (explaining that a small number of opt-outs and objections can be viewed as indicative of the fairness of the settlement); *In re Excess Value Ins. Coverage Litig.*, No. M-21-84RMB, MDL-1339, 2004 WL 1724980, at *11 (S.D.N.Y. 2004) (reasoning that small number of objectors suggests support for settlement). In addition, 1435 claim forms had been received by May 2015 -- seven months before the December 11, 2015, deadline.

In sum, because all factors weigh in favor of settlement, the Court finds the settlement to be fair, reasonable and adequate under Rule 23(e)(1)(C) of the Federal Rules of Civil Procedure.

## IV. Attorneys' Fees and Costs

### A. Request

In the notice sent to the class, Class Counsel indicated that they would seek up to one-third of the settlement total for attorneys' fees and/or for reimbursement of expenses. Consistent with that notice, Class Counsel now request a fee award of $346,666.67 and a $320,000 reserve for litigation expenses. Together, these amounts are equivalent to one-third of the total settlement fund.

The requested litigation expense fund comprises $276,716.70 in shared and held expenses already incurred by Class Counsel as of January 31, 2015, and $43,283.30 to be set aside for future litigation expenses. The expenses already incurred have been reported by Class Counsel in accordance with a court-approved protocol and approved by the court-appointed accountant, Philip A. Garrett. Any future expenses will also be vetted by Mr. Garrett before being paid from the fund.

Class Counsel have also expended more than 5000 hours in attorney and staff time on this litigation. All of these hours have been reported to Mr. Garrett, and he found them to be appropriate common benefit work. The requested fee award is equivalent to 17.3 percent of the total settlement fund.

Class Counsel's fee and expense request also sets forth a plan for allocating the requested award among the firms that have worked on the case.  At the hearing, Class Counsel represented that all of the firms that have worked on the case are represented in the allocation plan.  Further, all of the firms agree with the plan.

In its preliminary fairness determination, the Court concluded that a total attorney award (including both fees and expenses) not exceeding one-third of the fund was consistent with other awards approved in this circuit and within the limit of what the Court deems reasonable.  The Court now makes a more detailed inquiry into Class Counsel's request.

**B.   Class Benefit**

The Court begins by assessing the monetary value of the settlements for the purpose of calculating attorneys' fees. Notably, a substantial portion of the settlement funds (approximately $1,552,351.88 based on current claims information and the Court's estimates of future claims) will likely be distributed *cy pres*.  Courts take different approaches in valuing *cy pres* awards when it comes to determining attorneys' fees.  Some courts consider a *cy pres* award to be sufficiently beneficial to class members to warrant awarding attorneys' fees on the basis of the entire settlement fund, regardless of the amount actually

41

claimed by the class. *See, e.g.*, *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437-38 (2d Cir. 2007). Other courts hold that *cy pres* distributions should not be considered beneficial to the class and therefore should not be included as part of the common fund on which an award of attorneys' fees is based. *See, e.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) ("The judge excluded . . . the *cy pres* award of $1.13 million in calculating the benefit to the class, for the obvious reason that the recipient of that award was not a member of the class . . . ."). Still other courts take a "middle" approach, discounting the *cy pres* award's monetary value to account for the indirect benefit provided to the class. *See, e.g.*, *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1077.

The Court finds that the "middle" approach is most appropriate in this case. Courts generally consider the benefit to the class to be the most important consideration when awarding attorneys' fees in class action cases. *See, e.g.*, *In re AT&T Corp.*, 455 F.3d 160, 165-66 (3d Cir. 2006) ("[W]hat is important is that the district court evaluate what class counsel actually did and how it benefitted the class."); *Strong v. Bellsouth Telecomm., Inc.*, 137 F.3d 844, 851 (5th Cir. 1998) (affirming the district court's refusal to award attorneys' fees, beyond what counsel had already collected in related cases, in light of the

non-monetary benefit to the class).  Importantly, the Fifth Circuit recognizes that *cy pres* awards provide *some* indirect benefit to the class.  *See Klier*, 658 F.3d at 474.  Because the *cy pres* benefit is only indirect, though, it is "inappropriate to value *cy pres* on a dollar-for-dollar basis."  *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1077; *see also* Am. Law Inst., Principles of the Law of Aggregate Litigation § 3.13 cmt. (a) ("Because *cy pres* payments . . . only indirectly benefit the class, the court need not give such payments the same full value for purposes of setting attorneys' fees as would be given to direct recoveries by the class.").

Recognizing that the potential *cy pres* distribution in this case confers some "aggregate, indirect, prospective benefit [to] the class[,]" *see Klier*, 658 F.3d at 474 (quoting *In re Airline Ticket Comm'n*, 307 F.3d at 682), the Court discounts the potential *cy pres* payment by 50 percent to best value the benefit to the IPP class members.  *See In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1077.  Therefore, for purposes of calculating reasonable attorneys' fees, the indirect benefit that the *cy pres* distribution confers on the class members is valued at approximately $791,699.46.  Adding this amount to the approximate value of actual claims filed ($229,648.12), plus the $8,000 in

incentive awards to the Named Plaintiffs, brings the value of the settlement fund to approximately $1,029,347.58.

In valuing the settlement for purposes of attorneys' fees, the Court also finds that the notice and administrative costs provided a benefit to the class.  Without sufficient notice and successful administration, class members would be unaware of their claims and unable to collect the monetary awards to which they are entitled under the settlement agreements.  *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999) ("[Class members'] right to share the harvest of the lawsuit upon proof of their identity, *whether or not they exercise it*, is a benefit in the fund created by the efforts of the class representatives and their counsel.").  Accordingly, the Court finds that the notice and administration costs are entitled to their full value of $210,000.  Thus, the total monetary value of the settlement on which to calculate reasonable attorneys' fees is $1,239,347.58.

### C.  Legal Standard

The court must independently analyze the reasonableness of the attorneys' fees proposed in the settlement agreement.  Here, the proposed fees amount to 17 percent of the total settlement fund and 27.9 percent of the settlement value as determined by the Court after discounting the *cy pres* award.  *See Strong*, 137 F.3d

44

at 849-50; *see also* Fed. R. Civ. P. 23(e).   In a common fund settlement, in which the plaintiffs' attorneys are paid out of settlement proceeds, the interests of the attorneys conflict with those of the class.   Put simply, the more money the attorneys get, the less the class gets.   The Fifth Circuit has established twelve factors to consider in calculating reasonable fees and costs. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).   In common fund cases, district courts typically use either the percentage method or the lodestar method to calculate attorney's fees.   The Fifth Circuit endorses the use of the percentage method, cross-checked with the *Johnson* factors.   *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 631, 644 (5th Cir. 2012).   The Court adopts that approach here.

A different standard applies to the expenses requested by Class Counsel.   Typically, class action counsel who create a common fund for the benefit of the class (as counsel have done here), are entitled to reimbursement of reasonable litigation expenses from that fund.   *See In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1089; *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, No. 6:12-1609, 2015 WL 965696, at *11 (W.D. La. Mar. 3, 2015).   And, in the non-class context, the Fifth Circuit has disapproved the application of the *Johnson* factors to reduce expenses across-the-board.   It explained:

> Fees may be increased above the lodestar; the cost of
> suit may not be. . . . [T]here appears to be no
> correlation between the Johnson factors and
> out-of-pocket expenses. While expenses incurred
> extravagantly or unnecessarily should be disallowed,
> this should be done on an item-by-item basis.

*Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1101 (5th Cir. 1982), *overruled in part on other grounds by Int'l Woodworkers of Am., AFL-CIO & its Local No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986), and *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193 (5th Cir. 1986). This makes sense: unlike fees, expense reimbursements are not a reward. They must be awarded simply to return counsel to the position they were in before the litigation began.

Finally, the Court must assess whether the total amount awarded to the attorneys, whether in fees or expenses, is fair to the class. As the Fifth Circuit holds, a district court abuses its discretion when it approves a settlement from which expenses may be sought without having any estimate as to what those expenses may be. *See In re Katrina*, 628 F.3d at 195. The Court must ensure that expenses will not "cannibalize the entire . . . settlement," and that money will remain for the class after administrative and litigation expenses have been deducted from the fund. *Id.* at 196. Thus, after assessing whether the fees and expenses requested are independently reasonable, the Court will

46

ensure that the overall sum requested is fair, adequate, and reasonable for the class.

**D.    Fees Request**

The Court assesses the fees requested by Class Counsel according to the percentage method, cross-checked with the *Johnson* factors. *See Union Asset Mgmt.*, 669 F.3d at 644.

*1.    Benchmark Percentage*

The Court begins by establishing a "benchmark" percentage, which it will then adjust for the particular circumstances of the case. *See, e.g., Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991) (citing *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)); *In re Catfish Antitrust Litig.*, 939 F.Supp. 493, 501 (N.D. Miss. 1996); *see also* Manual for Complex Litigation (Fourth) § 14.122 (2004). In determining the benchmark, the Court will consider fee awards in similar cases, which the Court notes is the last of the *Johnson* factors. To adjust the benchmark to the facts of this case, the Court will use the remaining *Johnson* factors, to the extent that they are applicable here.

The Manual for Complex Litigation states that a fee of 25 percent of a common fund "represents a typical benchmark." Manual, *supra*, § 14.121. The Ninth Circuit and Eleventh Circuit have adopted a benchmark of 25 percent in common fund cases. *See*

47

*Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003); *Camden I Condo.*, 946 F.2d at 774-75.

Further, data on fee awards in class action settlements is available in several academic analyses of class action data. *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27 (2004); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811 (2010). The Eisenberg and Miller study examines (1) data based on published decisions from "all state and federal class actions with reported fee decisions between 1993 and 2002, inclusive, in which the fee and class recovery could be determined with reasonable confidence"; and (2) information reported on more than 600 common fund cases from 1993 and 2002 in *Class Action Reports (CAR)*. Eisenberg & Miller, *supra*, at 28.

The study finds a "strong correlation between the fee amount and the client recovery." *Id.* at 52. The study further indicates that a scaling effect exists, for "[a]s client recovery increases, the fee percent decreases." *Id.* at 54. The authors of the study suggest that the results can assist courts in determining fee awards:

> [B]ecause our study finds an overwhelming correlation
> between class recovery and attorney fees, the court can
> conduct a simple initial inquiry that looks only at these

> two variables in any case where the size of the class
> recovery can be estimated.  The court need only compare
> the request in a given case with average awards in cases
> of similar magnitude.  If the request is relatively close
> to average awards in cases with similar characteristics,
> the court may feel a degree of confidence in approving
> the award.  If the request is significantly higher than
> amounts awarded in past cases, the court should inquire
> further.

*Id.* at 72.  Eisenberg and Miller divided the cases into ten ranges

of recovery (deciles) and then gave the mean and median fee

percent, as well as the standard deviation, for each decile.  *Id.*

at 73.

The Court finds the study's data on the average percentage

fee awarded in the recovery range comparable to this case useful

in arriving at a benchmark percentage fee.[37]  The Court's

discounted value of the settlement of approximately $1.2 million

falls within the less than 10 percent decile of client recovery,

which includes recoveries less than $1.4 million.  *Id.* at 73.

Based on the *Class Action Reports (CAR)* data set, the mean fee

percent for nonsecurities cases in this decile was 30.9 percent,

with a standard deviation of 8.2 percent.  *Id.*  The data set

generated from published decisions shows a mean fee percent for

cases in this decile of 29.5 percent, with a standard deviation of

---

[37]    Eisenberg and Miller suggest that a fee request within one
standard deviation of the mean is presumptively reasonable, and
that one falling between one and two standard deviations from
the mean may require further justification. *Id.* at 74.

5.9 percent.  *Id.*  An average of the mean fee percentages of the two data sets would be 30.2 percent.

The Fitzpatrick study gives a slightly lower figure, with a mean fee percent of 28.7 percent, with a standard deviation of 6.2 percent, for settlements between $750,000 and $1.75 million. Fitzpatrick, *supra*, at 839.  The Fitzpatrick study also indicates that the mean fee percentage for antitrust cases is 25.4 percent. *Id.* at 835.

Based on this data, the Court will use an initial benchmark of 27 percent, which is roughly the average of the two data sets in the Fitzpatrick study involving settlement funds of this size and settlements in antitrust litigation.  The 27 percent benchmark is slightly lower than the 30.2 percent average in the Eisenberg and Miller study, but the Court notes that Eisenberg and Miller's percentages are significantly higher than the standard 25 percent benchmark adopted by the Ninth and Eleventh Circuits.  Ultimately, whether the Court uses the percentages in Eisenberg and Miller or Fitzpatrick does not impact the result here because plaintiffs' fee request would be reasonable under either scenario.  Therefore, the Court finds 27 percent to be an appropriate benchmark.  The Court will next determine whether the benchmark should be adjusted based on the particular circumstances of this case.  In doing so, the Court will consider the other *Johnson* factors.

2.  Johnson *Factors*

The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the residuals obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of professional relationship with the client; and (12) awards in similar cases. *Von Clark v. Butler*, 916 F.2d 255, 258 n.3 (5th Cir. 1990).

The *Johnson* factors are intended to ensure "a reasonable fee." 488 F.2d at 720. Because not all of the *Johnson* factors are always applicable, the Court will consider only the factors relevant to this case. *See In re Harrah's Entm't, Inc. Sec. Litig.*, No. 95-3925, 1998 WL 832574, at *4 (E.D. La. Nov. 25 1998) (citing *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993)).

### Time and labor required

The Court finds that the amount of time and labor required in this case warrants an adjustment of the benchmark percentage.

51

IPPs reached a settlement with Hayward only after completing fact discovery.  IPPs' participation in fact discovery included participating in or attending the depositions of over eighty fact witnesses and reviewing approximately four million documents.  IPPs also worked to secure an expert to support their proof of liability and damages.  Moreover, they reached these settlements only after successfully defending against a motion to dismiss.  The magnitude of the work required in connection with discovery, the motion to dismiss, negotiating the settlement, preliminary approval of the settlement, and the fairness hearing merits an increase in the benchmark percentage.

### *Novelty and difficulty of the question and skill required to perform the legal service*

"An antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003).  Here, IPPs have had to analyze and argue, among other things, the difficult issue of indirect-purchaser standing under the laws of four different states.  The Court does not doubt that handling this difficult case required considerable skill and experience.  Given the inherent difficulty involved in antitrust class actions and the proof challenges presented by this case, as well as accounting for counsel's skill

and expertise, the Court finds that an increase in the benchmark percentage is merited.

### The customary fee

The Court has discussed, *supra*, the typical fees in antitrust cases involving comparable awards. Because the benchmark percentage is about average for cases of this kind, the Court finds that this factor does not warrant an adjustment.

### Whether the fee is fixed or contingent

Consideration of this factor is designed to "demonstrat[e] the attorney's fee expectations when he accepted the case." *Johnson*, 488 F.2d at 718. This factor considers the financial risks a contingency fee arrangement places on counsel. *See In re Enron Corp. Sec. Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 791 (S.D. Tex. 2008). Class counsel undertook this case on a contingency basis and have thus far received no payment. But because the Court's benchmark is comparable to a reasonable contingency fee award, the Court finds that consideration of this factor does not justify an increase to the fee award.

### Time limitations imposed by the client or the circumstances

Under this factor, the Court is to give a premium for "priority work that delays the lawyer's other legal work." *Johnson*, 488 F.2d at 718. The Court finds that no facts in this

case suggest that this factor justifies an adjustment in the benchmark fee.

### Amount involved and the results obtained

Counsel obtained a fair settlement for the plaintiff class. *See* Part II, *supra*. This is not a case in which the class receives only illusory benefits in the form of coupons or discounts. Instead, counsel has secured a cash settlement that allows class members to recover their alleged losses, thus mitigating some of the risk inherent in continuing with litigation against the remaining defendants.

Yet only a relatively small portion of the settlement funds will actually be distributed to class members, with charitable and educational organizations receiving the remaining funds in the form of *cy pres* distributions. Because the Court has already discounted the monetary value of the settlements to account for benefits actually delivered to the class, this factor is neutral.

### The experience, reputation, and ability of the attorneys

The Court is satisfied that the experience and reputation of the attorneys involved are of the highest quality. But as the Court has accounted for counsel's experience and skill in the *Johnson* factor considering the skill necessary to litigate the case, a further increase in the percentage is not warranted.

### *Undesirability of the case*

The Court finds that although this is not the type of unpopular case that might stigmatize the lawyer who takes it, *see Johnson*, 488 F.2d at 719, there are some aspects of this case that made it undesirable.  The risk of nonrecovery, discussed *supra*, is significant.  Further, the relatively small size of the individual claims made undertaking expensive litigation on a contingent fee an unattractive proposition.  Class certification would change this dynamic, but, here, there remains a serious risk that a class will not be certified.  Accordingly, the Court finds that the risks inherent in this case warrant an increase in the fee award.

### *The nature and length of the professional relationship*

There is no evidence of any special or lengthy professional relationship between class counsel and the class members.  The relationship did not antedate the litigation, nor will it likely continue beyond the closure of this case.  The Court finds that consideration of this factor does not warrant an increase in the fee award.

In sum, three of the *Johnson* factors merit an increase in the fee award.  The Court finds that these factors warrant an increase in the fee award to 30 percent.  Applying 30 percent to the settlement fund's actual monetary value of $1,239,347.58 to the class, as determined in Part IV.B. *supra*, an appropriate attorney

fee award is $371,804.27.  Class Counsel's requested fee award is $346,666.67.  Therefore, the Court easily concludes that Class Counsel's request is reasonable.

### E.   Expense Request

Class action counsel who create a common fund for the benefit of the class, are entitled to reimbursement of reasonable litigation expenses from that fund.  *See In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1089.  Here, the expenses incurred are reasonable.  IPPs reached a settlement with Hayward and Zodiac only after completing fact discovery, including the depositions of over eighty fact witnesses, and the review of over four million documents.  This sort of work requires not only attorney hours but also money--for discovery vendors, travel, copying, and so on. All of the expenses that Class Counsel seek from the fund fall within the categories pre-approved by Pretrial Order No. 9, and Mr. Garrett reviewed and approved all of them.  Thus, the Court concludes that the expenses are reasonable and eligible for reimbursement.

### F.   Fairness to Class

Class Counsel have requested reasonable attorneys' fees and expenses.  At the same time, a fair portion of the settlement must be reserved for the benefit of the class.  All together, the fees and expenses requested by Class Counsel amount to one-third of the

total settlement fund.   They also project that settlement administration expenses will amount to approximately $210,000, which the Court considers beneficial to the class.   This would leave $1,123,333.33 left for distribution to class members.   The Court concludes that the one-third sum sought by Class Counsel strikes a fair balance between the attorneys' right to recover reasonable fees and expenses, and the class's right to the benefit of a fair portion of the settlement.   Thus, the Court approves Class Counsel's request for $346,666.67 in fees and $320,000 for a litigation expenses reserve.

### G.   Apportionment of Fees

Class Counsel propose a method for allocating the requested award among the firms that have worked on the case.  Class Counsel represent that all of the firms that have worked on the case are represented in and agree with the proposed allocation plan.   In the Fifth Circuit, attorneys may apportion fees among themselves without substantial involvement by the Court, so long as counsel develop a plan agreeable to all attorneys involved.  *See Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir. 1992) (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987)); *see also Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 869-70 (E.D. La. 2007).   Here, counsel are in agreement about the plan.

Counsel explains the proposed allocation plan in some detail in their motion.  The Court has reviewed the plan.  The plan sets out the number of hours spent by each firm, along with a description of the types of work done by each firm.  All of these hours have been reported to Mr. Garrett, and he has agreed that they represent appropriate common benefit work.  The plan also lists the amount of money each firm has fronted for expenses, either in the form of held costs or assessments.  At the hearing, Class Counsel and Mr. Garrett confirmed that all of these expenses have already been vetted by Mr. Garrett and approved as appropriate common benefit expenses.  Overall, the Court finds that the proposed allocation plan takes into account the work done and the expenses covered by each firm so far and arrives at a fair division of the requested award.  Moreover, all of the firms are in agreement about the plan.  Therefore, the Court approves the proposed allocation of common benefit attorneys' fees and expenses as set forth in IPPs' motion.  The Court retains jurisdiction for the purposes of supervising the allocation.

## V.  Conclusion

For the foregoing reasons, the Court grants IPPs' Final Approval of the Settlements Between Indirect Purchaser Plaintiffs and Hayward Industries, Inc., and Between Indirect Purchaser

Plaintiffs and Zodiac Pool Systems, Inc.  The Court also orders that Class Counsel be awarded fees and expenses as set forth in this order.

New Orleans, Louisiana, this 27th day of July, 2015.

_Sarah Vance_

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE