UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET ANTITRUST          SECTION: R(2)
LITIGATION                             JUDGE VANCE
                                       MAG. JUDGE WILKINSON


**THIS DOCUMENT RELATES TO ALL DIRECT-PURCHASER PLAINTIFF CASES**


**ORDER AND REASONS**


Before the Court is Direct Purchaser Plaintiffs' Motion for Preliminary Approval of Settlement Between Direct Purchaser Plaintiffs and Pentair Water Pool and Spa, Inc.[1] For the following reasons, the Court GRANTS the motion and CERTIFIES the proposed settlement class.


**I.   Background**

**A.   Factual Background**

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against Pool and Manufacturer Defendants.  Pool is the country's largest distributor of products used for the construction and maintenance of swimming pools (Pool Products).[2]  Manufacturer Defendants are the three largest manufacturers of Pool Products in the United

---

[1]     R. Doc. 665.

[2]     R. Doc. 284 ¶ 39.

States: Hayward Industries, Inc. (Hayward), Pentair Water Pool and
Spa, Inc. (Pentair), and Zodiac Pool Systems, Inc. (Zodiac).[3] As
defined in DPPs' Second Consolidated Amended Class Action
Complaint (SCAC), Pool Products are the equipment, products,
parts, and materials used for the construction, renovation,
maintenance, repair, and service of residential and commercial
swimming pools. Pool Products include pumps, filters, covers,
drains, fittings, rails, diving boards, and chemicals, among other
goods. Pool buys Pool Products from manufacturers, including the
three Manufacturer Defendants, and in turn sells them to DPPs,
which include pool builders, pool retail stores, and pool service
and repair companies (collectively referred to as "Dealers" in the
SCAC).[4]

On November 21, 2011, the Federal Trade Commission (FTC)
announced that it conducted an investigation into unfair methods
of competition by Pool and entered a consent decree with Pool
resolving the matter. Shortly after the FTC's announcement,
several plaintiffs filed suit in this and other districts. On
April 17, 2012, the panel on multidistrict litigation consolidated
the suits for pretrial purposes in this court.[5] Plaintiffs later
added their claims against the Manufacturer Defendants.

---

[3]   *Id.* ¶ 28.

[4]   *Id.* ¶ 31.

[5]   R. Doc. 1.

DPPs filed their first Consolidated Amended Complaint (CAC) on June 29, 2012.[6]  DPPs initially alleged (1) that Pool monopolized and attempted to monopolize the Pool Products distribution market in the United States in violation of Section 2 of the Sherman Act by acquiring rival distributors and by entering into agreements with manufacturers to exclude Pool's rivals; (2) that Pool and the Manufacturer Defendants violated Section 1 of the Sherman Act by engaging in an unlawful conspiracy to exclude Pool's competitors; and (3) that defendants fraudulently concealed their illegal conduct and thus are liable for damages outside of the statutory limitations period. Plaintiffs claimed that the defendants' allegedly illegal conduct caused plaintiffs to pay more for Pool Products than they would have absent the unlawful activity.

On April 11, 2013, the Court issued an order dismissing certain of DPPs' claims from the CAC.[7]  First, the Court dismissed DPPs' monopolization claim because they did not allege that Pool possessed monopoly power in the relevant market.[8]  Second, the Court dismissed DPPs' claim that defendants engaged in a *per se* illegal boycott because only horizontal conspiracies among competitors can give rise to *per se* liability under Supreme Court

---

[6]     R. Doc. 107.

[7]     R. Doc. 221.

[8]     *Id.* at 25.

precedent, and "the complaint lack[ed] any allegations that manufacturers colluded with each other."[9]   Finally, the Court dismissed DPPs' allegation of fraudulent concealment because plaintiffs failed to assert that defendants concealed the allegedly unlawful agreements, or that defendants engaged in a "self-concealing" antitrust violation.[10]   The Court allowed the CAC's claim of attempted monopolization under Section 2 of the Sherman Act and the CAC's Section 1 claims under the rule of reason to go forward.[11]

DPPs thereafter sought leave to file an amended complaint.[12] In support of that motion, DPPs asserted that "[a]fter filing the CAC, DPPs discovered new information demonstrating communications among Defendants--including communications among the Manufacturer Defendants themselves--that persuasively support a *per se* Section 1 claim and Defendants' fraudulent concealment of their misconduct."[13]   Following the Court's grant of their motion,[14] DPPs filed the SCAC, which contained more extensive allegations of horizontal agreements among the Manufacturer Defendants and of

---

[9]   *Id.* at 52.

[10]   *Id.* at 73-78.

[11]   *Id.* at 50, 70-71.

[12]   R. Doc. 240.

[13]   R. Doc. 240-1 at 3-4.

[14]   R. Doc. 281.

"secret" agreements among all defendants.[15]  DPPs did not reassert the Section 2 monopolization claim in the SCAC.

On December 18, 2013, the Court issued an order dismissing certain of DPPs' claims from the SCAC.[16]  First, the Court dismissed the SCAC's claim of a *per se* illegal conspiracy among the Manufacturer Defendants to disadvantage buying groups, on the ground that Manufacturer Defendants' parallel actions regarding the buying groups did not give rise to a strong inference of conspiracy because it was not plausible that their treatment of the buying groups stemmed from anything other than their independent perception of their own best interests.[17]  Second, the Court dismissed the SCAC's claim of fraudulent concealment because DPPs again failed to assert that defendants concealed their alleged offenses or that defendants engaged in a "self-concealing" antitrust violation.[18]  The Court allowed the SCAC's claim of a *per se* illegal conspiracy among the Manufacturer Defendants and Pool to fix freight minimums to go forward.

**B.   Settlement Agreement Background**

Negotiations leading to this settlement agreement took place over the course of two years.  Class Counsel for DPPs and counsel

---

[15]    R. Doc. 284.

[16]    R. Doc. 346.

[17]    *Id.* at 41.

[18]    *Id.* at 60-63.

for Pentair mediated this action before the Honorable Layn Phillips, a former federal district judge and a respected mediator of antitrust disputes. The parties' settlement negotiations included four full-day, in-person mediation sessions with Judge Phillips on July 22, 2013; March 20, 2014; October 1, 2014; and March 5, 2015. In addition, the parties met with Magistrate Judge Wilkinson on April 1, 2015 and June 22, 2015. The parties reached an agreement in principle on June 22, 2015 and executed the Settlement Agreement on July 22, 2015. The parties represent that they have not entered into any side agreements.

DPPs filed the present Motion for Preliminary Approval of Settlement on July 30, 2015. DPPs request that the Court: (1) preliminarily approve the proposed settlement agreement; (2) certify the Settlement Class and authorize the proposed named Settlement Class representatives to represent the class;[19] (3) appoint Class Counsel for purposes of Settlement; (4) preliminary approval the Plan of Allocation; (5) approve the proposed form of class notice; and (6) approve Garden City as Claims Administrator and Citibank N.A. (Citibank) as Escrow Agent.[20]

---

[19]    Aqua Clear Pools & Decks; A Plus Pools Corp.; Liquid Art Enterprises d/b/a Carl Boucher; Oasis Pool Service, Inc.; Pro Pool Services; SPS Services, LLC d/b/a Premier Pools & Spas; and Thatcher Pools, Inc. *See* R. Doc. 665 at 1.

[20]    R. Doc. 665-1 at 8.

**C.    The Proposed Settlement Class**

The Settlement Agreement defines the Settlement Class as:

> All persons and entities located in the United States
> that purchased Pool Products in the United States
> directly from PoolCorp, during the Class Period from
> November 22, 2007 to November 21, 2011. Excluded from
> the Settlement Class are Defendants and their
> subsidiaries, parents, or affiliates, whether or not
> named as a Defendant in the Second Consolidated Amended
> Class Action Complaint, and government entities.[21]

Class Members will be each member of the Settlement Class who
does not timely elect to be excluded from the Settlement class.
The parties stipulate that certification of the Settlement Class
is for settlement purposes only, and they retain all of their
respective objections, arguments, and defenses regarding class
certification in the event that settlement is not finalized.[22]

**D.    The Settlement Agreement**

Under the terms of the proposed Agreement, Pentair would pay
a settlement amount of $6 million into an Escrow Account
controlled by the parties pending final approval by the Court.
The Agreement requires Pentair to wire transfer the settlement
amount into the Escrow Account within 10 days of when the Court
enters a Preliminary Order approving the settlement.  Interest

---

[21]    R. Doc. 665-2 at 10 ¶ 23.

[22]    *Id.* ¶ 24.

from the account will accrue to the benefit of the settlement class.[23]

The Agreement provides that the $6 million settlement amount is an "all-in" figure, meaning that it is the *total* amount Pentair will pay under the agreement in exchange for the release of claims.[24]  Accordingly, the settlement amount will be used to pay: (1) the notice and administration costs; (2) attorneys' fees and litigation expenses; (3) incentive awards; (4) class member benefits; and (5) any remaining administration expenses and any other costs of any kind associated with the resolution of the action.[25]

Pentair also agrees to assist plaintiffs' counsel with document authentication and to continue to answer plaintiffs' questions about transactional data previously produced by Pentair during discovery.[26]

The Agreement identifies seven proposed named Class Settlement Representatives: Aqua Clear Pools & Decks; A Plus Pools Corp.; Liquid Art Enterprises d/b/a Carl Boucher; Oasis Pool

---

[23]   *Id.* ¶ 35-36.

[24]   *Id.* ¶ 35.

[25]   *Id.*

[26]   *Id.* at 22 ¶ 45.

Service, Inc.; Pro Pool Services; SPS Services, LLC d/b/a Premier Pools & Spas; and Thatcher Pools, Inc.[27]

The Agreement provides that it is intended to forever and completely release Pentair from all "Released Claims," which are defined as:

> any and all claims, demands, actions, suits, proceedings, causes of action, damages, liabilities, costs, expenses, penalties and attorneys' fees, of any nature whatsoever, whether class, individual, or otherwise in nature, whether directly, representatively, derivatively or in any other capacity, that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating in any way to the Action, which were asserted or that could have been asserted.[28]

Released Claims do not include claims against any Non-Settling Defendant. The Agreement further specifies that these releases constitute

> a waiver of Section 1542 of the California Civil Code and Section 20-7-11 of the South Dakota Codified Laws, each of which provides that a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor, and a waiver of any similar, comparable, or equivalent provisions, statute, regulation, rule, or principle of law or equity of any other state or applicable jurisdiction.[29]

---

[27]   *Id.* at 9 ¶ 16.

[28]   *Id.* at 14 ¶ 30.

[29]   *Id.* ¶ 32.

In DPPs' Memorandum of Law in support of their motion for preliminary approval of the settlement, DPPs nominate Garden City as the Claims Administrator for the settlement and Citibank as escrow agent.[30]

**E.   Notice Plan**

DPPs propose a notice plan similar to that used in connection with two earlier settlements.  The claims administrator will use Pool's transaction data to determine Settlement Class Members' addresses, where the claims administrator will mail hard-copy notices.[31]  Summary Notice will also be published in *Pool & Spa News* and *Aqua*, which DPPs represent are leading sources for industry information.[32]  The claims administrator will also establish a website for the case with information on the proposed settlement and its status, as well as links to settlement papers and court filings.  In addition, Garden City will establish a toll-free settlement "hotline" to respond to Settlement Class Member questions.[33]

To maximize recovery for Settlement Class Members, DPPs propose that the claims filing deadline for the Pentair settlement be the same as that for the Hayward and Zodiac settlements--

---

[30]   R. Doc. 665-1 at 33.

[31]   *Id.* at 30.

[32]   *Id.*

[33]   *Id.*

December 11, 2015.  DPPs represent that by using the same claims
filing deadline, both the mailed notice and mailed long form
notice and published short form notice will effectively serve as
reminders to any Settlement Class Members that have not yet filed
claims for the Hayward and Zodiac settlements.[34]  Regardless of the
claims filing deadline, all Settlement Class Member claims already
submitted and those submitted before December 11, 2015, in
connection with the Hayward and Zodiac Settlements will also be
considered in connection with the Pentair settlement.

    **F.    Plan of Allocation and Claims Process**

      DPPs also propose to use the same plan of allocation (Plan)
and claims process that is currently being used in connection with
the Hayward and Zodiac settlements.  According to the Plan, the $6
million settlement fund will first be used to pay attorneys' fees
and expenses approved by the Court.[35]  In addition, as specified in
the Agreement, all settlement administration expenses will also
come out of the $6 million settlement.  Garden City estimates that
administering the fund will cost between approximately $123,250
and $133,250.  Citibank's administration fee for the Escrow
Account is three basis points (.03%) per annum.[36]  Costs for notice
will also come out of the fund.

---

[34]    R. Doc. 665-1 at 31.

[35]    *Id.* at 28.

[36]    *Id.* at 33.

The Notice explains that Class Counsel will ask the Court to approve fees and expenses incurred in the prosecution of the lawsuit in an amount not to exceed $2,000,000 which is one-third of the settlement fund.[37]

The amount that remains of the $6 million settlement fund after all of these costs and expenses are paid (the Net Settlement Fund) is to be distributed on a pro rata basis to class members who submit valid and timely claims.[38]  Specifically, when a class member makes a claim, the claims administrator will review the claim for timeliness, completion, and accuracy, and then approve an amount for the claim.[39]  Once all timely and valid claims have been reviewed and any issues with the claims have been resolved, the total amount of all approved claims will form the basis for determining each class member's pro rata share of the Fund.  The proportion that a settlement class member's approved claim bears to the total amount of all recognized claims will determine the proportion of the Net Settlement Fund that the class member will receive.

---

[37]   R. Doc. 665-2 at 37 question 17; R. Doc. 665-2 at 42.

[38]   R. Doc. 665-1 at 28.

[39]   R. Doc. 665-1 at 29.

## II.  Class Certification

### A.   Legal Standard

The certification requirements of Federal Rule of Civil Procedure 23 generally apply when certification is for settlement purposes.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  A district court need not consider "whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."  *Id.* at 620 (citing Fed. R. Civ. P. 23(b)(3)(D)).  But the Court's consideration of the other factors in Rule 23 is of "vital importance" since the court will lack a later opportunity to make adjustments to the class.  *Id.* The existence of a settlement class may even "warrant more, not less, caution on the question of certification."  *Id.*

To be certified under Rule 23, the class must first satisfy four threshold requirements.  A court may certify a class only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  The party seeking certification bears the burden of establishing these requirements.  *Unger v. Amedisys*, 401 F.3d 316, 320 (5th Cir. 2005) (citing *Berger v. Compaq Computer*

13

*Corp.*, 257 F.3d 475, 479–80 (5th Cir. 2001)).  If the prerequisites of Rule 23(a) are met, the proposed class must additionally satisfy one of the three provisions for certification under Rule 23(b).  For certification of a 23(b)(3) damages class, the court must find that questions of law or fact common to class members predominate over questions affecting only individual members and that a class action is the best way to adjudicate the controversy.  Fed. R. Civ. P. 23(b)(3); *Unger*, 401 F.3d at 320.

In addition, a court that certifies a class must also appoint class counsel.  Fed. R. Civ. P. 23(g).  In appointing class counsel, the Court must consider:

> (I) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g)(1)(A).

**B.   Discussion**

For the following reasons, the Court finds that the class may be certified for settlement purposes under Rule 23.

###### 1.    Rule 23(a) Requirements

##### *Numerosity*

Rule 23(a)(1) requires that the class be so large that joinder of all members is impracticable.   To satisfy the numerosity requirement, "a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000) (quoting *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981)).   A mere allegation that the class is too numerous to make joinder practicable is insufficient. *Pederson*, 213 F.3d at 868 (citing *Fleming v. Travenol Labs., Inc.*, 707 F.2d 829, 833 (5th Cir. 1983)).

Here, the proposed Settlement Class consists of persons and entities that purchased Pool Products in the United States directly from Pool, during the period from November 22, 2007 to November 21, 2011.  DPPs estimate that the proposed Class consists of approximately 74,842 direct purchasers from Pool.[40]   Although the number of members in a proposed class is not determinative of whether joinder is impracticable, it has been noted that any class consisting of more than 40 members "should raise a presumption that joinder is impracticable." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citing 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.05 (3d ed.

---

[40]    R. Doc. 665 at 19.

1992)).   In addition, class members are geographically dispersed throughout the United States, making joinder of all Class Members impractical.   Thus, the Court finds that plaintiffs have satisfied the numerosity requirement.

### *Commonality*

The commonality test of Rule 23(a)(2) requires that the class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).   The requirement that class members have all "suffered the same injury" can be satisfied by "an instance of the defendant's injurious conduct, even when the resulting injurious effects--the damages--are diverse."   *In re Deepwater Horizon*, 739 F.3d 790, 810-11 (5th Cir. 2014).

The principal requirement of commonality is that class members raise "at least one contention that is central to the validity of each class member's claims."   *Id.* at 810.   This "common contention," "must be of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."   *Wal-Mart Stores*, 131 S. Ct. at 2551.   Thus, "[w]hat matters to class certification . . . is not the raising of common 'questions'--even in droves--but, rather the capacity of a classwide proceeding to generate common answers."   *Id.*   "These 'common answers' may . . .

relate to the injurious effects experienced by the class members, but they may also relate to the defendant's injurious conduct. '[E]ven a single common question will do.'"   *In re Deepwater Horizon*, 739 F.3d at 811 (quoting *Wal-Mart Stores*, 131 S. Ct. at 2556).

To make a "meaningful determination" of whether an allegedly common contention satisfies commonality, a court must "look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law.'"   *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 841 (5th Cir. 2012) (quoting *McManus v. Fleetwood Enters. Inc.*, 320 F.3d 545, 548 (5th Cir. 2003)). Specifically, the court should analyze how resolution of an allegedly common question of law or fact will decide an issue central to an element or defense of each of the class members' claims at once.   *See id.* at 841-42.

Again, the claims remaining in the case are: (1) DPPs' Section 2 attempted monopolization claim against Pool; (2) DPPs' Section 1 claims under the rule of reason involving three separate vertical conspiracies (one between Pool and each Manufacturer Defendant); and (3) DPPs' Section 1 claim under the *per se* rule involving a horizontal agreement among the Manufacturer Defendants and Pool to fix prices regarding freight minimums.

Section 2 of the Sherman Act forbids monopolization and attempts to monopolize. 15 U.S.C. § 2. The elements of attempted

17

monopolization are that the defendant (1) engaged in predatory or anticompetitive conduct, (2) with the specific intent to monopolize, and (3) with "a dangerous probability" of achieving monopoly power. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993). For conduct to be anticompetitive, it "must have an 'anticompetitive effect[;]' [t]hat is, it must harm the competitive *process* and thereby harm consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). "In contrast, harm to one or more *competitors* will not suffice." *Id.* In appraising whether there is a dangerous probability of success, courts focus principally on the defendant's share of the relevant market. *See, e.g., Pastore v. Bell Tel. Co.*, 24 F.3d 508, 512 (3d Cir. 1994) (quoting *Spectrum Sports*, 506 U.S. at 459) ("Determining whether a 'dangerous probability' exists requires 'inquiry into the relevant product and geographic market and the defendant's economic power in that market.'"). Market definition is a necessary component of this analysis, because without a definition of a relevant market, there is no way to measure a defendant's ability to lessen or destroy competition. *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). A relevant market has both product and geographic dimensions. *Brown Shoe Co. v. United States,* 370 U.S. 294, 324 (1962); *Surgical Care Ctr. v. Hosp. Dist.*, 309 F.3d 836, 839-40

(5th Cir. 2002) (affirming dismissal for failure to provide evidence sufficient to demonstrate relevant geographic market).

Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. For the *per se* rule to apply to a Section 1 claim, there must be a horizontal agreement among competitors. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 412 (5th Cir. 2007) (following *NYNEX*). If the conduct involves only vertical agreements, the practice must be evaluated under the rule of reason, which deems a restraint illegal if it has an anticompetitive impact on the relevant market. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002). Absent any agreement, there is no Section 1 claim, because an anticompetitive agreement is the *sine qua non* of a Section 1 violation. To prove an agreement for antitrust purposes, the plaintiff must present direct or circumstantial evidence of a "conscious commitment to a common scheme" that "tends to exclude the possibility of independent action." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

The Court could list any number of common questions of fact critical to establishing the antitrust violations alleged by DPPs. For example:

- What is the relevant product market for purposes of assessing market power?

- What is the relevant geographic market for purposes of assessing market power?

- What was Pool's share of the relevant market?

- Did the manufacturing defendants enter into a horizontal agreement regarding freight minimums?

- Did Pool engage in exclusionary conduct?

- Did the Manufacturer Defendants enter anticompetitive vertical agreements with Pool?

Because class members all base their claims on the same alleged violations and the same course of conduct by defendants, each of these questions of fact applies equally to the claims of each class member.  Resolving any one of these questions for one class member would resolve the question for all class members.  The same logic would apply to any questions of law relevant to defendants' alleged antitrust violations.  Thus, class members have no trouble showing that they share many common contentions relevant to establishing defendants' violations of the antitrust laws.

### *Typicality*

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  The test for typicality is not demanding, and it

focuses on the general similarity of the legal and remedial theories behind plaintiffs' claims. *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997). Thus, "many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." 7A Wright & Miller, *Federal Practice and Procedure* § 1764 (2014).

The parties nominated to be named Settlement Class Representatives are the same as the named plaintiffs in the SCAC.[41] The SCAC alleges that all of the plaintiffs purchased Pool Products directly from Pool during the class period, and that as a result of the defendants' alleged anticompetitive conduct, all suffered damages from paying supracompetitive prices and facing reduced product choice.[42] Plaintiffs' claims are identical to those of the settlement class, which also consists entirely of direct purchasers of Pool Products from Pool during the class period. In addition, nothing before the Court indicates that the class representatives would be subject to any unique defenses that would render them atypical class representatives. The Court therefore finds that the representatives' claims are typical of the claims of the putative settlement class members.

_____

[41]   *See* R. Doc. 284 at 7-8.

[42]   R. Doc. 284 ¶¶ 126-127.

***Adequacy***

Rule 23(a) also requires that the representative parties must "fairly and adequately protect the interests of the class." "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625 (citing *Falcon*, 457 U.S. at 158 n.13). Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625-26 (citations and internal quotation marks omitted). The adequacy requirement "also factors in competency and conflicts of class counsel." *Id.* at 626 n.20.

Here, as discussed in the Court's analysis of typicality, the interests of the proposed class representatives appear to be aligned with the interests of the class, because class members all raise identical claims relating to the same alleged conduct and according to the same theory of damages. In addition, DPPs do not plan to seek incentive payments for the representatives, meaning that class representatives will recover on the same basis as all other class members.[43] Thus, the Court sees no conflict of interest between the proposed settlement class representatives and the settlement class. In addition, as discussed *infra*, counsel for DPPs is experienced and has prosecuted this action vigorously. The Court therefore finds that the adequacy requirement is met.

---

[43]    R. Doc. 665-1 at 30.

## 2.    Rule 23(b) Requirements

For class actions seeking money damages, Rule 23(b)(3) imposes two prerequisites, predominance and superiority: "[Q]uestions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members, and ... a class action [must be] superior to the other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).   To predominate, "common issues must constitute a significant part of the individual cases." *Mullen,* 186 F.3d at 626.   "This requirement, although reminiscent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Unger,* 401 F.3d at 320 (quoting *Amchem Prods.,* 521 U.S. at 623-24).

### *Predominance*

To determine whether the class claims meet the predominance requirement, the court must "identify the substantive issues that will control the outcome, assess[] which issues will predominate, and then determin[e] whether the issues are common to the class." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).

As the Court discussed in its commonality analysis, establishing the predicate antitrust violation to support each of these claims involves a large number of common questions of fact

23

and law.   Yet liability in a private antitrust action requires that plaintiffs establish not only the fact of a violation of the antitrust laws, but also impact on plaintiffs from the violation. *See Blue Bird Body Co.*, 573 F.2d at 320.   "In making the determination as to predominance, of utmost importance is whether 'impact' should be considered an issue common to the class and subject to generalized proof, or whether it is instead an issue unique to each class member, and thus the type of question which might defeat the predominance requirement of 23(b)(3)." *Id.; see also id.* at 324 ("[I]f generalized proof of impact is in fact improper, then the district court must carefully consider whether this requirement of individual proof does not defeat the class certification on either predominance or manageability grounds."). Because this certification is for settlement purposes only, the Court need not consider whether individualized showings of proof of impact would cause problems for manageability, *see Amchem Prods.*, 521 U.S. at 620, but it must still examine whether the need for individualized proof of impact would overwhelm predominance.

Here, class members have articulated a single theory of impact: defendants' alleged anticompetitive conduct led to uniformly inflated Pool Product prices.   According to DPPs' expert, Dr. Rausser, plaintiffs' theory of impact can be demonstrated for a nation-wide class of direct purchasers using

common evidence and analysis.[44] Specifically, he asserts that because "PoolCorp tightly controlled its prices in a centralized manner" and applied price increases "across all types of customers and products . . . in a step-wise fashion, simultaneously and systematically," all proposed class members suffered a common impact in the form of uniformly inflated prices.[45] Dr. Rausser asserts that his "Overcharge regression model" isolates the effect of defendants' alleged anticompetitive behavior on Pool Product pricing.[46] He further asserts that the Overcharge regression model provides a "Class-wide measure of the impact of Defendants' anti-competitive behavior, and it shows that prices were elevated during the class period by 4.97%."[47] Plaintiffs have demonstrated that they have a plausible method for proving impact utilizing a method common to the class.

In addition, Dr. Rausser asserts that damages may also be calculated for each individual class member by multiplying the average overcharge by each class member's purchases.[48] Thus, plaintiffs have demonstrated a possible way that individualized damages could be calculated using a uniform methodology across the

---

[44]    R. Doc. 471-1 at 9.

[45]    *Id*. at 7.

[46]    *Id*.

[47]    *Id*.

[48]    *Id*.

class.  Because class members share issues of fact and law related to establishing defendants' alleged violations of the antitrust laws, and because DPPs have demonstrated that they also have both a plausible method for proving impact using class-wide proof and methodology and a plausible method for proving individual damages using class-wide methodology, the Court concludes that common issues predominate.

### *Superiority*

Next, the Court finds that a class action is superior to other methods of adjudicating this case.  As the Supreme Court explains:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem Prods.*, 521 U.S. at 617 (citation omitted).  This logic applies here, where the amount at stake for any individual plaintiff would not make litigating a complex antitrust dispute worth the time, money, or effort.  As DPPs were allegedly harmed by a common set of facts, certifying the case as a class action allows the claims of many direct purchasers to be resolved efficiently at one time.

### 3.    Rule 23(g)

Certifying a settlement class also requires appointing class counsel.  DPPs ask the Court to approve the firms of Herman, Herman & Katz, LLC; Bernstein Leibhard LLP; Kaplan Fox & Kilsheimer LLP; and Labaton Sucharow LLP as class counsel. Proposed class counsel are experienced and well-qualified in class actions and complex litigation, including antitrust litigation. They have ably served on Plaintiffs' Executive Committee.[49]  They have effectively pursued this litigation on behalf of the class since the time of their appointment and have devoted substantial resources to this effort.  Accordingly, the Court finds that each of the proposed firms satisfies the criteria for settlement class counsel under Rule 23(g).

## III. Preliminary Fairness Determination

### A.    Legal Standard

Federal Rule of Civil Procedure 23 governs the settlement of class actions.  *See Henderson v. Eaton,* No. Civ. A. 01-0138, 2002 WL 31415728, *2 (E.D. La. 2002) (citing *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176-77 (5th Cir. 1975)).  A class action may not be dismissed or compromised without the district court's approval.  *See* Fed. R. Civ. P. 23(e); *see also Cope v. Duggins*,

---

[49]    *See* R. Doc. 79 (Order appointing Russ Herman, Ronald Aranoff, Hollis L. Salzman, and Robert Kaplan to Plaintiffs' Executive Committee).

203 F. Supp. 2d 650, 652–53 (E.D. La. 2002) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

The Court must "ensure that the settlement is in the interests of the class, does not fairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978)). Because the parties' interests are aligned in favor of a settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279–80 (7th Cir. 2002) (noting that the class action context "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements"); *see also* Manual for Complex Litigation (Fourth) § 21.61 (2004). The Court's duty of vigilance does not, however, authorize it to try the case in the settlement hearings. *Cotton*, 559 F.2d at 1330.

As this motion is for *preliminary* approval of a class action settlement, the standards are not as stringent as those applied to a motion for final approval. *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007); Manual, *supra*, § 21.63 ("At the stage of preliminary approval, the questions are simpler, and the court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final approval."). If the proposed

28

settlement discloses no reason to doubt its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval, the court should grant preliminary approval. *See In re Stock Exch. Options Trading Antitrust Litig.*, No. 99 Civ.0962, 2005 WL 1635158, at *5 (S.D.N.Y. July 8, 2005); *McNamara v. Bre-X Minerals Ltd.,* 214 F.R.D. 424, 430 (E.D. Tex. 2002).

**B.   Discussion**

The Court finds no reason to doubt the fairness of the process by which the parties arrived at a settlement agreement. Plaintiffs and defendants arrived at the agreement after four formal sessions of arm's length mediation with former judge Layn Phillips and two settlement conferences with Magistrate Judge Wilkinson.  In addition, settlement occurred after three years of litigation and extensive fact discovery, and thus counsel for all parties were experienced and familiar with the factual and legal issues in the case.

In addition, the settlement does not appear to give preferential treatment to the named plaintiffs or any segment of the class.  Indeed, DPPs assert that they have no intention of seeking incentive payments for the settlement class representatives so that the lead plaintiffs would recover on the

same basis as all class members.   To the extent that class members' claims exceed the Net Settlement Fund, each claimant will be compensated on a pro rata basis according to the claimant's calculated loss under the allocation plan.   Thus, the Court finds the allocation plan to be fair and unbiased.

Next, the Court has studied the "Released Claims" provision in the Settlement and finds it reasonable.   The Agreement provides that it is intended to forever and completely release Pentair from all "Released Claims," which are defined as:

> any and all claims, demands, actions, suits, proceedings, causes of action, damages, liabilities, costs, expenses, penalties and attorneys' fees, of any nature whatsoever, whether class, individual, or otherwise in nature, whether directly, representatively, derivatively or in any other capacity, that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating in any way to the Action, which were asserted or that could have been asserted.[50]

Released Claims do not include any claims against any Non-Settling Defendant.

Regarding unknown claims, the Agreement further specifies that these releases

> constitute a waiver of Section 1542 of the California Civil Code and Section 20-7-11 of the South Dakota Codified Laws, each of which provides that a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the

---

[50]   R. Doc. 665-2 at 14 ¶ 30.

time of executing the release, which if known by him
must have materially affected his settlement with the
debtor, and a waiver of any similar, comparable, or
equivalent provisions, statute, regulation, rule, or
principle of law or equity of any other state or
applicable jurisdiction.[51]

The Court finds that this release is not impermissibly broad.
Courts have consistently approved releases in class action
settlements that discharge unknown claims relating to the factual
issues in the complaint. *See DeHoyos v. Allstate Corp.*, 240
F.R.D. 269, 311-12 (W.D. Tex. 2007) (finding that release of
unknown claims was not impermissibly broad); *In re Corrugated
Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981)
("[A] court may release not only those claims alleged in the
complaint and before the court, but also claims which could have
been alleged by reason of or in connection with any matter or fact
set forth or referred to in the complaint."); *Zandford v.
Prudential-Bache Sec., Inc.*, 112 F.3d 723, 727 (4th Cir. 1997)
(noting that general releases are intended to "settle all matters
forever" including "claims of every kind or character, known or
unknown"). Because this release applies only to unknown claims
arising from the facts related to this Action, the Court does not
see any obvious deficiency with the release.

The Court also finds that the amount of the settlement is
within the range of possible approval. The parties agreed to

---

[51]    *Id.* ¶ 31.

settle the case for $6 million in cash.  This money is an all-in figure, to be reduced by attorneys' costs and expenses from this litigation and by all costs for providing notice and administering the settlement.  In the proposed Notice, DPPs state that they plan to seek an award for attorneys' fees and reimbursement of costs and expense in an amount not to exceed $2,000,000.  This sum is one-third of the $6 million total, making it roughly in line with other percentage awards that courts in this circuit have approved. *See, e.g.*, *Burford v. Cargill, Inc.*, CIV.A. 05-0283, 2012 WL 5472118 (W.D. La. Nov. 8, 2012) (approving 33.33 percent); *Jenkins v. Trustmark Nat. Bank*, No. 3:12-CV-00380, 2014 WL 1229661 (S.D. Miss. Mar. 25, 2014) (approving 33.33 percent; "[I]t is not unusual for district courts in the Fifth Circuit to award percentages of approximately one third."). The Court reserves judgment on final approval of fees and/or costs until presented with a request by class counsel.  For purposes of preliminary approval, however, the Court finds that a sum for attorneys' fees and costs of no more than one-third of the settlement fund is in keeping with practice in this circuit and is therefore within the limit of what the Court deems reasonable.

Finally, "[t]he settlement terms should be compared with the likely rewards the class would have received following a successful trial of the case." *Cotton*, 559 F.2d at 1330. In making this comparison, "[p]ractical considerations may be taken

into account." *Id.* "Proof difficulties" are "permissible factors" for a court to consider when evaluating the fairness of a settlement. *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 240 (5th Cir. 1982). In addition, "particularly in class action suits, there is an overriding public interest in favor of settlement," partly because "[i]t is common knowledge that class action suits have a well deserved reputation as being most complex." *Cotton*, 559 F.2d at 1331.

Applying these principles, the Court considers the merits of the $6 million settlement fund in light of the universe of potential damages in this case, balanced against the risks present in this particular litigation. DPPs' expert Dr. Rausser suggests that estimated damages for class members during the class period are $266.8 million.[52] He reaches this figure by multiplying Pool's sales figures during the class period by his calculated overcharge of 4.97 percent.[53] Although at first glance it appears that the settlement figure is small in comparison to the universe of potential damages, Dr. Rausser's projected damages reflect a *best* case scenario for plaintiffs' actual damages. Dr. Rausser's damages estimate does not reflect the substantial risks of nonrecovery or diminished recovery faced by plaintiffs in this litigation. First, DPPs' claims are subject to challenging

---

[52]    R. Doc. 665-1 at 25.

[53]    *Id.*

problems of proof.  This is not a follow-on case to a government prosecution of an established cartel.  Indeed, there is only one claim subject to a theory of *per se* illegality and the existence of a conspiracy is strongly contested.  Plaintiffs' attempted monopolization and Section 1 rule of reason claims are difficult to prove in that they require complex market analysis and consideration of potential justifications.  It is not unusual for these types of claims to be casualties of summary judgment.  Second, market definition--both the geographic and product dimensions--is complex and hotly disputed.  Third, DPPs face challenges in connection with the testimony of their expert, upon whom they rely to establish critical elements of their claims, including liability, the relevant market, overcharge, and impact.  Moreover, the challenges are interconnected.  To give just one example, the exclusion of plaintiffs' economic expert on *Daubert* grounds would bode ill for plaintiffs on class certification and summary judgment.

In addition, the settlement value of $6 million does not reflect the full value of the settlement to the class.  Pentair has agreed to cooperate with plaintiffs to answer questions about its transactional data and to assist with authenticating records as DPPs proceed against Pool.  Thus, taking into account both the risks of non-recovery that DPPs face and the benefits generated by

Pentair's continuing cooperation, the Court finds that the settlement figure is within the range of reasonableness.

## IV.  Notice

### A.    Content of the Notice

Federal Rule of Civil Procedure 23(c)(3) governs the notice requirements for class certification.  Specifically, the notice must state:

> (I) the nature of the action;

> (ii) the definition of the class certified;

> (iii) the class claims, issues, or defenses;

> (iv) that a class member may enter an appearance through an attorney if the member so desires;

> (v) that the court will exclude from the class any member who requests exclusion;

> (vi) the time and manner for requesting exclusion; and

> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(3)(B).

After reviewing the long form notice[54] and short form notice[55] filed by DPPs, the Court finds that both forms meet the requirements of Rule 23(c)(3).  The plain language of the notices apprises all class members of the nature of the action, the

---

[54]    R. Doc. 665-2 at 30-40.

[55]    R. Doc. 665-2 at 42.

definition of the class, the class claims and the defenses, the class members' right to be heard, the class members' right to exclusion, the time and manner for requesting exclusion, and the binding effect of a class judgment.  The notices also disclose the amount of settlement, a statement of attorneys' fees sought, the name and contact information of counsel, and the reasons for settlement.  Moreover, the notices use clear headings and utilize plain language.

> **B.   Method of Notice**

Under Rule 23(e)(1), when approving a class action settlement, the district court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." In addition, for classes certified under Rule 23(b)(3), courts must ensure that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified by reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The Due Process Clause also gives unnamed class members the right to notice of the settlement of a class action.  *Fidel v. Farley*, 534 F.3d 508, 513-14 (6th Cir. 2008) (citing *DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 943-44 (10th Cir. 2005)).  The notice must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *DeJulius*, 429 F.3d

at 944 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).  Still, "the type of notice to which a member of a class is entitled depends upon the information available to the parties about that person." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1098 (5th Cir. 1977). Thus, due process does not require *actual* notice to all class members who may be bound by the litigation.  *See Fidel*, 534 F.3d at 514.

Here, DPPs propose mailing hard-copy notices to all class members for whom they have a valid address from Pool's transaction data.  DPPs also propose publishing short form notice in two leading industry publications.  Garden City will also create both a case-specific website and "hotline" for potential class members to consult about the settlement.  The Court finds that the proposed method of notice satisfies the requirements of Rule 23(c)(2)(B) and due process.  The direct mailing of notice, along with publication of short form notice in print and on the web, is reasonably calculated to apprise class members of the settlement.

Accordingly, the Court APPROVES the proposed long and short form notices and the plan for providing notice.


## V.   Claims Administrator and Escrow Agent

Counsel requests the Court to approve Garden City as the Claims Administrator in this case.  Garden City would be

responsible for: (1) disseminating the Notice of Pendency of Class Action and Settlement of Class Action and the Proof of Claim and Release to potential Class Members in this action, including by direct mail and through its case-specific website; (2) assisting Class Members with questions regarding the proposed settlement and the submission of claims; (3) receiving and processing claims submitted regarding the settlement fund; (4) corresponding with Class Members submitting deficient claims; (5) reporting to Counsel and the Court; and (6) distributing settlement funds to approved claimants.  Garden City anticipates that $133,250 will be sufficient to cover these costs.

After reviewing the experience of Garden City and its proposed plan to administer the settlement, the Court is satisfied that Garden City will competently administer the settlement. Accordingly, the Court APPROVES Garden City as the Claims Administrator.

As Escrow Agent, Citibank would be responsible for accepting deposit of, safeguarding, and disbursing the settlement funds consistent with any final settlement order and further orders from the Court.  The Court also APPROVES Citibank as Escrow Agent.

## VI. Conclusion

For the foregoing reasons, the Court GRANTS DPPs' Motion for Preliminary Approval of Settlement Between Direct Purchaser

Plaintiffs and Defendant Pentair Water Pool and Spa, Inc.   A detailed procedural order will be issued in conjunction with this opinion.


New Orleans, Louisiana, this <u>13th</u> day of August, 2015.


_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE