UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET ANTITRUST          SECTION: R(2)
LITIGATION                             JUDGE VANCE
                                       MAG. JUDGE WILKINSON

**THIS DOCUMENT RELATES TO ALL INDIRECT-PURCHASER PLAINTIFF CASES**

**ORDER AND REASONS**

Indirect-Purchaser Plaintiffs (IPPs), together with Pentair Water Pool & Spa, Inc. (Pentair), move the Court to preliminarily approve a class action settlement between IPPs and Pentair.[1]  The parties also move the Court to certify a class for the purpose of the Pentair settlement.  For the following reasons, the Court grants the motion.

**I.    Background**

**A.    Factual Background**

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against Pool and Manufacturer Defendants.  Pool is the country's largest distributor of products used for the construction and maintenance of swimming pools (Pool Products).[2]  Manufacturer Defendants are the three largest manufacturers of Pool Products in the United

---

[1]    R. Doc. 659.

[2]    R. Doc. 290 at ¶ 27.

States: Pentair, Hayward Industries, Inc. (Hayward), and Zodiac Pool Systems, Inc. (Zodiac).[3]  As defined in IPPs' Third Amended Class Action Complaint (TCAC), Pool Products are the equipment, products, parts or materials, and chemicals used for the construction, renovation, maintenance, repair, and service of residential and commercial swimming pools.  Pool Products include pumps, filters, covers, drains, fittings, rails, diving boards, and chemicals, among other goods.[4]  Pool buys Pool Products from manufacturers, including the three Manufacturer Defendants, and in turn sells them to DPPs, which include pool builders, pool retail stores, and pool service and repair companies (collectively referred to as "Dealers" in the TCAC).[5]  IPPs are pool owners who indirectly purchased Pool Products manufactured by Manufacturer Defendants and distributed by Pool.  The IPPs named in the TCAC and their states of citizenship are: Jean Bove (CA), Kevin Kistler (AZ), Peter Moughey (FL), and Ryan Williams (MO).[6]  IPPs allege violations of state laws on behalf of classes of individuals and entities who purchased Pool Products not for resale in California, Arizona, Florida, and Missouri.

---

[3]    *Id*. at ¶ 22.

[4]    *Id*. at ¶ 1.

[5]    *Id*. at ¶ 31.

[6]    *Id*. at ¶¶ 12-15.

**B.    Procedural Background**

On November 21, 2011, the Federal Trade Commission (FTC) announced that it conducted an investigation into unfair methods of competition by Pool and entered a consent decree with Pool resolving the matter.    Shortly after the FTC's announcement, several plaintiffs filed suit in this district and several others. On April 17, 2012, the Judicial Panel on Multidistrict Litigation consolidated the suits for pretrial purposes in this Court.[7]   On May 17, 2012, IPPs filed their initial consolidated class action complaint in the multidistrict litigation in this Court.

On September 5, 2012, IPPs filed their Second Amended Class Action Complaint (SCAC).[8]    The SCAC alleged that Pool's and Manufacturer Defendants' conduct violated various antitrust and deceptive trade practices laws of California, Arizona, Florida, and Missouri.    Specifically, IPPs alleged violations of California's antitrust law, the Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*; the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; the state antitrust provisions of Ariz. Rev. Stat. §§ 44-1401, *et seq.*; the consumer protection provisions of the Florida Deceptive and Unfair Trade Practices Act, Fl. Stat. §§ 501.201, *et seq.*, including §501.204; and the consumer protection provisions of the Missouri Merchandising

---

[7]     R. Doc. 1.

[8]     R. Doc. 149.

Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*[9]   IPPs based their claims on allegations of the same underlying conduct DPPs alleged in their Sherman Act claims.   Specifically, IPPs alleged that Pool pursued a deliberate strategy to restrain trade and monopolize the Pool Product Distribution Market through acquiring competitors and foreclosing actual and potential competition by conditioning access to its distribution network on manufacturers' promises not to supply Pool's rivals.   IPPs also alleged that Manufacturer Defendants agreed with Pool to eliminate existing distribution competitors and prevent new entrants from obtaining the products necessary to compete.   IPPs alleged that they were injured and suffered damages because defendants' conduct caused them to pay higher prices for Pool Products than they would have otherwise paid absent defendants' illegal practices.   According to IPPs, the overcharge was passed on to them from the direct purchasers in the distribution chain.   Finally, IPPs also alleged that defendants fraudulently concealed their illegal conduct until November 2011 when the Federal Trade Commission investigation and related consent decree made public the nature of Pool's anticompetitive conduct.

On May 24, 2013, the Court dismissed IPPs' claims under the California Unfair Competition Law, Florida Deceptive and Unfair Trade Practices Act, and Missouri Merchandising Practices Act that

---

[9]      *Id.* at 2.

were based on the theory that defendants engaged in fraud or misrepresentation.[10]   The Court dismissed IPPs' *per se* illegal group boycott claim under the Cartwright Act because IPPs failed to allege a horizontal agreement.[11]   The Court also dismissed IPPs' claim that defendants fraudulently concealed their illegal conduct.[12]

    The Court allowed IPPs to go forward with their Unfair Competition Law and rule of reason Cartwright Act claims involving three vertical conspiracies (one between Pool and each Manufacturer Defendant), to the extent that the claims were predicated on a national market.[13]   The Court also allowed IPPs to go forward with their Arizona Antitrust Act claims of three vertical conspiracies, to the extent that the claims were predicated on a national market, and their Arizona Antitrust Act claim of attempted monopolization against Pool.[14]   The Court also found that IPPs stated a claim under the Florida Deceptive and Unfair Trade Practices Act based on their allegations of attempted monopolization by Pool and three vertical conspiracies, to the

---

[10]    R. Doc. 250 at 37-38.

[11]    *Id.* at 19-20.

[12]    *Id.* at 37-38.

[13]    *Id.* at 21-22.

[14]    *Id.* at 25-26.

extent that the claims were predicated on a national market.[15]   In addition, the Court found that IPPs stated a claim under the Missouri Merchandising Practices Act based on the same allegations.[16]   IPPs then filed their Third Amended Class Action Complaint (TCAC), which omitted the claims the Court dismissed.[17]

The parties have participated in extensive fact discovery, including the deposition of over eighty fact witnesses.  Fact and expert discovery is complete.

### C.   Settlement Agreement Background

Negotiations leading to the settlement agreement between IPPs and Pentair took place over the course of two years.  Class Counsel for IPPs and counsel for Pentair mediated this action before the Honorable Layn Phillips, a former federal district judge and a respected mediator of antitrust disputes.  Settlement negotiations included four full-day, in-person mediation sessions on July 22, 2013 in Chicago and March 20, 2014; October 1, 2014; and March 5, 2015 in New York.  The parties reached an agreement at the March 5, 2015 mediation session and finalized the terms on March 31, 2015, as a result of follow-up email and telephone communications facilitated by Judge Phillips.  IPPs and Pentair executed the Settlement Agreement on March 31, 2015.  The parties

---

[15]   *Id.* at 29-30.

[16]   *Id.* at 35.

[17]   *See* R. Doc. 290.

represent that they have not entered into any side agreements.

On July 6, 2015, counsel for IPPs and Pentair submitted a joint motion asking the Court to (1) grant preliminary approval of a class action settlement, (2) certify a settlement class, (3) appoint class counsel, (4) authorize notice to the proposed class of the proposed settlements, (5) schedule a fairness hearing, (6) stay all claims against Pentair in the MDL, and (7) establish a schedule for hearing motions for attorneys' fees, litigation expenses, and incentive awards for the named plaintiffs.[18]   On August 21, 2015, counsel for IPPs filed a motion to (1) expand the scope of Special Master Rick Stanley's original appointment, (2) appoint Angeion Group as Claims Administrator and Notice Agent, and (3) appoint First NBC Bank as Escrow Agent.

**D.   The Proposed Settlement Class**

The Settlement Agreement defines the Settlement Class as:

all individuals residing or entities operating in Arizona, California, Florida, or Missouri who or which, between January 1, 2008 and July 16, 2013, purchased indirectly from PoolCorp (and not for resale) Pool Products in Arizona, California, Florida, or Missouri manufactured by Hayward, Pentair, or Zodiac. Excluded from the Settlement Class are (1) individuals residing or entities operating in Missouri who or which did not purchase Pool Products primarily for personal, family, or household purposes, and (2) Defendants and their subsidiaries, or affiliates, regardless of whether named as a Defendant in this Action, and governmental entities or agencies.[19]

---

[18]   R. Doc. 659.

[19]   R. Doc. 659-2 at ¶ 5.

"PoolCorp" is defined to include Pool Corporation and its subsidiaries, including SCP Distributors, LLC and Superior Pool Products, LLC.[20]  "Pool Products" are defined as

> the equipment, products, chemicals, parts, or materials used for the construction, maintenance, repair, renovation or service of residential and (except in the State of Missouri) commercial swimming pools, including, among other goods, chemicals, pumps, filters, heaters, covers, cleaners, steps, rails, diving boards, pool liners, pool walls, and white goods (the parts necessary to maintain pool equipment manufactured by Defendants and sold directly or indirectly to Pool Corporation[.][21]

Class Members will include each member of the Settlement Class who does not timely elect to be excluded from the Settlement Class.  The parties stipulate that certification of the Settlement Class is for settlement purposes only, and they retain all of their respective objections, arguments, and defenses regarding class certification in the event that settlement is not finalized.[22]

### E.   The Settlement Agreement

Under the terms of the proposed Settlement Agreement, Pentair would pay a settlement amount of $600,000 into an Escrow Account pending the Court's final approval of the settlement.   The Agreement requires that Pentair wire transfer the settlement

---

[20]   *Id.* at ¶ 3.

[21]   *Id.*

[22]   *Id.* at ¶ 5.

amount into the Escrow Account within ten business days of the Court's entering a Preliminary Order approving the settlement. Interest from the account will accrue to the benefit of the Settlement Class.[23]

The Agreement provides that the settlement amount is an "all-in" figure, meaning that $600,000 is the total amount Pentair will pay under the agreement in exchange for the Released Claims.[24] Accordingly, the settlement amount shall be used to pay (1) the notice and administration costs, (2) attorneys' fees and litigation expenses, (3) incentive awards, (4) class member benefits, and (5) any remaining administration expenses and any other costs of any kind associated with the resolution of the action.[25]

Pentair also agrees to assist plaintiffs' counsel with document authentication and to answer plaintiffs' questions about transactional data previously produced by Pentair during discovery.[26]

The Agreement notes that IPPs and Pentair seek to re-confirm the appointment of Kevin Kistler, Jean Bove, Peter Mougey, and

---

[23]     *Id.* at ¶¶ 19-20.

[24]     *Id.* at ¶ 19.

[25]     *Id.*

[26]     *Id.* at ¶ 31.

Ryan Williams as Settlement Class Representatives.[27]

The Agreement provides that it is intended to forever and completely release Pentair from all "Released Claims," which are defined as:

> any and all claims, demands, actions, suits, proceedings, causes of action, damages, liabilities, costs, expenses, penalties, and attorneys' fees, of any nature whatsoever, whether class, individual, or otherwise in nature (regardless of whether any person or entity has objected to the settlement or makes a claim upon or participates in the Settlement Fund), whether directly, representatively, derivatively, or in any other capacity that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected and unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating to the Action, which were asserted or that could have been asserted, including any claims arising under any federal or state antitrust, unjust enrichment, unfair competition, or trade practice statutory or common law, or consumer protection law[.][28]

Released Claims do not include claims against any Non-Settling Defendant.[29] The Agreement further specifies that these releases constitute a waiver of Section 1542 of the California Civil Code, which states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the

---

[27]   *Id.* at ¶ 14.

[28]   *Id.* at ¶ 17.

[29]   *Id.* at ¶ 32.

debtor[.]"[30]   Releasors also waive rights or benefits available under "any law or any state or territory of the United States or District of Columbia, or by principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, including but not limited to Section 20-7-11 of the South Dakota Codified Laws."[31]

In a subsequent motion filed on August 21, 2015, IPPs move the Court to appoint Angeion Group as the Claims Administrator and Notice Agent for the settlement and First NBC Bank as Escrow Agent.[32]

### F.   Plan of Notice

The parties propose continuing to use Angeion Group, which the Court appointed as Claim Administrator for the Hayward and Zodiac settlements, as the Claims Administrator and Notice Agent for the Pentair settlement.[33]

Because this identical class was already notified in accordance with a court-approved notice plan in the parallel class settlements between IPPs and Hayward and Zodiac, the parties propose a substantially similar version of the previous notice plan.  The Claims Administrator will email a "Notice Package"

---

[30]   *Id.* at ¶ 18.

[31]   *Id.*

[32]   R. Doc. 670 at 1.

[33]   *See* R. Doc. 659-10; R. Doc. 664.

comprised of the Class Settlement Notice - Long Format ("Long Form Notice") and the Proof of Claim Form to the last known email address of all persons identified through Pentair's warranty registration and rebate request databases.[34]   In addition, the Claims Administrator will also email the 214,263 potential Class Members identified in Hayward and Zodiac's databases.[35]   The Class Settlement Notice - Short Form ("Short Form Notice") will also be published in several major newspapers in Arizona, California, Florida, and Missouri.[36]   The total combined circulation of these publications is 3,116,215.[37]   The Settling Parties will also issue

---

[34]   R. Doc. 659-6 at 1.   The Settling Parties assert that Pentair's warranty registration and rebate request databases revealed addresses for more than 175,000 individuals and entities.   This list does not, however, reveal whether any given product was sold through PoolCorp or some other distributor-- that is, many of these purchasers likely do not fit within the Class Member definition of "all individuals [or] entities . . . who or which . . . purchased indirectly from PoolCorp . . . ." Because the Settling Parties know that numerous names on this list are not putative Class Members, they point out that the expense of first-class mailed notice to these individuals is impracticable and unreasonable given the total amount of the settlement.   R. Doc. 659-1 at 31-32.

[35]   R. Doc. 664 at 1.

[36]   R. Doc. 659-6 at 1.   Short Notice will be published once in a daily edition and once in a Sunday edition of the following newspapers: <u>Arizona</u>: *The Arizona Republic*, *Arizona Daily Star*; <u>California</u>: *Los Angeles Times*, *The Sacramento Bee*, *San Jose Mercury News*, *The San Diego Union-Tribune*; <u>Florida</u>: *Miami Herald*, *Orlando Sentinel*, *Tampa Bay Times*, <u>Missouri</u>: *St. Louis Post-Dispatch*, *Kansas City Star*, *Springfield News-Leader*.   *Id.* at 1-2.

[37]   R. Doc. 659-10 at 4.

12

a press release through major press outlets throughout the United States, as well as to online venues with information and news offerings.[38]   Finally, the Claims Administrator will also make available a website with information on the proposed settlement and its status and links to settlement papers and court filings. Display advertisements on Google and Facebook will link to the website to encourage Class Members to seek additional information about the settlement.

G.   **Plan of Allocation and Claims Process**

The Settlement Agreement provides that the settlement fund will be used to pay attorneys' fees and expenses approved by the Court, all notice and settlement administration expenses and any other costs associated with the settlement.   The proposed Notice explains that Class Counsel will ask the Court to approve an award of attorneys' fees, costs, and expenses, not to exceed one-third of the $600,000 settlement fund.[39]   In addition, Class Counsel estimate that administering the settlement will not exceed $145,000.[40]

The Court also appointed a Special Master for the IPP settlement,[41] and tasked the Special Master with formulating and

---

[38]     *Id.*

[39]     R. Doc. 659-7 at 11.

[40]     R. Doc. 659-1 at 9 n.8.

[41]     R. Doc.

recommending an allocation protocol that would apportion the proceeds of the settlement fund--net of claims administration expenses, attorneys' fees and costs--to Class Members who submit valid claims. The Special Master made four preliminary recommendations regarding the Pentair settlement: (1) the same protocols concerning apportionment, allocation, and documentation that the Court approved in connection with the Hayward/Zodiac settlement should also apply to the Pentair settlement; (2) the amount to be awarded to any Pentair claimant should be reduced by the amount of any funds that claimant has already received from the Hayward/Zodiac fund; (3) in the event that claims under the Pentair settlement exceed available funds, the Court should reallocate any unclaimed funds from the Hayward/Zodiac settlement to the Pentair fund, rather than distributing those unclaimed funds in the form of a *cy pres* award; and (4) the Class Representatives should be awarded $500 in relation to the Pentair settlement.[42]

Consistent with the allocation protocol implemented in the IPP settlements with Hayward and Zodiac, the Special Master recommends apportioning the settlement fund among a single class of IPPs rather than separate apportionments among the settling jurisdictions.[43] The Special Master also recommends a claims

---

[42]    R. Doc. 673 at 2-3.

[43]    *See* R. Doc. 673 at 1-2.

procedure that gives Class Members the option to recover under a "Standardized Recovery Model" or an "Itemized Recovery Model," depending on the types of documentation they have available.[44] Consumers without extensive documentation would recover standard amounts for items purchased in particular categories of Pool Products. Consumers with extensive records could submit itemized claims based on their actual purchase prices. In any event, consumers would be able to recover only up to the alleged 4.97 percent overcharge on their eligible Pool Product purchases.

## II.  Class Certification

### A.   Legal Standard

The certification requirements of Federal Rule of Civil Procedure 23 generally apply when certification is for settlement purposes. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). A district court need not consider "whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Id.* (citing Fed. R. Civ. P. 23(b)(3)(D)). But the Court's consideration of the other factors in Rule 23 is of "vital importance" because the Court will lack a later opportunity to make adjustments to the class. *Id.* The

---

[44]   *See* R. Doc. 673 at 2(recommending that the same protocols implemented in connection with the IPP settlements with Hayward and Zodiac apply to the Pentair settlement); R. Doc. 485 at 10-12 (Special Master's Preliminary Allocation Report).

existence of a settlement class may even "warrant more, not less, caution on the question of certification." *Id.*

To be certified under Rule 23, the class must first satisfy four threshold requirements.  A court may certify a class only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  The party seeking certification bears the burden of establishing these requirements. *Unger v. Amedisys*, 401 F.3d 316, 320 (5th Cir. 2005) (citing *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001)).  If the prerequisites of Rule 23(a) are met, the proposed class must additionally satisfy one of the three provisions for certification under Rule 23(b).  For certification of a 23(b)(3) damages class, the district court must make a finding that questions of law or fact common to class members predominate over questions affecting only individual members and that a class action is the best way to adjudicate the controversy.  Fed. R. Civ. P. 23(b)(3); *Unger*, 401 F.3d at 320.

In addition, a court that certifies a class must also appoint class counsel. Fed. R. Civ. P. 23(g). In appointing class counsel, the Court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class

Fed. R. Civ. P. 23(g)(1)(A).

## B.    Discussion

For the following reasons, the Court finds that the class may be certified for settlement purposes under Rule 23.

### 1.    Rule 23(a) requirements

#### *Numerosity*

Rule 23(a)(1) requires that the class be so large that joinder of all members is impracticable. To satisfy the numerosity requirement, "a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000) (quoting *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981)).

Here, the proposed Settlement Class consists of persons and entities that purchased Pool Products in Arizona, California,

17

Florida, or Missouri indirectly from PoolCorp, during the time period between January 1, 2008 and July 16, 2013.  Counsel estimates that there are more than 500,000 putative class members in each of the Settling Jurisdictions, except Missouri, where counsel estimates that there are as many as 23,000 putative class members.[45]  Although the number of members in a proposed class is not determinative of whether joinder is impracticable, it has been noted that any class consisting of more than forty members "should raise a presumption that joinder is impracticable."  *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citing Newberg on Class Actions § 3.05).  Thus, the Court finds that plaintiffs easily satisfy the numerosity requirement.

### *Commonality*

The commonality test of Rule 23(a)(2) requires that the class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  The requirement that class members have all "suffered the same injury" can be satisfied by "an instance of the defendant's injurious conduct, even when the resulting injurious effects -- the damages -- are diverse." *In re Deepwater Horizon*, 739 F.3d 790, 810-11 (5th Cir. 2014).

The principal requirement of commonality is that class members raise "at least one contention that is central to the

_____

[45]    *Id.* at 20.

18

validity of each class member's claims." *Id.* at 810.  This "common contention," "must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 131 S. Ct. at 2551.  Thus, "[w]hat matters to class certification ... is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a classwide proceeding to generate common answers." *Id.*  "These 'common answers' may . . . relate to the injurious effects experienced by the class members, but they may also relate to the defendant's injurious conduct. '[E]ven a single common question will do.'"  *In re Deepwater Horizon*, 739 F.3d at 811 (quoting *Wal-Mart Stores*, 131 S. Ct. at 2556).

While "even a single common question" will satisfy the Rule 23(a)(2) commonality requirement, *Wal-Mart Stores*, 131 S. Ct. at 2556, the Rule 23(b)(3) predominance inquiry "is more demanding," *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 702 (5th Cir. 2012) (quoting *Wilborn v. Wells Fargo Bank, N.A.*, 609 F.3d 748, 755 (5th Cir. 2010)).  Because "[p]laintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement without satisfying Rule 23(a)'s commonality requirement," the Court combines its commonality analysis with its predominance analysis, *infra*.  See *id.* at 705 n.25 (noting the commonality requirement is "subsumed

under, or superseded by, the more stringent Rule 23(b)(3) [predominance] requirement" (quoting *Amchem*, 521 U.S. at 609)).

### *Typicality*

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The test for typicality is not demanding, and it focuses on the general similarity of the legal and remedial theories behind plaintiffs' claims. *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997). Thus, "many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." 7A Wright & Miller, *Federal Practice and Procedure* § 1764 (2014).

Here, the Class Representatives are the same as the Named Plaintiffs in the TCAC: Jean Bove (CA), Kevin Kistler (AZ), Peter Mougey (FL), and Ryan Williams (MO). The TCAC alleges that all of the plaintiffs purchased Pool Products indirectly from Pool during the class period, and that as a result of defendants' alleged anticompetitive conduct, all plaintiffs suffered damages from paying supracompetitive prices and facing reduced product choice.[46] Named Plaintiffs' claims are identical to those of the Settlement Class, which also consists entirely of indirect purchasers of Pool

---

[46]    R. Doc. 290 at ¶¶ 119, 123–127.

Products from Pool during the class period.  In addition, nothing before the Court indicates that the Named Plaintiffs would be subject to any unique defenses that would render them atypical class representatives.  The Court therefore finds that the Class Representatives' claims are typical of the claims of the putative Settlement Class Members.

### Adequacy

Rule 23(a) also requires that the representative parties must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem*, 521 U.S. at 625 (citing *Falcon*, 457 U.S. at 158, n. 13).  Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members."  *Id.* at 625-26 (citations and internal quotation marks omitted).  The adequacy requirement "also factors in competency and conflicts of class counsel."  *Id.* at 626 n.20.

Here, as discussed in the Court's analysis of typicality, the interests of the Class Representatives are aligned with the interests of the class, because Class Members all raise identical claims relating to the same alleged conduct and according to the same theory of damages.  Thus, the Court sees no conflict of

interest between the Class Representatives and the Settlement Class.

In addition, the parties have nominated experienced class action attorneys for Class Counsel. Tom Brill, the proposed Lead Counsel for the class, has already been appointed by the Court as IPPs' Liaison Counsel, as well as Class Counsel for the settlement class in IPPs' settlements with Hayward and Zodiac. He has close to four decades of experience as a trial lawyer, specializing in antitrust and consumer class litigation.[47] Moreover, he has worked diligently to coordinate and prosecute this action on behalf of IPPs since his appointment as Liaison Counsel over two years ago. The Court also finds the other proposed class counsel to be well qualified. Gerald Meunier of Gainsburgh, Benjamin has many years of experience in large class actions and has served on court-appointed plaintiffs' steering committees for a number of large multidistrict litigations.[48] Palmer Lambert, also of Gainsburgh, Benjamin has experience on a plaintiffs' steering committee and in drafting pleadings for large class actions.[49] John Edgar has served as lead counsel in a number of large class action cases including consumer and antitrust class actions.[50] Issac Diel has

---

[47]   R. Doc. 659-4 at 1.

[48]   R. Doc. 659-1 at 22.

[49]   *Id.* at 23.

[50]   R. Doc. 500-9 at 6.

concentrated his practice in antitrust, consumer protection, and deceptive trade practice actions for over twenty-three years, and has been involved extensively in this case in both fact and expert discovery and in defending against defendants' motion to dismiss.[51] Finally, Michael Brady has been lead counsel or co-counsel on a number of large consumer class actions.[52]   The Court therefore finds that the adequacy requirement is met.

### 2.   Rule 23(b) requirement

For class actions seeking money damages, Rule 23(b)(3) imposes two prerequisites, predominance and superiority: "[Q]uestions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members, and ... a class action [must be] superior to the other available methods for the fair and efficient adjudication of the controversy."   Fed. R. Civ. P. 23(b)(3).

#### *Predominance*

The Court combines its analysis of commonality and predominance.   While a single common question will satisfy commonality, to satisfy predominance, "common issues must constitute a significant part of the individual cases." *Mullen,* 186 F.3d at 626.   "This requirement, although reminiscent of the

---

[51]   R. Doc. 500-10 at 2; R. Doc. 659-1 at 24.

[52]   R. Doc. 659-1 at 24.

commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Unger,* 401 F.3d at 320 (quoting *Amchem,* 521 U.S. at 623-24).

To make a "meaningful determination" of whether an allegedly common contention satisfies commonality, a district court must "look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law.'" *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 841 (5th Cir. 2012) (quoting *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 548 (5th Cir. 2003)). Specifically, a district court should analyze how resolution of an allegedly common question of law or fact will decide an issue central to an element or defense of each of the class members' claims at once. *See id.* at 841-42. Similarly, to determine whether the class claims meet the predominance requirement, the court must "identify the substantive issues that will control the outcome, assess[] which issues will predominate, and then determin[e] whether the issues are common to the class." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).

The requirement that "a court know which law will apply before making a predominance determination is especially important when there may be differences in state law." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) (citation omitted). The Fifth Circuit has held that "in a class action governed by the

24

laws of multiple states, . . . 'variations in state law may swamp any common issues and defeat predominance.'" *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (quoting *Castano*, 84 F.3d at 741). Nevertheless, courts tend to be much less concerned with variations in state law when certifying a settlement-only class. The Third Circuit describes the difference between litigation classes and settlement classes as "key," because "when dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004); *see also In re Mexico Money Transfer Litig.*, 267 F.3d 743, 746-47 (7th Cir. 2001) ("Given the settlement, no one need draw fine lines among state-law theories of relief."). With settlement classes, courts are "not as concerned with formulating some prediction as to how [variances in state law] would play out at trial, for the proposal is that there be no trial." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 303 (3d Cir. 2011) (citation omitted). The Court agrees that state law variations are rightly viewed as creating primarily manageability concerns, which under *Amchem*, 521 U.S. at 620, the Court need not consider in the settlement context. *See Davis v. J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 609 (W.D.N.Y. 2011) ("[S]tate-law distinctions

impact trial manageability, which is relevant principally with respect to litigation at trial." (citation omitted)); *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 92 n.33 (D. Mass. 2005) ("In any event, the issue is one of manageability[.]").

IPPs from California, Arizona, Florida, and Missouri bring claims under their respective state laws. In ruling on defendants' last motion to dismiss, the Court recognized that the same alleged conduct could satisfy the requirements of each state's antitrust or consumer protection laws. Specifically, the Court allowed California IPPs to proceed with claims of three vertical conspiracies (one between Pool and each Manufacturer Defendant), to the extent that the claims are predicated on a national market, under two different California laws: California's antitrust law, the Cartwright Act, Cal Bus. & Prof. Code § 16720, *et seq.*, and the California Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*[53] The Court permitted Arizona IPPs to proceed with rule of reason claims of three vertical conspiracies, to the extent the claims are predicated on a national market, and a claim of attempted monopolization against Pool, all under the Arizona Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*[54] Florida IPPs were permitted to maintain claims under the Florida

---

[53]   R. Doc. 250 at 21-22.

[54]   *Id.* at 25-26.

Deceptive and Unfair Trade Practices Act, Fl. Stat. §§ 501.201, *et seq.*, based upon their allegations of three vertical conspiracies and an allegation of attempted monopolization, to the extent that the claims are predicated on a national market.[55]   Finally, the Court permitted Missouri IPPs to maintain claims under Missouri's consumer protection statute, the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020, based on allegations of three vertical conspiracies and an allegation of attempted monopolization, to the extent that the allegations are predicated on a national market.[56]

With respect to the alleged vertical agreements between Pool and the three Manufacturer Defendants, IPPs in all four states allege the same conduct and advance the same theory as to why that conduct violates the state antitrust or consumer protection laws of their respective states.   The Court could list any number of common questions of fact critical to establishing these violations.   For example:

    1.   Whether there was an anticompetitive agreement between Pool and each Manufacturer Defendant?

    2.   What was the scope of the alleged agreements?

    3.   What effect, if any, did the alleged agreements have on the Pool Products Distribution Market?

---

[55]   *Id.* at 29-30.

[56]   *Id.* at 35.

In addition, with the exception of California IPPs, plaintiffs also rely on the same allegedly anticompetitive single-firm conduct by Pool and the same theories as to why that conduct violates their respective state laws.

IPPs in all four states also share common questions of fact surrounding their ability to demonstrate injury from defendants' alleged illegal conduct. To recover, IPPs in all four states must be able to demonstrate injury. *See Somers v. Apple, Inc.*, 258 F.R.D. 354, 358 (N.D. Cal. 2009) (holding that recovery in indirect purchaser case under California law requires that indirect purchasers demonstrate (1) that direct purchasers paid an overcharge and (2) that direct purchasers passed on overcharges to plaintiffs); *Johnson v. Ariz. Hosp. & Healthcare Ass'n*, CV07-1292, 2009 WL 5031334 (D. Ariz. July 14, 2009) (explaining that violation, impact, and damages are essential elements of antitrust claim under Arizona law); *Noveshen v. Bridgewater Assocs., LP*, No. 13-61535-CIV, 2014 WL 4682709, at *8 (S.D. Fla. 2014) (listing deceptive act or unfair practice, causation, and actual damages as essential elements of FDUPTA claims); *Plubell v. Merck & Co.*, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009) ("[A] civil action under the MMPA requires that the litigant 'suffers an ascertainable loss of money or property, real or personal, as a result of [an unlawful practice].'" (citing Mo. Ann. Stat. § 407.025)).

To satisfy 23(b)(3), plaintiffs almost certainly must be able to establish injury using common proof. *See Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 324 (5th Cir. 1978) ("[I]f generalized proof of impact is in fact improper, then the district court must carefully consider whether this requirement of individual proof does not defeat the class certification on either predominance or manageability grounds."). When indirect purchaser plaintiffs cannot demonstrate impact through common proof, the problem of individualized proof can threaten to overwhelm predominance. *See, e.g.*, *Somers*, 258 F.R.D. at 361 (denying certification because indirect purchaser failed to establish a reliable method for proving common impact because purchaser's expert proffered no specific economic model, and his testimony did not show how his method would address the problem of an overcharge pass-through from re-sellers to members of the putative class); *In re Flash Memory Antitrust Litig.*, No. C 07-0086, 2010 WL 2332081, at *10, 19 (N.D. Cal. 2010) (denying certification because proposed indirect purchaser class could not show antitrust impact, specifically pass-through, by common evidence). Because this certification is for settlement purposes only, the Court need not consider whether individualized showings of proof of impact would cause problems for manageability, *see Amchem*, 521 U.S. at 620, but it must still examine whether the need for individualized proof of impact would overwhelm predominance.

29

Here, Class Members have articulated a single theory of injury: defendants' alleged anticompetitive conduct led to uniformly inflated Pool Product prices, and this overcharge was passed through from direct purchasers to indirect purchasers of Pool Products. IPPs rely on DPPs' expert to establish the uniform overcharge to direct purchasers. According to DPPs' expert, a uniform overcharge can be demonstrated for a nationwide class of direct purchasers using common evidence and regression analysis. IPPs' economic expert asserts that under the circumstances presented here, accepted economic theory predicts that the Pool Product overcharge would be fully passed on to indirect purchasers over the long run.[57] He further asserts that the evidence is consistent with the Pool Products overcharge being fully passed on by 2008, the start of the proposed class period.[58] Plaintiffs have put forth a plausible method for proving injury utilizing a method common to the class.

In sum, although California plaintiffs cannot proceed with a claim based on Pool's allegedly anticompetitive single-firm conduct, plaintiffs from all four states share many factual questions relevant to their claims based on the alleged anticompetitive vertical agreements between Pool and the three

---

[57]    R. Doc. 468-1 at 24 & n.10.

[58]    *Id.*

Manufacturer Defendants.   With regard to these three alleged agreements, all plaintiffs rely on the same conduct and advance the same theory as to why that conduct violates their respective state antitrust or consumer protection statutes.   Though there may be differences in the precise formulations of the legal standards applicable in each state, these distinctions go to manageability. In the context of a settlement class, the Court need not consider the possible manageability issues created by these distinctions, for "the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.   In addition, IPPs have also put forward a plausible method for proving injury using classwide proof and methodology.   The common factual questions related to plaintiffs' ability to prove defendants' allegedly illegal conduct and plaintiffs' resulting injuries constitute a significant part of plaintiffs' individual claims.   Classwide resolution of these issues would resolve elements central to the claims of all plaintiffs at once.   The Court concludes that common issues predominate.   It follows that commonality is satisfied as well.

### *Superiority*

 The Court finds that a class action is superior to other methods of adjudicating this case.   As the Supreme Court explains:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry

> potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem*, 521 U.S. at 617 (internal citation omitted). This logic applies here, where the amount at stake for any individual plaintiff would not make litigating a complex antitrust dispute worth the time, money, or effort. Certifying the case as a class action allows the claims of many indirect purchasers to be resolved efficiently at one time.

### 3. Rule 23(g)

Certifying a settlement class also requires appointing class counsel. IPPs nominate Tom Brill as Lead Counsel for the Settlement Class. For the reasons discussed in the Court's analysis of adequacy, *supra*, Mr. Brill is an appropriate choice. The Court also finds the other proposed Class Counsel to be well qualified, again for the reasons discussed in the Court's analysis of adequacy. Accordingly, the Court finds that each of the proposed firms are qualified to act as Settlement Class Counsel under Rule 23(g).


## III. Preliminary Fairness Determination

### A. Legal Standard

Federal Rule of Civil Procedure 23 governs the settlement of class actions. *See Henderson v. Eaton,* 2002 WL 31415728, at *2 (E.D. La. 2002) (citing *Pearson v. Ecological Sci. Corp.*, 522 F.2d

171, 176-77 (5th Cir. 1975)).  A class action may not be dismissed or compromised without the district court's approval.  *See* Fed. R. Civ. P. 23(e); *see also Cope v. Duggins*, 203 F. Supp. 2d 650, 652-53 (E.D. La. 2002) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

The Court must "ensure that the settlement is in the interests of the class, does not fairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978)).  Because the parties' interests are aligned in favor of settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) (noting that the class action context "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements."); *see also* Manual for Complex Litigation (Fourth) § 21.61 (2004).  The Court's duty of vigilance does not, however, authorize it to try the case in the settlement hearings. *Cotton*, 559 F.2d at 1330.

As this motion is for preliminary approval of a class action settlement, the standards are not as stringent as those applied to a motion for final approval.  *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007); Manual, *supra* § 21.63 ("At the stage of

preliminary approval, the questions are simpler, and the court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final approval."). If the proposed settlement discloses no reason to doubt its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval, the court should grant preliminary approval. *See In re Stock Exchs. Options Trading Antitrust Litig.*, No. 99 Civ. 0962(RCC), MDL No. 1283, 2005 WL 1635158, at *5 (S.D.N.Y. 2005); *McNamara v. Bre-X Minerals Ltd.*, 214 F.R.D. 424, 430 (E.D. Tex. 2002).

**B.  Discussion**

The Court finds no reason to doubt the fairness of the process by which the parties arrived at a settlement agreement. IPPs and Pentair arrived at the agreement after four formal sessions of arm's length mediation with the Honorable Layne Phillips.  Settlement discussions lasted nearly two years, and settlement ultimately occurred after three years of litigation and extensive fact discovery.  Thus, counsel for all parties were experienced and familiar with the factual and legal issues in the case.

In addition, the settlement does not appear to give preferential treatment to the Class Representatives or any segment

34

of the class.  The Special Master has recommended a modest incentive award of $500 each for the Class Representatives, to compensate them for the assistance they have provided to Class Counsel in developing the facts of the case by reviewing the complaints, submitting to a multi-hour deposition, preparing for the deposition, and gathering and submitting documents to Class Counsel.  The Special Master's allocation plan also aims to avoid any claimant's receiving a "double recovery," as the Special Master recommends reducing the amount awarded to any Pentair claimant by any amount the claimant has already received from the Hayward/Zodiac fund.  The Court finds this recommendation reasonable as long as the plaintiff's claim is paid in full by the Hayward/Zodiac settlement.

The Court does find problematic, however, the Special Master's recommendation that any unclaimed funds from the Hayward/Zodiac settlement be reallocated to the Pentair settlement fund.  This recommendation is untimely.  In its order granting final approval of the Hayward/Zodiac settlements, the Court already determined that any unclaimed funds will be distributed in the form of a *cy pres* award.  Excluding this recommendation from the Special Master's preliminary proposal, the Court finds the remainder of this suggested allocation plan to be fair and unbiased.

Next, the Court has studied the "Released Claims" provision in the Settlement Agreement and finds it reasonable.   The Agreement provides that it is intended to forever and completely release Pentair from all "Released Claims," which are defined as:

> any and all claims, demands, actions, suits, proceedings, causes of action, damages, liabilities, costs, expenses, penalties, and attorneys' fees, of any nature whatsoever, whether class, individual, or otherwise in nature (regardless of whether any person or entity has objected to the settlement or makes a claim upon or participates in the Settlement Fund), whether directly, representatively, derivatively, or in any other capacity that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected and unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating to the Action, which were asserted or that could have been asserted, including any claims arising under any federal or state antitrust, unjust enrichment, unfair competition, or trade practice statutory or common law, or consumer protection law[.][59]

Released Claims do not include any claims against any Non-Settling Defendant.   Regarding unknown claims, the Settlement Agreement further specifies that these releases constitute a waiver of Section 1542 of the California Civil Code, which provides for a release against unknown claims, and "any other rights or benefits available under any law of any state or territory of the United States or District of Columbia, or by principle of common law, which is similar, comparable, or equivalent to § 1542 of the

---

[59]    R. Doc. 659-2 at ¶ 17.

California Civil Code, including but not limited to Section 20-7-11 of the South Dakota Codified Laws."[60]

The Court finds that this release is not impermissibly broad. Courts have consistently approved releases in class action settlements that discharge unknown claims relating to the factual issues in the complaint. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 311-12 (W.D. Tex. 2007) (finding that release of unknown claims was not impermissibly broad); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) ("[A] court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint." (internal citations omitted)); *Zandford v. Prudential-Bache Sec., Inc.*, 112 F.3d 723, 727 (4th Cir. 1997) (noting that general releases are intended to "settle all matters forever" including "claims of every kind or character, known or unknown"). Because this release applies only to unknown claims arising from the facts related to this action, the Court does not see any obvious deficiency with the release.

The Court turns now to the economic fairness of the settlement and finds that the settlement amount is within the range of approval. The parties agreed to settle the case for

---

[60]     *Id.* at ¶ 18.

$600,000.  The settlement amount is an all-in figure, to be reduced by attorneys' costs and expenses from this litigation and by all costs for providing notice and administering the settlement.  The proposed notice forms indicate that Class Counsel plan to seek an award for attorneys' fees, costs, and expenses not to exceed one-third of the total fund.  The Court reserves judgment on final approval of costs and/or fees until presented with a request by Class Counsel.  For purposes of preliminary approval, however, the Court finds that a sum for the attorneys' fees and costs of one-third of the settlement fund is in keeping with practice in this circuit and is therefore within the limit of what the Court deems reasonable.  *See,* e.g., *Burford v. Cargill, Inc.*, CIV.A. 05-0283, 2012 WL 5472118 (W.D. La. Nov. 8, 2012) (approving 33.33 percent); *Jenkins v. Trustmark Nat. Bank*, No. 3:12-CV-00380, 2014 WL 1229661 (S.D. Miss. Mar. 25, 2014) (approving 33.33 percent and explaining that it is "not unusual for district courts in the Fifth Circuit to award percentages of approximately one third").

Finally, "[t]he settlement terms should be compared with the likely rewards the class would have received following a successful trial of the case." *Cotton*, 559 F.2d at 1330.  In making this comparison, "[p]ractical considerations may be taken into account." *Id.*  "[P]roof difficulties" are "permissible factors" for a court to contemplate when evaluating the fairness

38

of a settlement.  *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 240 (5th Cir. 1982).   In addition, "particularly in class action suits, there is an overriding public interest in favor of settlement," partly because "[i]t is common knowledge that class action suits have a well deserved reputation as being most complex."  *Cotton*, 559 F.2d at 1331.

Applying these principles, the Court considers the merits of the $600,000 settlement fund in light of the universe of potential damages in this case, balanced against the risks present in this particular litigation.   IPPs' expert suggests that estimated damages for Class Members during the class period are $23,951,893.[61] This figure reflects a best-case scenario for plaintiffs' actual damages.   Thus, the Court must balance it against the many risks inherent in this litigation.   First, IPPs' claims are subject to challenging problems of proof.   Regarding liability, no claim is subject to a theory of *per se* illegality, which makes proof of anticompetitive conduct more difficult. Further, the reports from the non-settling defendant's experts indicate that IPPs will face steep proof challenges in proving pass-through to prove injury.  Second, class certification in this case is fervently disputed.   Third, the admissibility of

---

[61]   R. Doc. 500-1 at 27 n.12 (memorandum in support of joint motion for preliminary approval of proposed Hayward and Zodiac settlements); *See* R. Doc. 139.

plaintiffs' expert testimony is hotly contested.  Moreover, the challenges are interconnected.  To give just one example, the exclusion of plaintiffs' economic expert on *Daubert* grounds would bode ill for plaintiffs on class certification and summary judgment.  Thus, in light of the significant risks of non-recovery, the Court finds that the settlement figure is within the range of reasonable.


**IV.  Notice**

   **A.   Content of the Notice**

   Federal Rule of Civil Procedure 23(c)(3) governs the notice requirements for class certification.  Specifically, the notice must state:

   (I) the nature of the action;

   (ii) the definition of the class certified;

   (iii) the class claims, issues, or defenses;

   (iv) that a class member may enter an appearance through an attorney if the member so desires;

   (v) that the court will exclude from the class any member who requests exclusion;

   (vi) the time and manner for requesting exclusion; and

   (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(3)(B).

40

The parties have submitted a Long Form Notice[62] and Short Form Notice[63] for the Court's review. The Court finds that both notices meet the requirements of Rule 23(c)(3). The plain language of the notices apprise all Class Members of the nature of the action, the definition of the class, the class claims and the defenses, the Class Members' right to be heard, the Class Members' right to exclusion, the time and manner for requesting exclusion, and the binding effect of a class judgment. The notices also disclose the amount of settlement, a statement of attorneys' fees sought, and the reasons for settlement. The Long Form Notice provides additional detail such as the name and contact information of counsel and the time and manner for requesting exclusion. Moreover, the notices use clear headings and utilize plain language.

**B.  Method of Notice**

Under Rule 23(e)(1), when approving a class action settlement, the district court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." In addition, for classes certified under Rule 23(b)(3), courts must ensure that class members receive "the best notice that is practicable under the circumstances, including individual notice

---

[62]    R. Doc. 659-7.

[63]    R. Doc. 659-8.

to all members who can be identified by reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Due Process Clause also gives unnamed class members the right to notice of the settlement of a class action. *Fidel v. Farley*, 534 F.3d 508, 513-14 (6th Cir. 2008) (citing *DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 943-44 (10th Cir. 2005)). The notice must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *DeJulius*, 429 F.3d at 944 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Still, "the type of notice to which a member of a class is entitled depends upon the information available to the parties about that person." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1098 (5th Cir. 1977). Thus due process does not require *actual* notice to all class members who may be bound by the litigation. *See Fidel*, 534 F.3d at 514.

Here, the parties propose emailing the putative Class Members' last known email addresses available through Pentair's, Hayward's, and Zodiac's warranty registration and rebate request databases. These databases revealed the names and email addresses of over 250,000 people or entities.[64] Short Form Notice would also be published in "major newspapers serving Arizona, California,

---

[64]   *See* R. Doc. 659-1 at 31; R. Doc. 664 at 1.

Florida, and Missouri."[65]  Both Long and Short Form Notice and the claim form will be available on a case-specific website.  In addition, display advertisements will be posted to Google and Facebook users in Arizona, California, Florida and Missouri.  The Notice Plan also calls for the issuance of a press release through major press outlets, both in print and online, throughout the United States, which would direct potential class members to the case website.

Under this plan, only a fraction of the class will receive individualized notice: those who registered their products for purposes of warranty and/or submitted a rebate request.  The lack of individualized notice to the remainder of the putative Class Members is not fatal to the Notice Plan, so long as there truly is no reasonable way to obtain email addresses for additional members of the class.  *See Montelongo v. Meese*, 803 F.2d 1341, 1351-52 (5th Cir. 1986) ("The rule requires only that notice be mailed individually to all class members whose names and addresses may be ascertained through reasonable effort.").

To make up for the lack of individual notice to the remainder of the class, the Settling Parties propose a print and web-based

---

[65]     R. Doc. 659-6 at 1-2.  <u>Arizona</u>: *The Arizona Republic*, *Arizona Daily Star*; <u>California</u>: *Los Angeles Times*, *The Sacramento Bee*, *San Jose Mercury News*, *The San Diego Union-Tribune*; <u>Florida</u>: *Miami Herald*, *Orlando Sentinel*, *Tampa Bay Times*, <u>Missouri</u>: *St. Louis Post-Dispatch*, *Kansas City Star*, *Springfield News-Leader*.

plan for publicizing notice.  The Court welcomes the inclusion of web-based forms of communication in the plan.  As the Seventh Circuit observed a full decade ago:

> When individual notice is infeasible, notice by publication in a newspaper of national circulation . . . is an acceptable substitute. Something is better than noting. But in this age of electronic communications, newspaper notice alone is not always an adequate alternative to individual notice. The World Wide Web is an increasingly important method of communication, and, of particular pertinence here, an increasingly important substitute for newspapers.

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (internal citations omitted).  The Court finds that the proposed method of notice satisfies the requirements of Rule 23(c)(2)(B) and due process.  The direct emailing of notice to those potential Class Members for whom Pentair, Hayward, and Zodiac have a valid email address, along with publication of notice in print and on the web, is reasonably calculated to apprise Class Members of the settlement.  *See Kelly v. Phiten USA, Inc.*, 277 F.R.D. 564, 569-570 (S.D. Iowa 2011) (finding email notices and newspaper publications to be sufficient notice).  Therefore, the Court approves the proposed notice forms and the plan of notice.


**V.   Claims Administrator, Notice Agent, and Escrow Agent**

Counsel moves to continue to use Angeion Group, the Court-appointed Claims Administrator for the Hayward and Zodiac settlements, as the Claims Administrator and Notice Agent for the

Pentair settlement. Angeion would be responsible for (1) implementing and coordinating the notice plan and (2) managing, accounting for, and disbursing funds from the settlements, including tax reporting and disbursing. Counsel anticipates that $145,000 will be sufficient to cover these costs.[66] After reviewing Angeion's experience, the Court is satisfied that Angeion is qualified to administer the settlement. Indeed, Angeion is currently administering the settlements between IPPs and Hayward and IPPs and Zodiac. Therefore, the Court approves Angeion as the Claims Administrator and Notice Agent.

Counsel also moves to appoint First NBC Bank, the Court-appointed Escrow Agent for the Hayward and Zodiac settlements, as Escrow Agent for the Pentair settlement. First NBC Bank would be responsible for accepting deposit of, safeguarding, and disbursing the settlement funds consistent with the final settlement order and further orders from the Court. First NBC Bank's fees will be capped at $2,500. The Court approves First NBC Bank as Escrow Agent.

---

[66]    R. Doc. 659-1 at 9 n.8.

## VI.  Conclusion

For the foregoing reasons, the Court GRANTS the Joint Motion for Preliminary Approval of Settlement and Certification of Settlement Class.  A detailed procedural order will be issued in conjunction with this opinion.

New Orleans, Louisiana, this <u>31st</u> day of August, 2015.

_Sarah Vance_
_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE