UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET                SECTION: R(2)
ANTITRUST LITIGATION               JUDGE VANCE
                                   MAG. JUDGE
                                   WILKINSON

**THIS DOCUMENT RELATES TO ALL DIRECT-PURCHASER
PLAINTIFF CASES**

**<u>ORDER AND REASONS</u>**

Direct-Purchaser Plaintiffs (DPPs) move the Court to grant final approval of a class action settlement between DPPs and Pentair.[1] In addition, Class Counsel for DPPs move the Court to approve the deduction of common benefit litigation expenses from the Settlement Fund.[2] Having considered the parties' legal memoranda and the evidence submitted at the fairness hearing held on January 8, 2016, the Court finds the settlement of this class action to be fair, reasonable, and adequate, and the Court awards expenses as provided in this order.

---

[1]    R. Doc. 684.

[2]    R. Doc. 685.

## I.    BACKGROUND

### A.    Factual Background

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against Pool and the Manufacturer Defendants. Pool is the country's largest distributor of products used for the construction and maintenance of swimming pools (Pool Products).[3] Manufacturer Defendants are the three largest manufacturers of Pool Products in the United States: Pentair, Hayward Industries, Inc. (Hayward), and Zodiac Pool Systems, Inc. (Zodiac).[4]

Plaintiffs define Pool Products as the equipment, products, parts, and materials used for the construction, renovation, maintenance, repair, and service of residential and commercial swimming pools. Pool Products include pumps, filters, covers, drains, fittings, rails, diving boards, and chemicals, among other goods. Pool buys Pool Products from manufacturers, including the three Manufacturer Defendants, and in turn sells them to DPPs, which

---

[3]    R. Doc. 284 at 13 ¶ 39 (DPPs' Second Consolidated Amended Complaint).

[4]    *Id.* at 10 ¶ 28.

include pool builders, pool retail stores, and pool service and repair companies (collectively referred to as "Dealers").[5]

### B.    Procedural History

On November 21, 2011, the Federal Trade Commission (FTC) announced that it conducted an investigation into unfair methods of competition by Pool and entered into a consent decree with Pool resolving the matter.  Shortly after the FTC's announcement, several plaintiffs filed suit in this and other districts. On April 17, 2012, the Judicial Panel on Multidistrict Litigation consolidated the suits for pretrial purposes in this Court.[6]  Plaintiffs later added their claims against the Manufacturer Defendants.

DPPs filed their first Consolidated Amended Complaint (CAC) on June 29, 2012.[7]  DPPs initially alleged (1) that Pool monopolized and attempted to monopolize the Pool Products distribution market in the United States in violation of Section 2 of the Sherman Act by acquiring rival distributors and by entering into agreements with manufacturers to exclude Pool's rivals; (2) that Pool and the Manufacturer Defendants violated Section 1 of the Sherman Act by engaging in an unlawful conspiracy to exclude Pool's competitors; and

---

[5]    *Id.* at 10-11 ¶ 31.

[6]    R. Doc. 1.

[7]    R. Doc. 107 (DPPs' Consolidated Amended Complaint).

(3) that defendants fraudulently concealed their illegal conduct and thus were liable for damages outside of the statutory limitations period. Plaintiffs claimed that the defendants' allegedly illegal conduct caused plaintiffs to pay more for Pool Products than they would have absent the unlawful activity.

On April 11, 2013, the Court dismissed certain of DPPs' claims from the CAC.[8]  First, the Court dismissed the DPPs' monopolization claim because DPPs did not allege that Pool possessed monopoly power in the relevant market.[9]  Second, the Court dismissed DPPs' claim that defendants engaged in a *per se* illegal boycott because only horizontal conspiracies among competitors can give rise to *per se* liability under Supreme Court precedent, and "the complaint lack[ed] any allegations that manufacturers colluded with each other."[10]  Finally, the Court dismissed DPPs' allegation of fraudulent concealment because plaintiffs failed to assert that defendants concealed the allegedly unlawful agreements, or that defendants engaged in a "self-concealing" antitrust violation.[11]  The Court allowed the claim of attempted

---

[8]      R. Doc. 221.

[9]      *Id.* at 25.

[10]     *Id.* at 52.

[11]     *Id.* at 73-78.

monopolization under Section 2 of the Sherman Act and the CAC's Section 1 claims under the rule of reason to go forward.[12]

DPPs thereafter sought leave to file an amended complaint.[13]  DPPs asserted that "[a]fter filing the CAC, DPPs discovered new information demonstrating communications between Defendants--including communications among the Manufacturer Defendants themselves--that persuasively support a *per se* Section 1 claim and Defendants' fraudulent concealment of their misconduct."[14]  The Court granted DPPs' motion,[15] and DPPs filed their Second Consolidated Amended Complaint (SCAC), which contained more extensive allegations of horizontal agreements among the Manufacturer Defendants and of "secret" agreements among all defendants.[16] DPPs did not reassert the Section 2 monopolization claim.

On December 18, 2013, the Court dismissed certain of DPPs' claims from the SCAC.[17]  First, the Court dismissed the claim of a *per se* illegal conspiracy

---

[12]     *Id.* at 50, 70-71.

[13]     R. Doc. 240.

[14]     R. Doc. 240-1 at 3-4.

[15]     R. Doc. 281.

[16]     R. Doc. 284.

[17]     R. Doc. 346.

among the Manufacturer Defendants to disadvantage buying groups, on the ground that it was not plausible that the Manufacturer Defendants' similar treatment of the buying groups stemmed from anything other than their independent perception of their own best interests.[18]   Second, the Court dismissed the fraudulent concealment claim because the DPPs again failed to assert that defendants concealed their alleged offenses or that defendants engaged in a "self-concealing" antitrust violation.[19]   The Court allowed the claim of a *per se* illegal conspiracy among the Manufacturer Defendants and Pool to fix freight minimums to proceed.

### C.    Settlement Agreement Background

#### 1.    *Settlement Negotiations*

Negotiations leading to this Settlement Agreement took place over the course of two years.  Class Counsel for DPPs and counsel for Pentair mediated these claims before the Honorable Layn Phillips, a former federal district judge and a respected mediator of antitrust disputes.  The parties' settlement negotiations included four full-day, in-person mediation sessions with Judge Phillips on July 22, 2013; March 20, 2014; October 1, 2014; and March 5,

---

[18]      *Id.* at 41.

[19]      *Id.* at 60-63.

2015.[20]  In addition, the parties met with Magistrate Judge Wilkinson on April

1, 2015, and June 22, 2015.[21]  The parties reached an agreement in principle

on June 22, 2015, and executed the Settlement Agreement on July 22, 2015.[22]

In support of their motion for preliminary approval, the parties notified the

Court that they have not entered into any side agreements.[23]

### 2.    *Preliminary Fairness Determination*

The Court preliminarily approved the DPP-Pentair Settlement and

certified its Settlement Class on August 13, 2015.[24]  Consistent with the

Settlement Agreement, the Court appointed seven named Settlement Class

Representatives: Aqua Clear Pools & Decks; A Plus Pools Corp.; Liquid Art

Enterprises d/b/a Carl Boucher; Oasis Pool Service, Inc.; Pro Pool Services;

SPS Services, LLC d/b/a Premier Pools & Spas; and Thatcher Pools, Inc.[25] The

Court approved the firms of Herman, Herman & Katz, LLC; Bernstein

Leibhard LLP; Kaplan Fox & Kilsheimer LLP; and Labaton Sucharow LLP as

---

[20]     *See* R. Doc. 684-2 at 3 (Declaration of Jay L. Himes).

[21]     *Id.*

[22]     *Id.*

[23]     *Id.* at 2 ¶ 8.

[24]     R. Doc. 667.

[25]     R. Doc. 668 at 2 ¶ 3 (procedural order).

Settlement Class Counsel for the purposes of Rule 23.[26]   The Court also approved Garden City as Claims Administrator and Citibank as Escrow Agent for the settlement.[27]   The Court further approved the proposed notice and claim forms, as well as the deadlines for submitting claims forms, opting out, and filing objections.[28]  The Court scheduled a fairness hearing on January 8, 2016, to determine whether the Settlement is fair and to determine an award of attorneys' fees and expenses.[29]

### D.   The Settlement Class

Consistent with the parties' Settlement Agreement, the Court certified the following Settlement Class:

> All persons and entities located in the United States that purchased Pool Products in the United States directly from PoolCorp, during the Class Period from November 22, 2007 to November 21, 2011. Excluded from the Settlement Class are Defendants and their subsidiaries, parents, or affiliates, whether or not named as a Defendant in the Second Consolidated Amended Class Action Complaint, and government entities.[30]

---

[26]   *Id.* at 2-3 ¶ 4.

[27]   *Id.* at 3 ¶¶ 6-7.

[28]   *Id.* at 4-6.

[29]   *Id.* at 3 ¶ 7.

[30]   *Id.* at 1 ¶ 1; R. Doc. 684-2 at 11 ¶ 23 (DPP-Pentair Settlement Agreement).

Class Members will be each member of the Settlement Class who does not timely elect to be excluded from the Settlement Class. The parties stipulate that certification of the Settlement Class is for settlement purposes only, and that they retain all of their respective objections, arguments, and defenses regarding class certification in the event that settlement is not finalized.[31]

### E.     The Settlement Agreement

Pentair has paid $6 million into an Escrow Account controlled by the parties pending the Court's final approval of the Settlement. Interest from the account accrues to the benefit of the Settlement Class. The Settlement Agreement provides that the $6 million settlement amount is "all-in" figure, meaning that it reflects the *total* amount Pentair will pay under the Agreement in exchange for the released claims.[32] Accordingly, the settlement amount has been and will be used to pay: (1) notice and administration costs; (2) attorneys' fees and litigation expenses; (3) class member benefits; and (4) any remaining administration expenses and any other costs of any kind associated with the resolution of the action.[33] Pentair also agreed to assist plaintiffs' counsel with

---

[31]     R. Doc. 684-2 at 11 ¶ 24.

[32]     *Id.* at 18 ¶ 35.

[33]     *Id.* at 19 ¶ 36.

document authentication and to continue to answer plaintiffs' questions about

transactional data previously produced by Pentair during discovery.[34]

The Agreement provides that it is intended to forever and completely

release Pentair from all "Released Claims," which is defined as:

> any and all claims, demands, actions, suits, proceedings, causes of action, damages, liabilities, costs, expenses, penalties and attorneys' fees, of any nature whatsoever, whether class, individual, or otherwise in nature, whether directly, representatively, derivatively or in any other capacity, that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating in any way to the Action, which were asserted or that could have been asserted.[35]

Released Claims do not include claims against any Non-Settling Defendant.

The Agreement further specifies that these releases constitute

> a waiver of Section 1542 of the California Civil Code and Section 20-7-11 of the South Dakota Codified Laws, each of which provides that a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor, and a waiver of any similar, comparable, or equivalent provisions, statute, regulation,

---

[34]    *Id.* at 23 ¶ 45.

[35]    *Id.* at 15 ¶ 30.

10

rule, or principle of law or equity of any other state or applicable jurisdiction.[36]

## F.    Notice

Federal Rule of Civil Procedure 23(c)(2)(B) governs the notice requirements for class certification.  Specifically, the notice must state:

(I) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).  After reviewing the proposed notice here, the Court found in its preliminary approval order that the notice met the requirements of Rule 23.    The Court also found that the proposed

---

[36]    *Id.* at 16 ¶ 32.

dissemination of the notice was the best notice practicable in accordance with

Rule 23(c)(2)(B) and that it met the requirements of Due Process.[37]

The notice plan was designed to provide members of the settlement class

with

(1)     a clear and detailed description of the terms of the Settlement;

(2)     the date of this Court's hearing on final approval of the Settlement;

(3)     the deadlines for opting out of the proposed Settlement Class or notifying the Court of an objection to the Settlement;

(4)     phone and internet contact information for the Settlement administrator, to permit members of the proposed Settlement Class to obtain answers to questions or other information; and

(5)     notice that, in the event the Court finally approves the Settlement, Class Counsel will seek from the Court reimbursement of costs and expenses the amount not to exceed one-third of the Settlement.[38]

The Notice was accompanied by the court-approved claim form.

---

[37]     R. Doc. 667 at 35-37.

[38]     R. Doc. 684-1 at 10 (Memorandum in Support of Motion for Final Approval).

Class Counsel has provided evidence that the notice was disseminated as planned.[39]   Garden City mailed settlement notice packets to 74,855 identified class members.[40]   As of December 22, 2015, Garden City had received 679 notice packets back from the postal service with forwarding address information.   It promptly re-mailed those packets to the updated addresses.[41]   The Postal Service also returned 11,110 packets without forwarding address information.[42]   In total, Garden City sent 63,745 notice packets that were not returned.[43]   Therefore, Garden City calculates that over 85% of the class received mailed notice.[44]

Garden City also arranged for summary notice to be published in the October 9, 2015, issue of *Pool & Spa News*, which subscribers received in September 2015, and the October 2015 issue of *Aqua*, which subscribers also

---

[39]     *Id.* at 11.

[40]     *See* R. Doc. 694-2 at 3 ¶ 3 (Declaration of Lori L. Castaneda).

[41]     *Id.*

[42]     *Id.*

[43]     *Id.* at ¶ 4.

[44]     *Id.*

received in September 2015.[45]   DPPs represent that these periodicals are leading sources for industry information.

Garden City also established and maintains a website for the Settlement. The website has been operational since January 15, 2015.   It provides information about the Settlement, deadlines, and frequently asked questions. It also includes copies of important documents, such as the notice and claim forms, the Settlement Agreement, the preliminary approval orders, and the motion for final approval.[46]   As of December 22, 2015, the website had received 2,071 visits.[47]

In addition, Garden City maintains a toll-free telephone number that is available with an automated answering system 24 hours a day and with customer representatives Monday through Friday from 8 a.m. to 5 p.m. Eastern Standard Time.[48]

Pentair has notified the appropriate State and Federal officials as required by the Class Action Fairness Act.   *See* 28 U.S.C. § 1715.   The Act requires notice to be given no later than 10 days after a proposed settlement

---

[45]     R. Doc. 684-3 at 4 ¶ 13 (Declaration of Jennifer M. Keough).

[46]     R. Doc. 684-1 at 11-12.

[47]     R. Doc. 694-2 at 6 ¶ 9.

[48]     *Id.* at ¶ 10.

of a class action is filed in court.  *Id.* § 1715(b).  And, under section 1715(d), a court may not grant final approval of a settlement until ninety days after the appropriate officials have been served with notice.

Here, Pentair moved for preliminary approval of its settlement with DPPs, and thus filed its proposed settlement in court, on July 30, 2015.[49]  On August 28, 2015, Pentair mailed notice to the necessary State and Federal officials, except for the Attorney General of Montana, who was mailed notice on September 2, 2015.[50]  Thus, Pentair did not comply with the Act's requirement of prompt notice.  Nonetheless, more than ninety days have passed since Pentair served notice on the appropriate officials, and no officials have raised complaints or concerns.  Therefore, the Court finds that the notice given satisfies the Act because the appropriate State and Federal officials have had "sufficient notice and opportunity to be heard" about the Settlement.  *In re Processed Egg Products Antitrust Litig.*, 284 F.R.D. 249, 258 n.12 (E.D. Pa. 2012) (collecting cases).

In sum, after reviewing evidence of the actual dissemination of the notice by the Claims Administrator, and the notice provided to State and

---

[49]    *See* R. Doc. 665.

[50]    R. Doc. 681 at 1-2 ¶ 4.

Federal officials under the Class Action Fairness Act, the Court confirms that the notice complies with the requirements of Rule 23 and Due Process, and with the Act.

### G.    Plan of Allocation and Claims Process

Under the proposed plan of allocation, the $6 million total settlement fund will first be used to pay all attorneys' fees and expenses, up to $2 million, approved by the Court.   In addition, as specified in the Agreement, all settlement notice and administration expenses will also come out of the fund.[51]

The amount that remains of the $6 million total settlement fund after these costs are paid is to be distributed on a pro rata basis to class members who submit valid and timely claims.[52]   Specifically, when a class member makes a claim, Garden City will review the claim for timeliness, completion, and accuracy, and then "approve" an amount for the claim.  Once Garden City reviews all timely and valid claims and resolves any issues with the claims, the total amount of all recognized claims will form the basis for determining each class member's pro rata share of the fund.[53]  The proportion that a settlement

---

[51]    R. Doc. 684-1 at 23.

[52]    *Id.*

[53]    R. Doc. 665-1 at 29 (Memorandum in Support of Motion for Preliminary Approval).

class member's recognized claim bears to the total amount of all recognized claims will determine the proportion of the settlement fund that the class member will receive.[54]

### H.   Opt-outs, Objections, and Claims

The deadline for opting out of the Pentair Settlement, as well as the Hayward and Zodiac settlements that the Court previously approved, was December 11, 2015.  Seven putative class members have requested exclusion from the Pentair Settlement.[55]  As of December 22, 2015, no class member has objected to the Settlement.[56]

The claims filing deadline for all three settlements was also December 11, 2015.  According to Class Counsel's testimony at the January 8 hearing, Garden City has received approximately 3,159 claims in connection with the Hayward, Zodiac, and Pentair settlements.  This number includes 18 late claims, filed after the December 11, 2015 deadline.  The Claims Administrator will nonetheless consider these claims for distribution of the settlement funds.

---

[54]    R. Doc. 684-1 at 23.

[55]    R. Doc. 694-1 at 2 (Declaration of Lori L. Castaneda, Exhibit A). These putative class members are Elite Pool Service; Environmental Home & Garden, Inc.; Kirk Pierce; Martin Pool Service; Oasis Pools & Spas; Pesco Sales, LLC; and Superior Concrete and Designs.  *Id.*

[56]    R. Doc. 694-2 at 5 ¶ 8.

At least 791 claims are "new" claims, meaning that Garden City received these claims after launching its notice program specifically for the Pentair Settlement.[57]   Garden City will evaluate all claims that it has received so far, including those sent in connection with the Hayward and Zodiac settlements, for inclusion in Pentair's settlement program.[58]

According to Class Counsel's representations at the fairness hearing, the claims report approximately $1.2 billion in Pool Products purchases across all three Manufacturer Defendants.  Class members will be allowed to recover up to the alleged 4.97% overcharge on their eligible Pool Products purchases. Thus, if all of the $1.2 billion in purchases reported are eligible Pool Products purchases, then the claims are worth approximately $59 million.  Therefore, claimants will likely recover less than the full amount of their claims, according to the pro rata method set forth above.  The average claim reports approximately $3,300 in purchases and the median claim reports $557 in purchases.  There are several very large claims, including at least two claims reporting approximately $100 million in purchases.  The claims rate so far is around 5%.

---

[57]     *Id.* at 5 ¶ 16.

[58]     *Id.*

## II.    Fairness Determination

### A.    Legal Standard: Fair, Adequate, and Reasonable

A class action may not be dismissed or compromised without the approval of the Court and notification to all class members.  Fed. R. Civ. P. 23(e).  Before the Court approves a settlement, the Court must find that the proposed settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004).

The Court must "ensure that the settlement is in the interests of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression."  *Ayers v. Thompson*, 358 F.3d 356, 368-69 (5th Cir. 2004) (quoting *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)).  Because the parties' interests are aligned in favor of settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings.  *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) (noting that the class action context "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements"); *see also* Manual for Complex Litigation (Fourth) § 21.61 (2004).  The Court's duty of vigilance does not, however, authorize it to try the case in the settlement hearings.  *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

19

The Fifth Circuit has identified six factors that the Court should consider in assessing whether a settlement is fair, adequate, and reasonable: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to plaintiffs prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members. *See Newby*, 394 F.3d at 301; *Ayers*, 358 F.3d at 369; *Reed*, 703 F.2d at 172.

## B.   Discussion

### 1.   *Settlement Obtained by Fraud or Collusion*

There is no evidence that any fraud or collusion infected the process by which the parties arrived at the Settlement Agreement.  Pentair and DPPs reached an agreement only after multiple formal mediation sessions with a mediator, as well as settlement conferences with the Magistrate Judge.

In its preliminary approval order, the Court reviewed the "Released Claims" provision in the Settlement and found the provision reasonable.[59]  The

---

[59]    R. Doc. 667 at 30-31.

Agreement provides that they are intended to forever and completely release

Pentair from all "Released Claims," which are defined as:

> any and all claims, demands, actions, suits, proceedings, causes of action, damages, liabilities, costs, expenses, penalties and attorneys' fees, of any nature whatsoever, whether class, individual, or otherwise in nature, whether directly, representatively, derivatively or in any other capacity, that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating in any way to the Action, which were asserted or that could have been asserted.[60]

Released Claims do not include any claims against any Non-Settling

Defendant.  Regarding unknown claims, the Agreement further specifies that

these releases constitute

> a waiver of Section 1542 of the California Civil Code and Section 20-7-11 of the South Dakota Codified Laws, each of which provides that a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor, and a waiver of any similar, comparable, or equivalent provisions, statute, regulation, rule, or principle of law or equity of any other state or applicable jurisdiction.[61]

---

[60]   R. Doc. 684-2 at 15 ¶ 30.

[61]   *Id.* at ¶ 32.

21

The Court found that these releases are not impermissibly broad.  Courts consistently approve releases in class action settlements that discharge unknown claims relating to the factual issues in the complaint.  *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 311-12 (W.D. Tex. 2007) (finding that release of unknown claims was not impermissibly broad); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) ("[A] court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint[.]").  The Fifth Circuit has explained that courts are required to enforce such broad provisions because they "contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation."  *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1312 (5th Cir. 1983).  Therefore, the Court finds the provisions to be reasonable.

As the Court also noted in its preliminary approval order, the Settlement does not give preferential treatment to the Class Representatives or any segment of the class.  The allocation plan compensates class members up to the amount that they were allegedly overcharged for qualifying Pool Products

purchases.  If class members' claims exceed the net settlement fund, each claimant will be compensated on a pro rata basis.  In addition, DPPs do not seek incentive payments for the Class Representatives.[62]  Thus, the lead plaintiffs will recover on the same basis as all class members.  The Court finds this allocation plan to be fair and unbiased.

That class members received notice of the allocation plan and have not objected to it buttresses the Court's conclusion.  Class members received notice that the attorneys would request up to one-third of the settlement for payment of attorneys' fees and common benefit expenses, and that notice and administration expenses would come out of the settlement as well.  They also had access, via the settlement website, to the motions for preliminary approval, which set forth in greater detail the proposed plan for allocating the net settlement fund between claimants.  No class members have objected to the fairness of the settlement, the allocation plan, or the attorneys' fee request for one-third of the settlement.

Because the Court finds no indication that the Settlement is fraudulent or collusive, or that it unfairly discriminates among class members, this factor favors approval of the Settlement.

---

[62]    R. Doc. 665-1 at 30 (Memorandum in Support of Preliminary Approval Motion).

### 2. *Complexity, Expense, and Likely Duration of the Litigation*

Under this factor, the Court considers whether settling now avoids the risks and burdens of potentially protracted litigation. *Ayers*, 358 F.3d at 369. The Settlement eliminates the need for DPPs to litigate their substantive claims against Pentair, which will save substantial time and expense. Moreover, this partial settlement allows the DPPs to mitigate some of the risk inherent in continuing in litigation against Pool, the only non-settling defendant. It guarantees at least some recovery for class members, however DPPs' claims against Pool are resolved.

The complexity of this litigation also favors settlement. As the ongoing motions practice involving Pool indicates, this case involves complex issues of proof in connection with both DPPs' substantive claims and their motion for class certification. If the Court grants DPPs' motion for class certification, the parties will still likely have to deal with an interlocutory appeal of the Court's class certification order. A trial in this matter would be lengthy and would require numerous attorneys, paralegals, and witnesses. This case also requires expert testimony to establish market definition, causation, and damages. After trial, the parties could still expect years of appeals. Therefore, the complexity and likely duration of this case weigh in favor of finding that partial resolution by settlement is a reasonable option for all parties involved.

24

### 3.    Stage of the Proceedings

This factor asks whether the parties have obtained sufficient information "to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369. The question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling on the terms proposed or continuing to litigate. *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 620-21 (citing *In re Train Derailment Near Amite, La.*, MDL No. 1531, 2006 WL 1561470, at *22 (E.D. La. 2006)). If the settlement proponents have taken affirmative steps to gather data on the claims at issue, and the terms of the settlement are not patently unfair, the Court may rely on counsel's judgment that the information gathered was enough to support a settlement. *In re Corrugated Container*, 643 F.2d at 211.

Here, settlement occurred after three years of litigation and extensive fact discovery. Counsel took over eighty fact witness depositions, numerous expert depositions, and reviewed over four million documents. In addition, DPPs defended against two rounds of motions to dismiss, and the parties briefed several *Daubert* motions and motions for summary judgment. Because of the advanced stage of the litigation, counsel for all parties were

familiar with the factual and legal issues in the case.  Therefore, the Court is satisfied that the parties were sufficiently informed to assess the strengths and weaknesses of their positions and to make a reasoned evaluation of whether and on what terms to settle.  This factor favors settlement.

### 4.     The Obstacles to Prevailing on the Merits

As the Court summarized in its preliminary fairness order, DPPs face at least three obstacles to prevailing on the merits of their claim.

First, DPPs' claims are subject to complex problems of proof.   In particular, DPPs' attempted monopolization and Section 1 rule of reason claims require market analysis and consideration of potential justifications. Market definition--both the geographic and product dimensions--is disputed. The Court is currently considering summary judgment motions by Pool on each of DPPs' substantive claims.

Second, class certification is also disputed.  Pool opposes DPPs' pending motion for certification of a litigation class.  Pool challenges, among other things, DPPs' ability to demonstrate commonality and predominance under Rule 23.

Third, DPPs face challenges in connection with the testimony of their expert, upon whom they rely to establish elements of their claims, including the relevant market, impact, and damages.  Moreover, all of the challenges just

26

summarized by the Court are interconnected.  In particular, the exclusion of DPPs' economic expert on certain key issues on *Daubert* grounds would bode ill for plaintiffs on class certification and summary judgment.

In sum, considering the risks DPPs face in surviving summary judgment, attaining class certification, and prevailing at trial and on appeal, the probability of success factor favors approval of the Settlement.

### 5.   *Range of Possible Recovery*

The Court "must establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair." *In re Corrugated Container*, 643 F.2d at 213. In particular, "[p]roof difficulties" are "permissible factors" for a court to consider when evaluating the fairness of a settlement. *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 240 (5th Cir. 1982).

The Court considers whether the $6 million total settlement fund is pegged at a fair point in the range of potential recovery, taking into account the risks present in this litigation.  DPPs' expert suggests that estimated damages for class members during the class period are approximately $266.8

million.[63]   He reaches this figure by multiplying PoolCorp's sales figures during the class period by his calculated overcharge of 4.97%.[64]   Although at first glance it appears that the settlement figure is small in comparison to the universe of potential damages, DPPs' projected damages reflect a *best* case scenario for plaintiffs' actual damages.  This damages estimate does not reflect the risks of nonrecovery or diminished recovery faced by plaintiffs in this litigation, as discussed above.  Indeed, the lower boundary of DPPs' range of possible recovery is zero.  The $6 million figure provides prompt and certain recovery of at least some of DPPs' alleged losses.

In addition, defendants in this case are subject to joint and several liability.  Therefore, in the event that the case proceeds to trial and DPPs secure a damages award, that award would be trebled before the settlements are deducted.  *See Sciambra v. Graham News Co.*, 841 F.2d 651, 657 (5th Cir. 1988) ("[T]he court should treble the amount of damage award . . . before deducting the amount of the . . . settlement.").  Thus, the Settlement does not affect class members' ability to recover the full damages to which they may be entitled.

---

[63]     *Id.* at 25.

[64]     *Id.*

28

The class also receives a non-monetary benefit as part of the settlement. Pentair has agreed to cooperate with DPPs to answer questions about their transactional data and to assist with authenticating records.  This cooperation will assist DPPs as they proceed against Pool.

After evaluating the range of possible recovery in light of the risks of non-recovery, the Court concludes that the $6 million total settlement fund is pegged at a fair point in the range.  Thus, this factor weighs in favor of settlement.

### 6.  Opinions of Class Counsel, Class Representatives, and Absent Class Members

The opinions of the affected parties are generally favorable towards the settlement.  The Court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement.  *Cotton*, 559 F.2d at 1330.  Here, Settlement Class Counsel have expressed their approval of the Settlement after over three years of litigation and extensive fact discovery, as discussed above.

Further, the Court has received no objections, and the Claims Administrator has received only seven requests to opt out.  Although the Court is careful not too infer too much from a paucity of objectors and opt-outs, the lack of objectors and low number of opt-outs suggest class-wide support for

the proposed settlement.  *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) (a small number of opt-outs and objections can be viewed as indicative of the fairness of the settlement); *In re Excess Value Ins. Coverage Litig.*, No. M-21-84RMB, MDL-1339, 2004 WL 1724980, at *11 (S.D.N.Y. 2004) (small number of objectors suggests support for settlement).

In addition, pursuant to the Class Action Fairness Act, Pentair sent notice of the settlement to the Attorneys General of all 50 states and the United States Attorney General.  They received no negative reaction to the settlement in response.  Additionally, since disseminating notice of the Pentair settlement, Garden City has received at least 791 "new" claim forms, for an approximate total of 3,159 claims.

In sum, because all of the factors weigh in favor of settlement, the Court finds the Settlement to be fair, reasonable and adequate under Rule 23(e) of the Federal Rules of Civil Procedure.

## III.   Request for Reimbursement of Expenses

### A.   Class Counsel's Request

In the notice sent to the class, Class Counsel indicated that they would seek up to one-third of the settlement fund for attorneys' fees and/or for

reimbursement of expenses.  Consistent with that notice, Class Counsel now request one-third of the settlement fund, or $2 million, for reimbursement of expenses only.

The expenses for which Class Counsel seek reimbursement can be divided into four categories.  First, there are "held" expenses that each firm pays as it incurs them.  Held expenses are typically overhead expenses such as travel and copying costs.  The court-appointed accountant, Philip Garrett, attests that he has determined all of these held expenses to be eligible for reimbursement.[65]  As of August 31, 2015, held expenses total $649,022.51.[66] Second, there are "shared" costs that have been paid out of the common litigation fund established by DPPs' co-liaison counsel in accordance with the terms of Pretrial Order No. 9.  Mr. Garrett has reviewed and approved all of the costs that have already been paid.  These costs total $3,019,801.91.[67] Third, there are shared costs that Class Counsel have incurred, but that Mr. Garrett has not yet processed and Class Counsel has not yet paid as of October

---

[65]     R. Doc. 685-2 at 2 ¶ 6 (Affidavit of Philip A. Garrett, CPA).

[66]     R. Doc. 685-1 at 6 (Memorandum in Support of Motion for Reimbursement of Expenses).

[67]     *Id.*  This amount consists of $1,220,022.66, which comprises expert fees, and $1,799,779.25 in other shared costs.  *See* R. Doc. 685-2 at 2 ¶ 7.

30, 2015. The unpaid shared costs total $142,858.29.[68] Finally, Class Counsel incurred $871,722.07 in costs that the Court assessed against them in Pretrial Order No. 39.[69] All together, the expenses paid and/or incurred by counsel on behalf of the class total $4,683,454.78.[70]

The Court has already awarded Class Counsel $3,316,667 in litigation expenses in connection with DPPs' settlements with Hayward and Zodiac.[71] While the total amount of litigation expenses already awarded ($3,316,667), plus the amount now requested ($2,000,000) exceeds the amount of expenses that counsel has incurred so far ($4,683,454.78), Class Counsel represent that they will use the excess sum ($633,212.22) to fund future litigation expenses.[72] Counsel anticipates that future litigation expenses will greatly exceed this excess sum, but in the event that they do not, counsel reserves the right to request that the Court award the remaining sum as attorneys' fees.[73] To date, the Court has not granted Class Counsel an attorneys' fees award.

---

[68]   R. Doc. 685-1 at 6.

[69]   *Id.*

[70]   *Id.*

[71]   R. Doc. 625.

[72]   R. Doc. 685-1 at 6-7.

[73]   *Id.* at 7.

In its preliminary fairness determination, the Court concluded that a total attorney award, including both fees and expenses, not exceeding one-third of the fund was in line with other awards approved in this circuit and within the limit of what the Court deems reasonable.  The Court now makes a more detailed inquiry into Class Counsel's request.

## B.    Legal Standard

The Court's power to review the expenses that Class Counsel seek from the settlement fund comes from the Court's responsibility to ensure that the settlement is fair, adequate, and reasonable for the class.  The Fifth Circuit has held that a district court abuses its discretion when it approves a settlement from which expenses may be sought without having any estimate as to what those expenses may be.  *See In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010).  The Court must ensure that expenses will not "cannibalize the entire . . . settlement," and that money will remain for the class after administrative and litigation expenses have been deducted from the fund.  *Id.* at 196.

In addition, some district courts have applied the twelve factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), to combined fee and expense requests.  *See, e.g.*, *In re Prudential Bache Energy Income P'ships Sec. Litig.*, No. 888, 1994 WL 202394 (E.D. La. May 18, 1994).

33

But expenses must be distinguished from fees. Typically, class action counsel who create a common fund for the benefit of the class (as counsel have done here), are entitled to reimbursement of reasonable litigation expenses from that fund. *See In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1089 (S.D. Tex. 2012); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, No. CIV. 6:121609, 2015 WL 965696, at *11 (W.D. La. Mar. 3, 2015). And, in the non-class context, the Fifth Circuit has disapproved courts' applying the *Johnson* factors to reduce expenses across-the-board. It explained:

> Fees may be increased above the lodestar; the cost of suit may not be. . . . [T]here appears to be no correlation between the Johnson factors and out-of-pocket expenses. While expenses incurred extravagantly or unnecessarily should be disallowed, this should be done on an item-by-item basis.

*Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1101 (5th Cir. 1982), *overruled in part on other grounds, Int'l Woodworkers of Am., AFL CIO & its Local No. 5376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986), *and, J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193 (5th Cir. 1986). This makes sense: unlike fees, expense reimbursements are not a reward. They must be awarded simply to return class counsel to the position they were in before the litigation began.

Here, the Court must confirm that the expenses claimed will not "cannibalize the entire . . . settlement," and that money will remain for the class after administrative and litigation expenses have been deducted from the fund. *In re Katrina*, 628 F.3d at 196. In short, the Court will assess the net amount remaining for the class after all expenses have been deducted and whether the claimed expenses are indeed reasonable. *See In re Heartland*, 851 F. Supp. 2d at 1089.

### C. Discussion

The Court determines that a sum of one-third of the settlement fund for reimbursement of expenses is fair to the class. Here, notice of the settlement informed the class that Class Counsel intended to seek up to one-third of the settlement fund for attorneys' fees and/or for reimbursement of expenses. No class members objected. This was not for want of class members with large potential claims (and thus ample reason to care about how counsel proposed divvying up the fund): the Claims Administrator has already received claims for millions of dollars. Thus, the lack of objectors provides some indication that the class considers a one-third stake for the attorneys to be fair. Further, the amount available for distribution to the class after deduction of Class Counsel's common benefit expenses is approximately $4 million, less the

Claims Administrator's notice and administration expenses.[74] This is the same amount that would have resulted if Class Counsel had requested an award consisting of both expenses and attorneys' fees of one-third of the settlement fund, which, as the Court has already noted, is consistent with awards that other courts in this Circuit have found to be reasonable.

In addition, the expenses incurred have been reasonable. All of the expenses that Class Counsel seek from the fund fall within the categories pre-approved by Pretrial Order No. 9, and all of them have been reviewed and approved by Mr. Garrett (or will be, before they are paid).

The expenses have also been necessary. Class counsel undertook this case on a contingency basis and thus far have received no payment. And this case has been expensive to litigate. DPPs reached a settlement with Pentair only after fact and expert discovery, and the review of over four million documents, was complete. This sort of work requires not only attorney hours but also money—for discovery vendors, travel, copying, and so on.

The set-aside for future litigation expenses and/or attorneys' fees is also reasonable. Courts routinely approve setting aside a portion of a partial settlement for counsel's future litigation expenses to be incurred as they prosecute non-settling defendants. *See, e.g.*, *Newby v. Enron Corp.*, 394 F.3d

---

[74]     Class Counsel estimate that notice and administration expenses will not exceed $133,250. *See* R. Doc. 665-1 at 33.

296 (5th Cir. 2004) (affirming district court's approval of partial settlement, which included setting aside $15 million for future litigation expenses); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634, 2015 WL 3396829, at *3 (N.D. Cal. May. 26, 2015) (approving counsel's request for a $3 million future litigation fund); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-1952, 2011 WL 717519, at *13 (E.D. Mich. Feb. 22, 2011) (collecting cases).  As noted, this case has been expensive to litigate, and will likely continue to be as the parties move on to class certification and other matters. Further, Class Counsel has yet to seek an award of attorneys' fees from any of the settlements with the Manufacturer Defendants.

In sum, the expenses incurred by Class Counsel so far have been both necessary and reasonable.  It is fair to permit Class Counsel to recover these expenses from the settlement fund.  At the same time, a fair portion of the settlement must be reserved for the benefit of the class.  The Court concludes that the one-third sum sought by Class Counsel strikes a fair balance between these competing interests.  Thus, the Court approves Class Counsel's request for $2,000,000 from the fund for reimbursement of litigation expenses.

## IV.   Conclusion

For the foregoing reasons, the Court GRANTS DPPs' Motion for Final Approval of the Settlement Between Direct-Purchaser Plaintiffs and Pentair Water Pool and Spa, Inc.

The Court also orders that Class Counsel receive $2,000,000 from the settlement fund for reimbursement of litigation expenses.

New Orleans, Louisiana, this <u>20th</u> day of January, 2016.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE