UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET
ANTITRUST LITIGATION                      SECTION: R(2)

JUDGE VANCE
MAG. JUDGE
WILKINSON


**THIS DOCUMENT RELATES TO ALL DIRECT-PURCHASER**

**PLAINTIFF CASES**

<u>**ORDER AND REASONS**</u>

Defendants Pool Corporation, SCP Distributors LLC, and Superior Pool Products (collectively, "Pool") move for summary judgment on direct-purchaser plaintiffs' (DPPs') *per se* horizontal conspiracy claim.[1]  Having considered the record evidence as a whole, the Court finds that DPPs have not presented sufficient evidence to raise an issue of material fact as to the existence of an unlawful horizontal conspiracy.  Accordingly, the Court grants the motion for summary judgment.

---

[1]     R. Doc. 516.

## I.   BACKGROUND

DPPs' lone *per se* claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, alleges that in the fall of 2007, the Manufacturer Defendants, Pentair Water Pool and Spa, Inc. (Pentair); Hayward Industries, Inc. (Hayward); and Zodiac Pool Systems, Inc. (Zodiac; formerly "Jandy"),[2] unlawfully conspired with each other and with Pool to increase the minimum purchase amount necessary for customers to qualify for free freight on their Pool Products purchases ("free freight minimums") from $10,000 to $20,000.   Plaintiffs claim that Pool orchestrated the conspiracy to disadvantage buying groups.   These buying groups consist of Pool Products "Dealers" who aimed to buy directly from the manufacturers rather than from Pool Products distributors, such as Pool. Plaintiffs contend that Pool, the Manufacturer Defendants' largest customer, demanded that the manufacturers increase their free freight minimums. Plaintiffs also contend that the Manufacturer Defendants acted against their

---

[2]   Zodiac, as it exists today, did not come about until October 2008.  Before then, a company called Polaris Pool Systems, Inc. sold pool products in the United States.  Simultaneously, The Carlyle Group owned and operated Jandy Pool Products, Inc.  In 2006, Polaris Pool Systems changed its name to Zodiac Pool Care, Inc.  On September 28, 2007, the Carlyle Group and Zodiac announced that Jandy and Zodiac would be merging to form "Zodiac Marine & Pool."  DPPs challenge Jandy's 2007 free freight minimum increase only.  Therefore, any reference to conduct by "Jandy" throughout this Order is attributable to the modern, post-merger Zodiac.

independent business interests by agreeing among themselves and with Pool to the identical price increase.

Defendants deny that any agreement exists among the manufacturers or with Pool.  Regarding the Manufacturer Defendants' free freight minimum increases, defendants contend that the manufacturers acted in their independent best interests because their preferred means to market was through distribution and Dealer buying groups, which were a small part of the manufacturers' sales base, grew to include smaller Dealers, which increased the manufacturers' production and distribution expenses during a time of rising fuel costs.

### A.   Summary Judgment Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party,

but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must

identify specific facts that establish a genuine issue for trial.  *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

### B.    Proving a Horizontal Conspiracy Under Section 1 of the Sherman Act

Section 1 of the Sherman Act forbids every contract, combination, or conspiracy that unreasonably restrains trade.   *See* 15 U.S.C. § 1; *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 98 (1984).  To prevail on their horizontal conspiracy claim, DPPs must prove the existence of an anticompetitive agreement or conspiracy among actual competitors.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223-24 (1940).   A showing of concerted action is vital to any Section 1 conspiracy claim.  *Tunica Web Adver. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 409 (5th Cir. 2007) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)).  DPPs must also prove that they suffered an "antitrust injury" from Pool's alleged violation.  *Id.*; *see also Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th

Cir. 1978). "Antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

### 1.     *Horizontal Price-Fixing Agreements Are Per Se Illegal*

Courts consider certain agreements to be "inherently anticompetitive." *See Tunica Web*, 496 F.3d at 412. When the defendants' agreement "facially appears to be one that would always or almost always tend to restrict competition and decrease output," or constitutes a "naked restrain[t] of trade with no purpose except stifling [] competition," it is deemed *per se* unreasonable—and thus *per se* illegal—under Section 1, and condemned without further analysis. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979); *see also Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

Horizontal price-fixing agreements among competitors are traditionally *per se* illegal, while vertical price-fixing agreements among firms at different levels in the distribution chain are not. *See, e.g.*, *Leegin*, 551 U.S. at 886; *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014). Agreements affecting components of a product's purchase price, such as agreements to terminate discounts or the practice of extending credit to

6

purchasers, are equivalent to price fixing because they distort the ultimate price a consumer pays for a good or service. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980).

Here, the Manufacturer Defendants' freight charges are a component of the purchase price for Pool Product purchases. *See id.* at 648-49. DPPs allege that the Manufacturer Defendants, who are horizontal competitors, conspired among themselves and with Pool, to raise the free freight minimums for Pool Products purchases. To prevail on their claim of *per se* liability, plaintiffs must show that the Manufacturer Defendants conspired with each other, and that Pool knowingly joined their horizontal conspiracy. If plaintiffs cannot show the existence of the horizontal element, *i.e.*, collusion among the Manufacturer Defendants, their *per se* claim must fail.

2. *Proving an Unlawful Agreement with Direct Evidence or with Circumstantial Evidence and "Plus" Factors*

To prove a Section 1 conspiracy, an antitrust plaintiff may present direct or circumstantial evidence of an unlawful agreement. *Golden Bridge Tech., Inc. v. Motorola Inc.*, 547 F.3d 266, 271 (5th Cir. 2008). "Direct evidence explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences . . . to support a conspiracy claim." *Id.* (citing *Tunica Web*, 496 F.3d at 409). In other words,

direct evidence cannot be ambiguous; rather, "[d]irect evidence is tantamount to an acknowledgment of guilt . . . ." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014).   With direct evidence, "the fact finder is not required to make inferences to establish facts."   *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) (quoting *Rossi v. Standard Roofing*, 156 F.3d 452, 466 (3d Cir. 1998)).   Evidence of a conspiracy that depends on additional inferences is "at most, circumstantial[.]"   *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted.")

An antitrust plaintiff who is unable to present direct evidence may nonetheless rely on circumstantial evidence of a conspiracy.  *See Viazis*, 314 F.3d at 763.   To survive summary judgment, however, the plaintiff must present strong circumstantial evidence of a conspiracy because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  Circumstantial evidence "must tend to rule out the possibility that the defendants were acting independently[.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (citing *Matsushita*, 475 U.S. at 588); *see also Golden Bridge*

8

*Tech.*, 547 F.3d at 270-71 ("To survive a motion for summary judgment [the plaintiff] must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.").

Independent parallel conduct, "or even conduct among competitors that is consciously parallel," on its own, cannot establish the requisite contract, combination, or conspiracy. *Golden Bridge Tech.*, 547 F.3d at 271 (citing *Bell Atl.*, 550 U.S. at 553-54)). Neither will conduct that is "consistent with other, equally plausible explanations . . . give rise to an inference of conspiracy." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 315 (5th Cir. 2000) (quoting *Matsushita*, 475 U.S. at 587)); *see also Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485, 494 (5th Cir. 1984) ("[T]he inference of a conspiracy is always unreasonable when it is based solely on parallel behavior that can be explained as the result of the [defendants'] independent business judgment . . . ."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010) ("[A]llegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged."). Accordingly, a plaintiff relying only on circumstantial evidence must establish both "conscious parallelism" and certain "plus factors." *See Royal Drug Co., Inc. v. Grp. Life & Health Ins. Co.*, 737 F.2d 1433, 1437 (5th Cir. 1984) (citation omitted). "Existence of these plus factors

9

tends to ensure that courts punish 'concerted action'—an actual agreement—instead of the 'unilateral, independent conduct of competitors.'" *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (citation omitted).

"Plus factors" include "(1) evidence that the defendant had a motive to enter into a price-fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Burtch*, 662 F.3d at 227 (quoting *In re Ins. Brokerage*, 618 F.3d at 321-22). Most courts require evidence demonstrating the defendants' conduct "was contrary to their economic self-interest so as not to amount to a good faith business judgment." *Royal Drug Co.*, 737 F.2d at 1437 (quoting *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 559 (5th Cir. 1980)); *see also Intervest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 165 (3d Cir. 2003) (requiring plaintiff relying on circumstantial evidence to show that defendants acted contrary to their economic interests). Some courts also consider whether the defendants exchanged or "had the opportunity to exchange information relative to the alleged conspiracy." *Hyland*, 771 F.3d at 320. Generally though, "evidence that a market is ripe for collusion, that defendants acted against their interests, or that defendants were motivated to collude is too ambiguous to support an inference of agreement" because these circumstances

10

are just as likely to result from independent conduct. *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 789 (M.D. Pa. 2014) (citing *In re Baby Food*, 166 F.3d at 122), *aff'd*, 801 F.3d 383 (3d Cir. 2015); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193-94 (9th Cir. 2015).

The court "should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." *Matsushita*, 475 U.S. at 593 (citing *Monsanto*, 465 U.S. at 762-64). Indeed, mistaken inferences of unlawful action "chill the very conduct the antitrust laws are designed to protect." *Id.* (citing *Monsanto*, 465 U.S. at 763-64). In sum, an antitrust plaintiff will survive summary judgment only if "the inference of conspiracy is reasonable in light of competing inferences of independent action or collusive action that could not have harmed the plaintiff." *Tunica Web*, 496 F.3d at 409 (quoting *Matsushita*, 475 U.S. at 588)).

## II. DISCUSSION

### A. The Pool Products Industry

As defined by DPPs, Pool Products are the equipment, products, parts, and materials used for the construction, renovation, maintenance, repair, and

service of residential and commercial swimming pools.  Pool Products include pumps, filters, covers, drains, fittings, rails, diving boards, and chemicals, among other goods.  The Pool Products industry is made up of multiple layers of market participants, including manufacturers, distributors, dealers, and ultimately, the end-consumers.  Manufacturers sell Pool Products primarily to distributors, but they also sell to Dealer buying groups and big box retailers. Distributors also sell Pool Products to Dealers, who in turn sell those products to the end-consumers.

The Manufacturer Defendants are Pentair, Hayward, and Zodiac.  Pool, the only distributor defendant, buys Pool Products from manufacturers, including the three Manufacturer Defendants, and in turn sells them to DPPs, which include pool builders, pool retail stores, and pool service and repair companies (collectively referred to as "Dealers").

Pool is the largest Pool Products distributor, with a market share of no more than thirty-eight percent, which remained stable from 2004 - 2011.[3]  The record does not reveal the Manufacturer Defendants' market shares, but Pool's preferred vendor program, which consisted of manufacturers who sold at least $2 million worth of merchandise to Pool, included seventy-six other vendors

---

[3]     Rausser Initial Report, April 10, 2014, at 38-39.

12

during the relevant period.[4]  It appears undisputed that Pentair, Hayward, and Zodiac are the largest manufacturers in Pool's preferred vendor program and that each Manufacturer Defendant offers a broad line of Pool Products. During the relevant time period, Pool was the Manufacturer Defendants' largest distributor customer.  Together, the Manufacturer Defendants' sales to Pool totaled approximately forty-six percent of Pool's total purchases.[5]

Dealer "buying groups" are organizations made up of a number of Pool Products Dealers who aim to buy directly from the manufacturers instead of from Pool Products distributors, such as Pool.  Using their collective volume of purchases as leverage to negotiate directly with the manufacturers, Dealers submit their individual orders to the buying group organization, which then purchases, on behalf of its Dealer members, larger orders of Pool Products from the manufacturers.[6]  The two principal buying groups in the Pool Products industry are Aquatech, led at all relevant times by Jeff Fausett, and Carecraft, led at all relevant times by Greg Howard.

During the alleged conspiracy period, buying groups expanded their membership to include smaller Pool Products Dealers.  During the same

---

[4]     *Id.* at 37.

[5]     *Id.* at 38.

[6]     Deposition of Jeffrey Fausett, January 24, 2014, at 23:21-25:18.

13

period, fuel costs increased, peaking in November 2007.[7] According to plaintiffs' expert, no buying group accounted for more than one percent of the Manufacturer Defendants' sales, except for Aquatech and Carecraft. Plaintiffs' expert estimates that Pentair's sales to these two buying groups totaled five percent of its overall business; Zodiac's sales, eight percent; and Hayward's sales, three percent.[8]

## B.   Summary Judgment Evidence

### 1.   Plaintiffs' Purported Direct Evidence

There is no direct evidence that the Manufacturer Defendants agreed among themselves to the increase in free freight minimums.  Nonetheless, plaintiffs contend that there is direct evidence of collusion.

First, plaintiffs rely on a November 30, 2007 e-mail in which Pool's CEO Manny Perez de la Mesa wrote: "Pentair, Hayward, and Jandy have all agreed to the $20K freight minimum with NO exceptions. I need to know if anyone does not comply."[9]   This e-mail is not direct evidence of a horizontal

---

[7]     Elzinga DPP Report, April 10, 2014, at 53.

[8]     Rausser Initial Report, April 10, 2014, at 40-42.

[9]     POOLMDL-013-0023586 (November 30, 2007 e-mail from Perez de la Mesa to Postoll and Cook).

agreement among the Manufacturer Defendants to increase their free freight minimums because the e-mail is ambiguous. *See Hyland*, 771 F.3d at 318 ("Direct evidence is tantamount to an acknowledgment of guilt . . . ."); *Golden Bridge Tech.*, 547 F.3d at 271 (explaining that direct evidence must be "explicit"). This one-time use of the word "agree" cannot be unambiguously read to mean that the Manufacturer Defendants agreed with each other, as well as with Pool, to fix prices. *See In re Baby Food*, 166 F.3d at 127 (holding that an "isolated, single use" of the word "truce" was not direct evidence of an unlawful conspiracy).

The Manufacturer Defendants' $20,000 free freight minimums applied equally to distributors, like Pool, and to other customers, like buying groups or independent Dealers. Considering this, the e-mail could be read to mean that each Manufacturer Defendant agreed separately with Pool that its new free freight minimum was $20,000 and that the manufacturers would not make exceptions for other customers. Thus, DPPs' argument that no additional evidence is required to show collusion among the Manufacturer Defendants is without merit. Although Perez de la Mesa testified as to what he meant by this e-mail, the Court's holding does not rest on a credibility determination as to Perez de la Mesa's testimony. The evidence, on its face, is ambiguous. Evidence that is equally consistent with each Manufacturer

Defendant's agreeing separately with Pool is not direct evidence of a horizontal conspiracy among the manufacturers. Ambiguous statements cannot serve as direct evidence of a conspiracy. *See Hyland*, 771 F.3d at 318; *Golden Bridge Tech.*, 547 F.3d at 271. "[C]ases require that direct evidence of an illegal agreement be established with much greater clarity." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 149 (3d Cir. 2003).

Plaintiffs also rely on a September 2007 conversation between Bruce Fisher, Hayward's Vice President of Sales and Marketing, and Bob Rasp, Jandy's President and CEO, as direct evidence of a conspiracy. The record does not support that assertion. On September 17-18, 2007, Fisher, for Hayward, and Rasp, for Jandy, separately attended the annual conference of the Independent Distributors Network (IDN).[10] By this time, both Pentair and Hayward had already announced their free freight minimum increases.[11] Pentair alerted customers, including Aquatech's Jeff Fausett, as early as August 30, 2007, that a $20,000 free freight minimum was effective

---

[10]     *See* R. Doc. 516-1 at 27.

[11]     AQ0001370 (August 30, 2007 e-mail from Murray to Fausett announcing that free freight minimum increase would accompany Pentair's 2008 Early Buy program); HAY-MDL-0802568 (September 10, 2007 letter from Massa to Customers announcing a free freight minimum increase effective January 2, 2008).

16

immediately as part of Pentair's 2008 Early Buy program.[12]   Hayward

publicized its decision to combine its multiple product lines, accompanied by

a new $20,000 free freight minimum—effective January 2, 2008—on

September 10, 2007.[13]

     After the IDN conference, Fisher summarized his encounter with Rasp

in an e-mail to other Hayward employees.  Fisher wrote: "Chatted with Bob

Rasp and he advised that business is still very weak for them and he cannot

afford to cut any more people. Interestingly enough, he openly admitted to

being over staffed to begin with."[14]  DPPs argue that this "meeting" serves as

---

[12]     AQ0001370 (August 30, 2007 e-mail from Murray to Fausett announcing that free freight minimum increase would accompany Pentair's 2008 Early Buy program).

[13]     HAY-MDL-0802568 (September 10, 2007 letter from Massa to Customers announcing a free freight minimum increase effective January 2, 2008).  Before 2007, Hayward maintained three separate free freight programs because Hayward maintained three separate product lines: "Hayward" brand products, "Goldline" brand products, and "AquaVac" brand products.  To receive free freight, a customer had to purchase a minimum of $10,000 in Hayward brand products, a minimum of $10,000 in Goldline brand products, or a minimum of $10,000 in AquaVac brand products.  A customer could not receive free freight on an order that totaled $10,000 in purchases from more than one product line.  *See* HAY-0002638 (January 7, 2011 First Amended Responses to the Civil Investigative Demand issued by the Federal Trade Commission); HAY-MDL-0425818-21 (September 13, 2007 e-mail from Fausett to Massa with Hayward program flyer attached).

[14]     HAY-MDL-0209906 (September 20, 2007 e-mail from Fisher to Massa and Buffa).

direct evidence of a horizontal agreement among defendants because this conversation gave Fisher and Rasp an opportunity "to confirm the free-freight conspiracy."[15] Further, DPPs charge Rasp with admitting, "I might have said something to him."[16]

Not only does Fisher's e-mail fail to "explicitly refer[] to an understanding" between Hayward and Jandy, but it also fails to implicate in any way the other alleged conspirators, Pentair and Pool. *See Golden Bridge Tech.*, 547 F.3d at 271. Most importantly, the e-mail is devoid of any mention of free freight minimums. Fisher's recalling that Jandy's "business is still very weak and [that Jandy] cannot afford to cut any more people" demonstrates nothing more than that Fisher and Rasp engaged in business small talk. *Coleman v. Cannon Oil Co.*, 849 F. Supp. 1458, 1469 (M.D. Ala. 1993) ("[T]hat defendants met together or telephoned each other [does] not support a finding by itself that they had engaged in an effort to fix prices. . . . [I]t remains the plaintiff's burden to prove that the defendant succumbed to the temptation and conspired."). To conclude that this vague statement about Jandy's employee roster establishes that Hayward and Jandy colluded with each other,

---

[15]    R. Doc. 585 at 18.

[16]    *Id.*

18

as well as with Pentair and Pool, to fix the price of free freight minimums, would require additional inferences. *See Tunica Web*, 496 F.3d at 409 (holding that direct evidence must be explicit "while circumstantial evidence requires additional inferences").

The Court also rejects DPPs' assertion that Rasp admitted at his deposition that he "might have said something to [Fisher]" about Jandy's free freight minimums. Rasp's "admission" came in response to questioning about a subject unrelated to price fixing: whether Rasp told Fisher that Jandy was over-staffed. When asked, "can you tell me what you meant when you said you couldn't afford to cut anymore people?" Rasp answered:

> [A]t that time we were going through an integration of the two companies, too. I knew that I was going to become president of the combined company, so there was -- and that wasn't public information. So I knew that we were going to have to combine and cut people, so I might have said something to him.[17]

Rasp's testimony is far from the admission or "acknowledgment of guilt," necessary to serve as direct evidence of a price-fixing conspiracy. *See Hyland*, 771 F.3d at 318. His reponse does not even touch the relevant subject matter of the alleged conspiracy–that is, an increase in the Manufacturer Defendants' free freight minimums. At best, DPPs have offered circumstantial evidence of

---

[17]     Deposition of Robert Rasp, January 8, 2014, at 144:16 - 145:14.

an opportunity to conspire.  Yet the existence of an opportunity to conspire is an insufficient basis on which to infer a conspiracy.  *See, e.g., Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 53 (3d Cir. 2007); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 227 (4th Cir. 2004).  Accordingly, this testimony does not constitute direct evidence of a price-fixing conspiracy among Pool and the Manufacturer Defendants.

Next, DPPs assert that an April 1, 2009 e-mail from a Pool employee, sent nearly two years after the allegedly unlawful 2007 free freight increase, is direct evidence of the alleged horizontal conspiracy.  On December 15, 2008, Zodiac announced to Aquatech customers that its free freight minimum for 2009 would be $25,000.[18]  Approximately three months later, on March 2009, Zodiac announced that, starting April 1, 2009, its free freight minimum would decrease to $20,000.[19]  When another employee forwarded Zodiac's March announcement to Steve Nelson at Pool, Nelson wrote to Zodiac's David Nibler and Todd Cramer:

> I am concerned about the email below . . . on a couple of levels.
> The first is that a lot of thought went into the establishment of the

---

[18]   *See* ZPC0300642 (December 15, 2008 letter from Cramer to Fausett).

[19]   POOLMDL-013-0007491 (March 30, 2009 letter from Zamora to "Valued Customer").

amount of the purchase from you that would result in freight prepaid status. We participated in those discussions and believe that the prior level was appropriate for distribution to provide value to its customers.

The second concern is the total lack of consideration in providing us information not only on the fact that you were considering changing this level, but once that decision was reached no prior notification was provided to us.

> . . . .

Please evaluate how this issue was handled.[20]

Cramer replied:

We made the decision to change our freight policy very quickly, and in our haste, my colleagues and I each thought the other was to communicate this information to PoolCorp. We make it a point to communicate to you sooner than we do to others. But we blew this one, and for that I apologize.

Your first point concerns the content of the decision itself.

Our prepaid freight minimum has been at $25,000. Our primary competitors, Pentair and Hayward, are at $20,000.

In a tough business environment, this placed us at a severe competitive disadvantage.

Sales pressure came from many directions, most of all Distribution. This was not a decision made in response to pressure from buying groups.

Had Pentair and Hayward raised their minimums to $25,000, we would have been happy to keep ours there as well. It has been

---

[20]     POOLMDL-013-0007489 (April 1, 2009 e-mail from Nelson to Nibler and Cramer).

many months since we announced the move to $25,000, and they chose not to follow.

We felt we had no choice but to remain competitive, and drop to their level.

We also felt that most of our customers are operating at smaller volumes. Yesterday's 25 is today's 20. Just like we lowered the minimum for your orders at the end of March from $75K to $25K, we felt we needed to accommodate ourselves to everyone's new operational demands.[21]

The foregoing e-mail exchange is not direct evidence of DPPs' alleged price-fixing conspiracy for a number of reasons. First, DPPs' allege that the Manufacturer Defendants and Pool conspired to fix the price of the manufacturers' free freight minimums in fall 2007.[22] Nelson's e-mail, sent on April 1, 2009, came directly after Zodiac announced a change to its free freight minimum in March 2009. Neither Zodiac's March 2009 announcement, Nelson's e-mail to Zodiac, nor Cramer's response to Nelson mention the 2007 free freight minimum increase. Second, Nelson's e-mail fails to mention any agreement that allegedly occurred two years earlier or any agreement with the

---

[21]     POOLMDL-013-0007488 (April 1, 2009 e-mail from Cramer to Nelson).

[22]     R. Doc. 585 at 7 ("During the August-December 2007 period, all three Manufacturer Defendants doubled their minimum amount needed to qualify for free freight on product shipments from $10,000 to $20,000 . . . . The Manufacturer Defendants' collective increase was part of a conspiracy, led by PoolCorp . . . .").

other Manufacturer Defendants.  *See Golden Bridge Tech.*, 547 F.3d at 271 ("Direct evidence explicitly refers to an understanding between the alleged conspirators . . . .")*; Burtch*, 662 F.3d at 225-26 (holding that telephone conversations between defendants failed to constitute direct evidence of a conspiracy because they did not "specify a time or place that any actual agreement to fix credit terms occurred [or] indicate that any particular individuals or [defendants] made such an agreement").  In fact, the e-mail plainly explains that Zodiac had increased its free freight minimum from $20,000 to $25,000 without agreeing to the increase with the other two Manufacturer Defendants, that neither Pentair nor Hayward followed suit, and that Zodiac ultimately had to decrease its $25,000 minimum to meet competition.

Third, that Zodiac discussed the $25,000 minimum with Pool before Zodiac reduced it to $20,0000 is not evidence of a horizontal conspiracy.  Pool's relationship with Zodiac is vertical, not horizontal.  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762 (1984) ("A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market."); *Ill. Corporate Travel, Inc. v. Am Airlines, Inc.*, 806 F.2d 722, 726 (7th Cir. 1986) ("In any chain of distribution discussions of price will be frequent–and . . . beneficial too.").

Without more, Nelson's e-mail—sent to a single Manufacturer Defendant well after the relevant time period and in response to some other business decision—is far from "tantamount to an acknowledgment of guilt," and therefore cannot serve as explicit, direct evidence of an unlawful conspiracy. *See Hyland*, 771 F.3d at 318. If anything, Nelson's e-mail suggests that the Manufacturer Defendants did not collude regarding their free freight minimums.

In sum, none of the evidence on which DPPs rely directly establishes, without additional inferences, that defendants engaged in a horizontal price-fixing conspiracy to raise the Manufacturer Defendants' free freight minimums. Accordingly, the Court considers the foregoing evidence among the totality of circumstantial evidence supporting DPPs' claims.

### 2. *Analysis of Circumstantial Evidence and Plus Factors*

Without direct evidence of an unlawful conspiracy, the Court must consider all of the circumstantial evidence in the record to determine whether the Manufacturer Defendants engaged in parallel pricing and whether sufficient evidence of certain "plus factors" supports DPPs' allegations of a horizontal price-fixing conspiracy. DPPs contend that, during August through December 2007, all three Manufacturer Defendants doubled their free freight minimums from $10,000 to $20,000. DPPs also rely on the following plus

24

factors to support their claim of a horizontal price-fixing conspiracy: (1) the Manufacturer Defendants acted contrary to their individual interests; (2) the Manufacturer Defendants' purported business justifications are pretextual; (3) the Manufacturer Defendants were motivated to conspire; and (4) the structure of the Pool Products industry was conducive to collusion.[23]

To demonstrate parallel pricing, a plaintiff need not show that the defendants set uniform prices. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940)). "It is sufficient that the price increases are reasonably proximate in time and value." *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014), *aff'd*, 801 F.3d 383 (citations omitted).

Here, the evidence demonstrates that not only did the Manufacturer Defendants each announce their free freight minimum increases within a four-month period, but also that these increases all took effect within four months of each other. Pentair was the first to announce its free freight minimum increase on August 30, 2007, via e-mail to certain customers.[24] Pentair's Dave

---

[23]     *See* R. Doc. 585 at 21.

[24]     *See* PWPS-0618840 (August 30, 2007 e-mail from Murray to Fausett).

Murray wrote to Aquatech's Jeff Fausett: "Jeff . . . need to go over 2008 Early Buy program real time with you - same as 2007 except for following: . . . Prepaid freight has increase[d] from 10,000 to 20,000."[25]   Hayward announced second.  Though internal documents indicate that Hayward had decided as early as July 2007 to increase its free freight minimum to accompany unifying its multiple product lines,[26] Hayward did not announce the free freight increase until September 10, 2007, approximately two weeks after Pentair's announcement.[27]   An e-mail between Hayward employees reveals that Hayward waited specifically to see if other manufacturers increased their free freight minimums: "Mike thought it would be a good idea to see if Pentair and Jandy move forward with an increase in their free freight

---

[25]     *Id.*

[26]     *See* HAY-MDL-0240712 (July 1, 2007 e-mail from Metkovich to Massa) ("He is going to look pretty smart when we go to 20K for freight."); HAY-MDL-0208241 (July 19, 2007 e-mail from Baker to Davis, Diamond, et al.) ("I do not like the $20K free freight policy where customers can mix and match GL + HPP product . . . I would however put more benefits into growth incentives rather than giving away freight."); HAY-MDL-0430932 (August 29, 2007 e-mail from Caldwell to Bahr) ("[W]e have a new free freight threshold minimum forthcoming . . . . HOWEVER, the new threshold has not been announced yet, so we **cannot communicate anything at this point.**).

[27]     *See* HAY-MDL-0802568 (September 10, 2007 letter from Massa to "Customers").

threshold before we announce."[28]   Zodiac (Jandy) announced last.   On December 7, 2007, four months after Pentair made the first announcement, Jandy published its new $20,000 free freight minimum in a bulletin titled, "Updated Jandy Freight Program."[29]

Pentair was also the first to make effective its free freight minimum increase.   According to Pentair's 2008 National Early Buy Program, the "Standard 2008 Freight Terms," which required customers to purchase at least $20,000 worth of products to receive free freight, were effective with orders placed on September 4, 2007.[30]   Hayward's September 2007 announcement specifically noted that its new "$20,000 prepaid freight minimum for all whole goods" would take effect on January 2, 2008, approximately four months after Pentair's free freight increase took effect.[31]   Finally, Zodiac's December 2007 updated freight program bulletin explained that "[e]ffective with orders placed

---

[28]   HAY-MDL-0430936 (August 31, 2007 e-mail from Caldwell to Davis).

[29]   *See* PWPS-0619613 (December 7, 2007 flyer titled "Updated Jandy Freight Program").

[30]   *See* PWPS-0888847-49 (September 1, 2007 e-mail from Del Amo attaching the "2008 Pentair Water Pool and Spa Early-Buy Programs for National Distributors").

[31]   *See* HAY-MDL-0802568 (September 10, 2007 letter from Massa to "Customers"); *see also* HAY-MDL-0209693 (September 12, 2007 letter from Massa to "Customers").

January 2, 2008"–four months after Pentair's effective date, but the same day as Hayward's effective date–Jandy products would be subject to a $20,000 free freight minimum.[32]

In support of its motion for summary judgment, Pool points out, and DPPs do not dispute, that the "pool year," which regulates the distribution of Pool Products, begins October 1.[33] Thus, according to Pool, the simultaneous timing of the Manufacturer Defendants' announcements is not unusual. Pool also emphasizes that the Manufacturer Defendants independently raised their respective free freight minimums at different times, with days or weeks between the Manufacturer Defendants' announcements and between the effective dates of the price increases. But as noted, to demonstrate that defendants engaged in parallel pricing, DPPs are not required to show that the Manufacturer Defendants increased their prices in lockstep; DPPs need only show that the price increases "are reasonably proximate in time." *See In re Chocolate Confectionary*, 999 F. Supp. 2d at 787. That the Manufacturer Defendants' announcements and effective price increases took place over the course of several months does not disprove that the Manufacturer Defendants

---

[32]     *See* PWPS-0619613 (December 7, 2007 flyer titled "Updated Jandy Freight Program").

[33]     R. Doc. 516-1 at 9.

engaged in parallel behavior. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 364-68 (2d Cir. 2004) (finding sufficiently parallel price increases that occurred over two months); *In re Text Messaging Antitrust Litig.*, No. 08 C 7082, MDL No. 1997, 2009 WL 5066652, at *5 (N.D. Ill. Dec. 10, 2009) (accepting as sufficiently parallel price increases that occurred over ten months).

Because proof beyond mere parallelism is required to sustain a claim of horizontal conspiracy, the Court now analyzes DPPs' plus factor evidence.

*Actions Contrary to Individual Interests*

DPPs first argue that the Manufacturer Defendants' free freight minimum increases were contrary to their individual economic interests.[34] To show that a defendant acted contrary to its interests, an antitrust plaintiff must present "evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004). "Where there is an independent business justification for the defendant's behavior, no inference of conspiracy can be drawn." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan,*

---

[34]     *See* R. Doc. 585 at 21.

203 F.3d 1028, 1037 (8th Cir. 2000) (citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456-57 (11th Cir. 1991)).

To show that the Manufacturer Defendants' direct sales to Dealers were profitable and thus in the manufacturers' best interests to continue, DPPs point to three documents indicating that, at some point, all three Manufacturer Defendants looked into how to maintain generally their Pool Products sales.  DPPs first direct the Court to an undated Pentair PowerPoint, titled "Pentair Core Strategic Growth," which contains a slide titled "Must Balance Multiple Channels to Market."[35]  A chart on this slide depicts the four types of customers to which Pentair directly sells Pool Products.[36]  The first group of customers contains "Distributor Association Groups & Dealer Buying Groups"; the second group, "Distributor[s]"; the third group, "Nat'l Retail[,] e.g. Leslie's"; and the fourth group, "Internet/Catalog."[37] This slide also notes that in the distributor category, Pool is the largest, but there are "170 others."[38] The following slide on Pentair's PowerPoint, titled "Channels to market -

---

[35]     PWPS-0137804 ("Pentair Core Strategic Growth" PowerPoint, Slide 13).

[36]     *Id.*

[37]     *See id.*

[38]     *See id.*

Preliminary," indicates that Pentair's direct sales to Dealers make up less than ten percent of its total sales.[39]  Specifically, Pentair calculates its sales to distributors as 92.4 percent of its total sales, while direct sales to Dealers make up 7.6 percent.[40]

DPPs next direct the Court to consider a Hayward document titled "Strategic Review of the Role of the Distributor in the U.S. Market."[41]  This document, dated March 20, 2007—as DPPs note, months before the Hayward's free freight increase—indicates that Hayward had considered a "Pool Market Channel Access Strategy between distribution (traditional 2 step) and the growth of dealer buying groups."[42]  The document  also states, "[t]he group was in agreement that the strategy should remain to be everything to all Markets. Commitment is to remain in both channels with some degree of separation through programming."[43] On the same page, but not mentioned by

---

[39]     PWPS-0137805 ("Pentair Core Strategic Growth" PowerPoint, Slide 14).

[40]     *Id.*

[41]     *See* HAY-MDL-0014704 (March 20th "Strategic Review of the Role of the Distributor in the U.S. Market").

[42]     *See id.*

[43]     *See id.*

DPPs, Hayward notes that it also considered "Freight Requirements," elaborated as follows:

> Issue was to raise freight Requirements in all business segments nationally. Dollars discussed ranged from $15k to 20K, which would include Hayward, Goldline and Aqua Vac. One of the concerns was how it would affect Goldline. It was agreed that having single point of inventory would be essential in increasing the freight minimums and should be investigated further in order to be competitive with other major bundlers.[44]

Finally, DPPs direct the Court to consider a 2007 "Business Review" PowerPoint that Zodiac (Jandy) created.[45] On a slide titled "Special Topics-Strategic Plan Outline," Zodiac notes as one of its strategies that it wants to "Continue to expand Jandy customer base & increase customer profitability."[46]

DPPs' proffered evidence is too general to suggest that the Manufacturer Defendants acted irrationally, or contrary to their individual interests, by increasing their free freight minimums. Further, DPPs ignore the breadth of evidence, dating as far back as 2002, which reveals that the Manufacturer Defendants considered large, full-truck orders of Pool Products, rather than

---

[44]    *See id.*

[45]    *See* ZPS080041198 (Jandy Business Review PowerPoint Slide no. 2: Jandy Business Environment).

[46]    *See* ZPS-080041211 (Jandy Business Review PowerPoint Slide no. 28: Special Topics - Strategic Plan Outline).

smaller, more frequent orders from buying group Dealers, to be the most efficient means of distributing their goods to end-consumers.

Specifically, the Court begins by noting that Hayward's "Strategic Review" does demonstrate that Hayward desired to "remain in both [distribution] channels," albeit, "with some degree of separation."[47]  On its face, this memo demonstrates that Hayward did not view distributors and dealers equally.  In the same breath, however, Hayward considered "rais[ing] freight Requirements in all business segments nationally," discussed increasing its current amount to "20K," and planned to investigate further how to raise its free freight minimum "to be competitive with other major bundlers."[48]  The juxtaposition of Hayward's intent to sell its products to both distributors and Dealers with Hayward's idea to increase its free freight minimum illustrates that Hayward did not believe that these two sales approaches were inconsistent.  This document indicates that Hayward did not view a decision to increase its free freight minimum as likely "to deprive itself of a profitable sales outlet," as DPPs suggest.  *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 932 (7th Cir. 2000) (noting that defendant toy manufacturers were

---

[47]     *See* HAY-MDL-0014704 (March 20th "Strategic Review of the Role of the Distributor in the U.S. Market").

[48]     *See id.*

"reluctan[t]" to forego continued sales to "a new, fast-growing, and profitable channel of distribution").

The evidence against Pentair and Zodiac is even less persuasive.  As to Pentair, DPPs emphasize the title of an undated PowerPoint slide– "Must Balance Multiple Channels to Market"–without considering the information in context.  DPPs ignore the remainder of the information on that slide, as well as the remainder of the information in the PowerPoint as a whole.  *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) (noting that a plaintiff's supposed evidence of unlawful conduct must be considered in the appropriate context); *Hyland*, 771 F.3d at 319 (same).  The relevant slide contains a chart, with sections indicating the four types of customers to which Pentair directly sells Pool Products, two of which are "Distributor Association Groups & Dealer Buying Groups" and "Distributor[s]."[49]  The slide contains no other relevant information regarding its sales to these customers.[50]  Only on the following slide does Pentair note that the vast majority of its business—92.4 percent—goes through distribution, with 7.6 percent of total sales directly to Dealers.  Further, a 2010 Pentair e-mail indicates that Pentair believed that its

---

[49]    PWPS-0137804 ("Pentair Core Strategic Growth" PowerPoint, Slide 13).

[50]    *See id.*

direct sales to buying groups had changed over the last several years because of a proliferation of smaller members, making these sales inefficient and disruptive of Pentair's primary channel to market, which was distribution. Dave Murray explained his view of dealer buying groups as follows:

> [T]hese groups historically were small in membership, made up of higher end builders with protected exclusive territories. This all changed over the past 4-5 years . . . . This was due to virtually allowing anyone at any time in any territory to join. The conflict created by them caused an unnecessary disruption to our distribution channel due to loss of business, lower distributor margins as dealers received our pricing and was a complete no win situation for Pentair. Distribution is 85% of our business and we must have distributors financially health[y] in order for Pentair to be successful. Additionally and most importantly, operationally we do not have the template to service these smaller accounts efficiently or effectively.[51]

As to Zodiac, DPPs direct the Court to a company PowerPoint. A slide titled "Special Topics-Strategic Plan Outline" contains the following note within a long, bullet-point list: "Continue to expand Jandy customer base & increase customer profitability."[52] The slide says nothing about buying groups or the profitability or efficiency of Jandy's sales to Dealer customers. It would

---

[51]    PWPS-0613696.

[52]    *See* ZPS-080041211 (Jandy Business Review PowerPoint Slide no. 28: Special Topics - Strategic Plan Outline).

be speculative to infer anything about the relative value of buying group sales to Jandy from this single line in a multi-page PowerPoint presentation.

In addition to the overly general nature of DPPs' proffered evidence, there is ample record evidence suggesting that the Manufacturer Defendants viewed direct sales to Dealers as less desirable than their sales through distribution, especially as buying groups accepted an influx of smaller participants and fuel costs increased.   To begin with, DPPs themselves specifically claim, and the Manufacturer Defendants agree, that "the wholesale distribution network is *the most efficient way for manufacturers to reach customers.*"[53]   DPPs admit that manufacturers prefer to sell to distributors, rather than directly to Dealers, for a number of reasons:

> Distributors purchase and warehouse significant volumes of Pool Products throughout the year, allowing manufacturers to operate their factories year-round notwithstanding the seasonal nature of the pool industry.  Distributors also provide one-stop shopping, timely delivery, and the extension of credit to thousands of Dealers, thereby providing Dealers and manufacturers with significant transactional efficiencies.  Additionally, distributors often help manufacturers administer their Dealer rebate and warranty programs, and provide answers to the Dealers' product-related questions.  By displaying the Pool Products of particular manufacturers, distributors are also able to afford manufacturers

---

[53]      R. Doc. 284 at 11 ¶ 32 (emphasis added).

product visibility and help to create and maintain brand recognition among industry participants generally.[54]

Additionally, DPPs recognize that manufacturers prefer to sell their products to wholesale distributors because of the costs attendant to distribution, the Manufacturer Defendants' lack of expertise in distribution, and the difficulty manufacturers have obtaining products to distribute from competing manufacturers.[55]  The Supreme Court has also recognized the benefits of a traditional wholesale distribution chain:  "[D]istributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763-64 (1984).

Moreover, each Manufacturer Defendant offers evidence suggesting that distribution efficiencies and efforts to cut costs were the impetus behind its free freight minimum increase.  As Vice President of Marketing Carlos Del Amo testified, Pentair's business model "is to go through distribution . . . for consolidating freight purposes and many strategic reasons. A lot of cost

---

[54]     *Id.* at ¶ 33.

[55]     *Id.* at ¶ 34.

savings. [Pentair is] really not good at selling small quantities of product and shipping them on time."[56]  This testimony is consistent with Murray's e-mail from 2010, cited earlier.  Further, Jeff Fausett, the President and CEO of the Aquatech buying group admitted: "Pentair was consistently telling us that they were concerned about the smaller vendors . . . meaning that, you know, *they were shipping product at low volume to people and that wasn't their business model*. They were built around large-order sales, not small-order sales."[57] Consistent with Pentair's "lean" approach to manufacturing and distributing its Pool Products, Pentair repeatedly sought to decrease the cost of shipping goods to its customers.[58]

In August 2006, one year before Pentair increased its free freight minimum, a Pentair employee opined that raising free freight to just $14,000 was a "$750,000 opportunity" because this order minimum "would allow [Pentair] to build multi stop truckloads [that] are cheaper, faster, and will get [Pentair's] products to [its] customers in a non compromised fashion."[59]

---

[56]    Deposition of Carlos Del Amo, January 22, 2014 at 35:3-10.

[57]    Deposition of Jeffrey Fausett, January 24, 2014, at 109:10-110:10 (emphasis added).

[58]    *See* Deposition of Bill Whitehurst, January 30, 2014, at 65:14-66:21, 99:16-100:16.

[59]    PWPSe-0283945.

38

Pentair President Karl Frykman also testified that he discussed raising the $10,000 free freight minimum to "increase the size of the orders going out of [Pentair's] factory [because] [t]he lower the order volume, the more [Pentair was] acting like a distributor, and [Pentair] really [was]n't set up to do that well. So it was a matter of efficiency . . . ."[60]  Frykman also explained that "smaller dealers" burdened Pentair's shipping process, so Pentair "wanted to discourage their ability to buy small quantity orders . . . and drive [Pentair's] efficiency down."[61]

When Pentair finally announced its free freight increase in August 2007, Aquatech's Jeff Fausett described Pentair's increase as a way for Pentair "to mask its own ineffectiveness in production and inventory."[62]  Another Dealer also wrote to Murray about the increase and acknowledged Pentair's freight issues: "*I understand that freight cost[s] have been issues for most manufacture[r]s* this past season and I am sure the level of your backorders and shipping from across the country have not helped your cost."[63]  This same

---

[60]    *See* Deposition of Karl Frykman, December 19, 2013, at 219:2-7.

[61]    *See id.* at 219:10-15.

[62]    AQ0000647 (September 4, 2007 e-mail from Fausett to Murray).

[63]    PWPS-0619033 (September 11, 2009 e-mail from Tassin to Cannon and Murray) (emphasis added).

Dealer later wrote to Dave Murray again: "The one point that . . . makes some sense to me is that *Pentair is not a company that can support a lot of small volume locations.*"[64]  In contrast to those Dealer buying group members upset by the freight increase, Carecraft's Greg Howard wrote to Pentair's Dave Murray: "I fully support the change and . . . will gladly comply with it."[65]

Beginning in 2004, Hayward also considered increasing its free freight minimum to compensate for rising fuel costs.  Vice President of Logistics and Information Systems David Caldwell wrote to another Hayward employee:

> [S]everal months ago, we (Bruce, you[,] Kevin[,] and I) talked about raising the free freight possibly as high as $15k. The reasoning at that time was the increase in freight costs as a result of fuel oil price inflation. With crude oil now even higher than it was in May/June when the issue was last raised . . . it would seem that we should opt for the higher threshold. For the past several years, I have been asked to monitor and report on freight costs whenever the issue came up during the POB financial review.[66]

In March 2007, Hayward's Vice President of Sales and Marketing Bruce Fisher asked other employees to provide input on topics they wanted to

---

[64]    PWPS-0070878 (July 27, 2010 letter from Tassin to Murray and Fausett) (emphasis added).

[65]    PWPS-0619374 (October 3, 2007 e-mail from Howard to Murray).

[66]    HAY-MDL-0258378 (September 2, 2004 e-mail from Caldwell to Williams).

discuss at Hayward's 2008 Annual Sales and Marketing Planning Meeting.[67]

Fisher received a number of responses indicating that Hayward employees

were concerned about shipping efficiency, freight costs, the existing $10,000

free freight minimum, and the influx of small Dealers joining buying groups.

For example, Hayward's Vice President of Sales Michael Massa wrote:

1) Analyze our freight policy with regard to Freight Minimums and
Single Point of Shipment:

- *Freight costs continue to rise and the more we can put on
  one shipment helps us keep our costs in line.*

- Purchasers of G[old]L[ine] Product are at a disadvantage
  because they need to buy a min of 10K on one order to
  receive freight prepaid. HPP [Hayward branded products]
  Customers have the same 10K minimum. Our competitors
  are able to offer their customers a combined 10K minimum
  including all products. (Pumps/filters, cleaners, along with
  controls and salt). We need to look at shipping GL Products
  out of all HPP Warehouses to joint customers.

- With adding HPP, GL, and now AquaVac products into one
  shipment, I see no reason we could not raise our minimum
  shipment to 15K - 18K Min or more to our direct customers
  By doing so, [we] would probably raise our actual shipment
  amount to more than double.

- The increase in freight minimums would make it harder for
  the small builder group member to meet the freight
  minimums and it would help distribution get some of these
  customers back into distribution. This would make a true

---

[67]     HAY-MDL-0205784 (March 12, 2007 e-mail from Fisher to
Harper, Whitmarsh, et al.).

distributor stronger in his market to compete with buying groups[.]

• It would benefit our current HPP & GL supporters because it would be a joint purchase to reach the minimums as opposed to two separate orders of 10K each to reach these minimums.

• *Look at ways to encourage full truckload orders. At some point the cost of the trailer is paid for before the truck is full.* Should we look at offering a discount to our customers who order in full truckloads and offer a portion of the savings back to distribution for ordering in truckload quantities[?] Our competitors are doing that today.

. . . .

3) Builder Groups Vs. Distribution: With builder groups increasing their membership weekly, *what do we do to pro-actively (and in our best interest) control the influx of small builders and dealers joining buying groups and buying direct?* What advantages can we give distribution to keep these smaller members from wanting to join a builder group? *The addition of too many group members will eventually put a strain on the system as we try to deliver to each of these members. Look at freight issues/minimums, pricing difference, truckload discount programs, terms, early buy programs, etc.*[68]

David Caldwell voiced similar concerns:

#1 - Freight Costs issue - assess notion of free freight and only freight. In other words, continue to provide free freight incentives, but assess the viability to pass along accessorial charges as a standard. Excessive accessorial charges would be billed (e.g., demurrage charges and the like)[.]

---

[68]     HAY-MDL-0512418-20 (March 16, 2007 e-mail from Massa to Fisher, Diamond, *et al.*) (emphasis added).

. . . .

*Truckload orders will save some freight dollars. Full pallet ordering in combination with that would really speed the pick process and help to offset the cost of an affordable truckload discount.*

Parts orders - "each" picks to be split off from case picks. *Freight costs for Each Picks could be passed on to the customer to help defray some cost* to HPP and incentivise [sic] full case ordering.[69]

In addition, this e-mail chain reflects that Hayward's decision to combine its previously separate product lines also motivated its free freight minimum increase. Similarly, on July 1, 2007, another Hayward employee noted that he had already begun telling Dealer buying groups about the potential to combine product lines accompanied by a free freight increase:

Here are my notes on a meeting . . . I had with Greg Howard last week. . . . [Howard] [u]nderstands that their [sic] may be changes in freight programs in 2008. I said nothing has been decided but we are looking at possibl[y] making a change. Tied in GL and HPP lines next year and raise minimum. He didn't see a problem.[70]

Zodiac's President and CEO also testified that freight costs were one of the reasons behind Jandy's new $20,000 free freight minimum:

---

[69]     HAY-MDL-0512417 (April 5, 2007 e-mail from Caldwell to Massa) (emphasis added).

[70]     HAY-MDL-0240712 (July 1, 2007 e-mail from Metkovick to Massa).

43

[T]here's various factors in the marketplace. One is we had a more extensive line. We at Jandy Pool Products -- we kept, you know, higher volumes. *Freight costs were going up. So to get free freight, we just required a larger volume.* Plus, you know, we heard through market intelligence that Pentair or Hayward had done it as well, earlier in the year. So we thought it justified for us.[71]

Jandy's decision to follow its competitor's price increase to offset cost increases does not signal behavior contrary to its independent business interests. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 128 (3d Cir. 1999) (refusing to infer conscious parallelism "merely because the evidence tends to show that a defendant may have followed a competitor's price increase"). In *In re Chocolate Confectionary Antitrust Litigation*, the district court noted that a defendant with less market share relative to the others not only independently wanted to increase prices to meet rising costs, but also waited to see if its competitors increased prices so that it could "follow any price advance." 999 F. Supp. 2d 777, 796-97 (M.D. Pa. 2014), *aff'd*, 801 F.3d 383 (3d Cir. 2015). The court in *Chocolate Confectionary* found that this defendant's following other competitors' price leads was a rational business decision. *See id.* at 796; *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (explaining that "firms may arrive

---

[71]     Deposition of Robert Rasp, January 8, 2014, at 140:13-21 (emphasis added).

at identical decisions independently [because] they are cognizant of—and reacting to—similar market pressures [and their] competitors' behavior . . . .").

Further, DPPs' own economic expert, Dr. Gordon Rausser, testified that it was not unreasonable for Zodiac (Jandy) to pay attention to its competitors' prices and adopt similar policies:

> Q:   . . . It's not your position that Jandy somehow had an obligation to ignore information that's in the marketplace about what its competitors were doing on free freight policies, is it?
>
> A:   No.
>
> Q:   . . . And it's reasonable for a company that sees its competitors have taken a certain stance on free freight policy to consider adopting that policy for itself?
>
> A:   In the abstract . . . Yes.[72]

In sum, increasing free freight minimums made good business sense for the Manufacturer Defendants because higher free freight minimums encouraged all customers—distributors and Dealers alike—to make larger, less frequent orders.  This, in turn, helped to reduce shipping costs in the face of rising fuel prices.  It is undisputed that the Manufacturer Defendants preferred to deal in bulk because larger orders, or "full truckload orders" decreased the Manufacturer Defendants' shipping costs, and therefore potentially increased

---

[72]   Deposition of Dr. Gordon Rausser, July 11, 2014, at 354:3-20.

profits. *See Barr Labs. Inc. v. Abbott Labs.*, 978 F.2d 98, 104 (3d Cir. 1992) (noting that "dealing in large volumes" minimizes transaction costs). Further, it is undisputed, that "the vast majority of Dealers . . . tend to be small operations that lack the resources and customer base to purchase Pool Products in volume directly from manufacturers."[73] Thus, the higher free freight minimums benefitted the Manufacturer Defendants in two ways. First, the $20,000 minimum encouraged Dealers to continue to buy Pool Products from wholesale distributors—the Manufacturer Defendants' preferred channel to market. Second, the $20,000 minimum ensured that Dealers buying directly from the manufacturers would purchase Pool Products in sufficiently large volumes to minimize the Manufacturer Defendants' existing shipping inefficiencies, particularly as the buying groups began including smaller Dealers and fuel costs rose.

Hayward's free freight minimum was also justified by its decision to combine its previously distinct product lines. According to Hayward's September 2007 pricing announcement, this new "Single Point of Contact" model gave customers "a single source for all of their Hayward, Goldline, and AquaVac product requirements," and enabled customers "to reach order

---

[73]    R. Doc. 284 at 11 ¶ 34.

minimums and prepaid freight minimums by combining what previously was a separate requirement for order size and freight minimums for each of the three companies."[74]

In opposition, DPPs point to the timing of the free freight increases—fall 2007, amid a national recession—as general evidence the price increases were contrary to the Manufacturer Defendants' economic interests. It is undisputed that the economy at this time was weak, the housing market was down, and the pool industry was slowing.[75] Generally, "reduced demand and excess supply are economic conditions that favor price cuts, rather than price increases." *In re Flat Glass*, 385 F.3d at 361. But "[r]ising prices do not themselves permit an inference of a collusive market dynamic. Even in a concentrated market, the occurrence of a price increase does not itself permit a rational inference of . . . supracompetitive pricing." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 129-30 (3d Cir. 1999) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993)). And, as noted, cutting costs is also a rational response to declining economic

---

[74]   *See* HAY-MDL-0802568 (September 10, 2007 letter from Massa to "Customers").

[75]   *See, e.g.*, Deposition of Bob Rasp, January 8, 2014, at 149:3-5 ("[T]he industry was slowing down, and we had to reduce costs.").

conditions.  *See, e.g., Barr Labs.*, 978 F.2d at 104 (noting that "dealing in large volumes" minimizes transaction costs); *In re Chocolate Confectionary*, 999 F. Supp. 2d at  792-93 (noting that competitors may rationally increase price to mitigate anticipated increases in costs); 6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1434, at 269 (3d ed. 2010) (noting a "rise in raw material costs" as an "independent explanation" for a price increase); *cf. Am. Tobacco Co. v. United States*, 328 U.S. 781, 805-10 (1946) (finding conspiracy when firms simultaneously increased price *absent* a corresponding increase in costs).

In the face of ample evidence indicating that the Manufacturer Defendants raised their free freight minimums to offset growing and costly shipping inefficiencies, DPPs bear the burden to identify specific facts that establish a genuine issue for trial.  *See Celotex*, 477 U.S. at 325; *Little*, 37 F.3d at 1075.  To counter the Manufacturer Defendants' efficiency justifications, DPPs argue that these reasons are merely pretextual.  The Court addresses this argument in the following section.

### *Pretextual Business Justifications*

DPPs contend that there are factual disputes as to whether the Manufacturer Defendants' proffered efficiency justifications are pretextual. In support, DPPs assert that none of the Manufacturer Defendants' formal

announcements cites fuel costs or efficiency as the reason for the free freight increase.

Neither Pentair's 2008 Early-Buy Program announcement, nor Zodiac's Updated Freight Program announcement, cites any reason for their increases in free freight minimums or any other costs noted on the announcements.[76] They appear to be simply promotional bulletins.   But, as noted, other documentary evidence supports the Manufacturer Defendants' explanation. Defendants point to evidence as far back as 2002 that shows shipping inefficiencies at the forefront of the manufacturers' pricing concerns.   That these documented concerns predate, as well as are contemporaneous with, the allegedly collusive free freight increase undermines DPPs' pretextual argument.   *See In re Chocolate Confectionary*, 999 F. Supp. 2d at 794 ("Plaintiffs have failed to adduce any evidence which would tend to suggest that these documents were sham portrayals in furtherance of the price-fixing conspiracy.").

Further, although the price announcements themselves fail to mention fuel costs, oral and written communications between the manufacturers and

---

[76]     PWPS-0888847 (September 1, 2007 e-mail from Del Amo attaching the "2008 Pentair Water Pool and Spa Early-Buy Programs for National Distributors"); PWPS-0619613 (December 7, 2007 flyer titled "Updated Jandy Freight Program").

their customers reveal that the Aquatech and Carecraft buying groups, as well as individual Dealers, understood that defendants justified their raising free freight minimums to account for shipping costs.  For example, Pentair's Dave Murray left Jeff Fausett a voice message explaining that, to meet the new $20,000 free freight minimum, Pentair expected its customers to "condense buys" and "put things together" to build larger orders.[77]  A Pool Products Dealer and Aquatech buying group member wrote to Murray: "I understand that freight cost[s] have been issues for most manufacture[r]s this past season."[78]  Later, the same Dealer wrote to Murray again: "The one point that Dave [Murray] made that makes some sense to me is that Pentair is not a company that can support a lot of small volume locations."[79]  In the face of evidence contrary to DPPs' arguments, "plaintiffs may not rely merely on general assertions that defendants' cost-based and self-interested rationalizations are pretextual: at summary judgment, antitrust plaintiffs, like any plaintiff, must offer affirmative evidence which creates a genuine issue of

---

[77]     AQ0000644 (Transcript of voicemail message from Murray to Fausett).

[78]     PWPS-0619033 (September 11, 2009 e-mail from Tassin to Cannon and Murray).

[79]     PWPS-0070878 (July 27, 2010 letter from Tassin to Murray and Fausett).

material fact for trial." *In re Chocolate Confectionary*, 999 F. Supp. 2d at 796.

Regarding Hayward's 2007 free freight minimum increase, DPPs admit that Hayward cited its product combination as justification raising its free freight minimum.  Nonetheless, DPPs contend that this justification does not suffice to explain how Hayward came to offer its $20,000 free freight minimum "at exactly the same time" that Pentair and Zodiac increased their minimums.[80]

First, Pentair's free freight increase was already market knowledge by the time Hayward announced its increase on September 10, 2007.[81]  In addition, that Hayward and Zodiac's price increase took effect simultaneously does not alter Hayward's announcing in early September that it would unify its product lines, accompanied by a $20,000 free freight minimum, starting January 2, 2008.  Months after Hayward's announcement, in December 2007, Zodiac (Jandy) announced its own free freight increase would also take effect

---

[80]     R. Doc. 585 at 24.

[81]     *Compare* AQ0001370 (August 30, 2007 e-mail from Murray to Fausett announcing that free freight minimum increase would accompany Pentair's 2008 Early Buy program), *with*, HAY-MDL-0802568 (September 10, 2007 letter from Massa to Customers announcing a free freight minimum increase effective January 2, 2008).

on the same day. Thus, the timing of Zodiac's free freight increase does not detract from Hayward's earlier justifications for its own decision.

In sum, beyond their own speculative assertions, DPPs have not offered any specific evidence to refute the Manufacturer Defendants' proffered business justifications. DPPs cannot withstand a motion for summary judgment merely by attempting to "discredit[] the credibility of the movant's evidence." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d. Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)). They must produce "some affirmative evidence" in their favor to create a factual dispute for trial. *See id.*

### *Motivation to Conspire and Industry Structure Conducive to Collusion*

Evidence that a defendant was motivated to enter a price-fixing conspiracy is often similar or related to evidence that the industry is conducive to collusion. *See, e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004); *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015) ("Evidence of a motive to conspire means that the market is conducive to price fixing . . . ."). Accordingly, the Court considers these factors together.

DPPs assert that a number of market dynamics rendered the Pool Products industry conducive to collusion. First, Pool Products are specialized,

52

with few realistic substitutes.  Second, the Manufacturer Defendants are the nation's "most important Pool Products suppliers."  Third, Pool is the only national distributor; other Pool Products distributors are regional or local. Fourth, Pool is the Manufacturer Defendants' best customer.  Fifth, Pool had "significant leverage" over the Manufacturer Defendants.  Sixth, the Pool Products industry is insulated from import competition because foreign manufacturers sell poor quality products.  DPPs rely on the report of their economics expert, Dr. Gordon Rausser, for each of these assertions.[82]  DPPs contend that the Manufacturer Defendants were motivated to conspire for similar reasons.  DPPs assert that because Pool was each manufacturer's largest customer, all manufacturers sought to maintain access to Pool's national distribution network.  DPPs also assert that to avoid any loss in market share incurred by raising prices, each Manufacturer Defendant was unwilling to increase its free freight minimum absent assurance that the others would do the same.[83]

DPPs' arguments here rest on the assumptions that the Manufacturer Defendants' free freight increases were contrary to their individual business

---

[82]    *See* R. Doc. 585 at 29-31.

[83]    *See id.* at 27-29.

interests and that the Manufacturer Defendants increased the free freight minimums out of fear of losing Pool's business.  There is no evidence that Pool "demanded" or "insisted" that the Manufacturer Defendants raise their free freight minimums before the manufacturers' parallel price increase occurred. Nor is there any evidence that Pool threatened to switch to other manufacturers if the free freight minimums were not increased.  Indeed, when Zodiac unilaterally decreased its $25,000 free freight minimum in March 2009, Pool's response was not to cut off or punish Zodiac as a supplier, but merely to complain.  Further, DPPs simply assume that Pool would have jettisoned a premier product line offered by its largest supplier, Pentair, to force a free freight increase to disadvantage buying groups and that Pentair had a realistic fear that this would happen.[84]  DPPs' mere citation to conclusory statements by an expert does not make this assertion supported by the record evidence.

---

[84]     Dr. Rausser estimates that, together, the Manufacturer Defendants made up approximately forty-six percent of Pool's total purchases during the relevant time period.  Dr. Rausser does not further break down that number.  *See* Rausser Initial Report, April 10, 2014, at 37. According to the defendants' experts, Pentair's sales to Pool accounted for anywhere from twenty to twenty-five percent of Pool's total purchases during the relevant period.  This is almost twice as large as Pool's next largest supplier, Hayward.  *See* Johnson Initial Report, at 29; Elzinga DPP Report, April 10, 2014, at 16-17.

Aside from these problematic assumptions, any evidence that the Manufacturer Defendants were motivated to conspire in a market conducive to collusion is insufficient to push DPPs' theory of conspiracy past the summary judgment stage.  Once a court has already found that evidence of the defendants' parallel pricing may exist, "evidence that a market is ripe for collusion . . . or that defendants were motivated to collude is too ambiguous to support an inference of agreement, because these circumstances could just as readily be the result of unilateral independent conduct."  *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 789 (M.D. Pa. 2014) (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d. Cir. 1999)), *aff'd*, 801 F.3d 383 (3d Cir. 2015).  According to Professors Areeda and Hovenkamp, "motivation in the sense of a reasonable prospect of increasing profits through collective action is a logical corollary of interdependence. . . . Motivation is thus synonymous with interdependence and therefore adds nothing to it."  6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1434, at 269 (3d ed. 2010).  In other words, motivation to collude or market interdependence merely restates that parallel conduct occurred.  *See id.* at 264.

When courts do rely on evidence of the defendants' motivation or general market structure, they often require that the plaintiff also show that

defendants acted contrary to their own economic interests. *See, e.g., Royal Drug Co. Inc. v. Grp. Life & Health Ins. Co.*, 737 F.2d 1433, 1437 (5th Cir. 1984) (citation omitted); *Venzie Corp. v. U.S. Mineral Prods. Co., Inc.*, 521 F.2d 1309, 1314 (3d Cir. 1975) (citations omitted). That the defendants acted contrary to their self-interests helps illustrate that something more than mere interdependence led to the parallel pricing. *See* Areeda & Hovenkamp, *supra* at 270. Here, because DPPs failed to present sufficient evidence that the Manufacturer Defendants acted irrationally by increasing their free freight minimums, DPPs' evidence does not go beyond mere interdependence. "Parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). The Sherman Act does not condemn parallel pricing achieved merely through interdependence, rather than collusion. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (holding interdependence is "not in itself unlawful").

### 3. Summary

Viewing the record as a whole, the Court finds that the evidence presented is insufficient to raise an genuine issue of material fact as to the

existence of a horizontal conspiracy among the Manufacturer Defendants and with Pool.   DPPs' best evidence is the ambiguous e-mail Pool's CEO Manny Perez de la Mesa sent to coworkers on November 30, 2007, and the Manufacturer Defendants' parallel pricing.  But the evidence presented here in its totality cannot withstand summary judgment because plaintiffs have failed to demonstrate significant plus factors.  DPPs' circumstantial evidence does not tend to exclude the possibility that the Manufacturer Defendants independently raised their free freight minimums. Accordingly, DPPs' claim of a horizontal price-fixing conspiracy against Pool must be dismissed.

## C.   Impact

Because the Court concludes that DPPs' evidence of alleged price-fixing agreement is insufficient as a matter of law, the Court need not also consider whether DPPs have demonstrated that they suffered "antitrust injury" as a result.  Without proof of concerted action, DPPs' claim must fail because the "very essence of a section 1 claim, of course, is the existence of an agreement." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994).

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Pool's motion for summary judgment on DPPs' horizontal conspiracy claims.

New Orleans, Louisiana, this 27th day of January, 2016.

*Sarah Vance*

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE