UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
|  | MDL No. 2328 |
| IN RE: POOL PRODUCTS DISTRIBUTION MARKET ANTITRUST LITIGATION | SECTION: R(2) |
|  | JUDGE VANCE MAG. JUDGE WILKINSON |

**THIS DOCUMENT RELATES TO ALL CASES**

## <u>ORDER AND REASONS</u>

Defendants Pool Corporation, SCP Distributors LLC, and Superior Pool Products (collectively, "Pool"), move to exclude the testimony of Dr. Gordon C. Rausser, an expert for the Direct-Purchaser Plaintiffs (DPPs).[1]  The Court has reviewed the parties' submissions and has heard oral argument on the motion.  For the following reasons, the Court grants defendants' motion in part and denies it in part.

---

[1]     R. Doc. 508.  Originally, Pool along with Pentair, one of the Manufacturer Defendants, jointly moved to exclude Dr. Rausser's testimony.  Pentair has since settled with DPPs.  *See* R. Doc. 699. Accordingly, the motion as to Pentair is now moot.

## I.   BACKGROUND

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against Pool and the Manufacturer Defendants.  Pool is the country's largest distributor of products used for the construction and maintenance of swimming pools (Pool Products).[2]  The Manufacturer Defendants are the three largest manufacturers of Pool Products in the United States: Hayward Industries, Inc. (Hayward), Pentair Water Pool and Spa, Inc. (Pentair), and Zodiac Pool Systems, Inc. (Zodiac).[3]  As defined in DPPs' Second Consolidated Amended Class Action Complaint (SCAC), Pool Products are the equipment, products, parts, and materials used for the construction, renovation, maintenance, repair, and service of residential and commercial swimming pools.  Pool Products include pumps, filters, covers, drains, fittings, rails, diving boards, and chemicals, among other goods.  Pool buys Pool Products from manufacturers, including the three the Manufacturer Defendants, and in turn sells them to DPPs, which include pool builders, pool retail stores, and pool service and repair companies (collectively referred to as "Dealers" in the SCAC).[4]

---

[2]   R. Doc. 284, ¶ 39.

[3]   *Id.* ¶ 28.

[4]   *Id.* ¶ 31.

DPPs have filed two consolidated amended complaints—the first on June 29, 2012[5] and the second on June 21, 2013[6]—each of which defendants moved to dismiss. The Court issued orders on both rounds of motions to dismiss, the details of which are summarized elsewhere.[7] Following those orders, DPPs were left with the following five claims: (1) a Section 1 claim under the *per se* rule involving a horizontal agreement between the Manufacturer Defendants and Pool to fix free freight minimums; (2) three Section 1 claims under the rule of reason involving three separate vertical conspiracies (one between Pool and each Manufacturer Defendant) to exclude Pool's competitors; and (3) a Section 2 attempted monopolization claim against Pool. Defendants have moved for summary judgment on these five claims. In addition, DPPs have moved for class certification. The Court has dismissed DPPs' Section 1 *per se* claim on summary judgment.

## II.   LEGAL STANDARD

---

[5]      R. Doc. 107.

[6]      R. Doc. 284.

[7]      *See, e.g.*, R. Doc. 482 at 2-6.

When expert testimony offered by one party is subject to a *Daubert* challenge, the Court must act as a "gatekeeper" under Federal Rule of Evidence 702.

A district court has considerable discretion to admit or exclude expert testimony under Rule 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). Rule 702, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that the *Daubert* gatekeeping function

4

applies to all forms of expert testimony).  The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

First, the Court must determine whether the proffered expert testimony is reliable.  The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.  *See Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998).  The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid.  *See Daubert,* 509 U.S. at 592-93.  The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.  *See id.* at 590.

The Court in *Daubert* articulated a flexible, non-exhaustive, five-factor test to assess the reliability of an expert's methodology: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Id.* at 593-95.  The Supreme Court has emphasized, however, that these factors "do not constitute a 'definitive checklist or test.'"  *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593).  Rather, district courts "must have considerable leeway in

deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.  Courts have also considered whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," *Daubert v. Merrell Down Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), whether the expert has adequately accounted for obvious alternative explanations, *see Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994), and whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting," *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).

A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system.  *See Daubert*, 509 U.S. at 596.   As the Supreme Court noted in *Daubert*: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.*  The Fifth Circuit has held that, in determining the admissibility of expert testimony, district courts must accord proper deference to "the jury's role as the proper arbiter of disputes between conflicting opinions.  As a general rule, questions relating to the bases and

6

sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

Nonetheless, expert testimony "must be reliable at each and every step or else it is inadmissible.  The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted).  "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

In *Joiner*, the Supreme Court explained that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." 522 U.S. at 146.  Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see also LeBlanc v. Chevron USA, Inc.,* 396 F. App'x 94, 98 (5th Cir. 2010).

Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *See Daubert*, 509 U.S. at 591. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the jury" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (citing *Viterbo*, 826 F.2d at 422).

## III.   DISCUSSION

Defendants challenge five aspects of Dr. Rausser's opinion. The Court begins by summarizing Dr. Rausser's opinion and methodology. The Court then summarizes the substantive antitrust and class certification law necessary to understand how the challenged portions of Dr. Rausser's opinion matter to DPPs' antitrust claims and motion for class certification. The Court then assesses defendants' five challenges to Dr. Rausser's opinion.

### A.   Dr. Rausser's Opinion and Methodology

#### 1.   *Opinion About Impact of Defendants' Conduct on Pricing*

Dr. Rausser opines that Pool could charge inflated prices for Pool Products as a result of a mixture of conduct by Pool and the Manufacturer

8

Defendants.  He states that his "liability analysis" is how he shows the conduct had an impact on prices and thereby on plaintiffs.[8]  His "liability analysis" consists of a narrative summary of the "documentary evidence" of Pool's and the Manufacturer Defendants' conduct during the class period, paired with a series of opinions about what the effect of that conduct would be on the market.  Dr. Rausser relies on the following conduct in his liability analysis.

To begin, Dr. Rausser states that Pool communicated with the Manufacturer Defendants about "cutting off" Pool's rivals.[9]  He describes several examples of alleged "foreclosures," in which the Manufacturer Defendants, at Pool's direction, allegedly refused to sell product to new distribution rivals in certain markets.  Dr. Rausser examines six incidents of foreclosure in his initial report.   He supports his analysis with the Manufacturer Defendants' transaction data, which he says demonstrates sales patterns consistent with foreclosure—that is, limited or non-existent sales to the allegedly foreclosed rivals during the class period.[10]

---

[8]     Rausser Deposition at 49:1-2.

[9]     Rausser Initial Report at 45.

[10]     *Id.* at 57.

Dr. Rausser also opines that Pool used its preferred vendor program to "facilitate its control of the market."[11]   For vendors in the program, Pool provided extra advertising, marketing programs, and product support.   In exchange, Pool required preferred vendors to maintain a certain percentage of sales (75% and later 80%) through distribution, including $2 million through Pool each year.   Dr. Rausser opines that Pool used the preferred vendor program as leverage to encourage other desired behaviors by its preferred vendors.

First, he states that the preferred vendors' supply agreements usually contained a most-favored-pricing clause (colloquially called "most favored nation" provisions–"MFNs" for short).[12]   The MFNs typically required that Pool receive a price at least equal to the lowest price offered to any other customer.   According to Dr. Rausser, the MFNs ensured that Pool "would have available to it inventory that was effectively priced lower than that of its rivals, giving Pool[] another advantage[,] which it could use to ensure that its rivals could not compete effectively."[13]

---

[11]   *Id.* at 62.

[12]   *Id.* at 63.

[13]   *Id.* at 64.

Second, Dr. Rausser states that Pool pressured its preferred vendors to police their own minimum acceptable advertised price (MAPP) and lowest acceptable advertised price (LAPP) policies. He states that "MAPP/LAPP provisions between manufacturers and their customers (either distributors or Dealers who purchased direct) prohibited the customers from advertising (not selling) the manufacturers' products at a price below the manufacturer's set minimum."[14] Similarly, Dr. Rausser suggests that Pool pressured its preferred vendors to police their own policies about dealer "redistribution," which involved a dealer's purchasing product directly from a manufacturer through a buying group and then redistributing that product to other Dealers.[15]

Third, Dr. Rausser states that Pool directed preferred vendors not to sell to new distributors, and that it used the preferred vendor program as leverage to enforce its demands.[16] According to Dr. Rausser, vendors who did not adhere to Pool's conditions ran the risk of being "punished" by being excluded from the preferred vendor program.[17]

---

[14]    *Id.* at 65-66.

[15]    *Id.* at 67.

[16]    *Id.* at 68.

[17]    *Id.* at 71-72.

Dr. Rausser also identifies two strategies supposedly targeted at eliminating competition from buying groups. Buying groups allowed Dealers to purchase product directly from vendors at pre-negotiated prices, thus enabling Dealers to circumvent distribution. First, Dr. Rausser asserts that Pool encouraged the Manufacturer Defendants to increase their minimum purchase amounts for receiving free freight. He notes that the Manufacturer Defendants began announcing increases to their free-freight minimums in the fall of 2007 and that all three had raised their minimum from $10,000 to $20,000 by February 2008.[18] According to Dr. Rausser, this hike in the free-freight minimums "increased the costs faced by many Pool Dealers, including buying group members," which in turn "made membership of such groups a less attractive option for Dealers wishing to escape" Pool.[19] This, in turn, "increase[d] Pool[]'s ability to sustain higher prices for its Dealer customers." Second, Dr. Rausser asserts that Pool sought to directly alter the incentives for Dealers to purchase through Carecraft, one of the two largest buying groups. Pool reached an agreement with Carecraft under which Carecraft would encourage its members to purchase through Pool and, in return, Pool would

---

[18]    *Id.* at 58.

[19]    *Id.* at 60.

provide incentive funds to Carecraft in the form of rebates for purchases its members made.[20] Dr. Rausser refers to this arrangement, which allegedly led Carecraft to "strongly encourage[]" its members to buy through Pool, as the "capture" of Carecraft.[21]

Finally, Dr. Rausser suggests that, in certain instances, Pool sought to directly influence its rivals' pricing, either through the medium of one of its vendors, or by contacting the rival directly.[22]

Dr. Rausser summarizes the alleged effect of these various forms of conduct as follows:

> Through its actions, PoolCorp, in collaboration with the Manufacturing Defendants, directly limited competition from rival distributors and reduced the extent to which Dealers (including proposed Class members) could escape PoolCorp's actions. PoolCorp also signaled its ability and commitment to aggressively dissuade entry and expansion. It created a credible threat that enabled it to elevate and maintain its prices across the United States, causing adverse impact across the proposed Class.[23]

---

[20]    *Id.* at 73.

[21]    *Id.* at 74.

[22]    *Id.*  at 74-77.

[23]    *Id.* at 88.

At his deposition, Dr. Rausser confirmed that it is his narrative liability analysis that demonstrates the impact of the defendants' conduct on Pool's prices.[24]

### 2.    Opinion About Commonality and Quantity of Impact

Having concluded that an impact exists, Dr. Rausser proceeds to evaluate whether that impact would be "common" across the class.  Dr. Rausser concludes that the allegedly supracompetitive pricing "caus[ed] an impact across all Class members,"[25] "regardless of region or product category."[26]  Dr. Rausser supports this opinion with an analysis of Pool's pricing system.  He opines that Pool "used a tightly controlled centralized pricing system to determine prices across geographical regions, products, and customers."[27]  Defendants attack this conclusion on the ground that it lacks factual support.

Dr. Rausser also conducts a "Common Factors" regression, which seeks to identify the key variables that predict variation in Pool Products prices.  For example, the Common Factors regression includes variables to represent costs,

---

[24]    Rausser Deposition at 49:1-2.

[25]    Rausser Initial Report at 84.

[26]    *Id.*

[27]    *Id.* at 88.

demand, seasonal variation, customer size, and product characteristics.  He contends that because his Common Factors regression can predict 99% of the variation in prices, it shows that "common factors predominate" in determining pricing across the class.

Next, Dr. Rausser uses a "before-and-after" analysis to quantify the alleged impact on the class.  The before-and-after analysis seeks to quantify damages by comparing two time periods: a "before" time period, when the allegedly anticompetitive conduct was still underway, and an "after" time period, also referred to as the "benchmark" period, when most of the allegedly anticompetitive conduct had supposedly stopped.  To compare the two time periods, he runs his "Common Factors" regression, but adds one additional variable, a "dummy" variable, which is set to 1 during the class period and to 0 during the benchmark period.  He calls this regression his "Overcharge" regression.  He uses November 21, 2011, as the dividing date between the before period and the benchmark period, because that is the date the Federal Trade Commission "publicly announced its investigation into Pool Products distribution" and "[d]uring that benchmark period, Pool[] was effectively prohibited from engaging in their previous anticompetitive conduct."[28]  A

---

[28]    *Id.* at 11.

positive and statistically significant coefficient on the overcharge dummy variable would indicate an overcharge attributable to the difference in competitive conditions between the class period and the benchmark period.

Defendants challenge Dr. Rausser's before-and-after analysis on two grounds.  First, they challenge the benchmark period Dr. Rausser uses on the ground that many of the types of conduct challenged by the DPPs continued into the benchmark period.  They argue that the benchmark period must be completely free of challenged conduct to be a reliable basis for a "before-and-after" analysis and that, because his benchmark period is not completely clean, his analysis should be excluded as unreliable.  Second, defendants argue that Dr. Rausser's analysis does not "fit" the facts of this case because it does not disaggregate the effect of "any particular allegedly unlawful acts."[29]  They contend that because this case includes separate claims, each involving a different constellation of defendants, the analysis must evaluate the impact of "individual alleged events."  *Id.*

Dr. Rausser's opinion also includes a proposed method for calculating "individual damages" for each individual transaction during the class period. Dr. Rausser estimates the individual overcharge for each transaction in two

---

[29]     R. Doc. 508-3 at 10.

steps.  First, he uses his Overcharge regression model to generate a "Predicted But-For Price" for the transaction.  Second, Dr. Rausser subtracts the Predicted But-For Price from the Actual Price that the customer paid for the transaction.  The difference between the Actual Price paid and the Predicted But-For Price is the "individual overcharge" for that transaction.[30]  Then, to correct for prediction error, Dr. Rausser takes the median overcharge for each product in a month and assigns that overcharge to all customers who purchased that product that month.

Defendants challenge his method on two grounds.  First, they argue that his calculated "individual" overcharge for each transaction inappropriately includes an error term.  Second, they challenge the final stage of his calculations, in which he substitutes a median overcharge term for his individualized estimates.  They argue that this substitution obscures the differences between transactions and leads to "false positives."  Ultimately, they contend that his method does not provide a reliable basis for the trier of fact to assess individual damages.

### 3.     Opinion About Relevant Geographic Market

---

[30]     *See* Rausser Declaration at 18 n.115.

Dr. Rausser concludes that the relevant geographic market is the United States.  He provides two bases for this conclusion.  First, he opines that Pool Product prices should have been "spatially integrated" across the country.[31] Second, he contends that his conclusion finds support in the results of a "cointegration test" he performed on Pool's pricing.[32]  Defendants challenge Dr. Rausser's spatial integration theory on the ground that it is not supported by the facts and his cointegration test on the ground that it is not reliable.

### B.   Relevant Substantive Law

DPPs rely on Dr. Rausser's opinions to support their antitrust claims and their motion for class certification.  The Court sets out the substantive law necessary to understand how the challenged portions of Dr. Rausser's opinion matter to DPPs' antitrust claims and motion for class certification.

### 1.   Attempted Monopolization Claim

Section 2 of the Sherman Act forbids monopolization and attempts to monopolize.  15 U.S.C. § 2.  DPPs maintain one attempted monopolization claim against Pool.   To prevail on the claim, DPPs must prove that Pool (1)

---

[31]     Rausser Initial Report at 35-37; Rausser Rebuttal Report at 48-56; Rausser Supplemental Report at 11 n.29.

[32]     Rausser Rebuttal Report at 55 n.109; Rausser Supplemental Report at 11 n.29.

engaged in predatory or anticompetitive conduct, (2) with the specific intent to monopolize, and (3) with "a dangerous probability" of achieving monopoly power. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993). In appraising whether there is a dangerous probability of success, courts focus principally on the defendant's share of the relevant market. *See, e.g.*, *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 512 (3d Cir. 1994) ("Determining whether a 'dangerous probability' exists requires 'inquiry into the relevant product and geographic market and the defendant's economic power in that market.'" (quoting *Spectrum Sports*, 506 U.S. at 459) ). Market definition is a necessary component of this analysis, because without a definition of a relevant market, there is no way to measure a defendant's ability to lessen or destroy competition. *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). A relevant market has both product and geographic dimensions. *Brown Shoe Co. v. United States,* 370 U.S. 294, 324 (1962); *Surgical Care Ctr. v. Hosp. Dist.*, 309 F.3d 836, 839-40 (5th Cir. 2002) (affirming dismissal for failure to provide evidence sufficient to demonstrate relevant geographic market).

In addition to establishing a Section 2 violation, to recover as private antitrust plaintiffs, DPPs must establish that they suffered injury in their "business or property by reason of anything forbidden in the antitrust laws."

*Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (citing Clayton Act § 4, 15 U.S.C. § 15).  They must also provide "some indication of the amount of damage."  *Id.* (citing *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 317 (5th Cir. 1978)).

### 2.    *Conspiracy Claims*

Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1.  The Supreme Court has made clear, however, that the prohibition on "every" restraint on trade actually "prohibits only agreements that unreasonably restrain trade." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998).

DPPs' remaining section 1 claims are three separate vertical conspiracy claims: one alleging an agreement between Pool and Pentair, another alleging an agreement between Pool and Hayward, and another alleging an agreement between Pool and Zodiac.  Vertical restraints are tested by the rule of reason. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) (overruling *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911), and extending application of rule of reason to all vertical restraints).

Under the rule of reason, courts must assess whether a challenged restraint "unreasonably restrained trade," that is, whether it caused an "injury

to competition." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir. 1997) (citations omitted).  Courts must balance

> the anticompetitive evils of a restrictive practice . . . against any procompetitive benefits or justifications within the confines of the relevant market.  Proof that the defendant's activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason.

*Id.* (citing *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1392 (5th Cir. 1983)).  When assessing the effect on competition of a vertical conspiracy in a case that includes multiple "discrete conspiracies," a court must evaluate each alleged agreement individually:

> [E]ach . . . agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies. . . . Indeed, to hold otherwise would be to suggest that the distinction between a single conspiracy and multiple conspiracies involving a common defendant is one without a difference.

*Dickson v. Microsoft Corp.*, 309 F.3d 193, 210-11 (4th Cir. 2002) (citations omitted).  If, on balance, the challenged conduct injures competition, then the conduct violates Section 1; if not, then not.

Almost always, courts must conduct this assessment within a precisely defined market.  *See Hornsby Oil Co.*, 714 F.2d at 1392-93 (holding that rule of reason analysis must be conducted in the context of the "appropriate

21

product and geographic markets").  The Court must assess all of the relevant market circumstances within that market, including the market power of the businesses involved in the challenged conduct.  *See id.*; *Leegin*, 551 U.S. at 885-86; *Dickson*, 309 F.3d at 209 n.18; *see also* 7 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1503a, at 393 (2010) (explaining that assessing whether harm to competition is "not only possible but likely and significant" ordinarily requires examining market circumstances).  That said, "elaborate market analysis" is not always required:

> [Because] the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as a reduction of output," can obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects."

*F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986).  In most instances, however, plaintiffs cannot present direct evidence of detrimental effects.  In that event, they must be able to define the relevant market. *Hornsby Oil Co.*, 714 F.2d at 1392-93.

In addition to proving a violation of the antitrust laws, to establish private antitrust liability, DPPs must prove that they suffered an injury from the violation, and they must provide "some indication of the amount of damage."  *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir.

2004) (citation omitted).  The injury must be "antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  In other words, the injury must be "congruent with the rationale for finding an antitrust violation in the first place." 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 355c4, at 81 (4th ed. 2014).  Thus, a plaintiff cannot demonstrate antitrust injury without first establishing a violation.  In addition, the causal link between the violation and the injury "may not be based on speculation," but rather "must be proved as a matter of fact and with a fair degree of certainty." *Blue Bird Body Co.*, 573 F.2d at 317.

Once antitrust injury has been established, plaintiffs enjoy a "relaxed burden" with respect to the amount of damages.  *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 435 (5th Cir. 1985).  But "the standard for proving the quantum of damages is not without bounds, for antitrust damages may not be determined by guesswork or speculation." *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 453 (5th Cir. 2005).  Rather, there must be enough for a factfinder to make a "just and reasonable estimate of the damage based on relevant data." *Id.* (quoting *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 46 (5th Cir. 1972).

### 3.     Class Certification

To be certified under Rule 23, the class must first satisfy four threshold requirements.  A court may certify a class only if:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  The party seeking certification bears the burden of establishing these requirements.  *Unger v. Amedisys*, 401 F.3d 316, 320 (5th Cir. 2005) (citing *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001)).

If the prerequisites of Rule 23(a) are met, the proposed class must also satisfy one of the three provisions for certification under Rule 23(b).  For certification of a 23(b)(3) damages class, the court must make a finding that questions of law or fact common to class members predominate over questions affecting only individual members and that a class action is the best way to adjudicate the controversy.  Fed. R. Civ. P. 23(b)(3); *Unger*, 401 F.3d at 320.

To determine whether the class claims meet the predominance requirement, the court must "identify the substantive issues that will control the outcome, assess[] which issues will predominate, and then determin[e] whether the issues are common to the class." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).  As summarized above, establishing the predicate antitrust violation to support each of DPPs' claims is only the first of three steps necessary to establish private antitrust liability.  DPPs must also prove that they suffered "antitrust injury" and make a showing as to the amount of damages.

The Court will need to determine whether injury and amount of damages are susceptible to common proof.  If injury "cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl.*, 339 F.3d at 302.  Likewise, when plaintiffs fail to adduce a formula capable of providing "a just and reasonable estimate of the damages of every class member," individual issues as to amount of damages will defeat predominance. *Id.* at 304; *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 297 (5th Cir. 2004) ("The necessity of calculating damages on an individual basis, by itself, can be grounds for not certifying a class." (citing *Bell Atl.*, 339 F.3d at 308)).  In *Piggly Wiggly*, the

25

Fifth Circuit held that a district court did not abuse its discretion by refusing to certify a class on the ground that many individualized damages determinations would be required "because many of the class members negotiated a price rather than being charged strictly on price lists." *Id.* at 298. In short, "[c]lass treatment . . . may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate." *Bell Atl.*, 339 F.3d at 307.

## C.   Analysis

Defendants challenge five aspects of Dr. Rausser's opinion.  The Court addresses each in turn.

### 1.   *Opinion About Pool's "Centralized Pricing System"*

Dr. Rausser opines that Pool "used a tightly controlled centralized pricing system to determine prices across geographical regions, products, and customers."[33]  He advances this opinion in support of his conclusion that Pool's allegedly supracompetitive pricing "caus[ed] an impact across all Class members,"[34] "regardless of region or product category."[35]  DPPs also rely on

---

[33]    Rausser Initial Report at 88.

[34]    *Id.* at 84.

[35]    *Id.*

Dr. Rausser's opinion about Pool's pricing system to support their proposed market definition in their summary judgment briefing.[36] Defendants challenge Dr. Rausser's opinion about Pool's pricing on that ground that it "is not supported by the facts" in the record and is therefore irrelevant.[37]

To prove that Pool centrally controlled pricing, Dr. Rausser asserts that "catalog" (or "P") pricing was the most prevalent form of pricing Pool used and that Pool could "commonly elevate[] prices across its Dealer customers" through "bulk matrix updates" of its prices.[38]   In contrast, defendants argue that "overwhelming factual evidence" indicates that Pool's prices are "set at the local branch level on a customer-by-customer, product-by-product basis."[39] Specifically, they argue that Pool extensively customized its pricing through the use of its matrix pricing system and price overrides; that catalog pricing not only represented a minority of Pool's sales, but also varied by geographic region; and that Dr. Rausser misrepresents the nature of Pool's "bulk matrix updates."

---

[36]     R. Doc. 582 at 14 (Opposition to Pool's Motion for Summary Judgment on DPPs' Attempted Monopolization Claims and IPPs' Analogous State Law Claims) (citing Rausser Initial Report at 88).

[37]     R. Doc. 508-3 at 16.

[38]     Rausser Initial Report at 94.

[39]     R. Doc. 508-3 at 16.

### *Pool's Pricing System*

The parties agree that Pool uses three main types of pricing: regional catalog, or "P," prices; matrix, or "M," prices; and override, or "OV" prices. Pool issues approximately fifteen different regional catalogs.[40] Catalog pricing is set with input from the divisional pricing managers for each geographic division.[41] Matrix pricing is created at the local branch level, and is customized to individual customers (or customer groups) and individual products (or product groups). Finally, override prices indicate sales for which the sales center manager at a particular branch overrides the catalog and matrix price options.

The parties also agree that Pool uses two types of matrix pricing: "asterisk" (or "*") pricing, and "dollar sign" (or "$") pricing. Asterisk pricing reflects a set markup or discount from the catalog price, or a set markup from cost.[42] Thus, when Pool inputs a change to either catalog prices or cost, asterisk pricing updates automatically.[43] Dollar sign pricing reflects a fixed

---

[40]     Deposition of Melanie Housey, May 2, 2013, at 139:2-3.

[41]     *See* "Division Pricing Manager Responsibilities," Rausser Declaration Exhibit K.

[42]     Deposition of Stephen Dwyer, November 14, 2013, at 52:16-18.

[43]     *Id.* at 52:21-53:3.

dollar price for a product for a specific customer or customer group.[44]  Dollar sign pricing does not update automatically.  Instead, when Pool experiences a cost increase from its vendors, it implements a "bulk update" of its dollar matrices to reflect the cost increase.[45]

### Defendants' Challenges

Pool's expert, Dr. Johnson, argues that Dr. Rausser inaccurately represents the nature of the matrix and override pricing.  According to Dr. Johnson, Dr. Rausser represents that commonality exists among transactions associated with the same price code, even though matrix and override pricing are, by definition, individualized.[46]  For example, an "M1" price code would be used to set a price specific to an individual customer and an individual product (*i.e.*, the price Customer C pays for Brand Y sand), while an "M6" price code would be used to set a price applicable to a group of a customers for an individual product (*i.e.*, the price Customers A, B, and C pay for Brand Y sand).  With override pricing, a Pool representative overrides the catalog and matrix price options.

---

[44]     *Id.* at 51:20-52:7.

[45]     *Id.* at 53:16-22.

[46]     Johnson Affidavit at 12.

Dr. Rausser and Dr. Johnson also disagree about how prevalent each type of pricing is, and what the prevalence of each pricing type implies about the degree to which Pool's pricing is "centralized." Dr. Rausser represents that approximately 43% of Pool's sales were made at catalog prices during the class period.[47] He argues that this demonstrates standardization in Pool's pricing. In contrast, Dr. Johnson, represents that "only 24%" of Pool's gross sales occurred at catalog prices during the class period.[48] Neither expert appears to dispute that 43% of Pool's sales, accounting for 24% of its gross sales, were made at catalog prices during the class period. Rather, they differ as to whether it is more helpful to analyze the percentage of orders or the percentage of sales dollars. Dr. Rausser criticizes Dr. Johnson's choice to analyze the percentage of sales dollars, as opposed to the percentage of orders made under each code, on the ground that using sales dollars "erroneously and needlessly gives the sales of a more expensive products a higher weight in the analysis."[49]

Finally, Dr. Johnson argues that Dr. Rausser misrepresents the nature of Pool's bulk updates. In his initial report, Dr. Rausser characterized Pool's

---

[47]     Rausser Initial Report at 91 tbl.23.

[48]     Johnson Affidavit at 8.

[49]     Rausser Declaration at 5 n.35.

bulk updates as a mechanism for Pool to manipulate prices "on a common basis"[50] and "commonly elevate[] prices across its Dealer customers."[51]  In his declaration, Dr. Rausser shifts his explanation and argues that the evidence still supports the idea that Pool's price updates were "company-wide," because "at the start of each year" Pool updated its "catalog prices, followed by matrix price updates."[52]

## Discussion

When determining the admissibility of evidence, district courts must afford "proper deference to the jury's role as the arbiter of disputes between conflicting opinions."  *14.38 Acres of Land*, 80 F.3d at 1077 (quoting *Viterbo*, 826 F.2d at 422).  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* (quoting *Viterbo*, 826 F.2d at 422).

The Court has reviewed the documents cited by both experts in support of their conclusions about the nature and degree of centralization of Pool's pricing.  The Court concludes that defendants' arguments consist of factual

---

[50]     Rausser Initial Report at 92.

[51]     *Id.* at 94.

[52]     Rausser Declaration at 7.

31

disputes and challenges to Dr. Rausser's conclusions, which are more appropriately explored through cross examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Dr. Rausser's conclusions about Pool's pricing are not devoid of factual support. Indeed, Dr. Rausser's reports cite a number of internal Pool documents that demonstrate some level of centralized control over pricing during the class period.

For example, he cites a document produced by Pool central management entitled "District Pricing Manager Responsibilities."[53] It states that the "core objective" of the division or district pricing manager position is to "improve the selling margins of the division."[54] The document outlines, step-by-step, the process divisions were to follow when making pricing decisions. Step one instructs the divisions to "Begin at 'P' [catalog] pricing . . . for many accounts it should be sufficient."[55] Steps two and three provide guidance on how to

---

[53]   "Division Pricing Manager Responsibilities," Rausser Declaration Exhibit K.

[54]   *Id.*

[55]   *Id.*

limit the use of customized matrix prices as much as possible.[56] The document also indicates that, as part of the process for setting catalog prices, all catalog price changes went through Steve Dwyer, the "corporate pricing manager."[57] This document demonstrates some level of centralized coordination and supervision of Pool's pricing.

Dr. Rausser also cites internal Pool emails discussing how to improve pricing discipline at the branch level. For example, he points to a 2006 email to senior staff from Manny Perez, Pool's president and CEO, in which Perez lists disciplinary actions to be taken against employees who grant unauthorized pricing exceptions. The list includes requiring the responsible employee to pay Pool for the difference between the sale price and the authorized price ("equivalent to reimbursing the Company for stealing") and "termination."[58] This document provides support for Dr. Rausser's opinion that "pricing discipline was instilled from the most senior levels[.]"[59]

Dr. Rausser also points to Pool's "Price Management 2011 Action Plan," which provides detailed instructions on managing Pool's active price matrices.

---

[56]     *Id.*

[57]     *Id.*

[58]     April 8, 2006 email, Rausser Declaration Exhibit Q.

[59]     Rausser Declaration at 4.

The plan instructs managers to review all price matrices for specific customers, eliminate obsolete entries, and then "[i]ncrease the gross margin percent on every matrix for every customer."[60]  The plan further instructs managers to review group matrices and reduce the number of customers and products assigned to the lists and "[i]ncrease the margins on all items on these lists."[61]  The plan explains:

> As a general rule, 80% of our customers watch pricing by focusing on a relatively small list of products they purchase frequently.  For these customers we should be able to raise our margins on every matrix item without raising any concerns.  This will be easier this year as we have inflation.  A margin going from 24.2% to 24.6% should go unnoticed.[62]

This document arguably provides step-by-step instructions for Pool's managers to implement across-the-board price increases for their customers.

These documents, and others like them, provide support for Dr. Rausser's opinion that Pool's pricing was subject to centralized control. Although Pool's pricing may not be as "tightly controlled" as Dr. Rausser opines, neither does it appear to be as atomized as Dr. Johnson suggests.  This

---

[60]     "Price Management 2011 Action Plan," Rausser Declaration Exhibit V.

[61]     *Id.*

[62]     *Id.*

"dispute[] between conflicting opinions" is best left to the jury. *14.38 Acres of Land*, 80 F.3d at 1077.

The Court reaches a similar conclusion about Dr. Rausser's opinion on the effect of Pool's bulk updates.  Although there is no dispute that the bulk updates do not update all prices for all products at one time, Dr. Rausser has pointed to some evidence that the bulk updates facilitated common, if not completely uniform, increases in prices.  Specifically, he has analyzed the effect of the bulk updates on pricing for different product lines, and he presents his results in a series of graphs demonstrating step-like increases in prices corresponding to the bulk updates.[63]  Thus, his bulk updates opinion is not without support in the record.

The Court denies defendants' motion to exclude Dr. Rausser's opinion about the centralization of Pool's pricing.

### 2.   *Definition of the Relevant Geographic Market*

Dr. Rausser opines that the relevant geographic market is the United States.[64]  He supports his conclusion by arguing that Pool Product prices

---

[63]    Rausser Reply Report at 13-24.

[64]    Rausser Initial Report at 35.

should have been "spatially integrated" across the country,[65] and by reporting his interpretation of a "cointegration test" of Pool's pricing.[66]   Defendants challenge Dr. Rausser's spatial integration analysis and cointegration test as unconnected to the facts of the case and unreliable.

### *"Spatial Integration" Theory*

Dr. Rausser recognizes that the FTC complaint, which did not allege a national market, referred to "local geographic markets, focusing on demand-side effects − *i.e.* the limited ability of Dealers in certain locales to switch to distributors operating far away."[67]   He argues, however, that a market can still be national on the basis of supply-side substitution.   He explains:

> [B]ecause Pool Products can and did ship throughout the United States . . . prices are expected to be related (or "spatially integrated") across the country, through supply-side substitution. Simply, where prices are elevated in one region relative to another (above that which can be justified by differences in transportation costs between the two), the economics of supply-side substitutability means that product flow will be restricted in the low-price region and re-directed to the higher price region, because such a re-direction would be economically beneficial to the supplier.   This dynamic (often referred to as "spatial arbitrage") serves to keep prices in different regions related, and

---

[65]     *Id.* at 35-37; Rausser Rebuttal Report at 48-56; Rausser Supplemental Report at 11 n.29.

[66]     Rausser Rebuttal Report at 55 n.109; Rausser Supplemental Report at 11 n.29.

[67]     Rausser Initial Report at 35.

it also means that the relevant enquiry regarding market power is one that looks across the United States and not just in a particular locale.[68]

Defendants challenge Dr. Rausser's spatial integration theory as ungrounded in the facts of the case.[69] They point out that Dr. Rausser has not identified any evidence indicating that Pool ever shipped product from one branch to another for the purpose of maximizing profits.  Pool's expert, Dr. Johnson, points to evidence that gross margins varied by geographic region, and that, therefore, if Pool were engaging in "spatial arbitrage," it should have been shifting sales from less profitable to more profitable divisions until gross margins across geographies equalized.[70] As an illustration, Dr. Johnson points out that average gross margins for the heaters product line were twice as high in the Southeast region as in the Southern California region.[71]  And yet Dr. Rausser has pointed to no evidence that heaters, or any other products, were transferred to improve margins.

At his deposition, Dr. Rausser could identify only two pieces of evidence in support of his spatial integration opinion.  First, he identified a memo in

---

[68]     *Id.* at 36.

[69]     R. Doc. 508-3 at 16-17.

[70]     Johnson Affidavit at 18.

[71]     *Id.* (citing Johnson Initial Report, Exhibit 61).

37

which Pool management discussed the need to review with branches matrix pricing producing a "gross margin of 10% or less based on replacement cost."[72] To explain the memo, he cited deposition testimony by Manny Perez, indicating that Perez wanted general managers to personally review all low-margin sales.  Dr. Rausser argued that this evidence demonstrates that Pool was aiming to "maximize total margins."  He reasoned that "the only way of maximizing total margins is, in fact, to equalize them, setting the incremental value of margins across regions of the country in equilibrium."[73]   This document does not demonstrate that spatial arbitrage actually occurred.

Second, Dr. Rausser identified a regional manager report that discussed Pool's internal mechanism for transferring product from one branch to a branch that is out-of-stock.[74]  Pool's counsel asked Dr. Rausser:

Q:   Is there anything in those documents that suggests that the subject of transferring product had anything to do with anything other than situations where one branch is out of stock of a product and needs to get product from another branch in order to fill demand?

A:   Well, certainly that's the major point that is visited in this document.   But it also shows . . . they put in place a mechanism for moving product from the area of excess

---

[72]   Exhibit 1848 to Rausser Deposition.

[73]   Rausser Deposition at 245:1-5.

[74]   Exhibit 3025 to Rausser Deposition.

> supply to an area of excess demand. . . . But fundamentally, it goes to taking advantage of areas in which pricing and margins are better in one are than they are in another.
>
> Q:  Show me where in Exhibit 3025 there's reference to the transfer of product being motivated by pricing or margins being better in one area rather than the other.
>
> A:  If you have a stock out–this is implicit. If you have stock out -
>
> Q:  This is a very specific question.
>
> A:  Okay. Fair enough.
>
> Q:  I'd like you to show me where explicitly it makes reference to that.
>
> A:  There is no statement that goes directly to margins, but this is the internal . . . managerial operations with regard to moving product from one local branch to another.[75]

The regional manager report is not evidence of shifting product to increase margins.

On the demand-side, which Dr. Rausser does not extensively address, Dr. Johnson's reports provide evidence that Pool Products sales were significantly more localized than Dr. Rausser suggests.  Specifically, Dr. Johnson points to evidence that buyers typically were not willing to travel long distances for Pool Products, or to have Pool Products shipped from far away

---

[75]   Rausser Deposition at 249:12-251:2.

(which he hypothesizes owes to high freight costs).  He shows that in most states, more than 90% of pick-up purchases were made at stores 50 miles or less from the buyer.[76]  Likewise, in most of the states where Pool has branches, more than 90% of the orders Pool shipped were to Dealers 125 miles away or less.[77]  Dr. Rausser responds:

> [T]hese statistics reflect only the distances over which Dealers *have* sourced Pool Products, not the distances over which they may be prepared to source Pool Products.  If prices are in equilibrium, in that spatial arbitrage opportunities have been exploited and prices across regions have stabilized as a result, then Dealers need not source Pool Products from greater distances in order to enjoy better prices that may be on offer at distant branches.  This does not mean that, if the network were to get out of equilibrium, with spatial arbitrage opportunities on offer, that Dealers would refrain from sourcing Pool Products from substantially further afield than 100 miles.[78]

But this is a bit like saying that the evidence for his theory is that there is no evidence.  That Dealers, for the most part, ship locally may be consistent with a market that is integrated and in equilibrium, but it is equally consistent with an unintegrated market.

Ultimately, the Court finds that there is simply too great an analytical gap between the underlying evidence presented and Dr. Rausser's opinion.  As

---

[76]     Johnson Rebuttal Report at 46, Exhibit 11.

[77]     *Id.* at 48, Exhibit 12.

[78]     Rausser Rebuttal Report at 54-55.

the Fifth Circuit has repeatedly held, "[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Guile*, 422 F.3d at 227 (quoting *Viterbo*, 826 F.2d at 422).  Thus, "an expert's opinion should not be admitted if it does not apply to the specific facts of the case." *Diggs v. Citigroup, Inc.*, 551 F. App'x 762, 765 (5th Cir. 2014) (citing *Kumho Tire*, 526 U.S. at 154).  Here, Dr. Rausser has failed to point to any evidence indicating that the theory of spatial integration applies to the facts of the Pool Products market.  The lack of evidence is telling; it is hard to imagine how Pool could have executed a nationwide program of margin-maximizing product transfers without having some sort of company policy in place.  Because Dr. Rausser's opinion of spatial integration is without support in the record, it offers no help to the fact finder, and the Court excludes it as irrelevant.

### *Cointegration Test*

In two footnotes, Dr. Rausser describes a "cointegration test" that he ran, which supposedly supports his conclusion that prices are spatially integrated.  First, in footnote 109 of his rebuttal report, Dr. Rausser writes:

> A cointegration test of PoolCorp's overall pricing supports that prices are spatially integrated across the regions of the United States.  To test for spatial integration of PoolCorp's prices I identified all products which were sold by PoolCorp in every quarter and in every census region (Northeast, Midwest, South, and West) over the period from January 2007 through September 2012 (inclusive).  I then computed the average quarterly price for

each of the four census regions over all 621 such products.   A
cointegration test confirms that the four resulting price series are
related, *see* my work papers. Fackler & Goodwin describe how
cointegration tests can be used to investigate spatial integration.

Then, in footnote 29 of his supplemental report, he writes:

In addition to the analysis presented in the Appendix, I have re-
run the cointegration analysis of PoolCorp's overall pricing
. . . after adjusting for the amended interpretation of PoolCorp's
pricing variable in its OH database.  However, because it is not
consistently available throughout the time period, and
cointegration analysis requires consistently measured time series,
no adjustment is made for the unit-of-measure issue.  The results
continue to support my conclusion that prices are spatially
integrated across the regions of the United States. *See* my work
papers.

That is all the description that Dr. Rausser provides of his cointegration

test. Dr. Rausser does not provide any evidence of his calculations or any

description of his results.  Without this, the Court is unable to evaluate Dr.

Rausser's methodology. Dr. Johnson, who has apparently seen Dr. Rausser's

work papers, writes, "Dr. Rausser does not describe either his testing or the

associated results.  It is unclear from a replication of his work papers what

serves as the basis for his claim that he continues to find support for his

conclusion."[79]  The Court cannot accept Dr. Rausser's bare assertion that the

test results "support[] that prices are spatially integrated across the regions of

---

[79]      Johnson Affidavit at 19 n.94.

the United States."  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. On this basis alone, Dr. Rausser's opinion about his cointegration test can be excluded as unreliable.

In addition, however, the Court has identified at least four substantive problems with the "methodology" of Dr. Rausser's cointegration test.  First, as Dr. Johnson observes, Dr. Rausser's sample set of 621 products is quite small. It represents less than 1% of the products sold by Pool.[80]  Dr. Rausser seeks to justify the small sample size by explaining that cointegration tests require "price series over a long period, with a high time-frequency," which counsels for using fewer regions and more frequent observations (*i.e.*, quarterly as opposed to annual).  And he represents that the 621 products he included in his analysis are the only products that were sold by Pool in all four Census regions every quarter.[81]  But this explanation does not answer the real question posed by a small sample set: Is the sample size big enough to yield statistically

---

[80]    *Id.* at 19.

[81]    Rausser Declaration at 11; Rausser Reply Report at 55 n.109.

significant results?  As Dr. Rausser does not provide his results, the Court has no way of knowing what level of statistical significance he obtained, if any.

Second, the Court finds no support for the use of four generic census regions for a test of geographic market integration in the Pool Products market.  The census regions do not correspond to the organization of the Pool Products industry or of Pool's business.  Moreover, each census region includes states that have little logical connection with one another.  For example, the "West" census region comprises Alaska, Hawaii, Montana, Wyoming, Colorado, New Mexico, Idaho, Utah, Arizona, Nevada, Washington, Oregon, and California.[82]  Thus, the region includes obvious "sunbelt" states (California, Arizona, New Mexico), and "snowbelt" states (Colorado, Washington).[83]  Common sense indicates that different pricing factors may apply between sunbelt and snowbelt states.  But because Dr. Rausser uses geographic regions that include states from both groups, the cointegration test

---

[82]     Johnson Affidavit at 19 n.93.

[83]     Johnson Initial Report at 78 (stating that the "snowbelt" comprises the northern United States); Deposition of Gregory Howard, July 25, 2013 at 259:13-16 ("The sunbelt typically starts in Southern California, works its way over to Florida and the southeast, and those are considered 12-month markets.").

44

cannot answer whether pricing is integrated between sunbelt and snowbelt states.

Third, Dr. Rausser admits that his data for the cointegration test does not correct for the "unit-of-measure issue."  The unit-of-measure issue is a significant data coding issue that plagued Dr. Rausser's initial and rebuttal reports.  The problem may be summarized as follows.  For some transactions, Pool records a quantity of "one," indicating that one unit of a product was sold.  For others, a quantity of "one" indicates "one case," indicating that twelve (or some other number greater than one) units of the product were sold.  Thus, without the unit-of-measure variable, it is impossible to know whether the price given for a particular transaction is the price for one unit or for multiple units.

Dr. Rausser explains that he did not correct for unit-of-measure in the data set for his cointegration test because unit-of-measure information is "not consistently available throughout the time period."[84]  He makes no attempt to explain what effect this error may have had on his results.  But the unit-of-measure issue was such a big problem in Dr. Rausser's initial and rebuttal reports that the Court permitted him—over defendants' objections—to submit

---

[84]      Rausser Supplemental Report at 11 n.29.

a supplemental report correcting the issue well after the deadlines for the exchange of expert reports had passed. This required numerous other adjustments to the Court's scheduling order, to wit: the defendants were allowed to submit supplemental reports from their experts in response to Dr. Rausser's supplemental report; Dr. Rausser had to be redeposed; and, most significantly, all of the briefing deadlines for summary judgment, class certification, and *Daubert* motions had to be pushed back by several months—all to correct for two data coding issues, the unit-of-measure issue being one. The Court has a hard time accepting that a coding issue this significant would not also cause problems for Dr. Rausser's results here.

Finally, the Court observes that Dr. Rausser has not followed the best practices prescribed by the very authorities he cites. Dr. Rausser's cointegration discussion cites P.L. Fackler & B.K. Goodwin, *Spatial Price Analysis*, *in* HANDBOOK OF AGRICULTURAL ECONOMICS 971 (Bruce L. Gardner & Gordon C. Rausser, eds. 2001). He states that the article "describe[s] how cointegration tests can be used to investigate spatial integration."[85] The Court has reviewed the article. It provides a number of cautions and caveats about

---

[85]     Rausser Reply Report at 55 n.109.

the limitations of the tests it describes, including cointegration tests.  The

article explains that as a result of these limitations,

> *empirical tests supporting integration could be consistent with a*
> *complete lack of integration*, and tests rejecting integration could
> occur in markets that are completely linked.  These indeterminate
> results follow from a number of weaknesses inherent in the
> empirical tests, including a lack of information about transaction
> costs, model misspecifications, and weaknesses in the inferential
> procedures.

*Id.* at 1017 (emphasis added).  The article goes on to summarize:

> What can be learned about spatial market behavior from empirical
> tests based upon prices alone?  These tests clearly provide
> information about spatial relationships among prices.  However,
> the tests should be interpreted within the context of institutional
> and factual characteristics of the markets in question as well as the
> shortcomings associated with each test.  *The significant*
> *limitations associated with individual tests suggest that*
> *inferences should not be based upon a single test but rather, when*
> *possible, on a variety of inferential techniques.*

*Id.* at 1018 (emphasis added).  Thus, the very article to which Dr. Rausser

directs the Court's attention undermines his approach here.  He has conducted

just one test, instead of the variety of tests and techniques prescribed by the

article.  Moreover, the article makes clear that the results of any one test

standing alone are simply not enough from which to draw conclusions.  Dr.

Rausser's isolated use of the cointegration test violates accepted best practice

as described by the authority upon which he relies.  For all of these reasons,
Dr. Rausser's opinion about his cointegration test is excluded as unreliable.

### 3.    *Benchmark Period*

Damages calculations in antitrust cases seek to compare plaintiffs' actual
experience in the real world with what the plaintiffs' experience would have
been, "but for" the antitrust violation.  *See* ABA Section of Antitrust Law,
*Antitrust Law Developments* 783 (7th ed. 2012).  One widely accepted
methodology for proving damages is a before-and-after analysis, which
"compares . . . the prices [a plaintiff] paid during the period of violations
with . . . prices paid . . . after [the violation period's] termination."  *Id.* at 786.

Dr. Rausser employs a before-and-after analysis here.  Dr. Rausser uses
November 21, 2011, as the dividing date between the "before" period—when the
allegedly anticompetitive conduct was still underway—and the "benchmark"
period—when most of the allegedly anticompetitive conduct had supposedly
stopped.  Dr. Rausser says he chose the date because it is the date the Federal
Trade Commission "publicly announced its investigation into Pool Products
distribution" and "[d]uring that benchmark period, Pool[] was effectively

prohibited from engaging in their previous anticompetitive conduct."[86] For his before-and-after analysis, Dr. Rausser uses the same variables as in his Common Factors regression, but adds one additional variable, a "dummy" variable, which is set to 1 during the class period and to 0 during the benchmark period. A positive and statistically significant coefficient on the overcharge dummy variable would indicate an overcharge attributable to the difference in competitive conditions between the class period and the benchmark period.

Defendants challenge Dr. Rausser's chosen benchmark period on the ground that many of the types of conduct challenged by the DPPs continued into the benchmark period. They argue that the benchmark period must be completely free of challenged conduct to be a reliable basis for a "before-and-after" analysis, and that because his benchmark period is not completely clean, his analysis should be excluded as unreliable. They cite *National Farmers' Organization, Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989), for the proposition that "an antitrust plaintiff's damages should reflect the difference between its performance in a hypothetical market *free of all antitrust violations* and its

---

[86]    Rausser Initial Report at 11.

actual performance in the market infected by the anticompetitive conduct." *Id.* at 1306 (emphasis added).

The Court rejects this argument. Defendants do not dispute that the before-and-after method is an accepted methodology to estimate overcharge damages. Nor do they provide any authority for the proposition that an expert's opinion must be excluded if the "after" period is not free of any residual effects of the challenged exclusionary or collusive conduct. *National Farmers' Organization*, cited by defendants, does not stand for that proposition, or anything close to it. Indeed, the Eighth Circuit's decision is a ringing endorsement of a liberal approach to calculating damages once the plaintiff has shown the fact of injury. *See* 850 F.2d at 1293 (explaining "a lesser standard of proof is applicable to proof of the amount of damages"). Further, as plaintiffs note, the court in *In re Linerboard Antitrust Litigation* rejected the argument that an expert's opinion must be excluded if the benchmark period is not free of collusion. *See* 497 F. Supp. 2d 666, 675 (E.D. Pa. 2007). In *Linerboard*, the plaintiffs alleged a horizontal price-fixing conspiracy. The plaintiffs' expert constructed a model that used variables representing cost, demand, and other predictive factors to predict what prices should have been absent the alleged collusion. For inputs, the expert used data that excluded the period of the alleged conduct. The expert subtracted

the predicted but-for prices generated by his model from the prices paid by the plaintiffs during the damages period. The defendants argued that, in choosing variables for his regression, the expert incorrectly assumed his benchmark period was free from collusion. The court concluded that even if the benchmark was not "perfectly competitive," the argument was unavailing. It reasoned that if there was in fact some collusion during the benchmark period, then the but-for price estimates would be too high, resulting in a "more conservative" estimate. *Id.*

The FTC Consent Decree required Pool to cease and desist from engaging in practices designed to induce or coerce manufacturers to refuse to deal with other distributors, as well as from exacting penalties, discriminating, or retaliating against manufacturers because they dealt with or intended to deal with other distributors. Further, the Consent Decree required Pool to desist from conditioning participation in its preferred vendor program on whether a manufacturer sold to other distributors. Thus, the focus of the FTC Consent Decree and, indeed, the most serious of plaintiffs' allegations, involve Pool's efforts to induce or coerce manufacturers to refuse to deal with actual or would-be competitors. The Court has seen nothing in the record to indicate that Pool persisted in that conduct during the after period. That the preferred vendor program continued in the after period is not inconsistent with a

51

cessation of anticompetitive activities.  Pool was not required to forego the program completely; it was required only to stop using it as a tool to exclude competitors.  Further, Dr. Rausser stated that during the after period, he did not "see any events with regard to foreclosure that one witnesses during the class period."[87] Dr. Rausser cited Pool Source as an example of a distributor that had been foreclosed, and to which Pentair and Zodiac began to sell substantial amounts in the after period.[88]  As to the other challenged "mechanisms that were still in place" in the after period, Dr. Rausser stated that he did not see "any evidence" to support the assertion that they were "effectively implemented to achieve anticompetitive results."[89]  The issues defendants raise with respect to free freight minimums and most favored nations clauses are not trivial, but they do not fundamentally undermine Dr. Rausser's analysis.  Rather, they provide a fertile subject for cross-examination.  *See Daubert*, 509 U.S. at 596.  Dr. Rausser's before-and-after analysis is not excludable.

### 4.    *Aggregated Causation Analysis*

---

[87]    Rausser Deposition at 395:15-397:6.

[88]    Rausser Initial Report at 54-55.

[89]    *Id.*

Fourth, defendants challenge Dr. Rausser's analysis on the ground that it does not disaggregate the impact of "any particular allegedly unlawful acts."[90]   They argue that this case, which includes separate claims against different combinations of defendants, requires a disaggregated analysis of the impact of "individual alleged events."

In response, DPPs argue that Dr. Rausser's aggregated analysis is "[c]onsistent with DPPs' allegations and the evidence."[91]   Essentially, they argue that because they allege that all of the challenged conduct is related in one way or another, it is correct for their expert to analyze all of the challenged conduct together.   In support of their position, they cite cases in which the plaintiffs maintain only one Sherman Act claim.   *See In re TFT LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal. 2010) (single conspiracy claim); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 265 (D.D.C. 2002) (single conspiracy claim); *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 813 (3d Cir. 1984) (single attempted monopoly claim); *LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) (single monopoly claim); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962)

---

[90]      R. Doc. 508-3 at 10.

[91]      R. Doc. 573 at 20.

(single conspiracy to monopolize claim).  They do not address whether an aggregated analysis can work in a case that involves multiple claims against different defendants.

Dr. Rausser confirms that he has taken an aggregated approach to analyzing the effect of the challenged conduct.  He explains that his model "measures the increase in prices . . . attributable to PoolCorp's exercise of market power *whatever the basis for the maintenance or enhancement of that power*."[92]  And he admits that the data will not allow him to disaggregate the effect, if any, of any individual challenged act or of any of DPPs' individual claims.  Thus, there is no dispute that Dr. Rausser's analysis does not demonstrate the effect of any specific challenged act or of any of the separate conspiracies.

Dr. Rausser defends his approach.  Indeed, he criticizes the defense experts for evaluating specific "alleged anti-competitive acts in isolation" and "attempting to trace the particular effects of each one as though none of the other conduct had taken place."[93]  He argues that, as a matter of economics,

---

[92]    Rausser Initial Report at 105 n.411 (emphasis added)

[93]    Rausser Reply Report at 47.

all of the alleged anticompetitive acts "must be judged based on their aggregate, rather than singular, effect."[94]

Here, defendants challenge the "fit" of Dr. Rausser's methods to the issues in this case, making a relevance argument. What is relevant to the proof of a claim depends on the legal standard that governs the claim. If, under the legal standard, only the conduct of certain parties is to be considered in determining if a violation occurred, an expert's opinion based on the conduct of others does not fit the case. As just summarized, Dr. Rausser's aggregated causation analysis purports to demonstrate and quantify the effect of all of the defendants' challenged conduct together. Thus, the Court must determine whether an analysis that seeks to demonstrate only the aggregated effect of all of the challenged conduct is relevant to all of DPPs' claims.

The Court begins with DPPs' attempted monopolization claim against Pool. Liability in a private antitrust action requires that DPPs prove (1) a violation of the antitrust laws, (2) the fact of damage, and (3) some indication of the amount of damage. *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 452 (5th Cir. 2005). "The fact of damage requirement is one of causation; the plaintiff must show that the defendant's unlawful conduct was

---

[94]     *Id.*

a material cause of injury to it[.]"  *Id.*  In a section 2 case, "[t]he fact finder should be able to consider the entire sum of unlawful exclusionary practices," although "care must be taken lest . . . causation and damages relate predominantly to lawful rather than unlawful conduct."  2B Areeda & Hovencamp at ¶ 310c7, at 235-237 (4th ed. 2014).  "The dominant conduct causing the plaintiffs injuries must still be found to be unlawful." *Id.* at 237. Here, DPPs rely on all of the challenged conduct in support of their attempted monopolization claim against Pool.  Thus, so long as all of the challenged conduct is found to be unlawful, proof of the aggregated effect of that conduct can satisfy the injury requirement for DPPs' section 2 claim.  Therefore, the aggregated analysis is relevant to DPPs' attempted monopolization claim against Pool.  Thus, Dr. Rausser's aggregated analysis need not be excluded as to DPPs' attempted monopolization claim.

Next, the Court assesses the evidence's relevance to DPPs' three vertical conspiracy claims.  With respect to these claims, the Court concludes that Dr. Rausser's aggregate analysis does not answer the relevant question.  His opinion cannot help the fact-finder determine whether any one of these vertical conspiracies had an anticompetitive effect on the relevant market.  As discussed earlier, DPPs' vertical conspiracy claims are assessed under the rule of reason.  To prevail on a rule of reason claim, a plaintiff must demonstrate

that a challenged restraint caused an adverse effect on competition, not simply to isolated competitors.  *See Doctor's Hosp. of Jefferson*, 123 F.3d at 307.  In assessing anticompetitive effects in the context of these vertical claims, the focus is not just on Pool's market share, but also on whether each Manufacturer Defendant had market power of antitrust concern.  *See Dickson,* 309 F.3d at 207-11.  Absent such power, a Manufacturer Defendant's collusion with Pool would be ineffective.[95] And, when assessing the effect on competition of a vertical conspiracy in a case that includes multiple "discrete conspiracies," a court must evaluate only the conduct in furtherance of each alleged agreement.  *Id.* at 210-11.  Dr. Rausser's aggregated analysis does not even attempt to demonstrate the effects of each defendant's acts taken in furtherance of each alleged conspiracy.  Indeed, he does not even advance a theory to explain how collusion between Pool and, for example, Zodiac, could have injured competition.  Dr. Rausser and plaintiffs treat the case as one big conspiracy among Pool and all three Manufacturer Defendants *inter se* to exclude Pool's rivals or would-be rivals in order to allow Pool to charge anticompetitive prices to its downstream customers.  Notably, this is a claim

---

[95]     *See* Elzinga DPP Report at 35-39.

that the Court dismissed on the pleadings because plaintiffs failed to plausibly allege horizontal collusion by the Manufacturer Defendants.[96]

Dr. Rausser does not demonstrate that any Manufacturer Defendant had the market power necessary to foreclose competition through an agreement with Pool. Dr. Rausser does not provide the market shares of each Manufacturer Defendant and merely provides how much of the Manufacturer Defendants' sales went to Pool and how much they collectively made up of Pool's sales. But Pool's purchases and sales do not constitute a market. Dr. Elzinga estimates, for example, that Zodiac's share of the total Pool Products purchased was between 6 and 7 percent.[97] So measured, Zodiac's individual share would suggest that it does not individually have the power to foreclose competition in a vertical agreement with Pool. Dr. Rausser's observation that Pool has buying leverage over the Manufacturer Defendants because Pool was their largest customer does not answer the question of whether any of these firms independently had the power to foreclose competition in a national market through an anticompetitive agreement with Pool. *See Dickson*, 309 F.3d at 208-11. For these reasons, the Court finds that Dr. Rausser's aggregate

---

[96]     *See* R. Doc. 221 at 51-56.

[97]     Elzinga DPP Report at 18.

58

causation analysis does not fit DPPs' three vertical conspiracy claims, and it excludes his aggregated analysis as to these claims.

### 5. Individual Damages Calculation

Finally, defendants challenge Dr. Rausser's proposed method for calculating "individual damages" for the members of the class. Defendants challenge two aspects of his proposed method: (1) its supposed inclusion of an error term in its estimates of the overcharge applicable to each transaction analyzed, and (2) its use of a median overcharge term instead of an individualized overcharge estimate in the final stage of each calculation. Defendants argue that as a result of these two alleged flaws, Dr. Rausser's proposed method leads to "false positives" and does not provide a reliable formula for calculating individual damages across the class.

### Inclusion of Error Term

Dr. Johnson represents that Dr. Rausser's individualized overcharge calculation for each transaction is equivalent to the uniform overcharge estimated by Dr. Rausser's Overcharge regression model, plus the prediction error associated with the transaction.[98] Dr. Johnson explains that "the error term in a regression model captures *what cannot be explained* by the model"

---

[98]    Johnson Affidavit at 3-4.

59

and argues that it is "therefore inappropriate to attribute the observed variation in prices that cannot be explained by Dr. Rausser's regression model to the overcharge."[99]

The Court rejects this argument.  Dr. Rausser estimates the individual overcharge for each transaction in two steps.  First, he uses his regression model to generate a "Predicted But-For Price" for the transaction.  Because this price is a prediction, it naturally includes an element of prediction error. (This is the "error term" to which Dr. Johnson refers.)  Second, Dr. Rausser subtracts the Predicted But-For Price from the Actual Price that the customer paid for the transaction.  The difference between the Actual Price paid and the Predicted But-For Price is the "individual overcharge" for that transaction.[100] That Dr. Rausser's model, like all predictive models, includes a measure of prediction error does not necessarily invalidate the model.  The Court will not exclude his individual damages calculation on this ground.

---

[99]     *Id.* at 4.

[100]     *See* Rausser Declaration at 18 n.115.

### *Use of Medians*

Defendants also challenge Dr. Rausser's use of median overcharges instead of individualized overcharge estimates in the final stage of each calculation.  They argue that this method leads to "false positives" and does not provide a reliable basis for the trier of fact to assess individual damages.

The Court begins by summarizing Dr. Rausser's method.  First, Dr. Rausser calculates "individual" overcharges for each transaction, as described above.  Then, to ameliorate the effects of prediction error, Dr. Rausser takes the median overcharge for each product in a month and assigns that overcharge to all customers who purchased that product that month.  He argues that this approach is "necessary given random prediction error," and that using medians "decreases individual overcharges that are too high (due to prediction error)" and "increas[es] individual overcharges that are too low or negative (due to prediction error)."[101]

If DPPs can establish an antitrust violation and antitrust injury, they will enjoy a "relaxed burden" with respect to the amount of damages.  *Pierce*, 753 F.2d at 435.  As the Fifth Circuit has explained, "[O]nce the causation hurdle has been overcome, the expert on damages need not be armed on the right

---

[101]     *Id.* at 18 & n.119.

hand with a slide rule, on the left hand with a computer. He is allowed some economic imagination so long as it does not become fantasy." *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 25 (5th Cir. 1974). Thus, while "antitrust damages may not be determined by guesswork or speculation," plaintiffs need provide only a sufficient basis a factfinder to make a "just and reasonable estimate of the damage based on relevant data." *El Aguila*, 131 F. App'x at 453.

Defendants have not established that Dr. Rausser's model fails to provide a basis for the factfinder to make a "just and reasonable estimate" of the damages for each plaintiff. DPPs' theory of the case is that class members were overcharged fairly uniformly across product lines and geographic regions. If DPPs persuade the factfinder that their theory of the case is correct, then, theoretically, a damages formula simply applying the estimated average overcharge to each plaintiff's purchases would be sufficient to provide a reasonable estimate of individual damages. *See Greenhaw v. Lubbock Cty. Beverage Ass'n*, 721 F.2d 1019, 1029 (5th Cir. 1983), *overruled in part on other grounds by Int'l Woodworkers of Am., AFL-CIO & its Local No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986) (approving the application of an average overcharge figure, rather than an overcharge figure tailored by purchase location, to calculate damages for individual purchasers

when it would have been impossible to determine how purchasers' shopping patterns would have differed in a competitive market).  Here, Dr. Rausser has presented a model even more refined than one simply applying the average overcharge to all purchases.  His individual damages model goes one step further, providing an overcharge estimate specific to the product purchased and the month of purchase.

Defendants argue that *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 725 F.3d 244 (D.C. Cir. 2013), requires the Court to reject Dr. Rausser's model.  In *Rail Freight*, the D.C. Circuit reversed the district court's class certification order, partly on the ground that the district court had failed to take a "hard look" at the soundness of the plaintiffs' proposed damages model.  *Id.* at 255.  In particular, the court noted that the plaintiffs' proposed damages methodology "detect[ed] injury where none could exist."  *Id.* at 252. In that case, however, the court could identify a segment of class members who categorically could not have suffered an overcharge: a group of shippers subject to legacy contracts and therefore "bound by rates negotiated before any conspiratorial behavior was alleged to have occurred."  *Id.*  No such group of categorically undamaged plaintiffs exists here.  Rather, defendants point to the negative overcharge estimates that Dr. Rausser's model generates for some transactions (before he corrects for prediction error) as evidence that some

class members "ha[d] no 'damages' at all."[102]  Defendants misunderstand the purpose of Dr. Rausser's individual damages model.  It does not purport to provide a precise *calculation* of the exact dollar amount each plaintiff was overcharged; it seeks to provide a reasonable *estimate* of each plaintiffs' likely overcharge.

To that end, Dr. Rausser has determined that using medians to control for prediction error results in more reasonable estimates.  And defendants have not provided any reason to refute that using a median is an appropriate econometric method to mitigate prediction error when generating an estimate. Moreover, an estimate is precisely what antitrust law permits plaintiffs to present, once they have cleared the evidentiary hurdles of establishing a violation and antitrust injury.  For these reasons, the Court will not exclude Dr. Rausser's proposed "formula . . . to calculate individual damages."  *Bell Atlantic*, 339 F.3d at 307.

---

[102]    R. Doc. 508-3 at 9.

64

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART defendants' motion to exclude the testimony of Dr. Rausser.  The Court excludes Dr. Rausser's opinion about (1) spatial integration, including his cointegration test; and (2) aggregate causation to demonstrate the effect of the alleged vertical conspiracies.

New Orleans, Louisiana, this 22nd day of February, 2016.

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE