UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL No. 2328

IN RE: POOL PRODUCTS
DISTRIBUTION MARKET
ANTITRUST LITIGATION                      SECTION: R(2)

JUDGE VANCE
MAG. JUDGE
WILKINSON

**THIS DOCUMENT RELATES TO ALL CASES**

**ORDER AND REASONS**

Defendants Pool Corporation, SCP Distributors LLC, and Superior Pool Products (collectively, "Pool") move for summary judgment on direct-purchaser plaintiffs' claim of attempted monopolization under Section 2 of the Sherman Act and on indirect-purchaser plaintiffs' related state-law claims.[1] The Court grants the motion because plaintiffs have failed to satisfy their burden on summary judgment as to the existence of a national geographic market and Pool's dangerous probability of succeeding in monopolizing that market.

---

[1]      R. Doc. 512.

## I.    BACKGROUND

### A.    Parties and Procedural Background

This is an antitrust case that direct-purchaser plaintiffs (DPPs) and indirect-purchaser plaintiffs (IPPs) filed against Pool and the Manufacturer Defendants.  Pool is the country's largest distributor of products used for the construction and maintenance of swimming pools (Pool Products).[2]  The Manufacturer Defendants are the three largest manufacturers of Pool Products in the United States: Hayward Industries, Inc. (Hayward), Pentair Water Pool and Spa, Inc. (Pentair), and Zodiac Pool Systems, Inc. (Zodiac).[3]

As defined in DPPs' Second Consolidated Amended Class Action Complaint and IPPs' Third Amended Class Action Complaint, Pool Products are the equipment, products, parts, and materials used for the construction, renovation, maintenance, repair, and service of residential and commercial swimming pools.  Pool Products include pumps, filters, covers, drains, fittings, rails, diving boards, and chemicals, among other goods.  Pool buys Pool Products from manufacturers, including the three Manufacturer Defendants, and in turn sells them to DPPs, which include pool builders, pool retail stores,

---

[2]    R. Doc. 284, ¶ 39.

[3]    *Id.* ¶ 28.

and pool service and repair companies (collectively, "Dealers").[4] IPPs are pool owners who indirectly purchased Pool Products manufactured by the Manufacturer Defendants and distributed by Pool.[5]

DPPs have filed two consolidated amended complaints—the first on June 29, 2012[6] and the second on June 21, 2013[7]—each of which defendants moved to dismiss. Following the Court's orders on those motions, DPPs were left with the following five claims: (1) a Section 1 claim under the *per se* rule involving a horizontal agreement between the Manufacturer Defendants and Pool to fix free freight minimums; (2) three Section 1 claims under the rule of reason involving three separate vertical conspiracies (one between Pool and each Manufacturer Defendant) to exclude Pool's competitors; and (3) a Section 2 attempted monopolization claim against Pool.

IPPs filed three amended complaints, the most recent on July 16, 2013.[8] Following the Court's order on defendants' motion to dismiss IPPs' state-law claims, IPPs were left with the following claims: (1) California Unfair

---

[4]     *Id.* ¶ 31.

[5]     *See* R. Doc. 290.

[6]     R. Doc. 107.

[7]     R. Doc. 284.

[8]     R. Doc. 290.

Competition Law and rule of reason Cartwright Act claims involving three vertical conspiracies (one between Pool and each Manufacturer Defendant); (2) Arizona Antitrust Act claims involving three vertical conspiracies and a claim of attempted monopolization against Pool; (3) Florida Deceptive and Unfair Trade Practices Act claims involving three vertical conspiracies and a claim of attempted monopolization against Pool; and (4) Missouri Merchandising Practice Acts claims based on defendants' alleged anticompetitive agreements to exclude Pool's rivals and Pool's attempted monopolization.[9]  Each of these claims was allowed to proceed to the extent it was predicated on a national market.

On January 27, 2016, the Court granted summary judgment on DPPs' horizontal conspiracy claims.  On April 29, 2016, the Court granted summary judgment on DPPs' vertical conspiracy claims and IPPs' related state-law claims of vertical conspiracy.  Pool now moves for summary judgment on DPPs' attempted monopolization claim and IPPs' related state-law claims.

**B.    Factual Background**

Plaintiffs contend that Pool "has no true rival on the national stage upon which it operates. It controls the only nationwide distribution network for Pool

_____

[9]       R. Doc. 250 at 21-30, 35.

Products, its scale matching that of its next 48 competitors combined."[10] According to plaintiffs, the size of Pool's presence "in an otherwise fragmented supply chain gives Pool Corp leverage over the 2,200 industry vendors."[11]  In particular, plaintiffs highlight that Pool was the "largest single customer for many manufacturers."[12]  For example, during the relevant time period, Pool "commanded approximately 47% of Pentair's sales, 41% of Zodiac's sales, and 35% of Hayward's sales."[13]  In addition, Pool ran a "preferred vendor program" for vendors through which Pool provided certain promotional and efficiency benefits and in return received better prices, larger rebates, and 60-day advanced notification of any price changes, as well as agreements to make $2 million in yearly sales to Pool and to make most sales through distribution, though not necessarily through Pool.[14]  Because Pool obtained the majority of its products from the "few 'select' vendors"[15] in the program, DPPs allege that

---

[10]     R. Doc. 582 at 1.

[11]     *Id.*

[12]     *Id.* at 4.  There is no record citation for the reference to "many manufacturers."

[13]     *Id.*

[14]     *Id.* at 5.

[15]     *Id.*

this made membership highly desirable, allowing Pool to use membership in the program as both carrot and stick to enforce its demands on vendors.

### *Exclusionary Conduct*

Plaintiffs argue that Pool used its "market leverage" to compel its vendors to agree to restrict sales to Pool's rivals, thereby placing Pool's rivals "at a competitive disadvantage."[16]   Plaintiffs point to evidence in the record related to nine occasions in which Pool sought to restrict sales to specific new distributors in various cities over a nine-year period.  The instances involved Hilton Distributors in Baton Rouge, Louisiana; Pool Source in Nashville, Tennessee; ATX in Austin, Texas; Gulf Coast Distributors in Naples, Florida; Shoreline Pool Distribution in Jackson, Mississippi; Aquagon in St. Louisiana, Missouri; Alpha 3 in Garrett, Indiana; BT2 in Brooklyn Park, Minnesota; and Aquastar—a manufacturer that occasionally sold directly to dealers.  DPPs rely on evidence suggesting that Pool pressured various manufacturers to refuse to sell product to these distributors.  DPPs also contend, without providing any factual support, that these nine instances "were not isolated 'one off' occurrences," but rather "part of a pattern" of Pool's "efforts to dominate the

---

[16]        *Id.* at 6.

national Pool Products distribution market."[17]  Of these nine rivals, there is evidence that only Gulf Coast Distributors and Hilton distributors are no longer in business.[18]

### *Other Conduct*

Plaintiffs rely on evidence of one instance in which Pool pressured a vendor, CLI, to raise prices to one of Pool's rivals, Independence.[19]  Plaintiffs also point to evidence that Pool pressured one of its vendors, the chemical manufacturer Sea Klear, to pressure one of Sea Klear's other distributors, Abcana, to raise the prices at which it was selling to dealers.  In other words, Pool pressured its vendor to pressure one of Pool's rivals to raise its prices. Sea Klear told Pool that it could not "tell a customer how to price their product or who they can sell it to," but noted that, like Pool, it was "concerned about

---

[17]     *Id.*

[18]     Gulf Coast closed in 2009.  Deposition of Nevin Douglas Learn, July 16, 2013, at 142:6-22.  Hilton's Baton Rouge location was acquired by W.W. Adcock in 2005 and has been in continuous operation since its opening.  Adcock did not previously own a distribution outlet in Louisiana, and, since taking over the Baton Rouge location, has expanded into Monroe, Louisiana and Hattiesburg, Mississippi.  Dr. John Johnson Initial Report, April 10, 2014, at 154 (citing Deposition of James Hilton Jr., November 12, 2013, at 61:19-62:4 and 65:4-10); *see also* Deposition of Dr. Gordon Rausser, July 10-11, 2014, at 448:6-49:6.  These three Adcock locations are managed by James Hilton, Jr., and they compete with Pool.

[19]     X-838.

distributors eroding margins just to take market share."[20]  Sea Klear "sent a formal email/letter" to Abcana "strongly suggesting that [it] consider making pricing modifications."[21]  Abcana then made an adjustment.

In addition, plaintiffs present some evidence that Pool pressured a buying group of pool builders, Master Pools Guild, to deny two distributors access as vendors to the group's program.[22]  Relatedly, plaintiffs point to evidence indicating that Pool pressured vendors to sell mostly through distribution, rather than selling directly to dealers.[23]  In particular, Pool focused on "pseudo distributors," Pool's term for dealers who also redistributed product on the side.[24]

Plaintiffs also discuss a number of other types of conduct by Pool, the exclusionary nature of which plaintiffs do not make clear.  Plaintiffs assert, for example, that Pool "exerted its buying power over manufacturers to secure a pricing advantage over rival distributors."[25]  In some instances, Pool relied on

---

[20]     X-1273.

[21]     PSX-83.

[22]     R. Doc. 582 at 7.

[23]     *Id.* at 8.

[24]     *Id.* at 8-11.

[25]     *Id.* at 11.

"most favored nations" clauses in its contracts with vendors, which entitled Pool to receive a price at least as low as the prices the vendor offered to Pool's competitors.[26]  Both the Seventh Circuit and First Circuit have found most favored nations clauses to be lawful.  *See Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("'Most favored nations' clauses are standard devices by which buyers try to bargain for low prices . . . . [This is] the sort of conduct that the antitrust laws seek to encourage."); *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1110 (1st Cir. 1989) ("[A] policy of insisting on a supplier's lowest price—assuming that the price is not 'predatory' or below the supplier's incremental cost—tends to further competition on the merits and, as a matter of law, is not exclusionary.").

Plaintiffs also cite three instances in which Pool "obtained rebates unavailable to other distributors," which allegedly enabled Pool "to offset industry-wide price increases."[27] This supposedly allowed Pool to "increase[]

---

[26]     DPPs cite a number of examples of these provisions. Notably, Hayward, one of the three Manufacturer Defendants, would not agree to such a provision. DPPs' assertion that because Hayward agreed that its pricing to Pool would be "competitive," its contract was therefore the "equivalent" of a "most favored nations" clause is without merit.

[27]     R. Doc. 582 at 12.

its margins, while the costs to its rivals increased."[28]  Plaintiffs also argue that Pool "sought to insure that its preferred vendors enforced their minimum advertised price ('MAPP') and lowest acceptable advertised price ('LAAP') programs."[29]  Supposedly, the MAPP and LAAP programs "benefitted PoolCorp by stifling discount prices that may have otherwise competed with the supra-competitive prices set by PoolCorp."[30]  Pool points out, however, that the MAPP/LAAP policies applied to the price at which *dealers* could *advertise* their products, not the prices at which *distributors* could *sell* their products.

### Impact and Damages

Relying on the opinion of their expert, Dr. Gordon Rausser, plaintiffs claim that they were injured by supracompetitive prices charged by Pool.  They state that Pool:

> (a) rais[ed] rivals' costs to enter and expand and us[ed] various foreclosure events to deliver a "credible threat" "that PoolCorp would do whatever it took to prevent [a] rival from competing effectively"; (b) "encourag[ed] the Manufacturing Defendants to raise the threshold for free-freight and to limit direct sales and sales through buying groups"; and (c) us[ed] "most-favored-pricing terms or equivalent . . . to raise rivals' costs[,]" all of which

---

[28]  *Id.* at 13.

[29]  *Id.* at 14.

[30]  *Id.*

"enable[d] PoolCorp to maintain supra-competitive pricing across its entire book of business."[31]

Pool contends that plaintiffs cannot sustain their burden of proof on any of these issues and that summary judgment is therefore warranted on DPPs' claims of attempted monopolization under Section 2 of the Sherman Act and IPPs' related claims under various state laws.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory

---

[31]     *Id.* at 31 (quoting Rausser Initial Report, April 10, 2014, at 84-88).

facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.*;

12

*Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

### A. DPPs' Attempted Monopolization Claim under Section 2

Section 2 of the Sherman Act forbids monopolization and attempts to monopolize. 15 U.S.C. § 2. To prevail on their attempted monopolization claim against Pool, DPPs must prove that Pool (1) engaged in predatory or anticompetitive conduct, (2) with the specific intent to monopolize, and (3) with "a dangerous probability" of achieving monopoly power. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).

In addition, liability in a private antitrust action requires that DPPs prove not only a violation of the antitrust laws, but also impact on DPPs from the violation. *See Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978). Specifically, DPPs must prove "antitrust injury," that is, "injury of the type the antitrust laws were intended to prevent and that flows from that

which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl O Mat, Inc.*, 429 U.S. 477, 489 (1977).

Pool raises three central challenges to DPPs' claim. Pool argues that DPPs cannot prove: (1) the relevant product and geographic market; (2) that Pool had a dangerous probability of achieving monopoly power; or (3) that the challenged conduct could have caused, much less did cause, antitrust injury to DPPs in the form of supracompetitive prices.

### 1.    Market Definition

"A court's evaluation of an attempted monopolization claim must include a definition of the relevant market." *United States v. Microsoft Corp.*, 253 F.3d 34, 81 (D.C. Cir. 2001) (citing *Spectrum Sports*, 506 U.S. at 455–56). The relevant market provides "context for evaluating the defendant's actions as well as for measuring whether the challenged conduct presented a dangerous probability of monopolization." *Id.* Without a definition of a relevant market, there is no way to measure a defendant's ability to lessen or destroy competition. *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965); *Surgical Care Ctr. v. Hosp. Dist.*, 309 F.3d 836, 839-40 (5th Cir. 2002) (affirming dismissal for failure to provide evidence sufficient to demonstrate relevant geographic market). A relevant market has both product

and geographic dimensions.  *Brown Shoe Co. v. United States,* 370 U.S. 294, 324 (1962).

Pool first challenges DPPs' proposed definition of the relevant geographic market as the United States.   In determining the relevant geographic market, the Court focuses on "the area of effective competition." *Apani Sw. Inc. v. Coca-Cola Enters. Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (citation omitted).  "The area of effective competition . . . must be charted by careful selection of the market area in which the seller operates and to which buyers can practicably turn for supplies."  *Id.* (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)); *see also Republic Tobacco Co. v. N. Atlantic Trading Co., Inc.*, 381 F.3d 717, 738 (7th Cir. 2004) (describing geographic market definition as a "two-part test": "careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies").  In addition, the geographic market selected must "correspond to the commercial realities of the industry and be economically significant."  *Brown Shoe*, 370 U.S. at 336-37.  "When determining whether a geographic market corresponds to commercial realities, courts have taken into account practical considerations such as the size, cumbersomeness, and other characteristics of the relevant product." *Apani*, 300 F.3d at 626; *see also Hornsby Oil Co. v. Champion Spark Plug*

15

*Co.*, 714 F.2d 1384, 1394 (5th Cir. 1983) ("Whether ascertaining the scope of a geographic market or submarket, however, such economic and physical barriers to expansion as transportation costs, delivery limitations and customer convenience and preference must be considered."). The location and facilities of other producers and distributors are also relevant. *T. Harris Young & Assocs. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991); U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines* 13 (2010) ("The scope of geographic markets often depends on transportation costs.").

DPPs' complaint defines the relevant geographic market as "the Pool Products Distribution Market in the United States, its territories and possessions, including Puerto Rico."[32] For the reasons that follow, the Court holds that DPPs' contention that the relevant geographic market is national in scope cannot survive summary judgment because it fails for lack of relevant evidence.

To start, the Court again notes that defining the relevant geographic market is a two-part inquiry—plaintiffs must present evidence of the market in which the seller operates and the market in which the buyer can practically

---

[32]    R. Doc. 284 at 39.

turn for supplies. *See Republic Tobacco*, 381 F.3d at 738 (describing geographic market definition as a "two-part test" that considers both buyers and sellers); *Apani*, 300 F.3d at 626 (explaining that the relevant geographic market must be defined with reference to both seller-side and buyer-side considerations). Here, DPPs provide no evidence as to buyer behavior or preferences. The omission of buyer-side evidence is a critical flaw in DPPs' proof of the relevant geographic market. *See, e.g., Heerwagen v. Clear Channel Comm'ns*, 435 F.3d 219, 228-29 (2d Cir. 2006) (affirming class certification denial based on national market because plaintiffs could not prove cross-elasticity of demand). Moreover, Pool provides evidence of buyer behavior, which DPPs do not contradict, indicating that Pool Products sales were significantly localized. Specifically, Pool's expert economist, Dr. John Johnson, points to evidence that buyers typically were not willing to travel long distances for Pool Products or to have Pool Products shipped from far away (which he says owes to high freight costs and the need by many buyers for quick deliveries). In his reports, Dr. Johnson shows that in most states, more than 90% of pick-up purchases were made at stores 50 miles or less from

the buyer.[33]  Likewise, in most of the states where Pool has branches, more than 90% of the orders Pool shipped were to dealers 125 miles away or less.[34]

The Court also considers the "economic and physical barriers to expansion," including "transportation costs, delivery limitations and customer convenience and preference."  *Hornsby Oil Co.*, 714 F.2d at 1394.  Dr. Johnson's evidence of predominantly local buying is probative on this point. And, intuitively, it makes sense that bulky items like pool equipment would entail transportation costs that significantly limit the distances over which dealers would be willing to pay shipping costs.  *See Apani*, 300 F.3d at 626; *Hornsby Oil*, 714 F.2d at 1394; *Horizontal Merger Guidelines*, *supra*, at 13. In addition, Dr. Johnson pointed out that pool builders and pool servicers often require products to be delivered quickly to complete a job, which can make distance delivery too time consuming or expensive.[35]

Pool's internal documents also reflect differences in local competition. For example, one document lists the 22 largest domestic markets in 2005 with Pool's separate market shares for each, which shows market shares ranging from 5.6% in San Francisco-Oakland-San Jose, to less than 20% in New York,

---

[33]    Johnson Rebuttal Report, June 11, 2014, at 46, Exhibit 11.

[34]    *Id.* at 48, Exhibit 12.

[35]    *Id.* at 44-45.

Philadelphia, Miami-Fort Lauderdale, Boston, and Washington, D.C., t0 58% in Orlando-Daytona, and 78.8% in Cleveland.[36]  This data suggests that Pool faced different competitive conditions in different geographic areas.  Pool's expert also cites copious evidence to the same effect.[37]

In an effort to rebut the evidence that Pool Products are distributed in local geographic markets, DPPs offer two types of proof.  First, they offer the expert testimony of Dr. Gordon Rausser, in particular his opinion that the theory of "spatial integration" and his "cointegration" test of the market show that Pool's prices, across the United States, are related.  Second, DPPs point to asserted facts about how Pool conducted its business to argue that these facts amount to "commercial realities" indicative of a national market.[38]

Dr. Rausser first had to acknowledge the FTC's position that, based on demand side effects limiting the ability of customers to switch to distributors operating far away, the relevant markets for Pool Product distribution were

---

[36]    PSX-57.

[37]    Johnson Initial Report, April 10, 2014, at 78-88, 129-35, 146-49 (discussing evidence of different competitive conditions in different geographic areas). For example, Dr. Johnson cites data used by Pool that shows Pool with market shares in 2006 of 10.8% in New York City and 10.3% in Philadelphia, compared to 38.5% in Los Angeles.  *Id.* at 147.

[38]    R. Doc. 582 at 22.

local.[39]  Indeed the FTC Complaint, which was the impetus for this litigation, alleged that "[w]ith the exception of a few large national pool retail chains that purchase products for their retail centers throughout the United States, competition among distributors for sales to dealers occurs locally.  The high cost of transportation and the general need for same-day or next-day delivery of pool products typically limits local markets to 50 to 100 square miles . . . ." *In re Pool Corporation*, FTC No. C-4345 (2012) (complaint at 3 ¶13).[40]  Dr. Rausser relied on "spatial integration" theory to rebut this conclusion.  He theorized that Pool moved product from less profitable to more profitable regions to maintain its profits.  As Dr. Rausser explained, when "prices are elevated in one region relative to another" Pool would re-direct its product to the "higher price region, because such a re-direction would be economically beneficial to [Pool]."[41]  Dr. Rausser concluded that this dynamic served to keep

---

[39]    Rausser Initial Report, April 10, 2014, at 35.

[40]    The FTC investigation ended with the issuance of a complaint and Consent Decree on January 10, 2012.  The FTC complaint charged a violation of Section 5 of the Federal Trade Commission Act based on Pool's alleged efforts to exclude rivals in several local markets where it had monopoly power.  The FTC accepted a consent agreement in which Pool stated that it entered the agreement only for settlement purposes and without admitting the facts or violation alleged. There are no FTC findings of fact or evidentiary record.

[41]    Rausser Initial Report, April 10, 2014, at 36.

"prices in different regions related."[42]  Dr. Rausser also ran a "cointegration test" to support his conclusion that national prices are spatially integrated.[43] As the Court explained in its order on defendants' motion in limine to exclude Dr. Rausser, Dr. Rausser provided no evidence that Pool moved product from less profitable to more profitable regions to maintain profits, and his cointegration test was unreliable.   Accordingly, the Court excluded Dr. Rausser's spacial integration opinion and his cointegration test.[44]  Thus, the Court does not consider them in deciding this motion.

In support of their argument that the "commercial realities" of Pool's business indicate a national market, DPPs rely on *United States v. Grinnell Corp.*, 384 U.S. 563 (1966).  There, the Supreme Court determined that the market for fire and burglar alarm systems ("accredited central station service") was national because "the business of providing such a service [was] operated on a national level."  *Id.* at 575.  As the Court explained:

> There is national planning.  The agreements we have discussed covered activities in many States.  The inspection, certification and rate-making is largely by national insurers.  The appellant ADT has a national schedule of prices, rates, and terms, though the

---

[42]    *Id.*

[43]    Rausser Reply Report, June 11, 2014, at 55 n.109.

[44]    R. Doc. 701 at 36-48.

> rates may be varied to meet local conditions.   It deals with
> multistate businesses on the basis of nationwide contracts.

*Id.*  Thus, even though the Grinnell companies sold their products locally, a

national market "reflect[ed] the reality of the way in which they built and

conduct[ed] their business."  *Id.* at 576.

A superficial analogy to *Grinnell* does not save plaintiffs from the factual

void in their overbroad market definition.[45]   The two cases involve totally

different types of markets.  Grinnell controlled three companies that had over

87% of the market for accredited central station burglary and fire protection

service.  The service consisted of providing hazard detecting devices in

customers' premises, which transmitted signals to a central station, which in

turn dispatched guards to the premises and notified fire and police

departments.   Pool, on the other hand, is a wholesale distributor which

allegedly has slightly more than a one-third market share and operates in a

highly fragmented market served by more than 2,000 manufacturers/vendors,

which produce thousands of products sold by 200 distributors.  In addition,

although DPPs rely on *Grinnell* to argue that Pool serviced "national

---

[45]    A national geographic market is essential to plaintiffs' assertion
of a nationwide class and common, nationwide impact.

accounts," such as "Home Depot, Interline, Leslie's, and Anthony & Sylvan,"[46] DPPs do not provide any information about the significance of Pool's national accounts in comparison to Pool's thousands of local and regional customers. Nor does this conclusory reference to "national accounts" rebut concrete evidence of predominantly localized buying.

Further, DPPs also analogize to *Grinnell* by arguing that Pool had a "centrally managed pricing system." But the centralized pricing system that plaintiffs refer to is different from the "national schedule of prices, rates, and terms" for burglary and fire alarm service described in *Grinnell.* Pool sells tens of thousands of products in more than 300 product lines, which are grouped in 28 product departments.[47] Pool's pricing, even if subject to centralized supervision, is far more complex than a single national schedule of prices for a limited number of services. Pool generally utilizes three types of pricing: regional catalog prices ("P" prices), matrix prices ("M" prices) and override prices ("OV" prices). Pool issues approximately ten or more different regional catalogs, from which "P" prices are derived.[48] Catalog pricing is set with input from the divisional pricing managers for each of Pool's ten

---

[46]    R. Doc. 582 at 23 n.28.

[47]    Johnson Initial Report, April 10, 2014, at 23.

[48]    Deposition of Melanie Housey, May 2, 2013, at 139:2-3.

geographic divisions.[49]  Matrix pricing is created at a local branch level and is customized to individual customers (or customer groups) and individual products (or product groups). Further, matrix prices can be either "asterisk prices" or "dollar sign prices," which differ in how they are marked up.[50]  Pool had approximately 220 branches across the United States in 2012 that had a role in pricing.[51]  Finally, override prices indicate sales for which the sales center manager at a particular branch overrides the catalog and matrix price options based on price negotiations with a particular customer.[52]  It is true that the Court denied Pool's *Daubert* motion to exclude Dr. Rausser's opinion that Pool maintained a centralized pricing system.  But the facts recited here about Pool's pricing system were undisputed.[53]  The Court stated that DPPs had produced evidence of "some level of centralized coordination and supervision," efforts to install price discipline, and a 2011 plan instructing managers on how

---

[49]     *See* "Division Pricing Manager Responsibilities," Rausser Declaration Exhibit K.

[50]     Deposition of Stephen Dwyer, November 14, 2013, at 52:16-18, 52:21-53:3.

[51]     PoolCorp 2012 Form 10-K, at 11.

[52]     Johnson Initial Report, April 10, 2014, at 40 (citing Deposition of Melanie Housey, May 2, 2013, at 208:10-209:1).

[53]     R. Doc. 701 at 28-29.

to handle matrix price increases.[54]   But the bottom line is there was no evidence of a single, national schedule of prices, rates, and terms as in *Grinnell*.  Further, evidence of centralized supervision does not explain why Pool needed as many as ten different catalogs in a given year that differed by region, if competitive conditions did not differ by region.

Moreover, in *Grinnell*, to enter the market for accredited central station service, firms had to satisfy inspection and certification standards set largely by national insurers.  Entry by distributors of Pool Products is not subject to similar national standards.  Thus, *Grinnell* is distinguishable, and reliance on it is no substitute for facts creating a genuine issue as to the existence of a national market.

Plaintiffs are left with reciting that Pool had a nationwide distribution system and operated a preferred vendor program.[55]   These are simply descriptions of how Pool operated, and Pool, by plaintiffs' own calculations, never had more than a 38% share of the supposedly national distribution market.  Most of the other players in the market operated regionally or locally,

---

[54]      *Id.* at 32-34.

[55]      *See* R. Doc. 582 at 3-5.

and pointing to Pool's mode of operation, without more, does not account for the commercial realities of the entire market place.[56]

Finally, the Court notes that DPPs cite *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301, 311  (5th Cir. 1997), to argue that the question is not "where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices."[57] But DPPs' argument from there is circular: they reason that Pool's customers travel short distances because Pool has service centers in 40 states.[58]  In other words, Pool's customers choose locations nearby because they have a Pool location nearby.  DPPs provide no evidence of how far afield Pool's customers could afford to go to switch dealers in the face of a price increase of any size.  DPPs do not analyze customer behavior at all.  Further, DPPs' argument does not explain the constraints of transportation costs and the need for same day or next day delivery. Nor does it explain why Pool would have 200 locations, its competitor Gorman would operate 30 locations in just Florida, and a third

---

[56]     In *Grinnell*, the Court looked at how the Grinnell companies operated, but in doing so, it was characterizing 87% of the market.

[57]     R. Doc. 582 at 20.

[58]     *Id.*

distributer, Pool Water Products, would open 20 different locations,[59] if each company could just as well serve their customers nationwide from a single location.

In sum, DPPs have failed to raise a triable issue of fact regarding the relevant geographic market. The Court need not address DPPs' definition of the relevant product market.

### 2. Dangerous Probability of Achieving Monopoly Power

Pool also challenges DPPs' ability to prove that Pool had a dangerous probability of achieving monopoly power. Monopoly power is "the power to control prices or exclude competition." *Fulton v. Hecht*, 580 F.2d 1243, 1246 (5th Cir. 1978) (quoting *United States v. E. I. Du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956)). To determine whether Pool had a dangerous probability of monopolization, the Court must consider the relevant market and Pool's ability to lessen or destroy competition in that market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Proof of dangerous probability of success requires plaintiffs to define the relevant market and to demonstrate "that substantial barriers to entry protect that market." *Microsoft Corp.*, 253 F.3d at 81.

---

[59]     Rausser Initial Report, April 10, 2014, at 31.

When making this assessment, courts typically examine the defendant's share of the relevant market, *see, e.g., Pastore v. Bell Tel. Co.*, 24 F.3d 508, 513 (3d Cir. 1994), and whether barriers to entry protect that market. *Microsoft Corp.*, 253 F.3d at 82. Barriers to entry matter "[b]ecause a firm cannot possess monopoly power in a market unless that market is also protected by significant barriers to entry," and "it follows that a firm cannot threaten to achieve monopoly power in a market unless that market is, or will be, similarly protected." *Id.* (citing *Spectrum Sports*, 506 U.S. at 456)).

The inquiries into market share and entry barriers require an appropriate market definition. *See, e.g., id.* ("Whether there are significant barriers to entry cannot, of course, be answered absent an appropriate market definition . . . ."). In light of the Court's finding that Pool is entitled to summary judgment on the issue of the relevant geographic market, this necessarily makes DPPs' dangerous probability analysis fatally flawed. But even assuming, for the sake of argument, that this shortcoming did not doom DPPs' case on dangerous probability at the outset, the Court finds that DPPs still fail to demonstrate that Pool had a dangerous probability of achieving monopoly power.

> a. *Market Share*

Although courts should be "wary of the numbers game," Pool must have "some legally significant share of the market before [it] approaches the level of dangerous probability of success condemned by the attempt provision of section two." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984). The Fifth Circuit has held that a market share below 10%, absent a showing of special market conditions, is insufficient as a matter of law to establish an attempted monopolization claim. *Id.* at 491. A market share of 33% can be sufficient to establish a dangerous probability of monopolization when other market factors are present and when a defendant's conduct suggests that actual monopolization is likely. *See M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) (attempted monopolization claim survived motion for summary judgment). In *M & M Medical Supplies*, the court described a set of benchmark market shares for attempted monopolization:

> (1) [C]laims of less than 30% market shares should presumptively be rejected; (2) claims involving between 30% and 50% shares should usually be rejected, except when conduct is very likely to achieve monopoly or when conduct is invidious, but not so much so as to make the defendant per se liable; (3) claims involving greater than 50% share should be treated as attempts at monopolization when the other elements for attempted monopolization are also satisfied.

29

*Id.* (citing 3 Areeda & Hovencamp ¶ 835c, at 350).  The Fifth Circuit agrees that a market share of less than 50% can support an attempt claim if other circumstances are present.  *See Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 532 (5th Cir. 1982); *Domed Stadium,* 732 F.2d at 490-91 (a share of less than 50%, while insufficient for actual monopolization, "may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present.").

Under DPPs' proposed limitation of the market to sales of Pool Products through distribution, Pool's market share during the relevant period fluctuated between 35.8% and 38.4%.[60]  Pool's shares as computed by Dr. Rausser over the relevant period are as follows:

| Year | PoolCorp's Share |
|------|------------------|
| 2004 | 37.9% |
| 2005 | 36.5% |
| 2006 | 37.1% |
| 2007 | 35.8% |
| 2008 | 35.7% |
| 2009 | 38.4% |
| 2010 | 36.2% |
| 2011 | 37.6%[61] |

---

[60]   Rausser Initial Report, April 10, 2014, at 39.

[61]   *Id.*

30

Market shares in this range are likely insufficient in the absence of "conduct . . . very likely to achieve monopoly," *id.*, or other factors, such as high barriers to entry. *Domed Stadium,* 732 F.2d at 490-91.

The Court observes that Pool's market share remained remarkably steady during the relevant time period, a fact that tends to undermine the contention that Pool's conduct was "very likely to achieve monopoly." *M & M Med. Supplies*, 981 F.2d at 168. "Although the conduct's potential at the time it occurs, rather than its actual effect, determines its legality, later effects sometimes indicate the nature of the potential." 3B Areeda & Hovenkamp ¶ 807f. Thus, "[o]ften conduct that has been occurring for a significant time shows no dangerous probability of success because it has already achieved all that it is going to achieve to strengthen the defendant's position." *Id.* The lack of movement in Pool's market share suggests that its conduct did not make it likely to achieve monopoly.

### b. *Barriers to Entry*

As noted, "[p]laintiffs have the burden of establishing barriers to entry into a properly defined relevant market." *Microsoft Corp.*, 253 F.3d at 82. Plaintiffs must not only show that barriers to entry protect the properly defined market, but that those barriers are "significant." *Id.* According to a leading antitrust treatise, "most Sherman Act §2 (monopolization and attempt

31

to monopolize offenses) . . . require robust proof of high entry barriers. Such conduct is rare, costly, and will not be undertaken unless the defendant can anticipate durable monopoly profits." 2B Areeda & Hovencamp ¶ 420b, at 77 (2014).

DPPs identify "economies of scale" and "access to key vendors" as entry barriers to the Pool Products market.[62] Although plaintiffs recite the presence of these asserted entry barriers, they provide no metrics or analysis for the Court to determine their significance. "The question is not whether there are barriers to entry, but rather whether the barriers in a particular industry are large enough to trigger judicial concern." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 531 (5th Cir. 1999) (noting that to be a barrier to entry there must be a showing that in a particular industry the costs incurred by new entrants significantly exceed the costs incurred by the monopolist). Here DPPs do not provide the Court or a "reasonable jury" a basis to conclude that such entry barriers, if they existed, were high or significant.

For example, although it is true that the Fifth Circuit recognizes that "control of essential or superior resources" can be a barrier to entry, *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F. 3d 410, 439 (5th Cir. 2008), DPPs have

---

[62]    R. Doc. 582 at 29.

not produced evidence that Pool's access to key vendors amounted to such "control." *See, e.g., Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1044-45 (9th Cir. 2005), *vacated on other grounds and remanded sub nom. Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) (finding control where defendant "restricted access to the already limited sawlog supply"); *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 499 (2d Cir. 2004) (describing how defendant's exclusive supply agreement with the only producer of a necessary input created a barrier to entry for plaintiff). Pool did not have exclusive arrangements with its suppliers. Its preferred vendor program required minimum sales to Pool of $2 million and that 75% to 80% of the vendor's sales be through distribution, but not necessarily through Pool. Although DPPs recite that Pool was each of the three Manufacturer Defendants' largest customer (approximately 47% of Pentair's sales, 41 % of Zodiac's sales, and 35% of Hayward's sales), this illustrates that most of the Manufacturer Defendants' sales went elsewhere. Further, plaintiffs do not dispute that there were 200 distributors in the market.[63] In addition, DPPs cite no evidence that these arrangements locked in vendors for a predetermined period of time or

---

[63]     Rausser Initial Report, April 10, 2014, at 31.

that they covered substantially all of the industry.  DPPs do not provide the Manufacturer Defendants' shares of the manufacturing market, and there are at least 2,200 industry vendors.[64]  DPPs do not cite data on the other preferred vendors' market shares or of Pool's shares of their sales.  Indeed, DPPs state that preferred vendors were a "few 'select' vendors."[65]  But, given Pool's alleged market share, it is clear that almost two-thirds of vendors' sales in the alleged market were not controlled by Pool.  DPPs' claim that Pool controlled access to key vendors comes primarily in the form of nine local vignettes particular to specific distributors to which Pool sought to restrict supplies in local markets over a nine-year period.  Plaintiffs have not provided evidence of significant, nationwide control of a limited resource.  *See Chicago Bridge & Iron*, 534 F. 3d at 439.

As to economies of scale, economists are divided on whether scale economies should be considered entry barriers.  One school of thought is that scale economies are not an entry barrier because they are not a cost unique to new entrants; everyone had to attain them.  George J. Stigler, *The Organization of Industry* 67 (1968) (defining entry barrier as "a cost of

---

[64]    R. Doc. 582 at 1.

[65]    *Id.* at 5.

34

producing . . . which must be borne by a firm which seeks to enter an industry but is not borne by firms already in the industry"). The Fifth Circuit appeared to use this approach in *Stearns*, 170 F.3d at 531, where it held that for transportation costs to represent a true barrier to entry there must be a showing that in a particular industry the costs incurred by new entrants significantly exceed the transport costs incurred by the monopolist. *See also Ball Memorial Hospital, Inc. v. Mutual Hospital Inc.*, 784 F.2d 1325 (7th Cir. 1986). The other view is that scale economies can be a barrier to entry if this is an advantage established sellers have over potential entrants that permits sellers to persistently raise prices above competitive levels without attracting new firms to enter the industry. Joe S. Bain, *Barriers to New Competition* 3 (1956). The Fifth Circuit appeared to incorporate this definition into its definition of entry barriers in *Chicago Bridge & Iron*: "Entry barriers are 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or *'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.*" 534 F.3d at 428 n.8 (emphasis added). Although *Stearns* is the older decision, and for that reason, controlling, the Court notes that even if it were not, plaintiffs' argument that scale economies were an entry barrier does not survive summary judgment. Mere recitation of the asserted existence of an entry barrier is insufficient to

35

create an issue of fact as to whether the barrier is high or significant.  For example, plaintiffs do not analyze what the minimum viable scale is to be profitable in this market.  They point only to Pool's nationwide distribution network.  But the existence of 200 distributors, one with over 30 locations in a single state and others with regional or large local operations[66] suggests that successful entry does not require national scale.[67]

Finally, while plaintiffs have fallen short of supplying evidence of significant entry barriers, "repeated past entry in circumstances similar to current conditions" is "reliable evidence of low [entry] barriers."  2B Areeda & Hovencamp ¶ 420b, at 77 (2014).  Here, Pool identifies nearly 100 instances of entry through new distributors or expansion by existing distributors during the relevant time period.[68]  "Entry while alleged exclusionary conduct is under way may suggest both that entry is easy and that the defendant's conduct is not really predatory at all."  *Id.* ¶ 422e3, at 101.

DPPs' expert conceded that because the market was "rapidly growing" there is "no surprise that there's expansion of those who are offering

---

[66]   Rausser Initial Report, April 10, 2014, at 31.

[67]   Johnson Rebuttal Report, June 11, 2014, at 41.

[68]   *See* Pool's response to FTC CID, Specification 18 (list of new entrants); *see also* Johnson Initial Report, April 10, 2014, at 166-170.

distributional services."[69]  But, DPPs argue that, of the nearly 100 examples of market entry identified by Pool, "only four" are "actually new distributors,"[70] with the rest in the form of expansions of established distributors.   This distinction, however, does not explain why this level of expansion by existing distributors was not an impediment to Pool's allegedly dangerous probability of achieving a monopoly in the allegedly national market.   Expansion by an existing rival can check a competitor just as entry by a new rival.  *See* ABA Section of Antitrust Law, Antitrust Law Developments 236 (7th ed. 2012) ("Barriers to expansion of existing firms (or their absence) are also relevant to the monopoly power inquiry.   Control over output and prices—the essence of market power—depends largely on the inability of competing firms to increase their own output quickly in response to other factors.").   As the Ninth Circuit stated in *Rebel Oil Co. v. Atlantic Richfield* Co., 51 F.3d 1421, 1441 (9th Cir. 1995), "[i]f there is undisputed evidence indicating that competitors have expanded output in the recent past, or have the ability to expand output in the future, summary disposition may be appropriate."   This reasoning applies here.   Further, expansion by an already successful competitor can be more

---

[69]    Deposition of Dr. Gordon Rausser, July 10-11, 2014, at 398:9-11.

[70]    R. Doc. 582 at 29.

37

effective than an entirely new operation since existing distributors have proven effectiveness in the market.   For all these reasons, DPPs have failed to demonstrate that Pool had a dangerous probability of achieving monopoly power.

Because Pool is entitled to summary judgment on the issues of the relevant market and whether Pool had a dangerous probability of achieving monopoly power, DPPs cannot sustain their claim of attempted monopolization.  The Court will not address the parties' arguments regarding impact and damages.

### B.    IPPs' State-Law Attempted Monopolization Claims

IPPs' remaining state-law claims depend on the existence of a national market.[71]  IPPs' expert, Dr. Keith Leffler, offered no opinion on the existence of a national market and IPPs present no evidence on this point apart from that relied on by DPPs.[72]  Because Pool is entitled to summary judgment on the issue of the relevant market, IPPs cannot sustain their state-law claims.

## IV.   CONCLUSION

---

[71]    R. Doc. 250; R. Doc. 288 at 10-11.

[72]    R. Doc. 582 at 34.

38

For the reasons above, the Court GRANTS Pool's motion for summary judgment on DPPs' claims of attempted monopolization and IPPs' related state-law claims against Pool.


New Orleans, Louisiana, this 1st day of July, 2016.


_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE